MARTIN J. BRILL (SBN 53220)
TODD M. ARNOLD (SBN 221868)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  mjb@lnbrb.com, tma@lnbrb.com

Counsel for Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>AGUA DULCE VINEYARDS, LLC, a California limited liability company,<br><br>Debtor.<br>_____<br>In re<br><br>CATHERINE P. MACADAM and DONAL J. MACADAM,<br><br>Debtors.<br>_____<br><br>☒  Affects All Debtors<br><br>☐  Affects Agua Dulce Vineyards, LLC only<br><br>☐  Affects Catherine P. MacAdam and<br>     Donal J. MacAdam only<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Lead Case No. 1:09-bk-15207-MT<br>(Jointly Administered with  Catherine P. MacAdam and Donal J. MacAdam – Case No. 1:09-bk-17476-MT)<br><br>Chapter 11 Cases<br><br><br>**NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING PROCEDURES FOR THE SALE OF ESTATE PROPERTY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF**<br><br><u>Hearing</u>:<br>Date:     May 3, 2010<br>Time:     10:00 a.m.<br>Place:    Courtroom "301"<br>             21041 Burbank Boulevard<br>             Woodland Hills, California 91367 |

1

1   **PLEASE TAKE NOTICE THAT** a hearing will be held at the above-referenced date,

2   time, and location for the Court to consider this motion (the "Sale Procedures Motion") of Agua

3   Dulce Vineyards, LLC, a California limited liability company ("ADV"), and Catherine P. and

4   Donal J. MacAdam (the "MacAdams"), debtors and debtors in possession in the above-

5   captioned, jointly administered Chapter 11 cases ("Debtors"), for an order establishing the

6   procedures for the sale of substantially all of ADV's assets.

7       **PLEASE TAKE FURTHER NOTICE** that this Sale Procedures Motion is based upon

8   this Notice of Motion and Sale Procedures Motion, the attached Memorandum of Points and

9   Authorities, declarations and exhibits, Local Bankruptcy Rule 6004-1, the records and files in

10  these Chapter 11 cases, and such additional evidence and argument as may be presented at or

11  before the hearing on the Sale Procedures Motion.

12      **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 6004-

13  1(b)(4), any party wishing to respond to this Sale Procedures Motion must file with the

14  Bankruptcy Court and serve on counsel for the Debtors a written response at least one (1) day

15  before the hearing.  Pursuant to Local Bankruptcy Rule 9013-1(h), failure to timely file and serve

16  a response in accordance with the Local Bankruptcy Rules may be deemed by the Bankruptcy

17  Court to be consent to the granting of the relief requested in this Sale Procedures Motion.

18  Dated:  April 26, 2010                    AGUA DULCE VINEYARDS, LLC,
                                              a California limited liability company
19
20                                            CATHERINE P. MACADAM and
                                              DONAL J. MACADAM
21

22                                            By:___*/s/ Martin J. Brill*_____
                                                  MARTIN J. BRILL
23                                                TODD M. ARNOLD
24                                                LEVENE, NEALE, BENDER, RANKIN
                                                    & BRILL L.L.P.
25                                                Attorneys for Debtors and
                                                  Debtors in Possession
26

27

28

2

1

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................. 3

I.    STATEMENT OF FACTS ..................................................................................................... 3

    A. THE DEBTORS AND THE FILING OF THE DEBTORS' CHAPTER 11
       BANKRUPTCY CASES .................................................................................................. 3

    B. EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11
       BANKRUPTCY CASES .................................................................................................. 4

    C. A SUMMARY OF THE PROPOSED SALE ................................................................. 6

        a.  Agreement to Sell Property and Assets ............................................................. 7
        b.  Auction Sale Agreement ..................................................................................... 7
        c.  Purchase and Sale Agreement and Joint Escrow Instructions
           [Western Commercial Bank Property]............................................................ 7
        d.  Asset Purchase Agreement and Joint Escrow Instructions
           [Agua Dulce Vineyards] ................................................................................. 7
        e.  Due Diligence and Confidentiality Agreement.................................................. 7

    D. THE PROPOSED SALE PROCEDURES ...................................................................... 9

       Marketing.............................................................................................................. 9
       Bids ..................................................................................................................... 10
       Qualification of Bidders..................................................................................... 11
       Auction................................................................................................................ 12
       Bank Breakup Fees ............................................................................................ 13

II.   DISCUSSION ..................................................................................................................... 14

III.  CONCLUSION ................................................................................................................... 18

DECLARATION OF CATHERINE P. MACADAM ............................................................... 19

i

1

# <u>TABLE OF AUTHORITIES</u>

Page(s)

2

**FEDERAL CASES**

3

<u>Cottle v. Storer Communication Inc.</u>
    849 F.2d 570 (11th Cir. 1988) ...................................................................16, 17

4

5

<u>CRTF Corp. v. Federated Dept. Stores</u>
    683 F. Supp. 422 (S.D.N.Y. 1988).....................................................................17

6

<u>In re 995 Fifth Ave. Assoc., L.P.</u>
    96 B.R. 24 (Bankr. S.D.N.Y. 1989)...............................................................16, 18

7

8

<u>In re Atlanta Packaging Products, Inc.</u>
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...................................................................14

9

<u>In re Crowthers McCall Pattern, Inc.</u>
    114 B.R. 877 (Bankr. S.D.N.Y. 1990).......................................................14, 15, 17

10

11

<u>In re Financial News Network, Inc.</u>
    126 B.R. 152 (Bankr. S.D.N.Y. 1991)..................................................................16

12

13

<u>In re Integrated Resources, Inc.</u>
    147 B.R. 650 (S.D.N.Y. 1992), <u>app. dismissed on jurisdictional grounds</u>, 3 F.3d 49
    (2d Cir. 1993)........................................................................................16, 17, 18

14

15

<u>In re S.N.A. Nut Co.</u>
    186 B.R. 98 (Bankr. N.D.Ill. 1995) .....................................................................16

16

17

**FEDERAL STATUTES**

18

11 U.S.C. § 363....................................................................................................14
11 U.S.C. § 363(f)..................................................................................................8

19

11 U.S.C. § 363(m).................................................................................................8
11 U.S.C. § 365......................................................................................................8

20

11 U.S.C. § 1107....................................................................................................3
11 U.S.C. § 1108....................................................................................................3

21

Bankr. R. 2002.....................................................................................................14
Bankr. R. 6004.....................................................................................................14

22

Bankr. R. 6004-1...................................................................................................2
Bankr. R. 6004-1(b)(4)..........................................................................................2

23

Bankr. R. 6004(f).................................................................................................14
Bankr. R. 9013-1(h)...............................................................................................2

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.    THE DEBTORS AND THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES.**

1.    On May 4, 2009, ADV filed a voluntary petition.  ADV is operating its business, managing its financial affairs, and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    On June 17, 2009, the MacAdams filed a voluntary petition.  The MacAdams are operating their business, managing their financial affairs, and operating their bankruptcy estate as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.    ADV is the operator of a 37 acre, fully operational vineyard and winery, featuring daily wine tasting and tours, and a gourmet gift shop.

4.    In 1999, the MacAdams, along with their partner, Ray Watt, through his various entities and affiliates including Narcissa Estates, Inc. ("Narcissa"), founded ADV when they discovered that the forty acre property that they originally acquired for real estate development had ideal soil and climate conditions for growing world-class grapes.  This property, which is located at 9640 and 9830 Sierra Highway, Agua Dulce, California 91390, houses ADV's winery, a residence occupied by the MacAdams and their 4 minor children, and planted vineyards (the "ADV Property").

5.    In December 2005, the MacAdams bought out Ray Watt's interest in ADV (which at that point was held entirely through Narcissa) for approximately $6.5 million.  The MacAdams' buyout of Mr. Watt's interest was financed in part through a hard money loan from KSI Capital Corporation ("KSI") for approximately $5.6 million (the "KSI Loan"), and in part through a promissory note in favor of Narcissa in the sum of $992,290, which was subsequently increased to $1,356,000, secured by a deed of trust against the ADV Property.

6.      Following the buyout of Ray Watt's interest in ADV in December 2005, ADV leased a 53 acre parcel of vacant land adjoining the ADV Property located at 10124 Sierra Highway, Agua Dulce, California 91390 (the "Bank Property" and together with the ADV Property, the "Properties") from Narcissa to expand ADV's planted vineyards.  ADV acquired the Bank Property from Narcissa in October 2007.  ADV's acquisition of the Bank Property was financed in part through a loan from Western Commercial Bank ("Bank") in the principal amount of $1 million (the "$1M Loan"), which loan was secured by a first priority deed of trust against the Bank Property, and in part through a promissory note in favor of Narcissa in the sum of $3,100,000, secured by a second priority deed of trust against the Bank Property.

7.      In 2007, ADV entered into a series of loan agreements with Bank, including the (a) $1M Loan and, (b) a loan in the principal amount of $6 million (the "$6M Loan), which loan was secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other monetary liens and encumbrances on the ADV Property, and (ii) senior liens on substantially all of ADV's other assets.  Since Bank did not provide enough funding to completely retire the KSI Loan, the MacAdams executed a new note in the amount of $400,000 in favor of KSI (the "New KSI Loan").

**B.      EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES.**

8.      Although ADV's business experienced robust and steady growth, at a rate of 10% each year from 2001 to 2007, the partner buyout and the purchase of the Bank Property increased ADV's debt load, creating cash flow issues when ADV's revenue was not sufficient to service all of ADV's debts.

9.      In an effort to increase its revenue, ADV attempted to expand its existing in-home wine parties division, called "Agua Dulce Wine Adventures," which eventually partnered up with Suzanne Somers' direct selling company.  This partnership was then picked up by a company called Youngevity, which had at the time over 300,000 consultants worldwide (primarily in the United States and Asia).  Although ADV hoped that its in-home wine parties division would

1    benefit from the Youngevity network, it ultimately did not result in the increase in sales and

2    revenue that ADV had expected.

3        10.    Although ADV began increasing its revenues by, among other things, selling its

4    wine in bulk, ADV suffered a huge setback in 2008 when a large number of its Wine Club

5    members were repeatedly invoiced in error by ADV's credit card processing system.  In the normal

6    course of business, ADV's Wine Club members receive six bottles of wine every three months and

7    ADV's credit card processing system automatically debits the payment for the wine from the

8    members' credit cards on file.  In early 2008, ADV's credit card processing software was

9    upgraded, causing a glitch that resulted in repeated debiting from the Wine Club members' credit

10   cards.  In an effort to salvage its relationships with the Wine Club members, ADV paid refunds

11   directly to many of the members.  In the meantime, members who had also contacted their credit

12   card companies obtained refunds directly from their credit card companies, who then turned

13   around and debited the refund amounts from ADV's bank accounts.  This resulted in a double hit

14   to ADV's bank accounts, leaving ADV's accounts overdrawn approximately $287,000 by the end

15   of the summer.

16       11.    As a result of the credit card processing fiasco, ADV faced a cash flow crisis,

17   causing ADV to fall behind on its accounts payable and prompting ADV to seek an additional loan

18   from Bank.  In November 2008, after contracting with a new credit card processing company,

19   ADV obtained a loan from Bank in the principal amount of $750,000 (the "$750K Loan").  ADV's

20   obligations to Bank under the $750K Loan are secured by a security interest in off-site and on-site

21   bottled wines, in-tank or in-barrel.  The documents underlying the $750K Loan allowed Bank to

22   create a reserve (the "Reserve Funds") from 30% of ADV's credit card deposits up to $100,000 to

23   cover chargebacks from the credit card processor.  This caused a severe cash flow crunch for

24   ADV.  Pursuant to Bank's various loans to ADV, Bank provided financing to ADV in the total

25   principal sum of $8.1 million and obtained a security interest in substantially all of ADV's assets,

26   including the ADV Property and the Bank Property.  One of the goals of these loans was to retire

27

28

1    the KSI Loan.  On March 4, 2009, Bank filed and recorded a Notice of Default against ADV to

2    initiate a foreclosure proceeding against the Bank Property.

3        12.    As a result of all of the foregoing, ADV was forced to seek protection under

4    Chapter 11 of the Bankruptcy Code in order to gain control over its cash (including the Reserve

5    Funds) and operations, to have the opportunity to implement business strategies targeted at

6    increasing revenue – including working with wine brokers and national distributors to increase

7    sales of its wine, at both the bulk sales level and direct sales level, to restructure its existing debt

8    and emerge a stronger and profitable company.

9        13.    The MacAdams personally guarantied ADV's obligations to Bank. The MacAdams

10    also personally guarantied a number of other ADV business debts.  Additionally, the MacAdams

11    are liable on the New KSI Loan.

12        14.    As a result of ADV's financial difficulties and inability to remain current on its debt

13    obligations, including those for the payment of the MacAdams' salaries, (a) a number of ADV

14    creditors made demands and initiated litigation against the MacAdams based on their guaranty

15    obligations, and (b) the MacAdams were unable to remain current on the New KSI Loan.  Based

16    on the foregoing events, among others, the MacAdams were forced to seek protection under

17    chapter 11 of the Bankruptcy Code in order to gain control over their assets, to continue to work

18    towards reorganization in the ADV bankruptcy case, and to restructure their existing debts.

19    **C.**    **A SUMMARY OF THE PROPOSED SALE.**

20        15.    After the Debtors' bankruptcy cases were filed, Bank obtained relief from stay and

21    foreclosed on the Bank Property.

22        16.    In consideration of the foregoing, and after considering its options, ADV has

23    concluded, in an exercise of its business judgment, that a sale of the ADV Property and

24    substantially all of ADV's other assets (excluding cash and avoidance causes of action) (the "Other

25    Assets" and, together with the ADV Property (the "ADV Assets") is in the best interests of ADV

26    and the creditors of its estate.

27

28

17.     After substantial arms-length negotiations between Debtors and Bank, the parties negotiated a series of documents (the "Sale Documents") to effectuate a joint sale of the Bank Property and the ADV Assets (collectively, the "Assets").  ADV believes that a joint sale of the Assets will provide the most benefit to the estate by, among other things, increasing the sale price for the Assets due to synergies between the Bank Property, the ADV Property, and the Other Assets, which should provide the maximum possible debt reduction and recovery for the Debtors' estates.

18.     The Sale Documents include, but are not limited to, the following primary documents:

a.     Agreement to Sell Property and Assets (the "Agreement to Sell") – a true and correct copy of the Agreement to Sell in substantially the form to be used by the parties is attached hereto as Exhibit "1;"

b.     Auction Sale Agreement (the "Auction Agreement") – a true and correct copy of the Auction Agreement in substantially the form to be used by the parties is attached as Exhibit "B" to the Agreement to Sell;

c.     Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property] (the "Bank APA") – a true and correct copy of the Bank APA in substantially the form to be used is attached as Exhibit "B" to the Auction Agreement;

d.     Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards] (the "ADV APA") – a true and correct copy of the ADV APA in substantially the form to be used by the parties is attached as Exhibit "C" to the Auction Agreement; and

e.     Due Diligence and Confidentiality Agreement (the "Confidentiality Agreement") – a true and correct copy of the Confidentiality Agreement in substantially the form to be used by the parties is attached as Exhibit "D" to the Auction Agreement.

7

19.     In summary,[1] under the Sale Documents, ADV is required to obtain (a) an order of the Court (the "Bid Procedures Order") approving the sale procedures set forth in this Sale Procedures Motion, and, (b) an order of the Court (the "Sale Order") approving a sale motion (the "Sale Motion") to be filed by ADV providing for, among other things, (i) the sale of the ADV Assets free and clear of all liens, claims, encumbrances or interests to Bank, subject to overbid after auction, pursuant to Section 363(f) of the Bankruptcy Code together with a good faith finding pursuant to Section 363(m) of the Bankruptcy Code, (ii) the assumption by ADV and assignment to Bank or a successful overbidder of executory contracts and unexpired leases designated in the Sale Documents pursuant to Section 365 of the Bankruptcy Code.

20.     If either (a) none of the bid amounts for the Assets is greater than the Minimum Overbid Amount (as defined below), or (b) the accepted bidder does not purchase all of the Assets for any reason, other than a breach or default by Bank of the Sale Documents, then Bank shall purchase the ADV Assets pursuant to the ADV APA by offsetting $6.1 million from the $6M Loan.  In the event Bank purchases the ADV Assets, Bank shall be responsible to pay the (a) all amounts Bank has agreed to pay Kennedy Wilson Auction Group, Inc. ("KW") in connection with the auction of the Assets (the "KW Fees"), (b) Bank Breakup Fees (as defined below), title costs, escrow costs, transfer taxes (to the extent owed), and certain professional fees Bank has agreed to pay (the "Professional Fees").  Bank shall not pay, and shall purchase the ADV Assets subject to, all outstanding property taxes to the extent due and payable by bank following its acquisition of the ADV Assets.

21.     In connection with any accepted bidder other than Bank purchasing the Assets, Bank and ADV agree to divide, allocate, and pay the accepted bid amount pursuant to Section 6 of the Agreement to Sell.

22.     If Bank purchases the ADV Assets as described in Section 6.2 of the Agreement to Sell, Bank will pay the unpaid attorneys' fees and costs incurred by counsel to ADV, as approved

---

[1] The summary description of the proposed transaction under the Sale Documents is for informational purposes only.  To the extent there is any inconsistency between the summary and the Sale Documents, the Sale Documents shall govern.

8

1    by the Court (the "Professional Fees") incurred from and after December 1, 2009 (the "Post-

2    December Professional Fees"), up to a maximum amount of $150,000.00.

3           If an accepted bidder purchases the Assets, Bank will pay the Post-December

4    Professional Fees and twenty-five percent (25%) of the attorneys' fess and costs incurred by

5    counsel to ADV incurred after the petition date and prior to December 1, 2009 (the "Pre-December

6    Professional Fees"), up to the aggregate, maximum amount of $150,000.00; provided, however,

7    that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the

8    loans from Bank to ADV, Bank shall instead pay seventy-five percent (75%) rather than twenty-

9    five percent (25%) of the Pre-December Professional Fees, up to the aggregate, maximum amount

10    of $200,000.00.

11           If the Court does not grant this Motion and/or the Sale Motion, Bank shall use

12    commercially reasonable efforts to foreclose all of its security interest in and to the ADV Assets

13    under applicable non-bankruptcy law in a commercially-reasonable period of time following

14    Bank's termination of the Agreement to Sell unless there is reasonable cause for Bank not to

15    foreclose, including, by way of example but not limitation, the discovery of material environmental

16    contamination on the ADV Property or the imposition of an stay or injunction prohibiting Bank

17    from doing so.  Notwithstanding any provision of the Agreement to Sell, provided (a) ADV and

18    the MacAdams, and their attorneys, have provided genuine cooperation and diligent, good faith,

19    and best efforts to obtain approval of this Motion and the Sale Motion, and (b) ADV and the

20    MacAdams, and their attorneys, have not directly, indirectly, or collusively interfered with Bank's

21    efforts to foreclose upon any of the ADV Assets, upon completion of the foreclosure sales of the

22    ADV Assets or termination of the Agreement to Sell, Bank shall pay the Post-December

23    Professional Fees to the appropriate parties up to a maximum amount of $100,000.00.

24    **D.**      **THE PROPOSED SALE PROCEDURES.**

25         23.    **Marketing** – As soon as practicable, but in no event later than May 10, 2010, and

26    continuing for thirty (30) calendar days thereafter, KW will market the Assets (the "Marketing

27    Period").

28

1       During the Marketing Period, KW will market the Assets by (a) delivering a notice of

2   offering letter to as many potential bidders as possible, (b) listing and advertising the Assets for

3   sale at an estimated price of between $10-$15 million (the "Auction Estimate Range") on various

4   internet sites, and with various brokerage and/or listing services, that list and offer for sale real

5   property and assets, similar to the Assets; and (c) submitting advertisements for the sale of the

6   Assets at the Auction Estimate Range in trade or industry newspapers and other print media.

7       In conjunction with the foregoing marketing efforts by KW, KW shall provide reasonable

8   assistance to potential bidders to enable such potential bidders to review, inspect, and evaluate the

9   Assets during the Marketing Period.  Without limiting the generality of the foregoing, during the

10  Marketing Period, KW shall (a) make information regarding the Assets available to potential

11  bidders that have completed, executed, and delivered to KW and Bank a due diligence and

12  confidentiality agreement, (b) coordinate with Bank and Debtors to permit potential bidders to

13  access the Assets for purposes of conducting site visits, and (c) receive written questions from

14  potential bidders with respect to the Assets and the auction, seek answers to the same from Bank

15  and Debtors, and provide written answers to such questions, as approved by Bank and Debtors, to

16  all potential bidders.

17      24.   **Bids** – KW will require all potential bidders to submit their bids to KW on or

18  before the business day following the end of the Marketing Period (the "Bid Submission Date").

19  KW may, in its reasonable discretion, (a) advise any Qualified Bidder (as defined below), who

20  submit bids prior to the Bid Submission Date with bid amounts that are less than threshold

21  minimum price equal to approximately $9.2 million (the "Minimum Overbid Amount"), which is

22  the sum of the amounts of the $6.1 million Bank credit bid for the ADV Assets, the $2.6 million

23  offering price for Bank Property, the KW Fees, cooperating broker fees, and Bank Breakup Fees,

24  that such bid amounts are less than the Minimum Overbid Amount and will not be accepted, and

25  that a higher amount may be submitted prior to the Bid Submission Date, and (b) extend the Bid

26  Submission Date for any bid that is not received by the Bid Submission Date if the reason for such

27  failure was beyond the reasonable control of the applicable Potential Bidder.

28

10

1    KW shall review each bid to determine if the person submitting the bid is a Qualified

2    Bidder.  If, in KW's reasonable determination, the person submitting the bid appears to be a

3    Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may

4    notify such person and provide a one-time opportunity to submit additional information

5    demonstrating that it is a Qualified Bidder.  Bids from all persons that are not Qualified Bidders

6    shall be set aside and not evaluated or considered further in the auction.

7    KW shall review and evaluate the bids submitted by Qualified Bidders and provide a

8    summary and analysis of the same to Bank and Debtor within one (1) Business Day after the Bid

9    Submission Date (as defined below).

10    If as part of its bid, any Qualified Bidder requests any insertions, deletions, or other

11    modifications to the Bank APA or the Debtor APA ("PSA Comments"), such bid shall be

12    considered non-conforming, unless and until such PSA Comments are approved by Bank or

13    Debtor, as applicable.  At the request of the applicable seller, KW shall notify the Qualified Bidder

14    as to which PSA Comments, if any, are approved by the applicable seller and permit the Qualified

15    Bidder to revise, amend, or withdraw its bid with respect thereto.

16    25.    **Qualification of Bidders** – In order to bid for the assets, a person must be a

17    qualified bidder (a "Qualified Bidder").  A Qualified Bidder is a person, other than Bank, that:

18    a.    Has submitted a bid to purchase the Assets;

19    b.    Has provided reasonably-detailed, credible, written evidence verifying its

20    ability to pay the applicable bid amount, in cash or other immediately

21    available funds, which such evidence may include, without limitation, (i)

22    statements of third-party deposit account balances showing readily-

23    available, liquid funds in the excess of the bid amount, (ii) letters of credit

24    or unconditional commitment letters from banks, credit unions, or other

25    financial institutions, and/or (iii) other written information demonstrating

26    that the Qualified Bidder has the financial ability to pay the bid amount; and

27

28

11

      c.     Is otherwise ready, willing, and permitted to purchase the Assets pursuant to the Sale Documents.

26.    **Auction** – Bank and ADV Parties shall review the summary of the bids prepared by KW.  Unless Bank and Debtor otherwise agree, and direct KW, in writing to the contrary:

      a.     If only one (1) Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then such bid shall be deemed the accepted bid;

      b.     If more than one Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then following Bank's and Debtors' review of the submitted bids, Bank and Debtors shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Assets (the "Live Auction").  In respect of the Live Auction, (i) all Qualifies Bidders that submitted bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (ii) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and Debtors agree that KW's services shall not be required for the Live Auction, (iii) the Live Auction shall be held at the location agreed upon by Bank and Debtors, with the offices of the Court, the ADV Property, and the offices of the Debtors' attorneys being approved locations for the Live Auction, and (iv) all other matters with respect to the Live Auction shall be agreed to by Bank and Debtors, with the advice and input from KW.  The Qualified Bidder submitting the highest bid amount in excess of the Minimum Overbid Amount at the Live Auction shall be the accepted bid.

If a Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, ADV will seek final approval of the Sale Motion providing for a sale of the Assets to such Qualified Bidder.  Upon such approval, Bank and ADV shall promptly sign and date the applicable purchase agreements submitted by the successful

1    Qualified Bidder, deliver the same to the escrow agent, and consummate the sale of the Assets

2    pursuant to the terms and conditions of the Sale Documents.

3         If no Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of

4    the Marketing Period or the Live Auction, as applicable, or if a Qualified Bidder does not purchase

5    the Assets for any reason, other than a breach or default of the Bank APA by Bank, ADV will seek

6    final approval of the Sale Motion, pursuant to which (a) Bank shall continue to own, and not sell

7    the Bank Property, and (b) Bank and ADV Parties shall enter into the ADV APA, and consummate

8    the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV

9    APA.

10        26.  **Bank Breakup Fees** – The sale procedures requested above contemplate an auction

11   with Bank as a stalking horse bidder.  The breakup fees to be paid to Bank (the "Bank Breakup

12   Fees") are in an amount equal to the fees and costs owed to Bank's attorneys incurred in

13   connection with Debtors' bankruptcy cases on and after December 1, 2009, the date the parties

14   began talking in earnest about the proposed sale, which include, without limitation, the fees and

15   costs of Bank's attorneys incurred pursuant to the transactions set forth herein.  As of April 13,

16   2010, the Bank Breakup Fees were equal to approximately $23,000.  This fee will only be paid if a

17   Qualified Overbidder purchases the Assets.  ADV believes that the existence of a stalking horse

18   bidder will generate additional interest in the purchase of the ADV Assets and spur multiple bids at

19   the auction, because the existence of a party willing and able to purchase the ADV Assets for an

20   established price helps provide additional potential buyers with an idea of the true market value of

21   the asset being sold and lends credibility to the sale of the ADV Assets.  Moreover, as discussed

22   above, due to synergies among the Bank Property, the ADV Property, and the Other Assets (e.g.,

23   the fact that the Bank Property, which is adjacent to the ADV Property, provides additional

24   vineyard acreage and has active water wells necessary for the operation of both properties), ADV

25   believes that offering the ADV Assets and the Bank Property together will result in ADV obtaining

26   a higher and better price for the ADV Assets.

27

28

## II.

## DISCUSSION

Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale.  Bankr. R. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "[i]t is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate."  In re Atlanta Packaging Products, Inc., 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988).  Additionally, courts have long recognized the need for competitive bidding at hearings on private sales; "[c]ompetitive bidding yields higher offers and thus benefits the estate.  Therefore, the objective is 'to maximize bidding, not restrict it.'"  Id.

A corollary to these principles is that the court should not "cherry-pick" among contractual provisions, objecting to select individual portions, if the agreement as a whole is supported by an articulated business judgment.  At least one bankruptcy court has expressly applied this corollary to a transaction including breakup and overbid provisions in the sale of the debtor's business.  In In re Crowthers McCall Pattern, Inc., 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the court approved a transaction including provisions relating to a breakup fee and a requirement that overbids be at least $500,000.  In responding to objections to other provisions of the agreement, the court held that:

> The Court is not to second guess the inclusion of some provisions
> as long as the Agreement as a whole is within reasonable business
> judgment, and the subject provisions do not distort the balance

Congress struck in Chapter 11.  Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al., 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) (some contractual provisions may be justified by the need to attract a prospective investor.).

Crowthers, 114 B.R. at 886.

ADV believes that proposed sale procedures are intended to and will result in ADV obtaining the highest and best price for the Assets.  Bank's agreement (1) to serve as a locked-in buyer and to permit its offer to be subject to overbid after substantial marketing by KW during a protracted Marketing Period, and (2) to pay certain of the attorneys' fees of ADV's counsel, which will reduce the administrative claims against the ADV estate and the secured and guaranty claims against both Debtors' estates, ensures the greatest overall benefit possible for the Debtors' estates.  However, Bank's willingness take the foregoing actions in conjunction with a sale of the Assets is conditioned upon all of the terms of the Sale Documents being approved by the Court, including the sale procedures set forth in this Sale Procedures Motion.

Besides being necessary for the Debtors' estate to obtain the substantial benefits afforded by the Sale Documents, the sale procedures serve numerous legitimate purposes.  The sale procedures (1) foster competitive bidding among any serious potential purchasers; (2) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate the transaction; (3) ensure that the highest possible price is obtained for the ADV Assets; (4) afford the broadest notice of the proposed sale as possible under the circumstances; and (5) compensate Bank for Bank's time, effort, costs and expenses incurred in this transaction, as well as the benefit that Bank has provided to the Debtor's estate by agreeing to serve as a locked-in buyer subject to overbid.  Faced with the options available in these cases, it is absolutely clear that the Sale Documents, including the sale procedures, are in the best interests of the Debtors' estates and their creditors.

A breakup fee such as the one which will be paid to Bank in the event of a successful overbid has been approved by numerous other courts.  In general, "[a] 'break-up fee' is an incentive payment to an unsuccessful bidder who placed the estate property in a sales

configuration mode ... to attract other bidders to the auction."  In re Financial News Network, Inc., 126 B.R. 152, 154 n. 5 (Bankr. S.D.N.Y. 1991); see also In re Integrated Resources, Inc., 147 B.R. 650, 653 (S.D.N.Y. 1992), app. dismissed on jurisdictional grounds, 3 F.3d 49 (2d Cir. 1993) ["[a] break-up fee, or more appropriately, a termination fee, is an incentive payment to a prospective purchaser with which a company fails to consummate a transaction"].  Agreements to provide breakup fees are designed to compensate the potential acquirer who serves as a catalyst or "stalking horse' which attracts more favorable offers.  In re S.N.A. Nut Co., 186 B.R. 98, 101 (Bankr. N.D.Ill. 1995); In re 995 Fifth Ave. Assoc., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

Outside of bankruptcy, a break-up fee is generally allowed as long as it "enhances" the bidding.  In re S.N.A. Nut Co., 186 B.R. at 102.  In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude."  Cottle v. Storer Communication Inc., 849 F.2d 570, 578 (11th Cir. 1988); In re 995 Fifth Ave., 96 B.R. at 28.  Generally speaking, whether the payment of a break-up fee is appropriate is evaluated under the "business judgment rule."  In re S.N.A. Nut Co., 186 B.R. at 102.  Under this rule, there is a presumption that, in making a business decision, the principals of the debtor acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company.  Therefore, procedures utilized by a corporate debtor with respect to a proposed sale should be approved when the Court determines that such procedures are fair and do not violate any of the debtor's fiduciary duties.  Id.

In evaluating the appropriateness of a breakup fee, the appropriate question for the court to consider is "whether the break-up fee served any of three possible useful functions:  (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  In re Integrated Resources, Inc., 147 B.R. 650, 662 (S.D.N.Y. 1992).  Additionally, so long as the break-up fee or overbid increment is not (1) the product of self-dealing by the debtor or the trustee, (2) likely to hamper or chill, rather than encourage, bidding on the assets to be sold, or (3) unreasonably large in relation to the

proposed purchase price, courts have approved the proposed procedures. <u>See, e.g.</u>, <u>In re</u>
<u>Integrated Resources, Inc.</u>, 147 B.R. 650, 657 (S.D.N.Y. 1992), <u>appeal dismissed</u>, 3 F. 3d 49 (2nd
Cir. 1993) (a break-up fee is permissible if reasonably related to the bidder's efforts and the
transaction's magnitude); <u>see also</u> <u>Cottle v. Storer Communication</u>, 849 F.2d 570, 578-79 (11th
Cir. 1988); <u>CRTF Corp. v. Federated Dept. Stores</u>, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); <u>In re</u>
<u>Crowthers McCall Pattern, Inc.</u>, 114 B.R. at 879.

The Bank Breakup Fees to be paid to Bank in the event of a successful overbid comports
with both the "business judgment rule" and is in the best interests of the Debtors' estates and
their creditors. As set forth in the accompanying declaration of Cathy MacAdam, Bank Breakup
Fees was requested by Bank and agreed to by Debtors in the course of negotiations, for several
reasons: (1) having invested significant time and financial resources in this transaction, including
by assisting in the drafting of term sheets and the Sale Documents, in the event of a successful
overbid, Bank wanted to recoup its time, effort, costs and expenses and ensure that it would not
lose money as a result of its efforts to acquire the Assets while simultaneously cooperating with
ADV regarding continued cash collateral use and forbearing from taking action to obtain relief
from stay and foreclose on the ADV Assets during the extended Marketing Period, (2) to the
extent other bidders extend qualifying bids, it was Bank's belief that such qualifying bids would
be premised, in large measure, upon Bank being locked-in as a buyer and "legitimizing" the sale,
such that Bank should be compensated in the event a qualifying bid other than Bank's bid is
rendered a successful bid; and (3) ADV and Bank were concerned about unqualified or unserious
bidders upsetting the proposed sale to obtain a competitive advantage or some other economic
benefit at the ADV's (and Bank's) expense; the Bank Breakup Fees were therefore designed to
ensure that only serious, financially qualified potential bidders would participate in the bidding
process. Thus, the Bank Breakup Fees were designed to ensure that Bank would not retract its
offer, establish a bid standard, and attract qualified additional bidders.

Moreover, the Bank Breakup Fees proposed in the Sale Documents is relatively modest
in comparison to the purchase price being paid by Bank. As described above, as of April 13,

2010, the Bank Breakup Fees were equal to approximately $23,000.  Assuming even $75,000 in Bank Breakup Fees by the consummation of a sale, such Bank Breakup Fees amount to approximately 1.2% of the $6.1 million credit bid offered by Bank.  ADV believes that this fee constitutes a "fair and reasonable percentage of the purchase price, and [is] reasonably related to the risk, effort, and expenses of the prospective purchaser."  In re Integrated Resources, Inc., 147 B.R. at 662; In re 995 Fifth Ave. Assoc., L.P., 96 B.R. at 28.

### III.

### CONCLUSION

**WHEREFORE**, Debtors respectfully request that the Court enter an order

(1)    finding that notice of the Sale Procedures Motion was adequate and appropriate;

(2)    granting the Sale Procedures Motion in its entirety;

(3)    approving the sale procedures as set forth herein;

(4)    authorizing the Debtor to conduct a sale of the Assets as set forth herein;

(5)    setting a hearing on the Sale Motion; and

(6)    granting such other and further relief as may be necessary or appropriate under the circumstances.

Dated:  April 26, 2010

AGUA DULCE VINEYARDS, LLC,
a California limited liability company

CATHERINE P. MACADAM and
DONAL J. MACADAM

By:    _/s/ Martin J. Brill_
            MARTIN J. BRILL
            TODD M. ARNOLD
            LEVENE, NEALE, BENDER, RANKIN
                & BRILL L.L.P.
            Attorneys for Debtors and
            Debtors in Possession

18

## DECLARATION OF CATHERINE P. MACADAM

I, CATHERINE P. MACADAM, hereby declare as follows:

1.      I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the Sale Procedures Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Sale Procedures Motion.

3.      I am the Manager of Sweetwater Vineyards, LLC, which is the Manager of ADV.

4.      On May 4, 2009, ADV filed a voluntary petition.  ADV is operating its business, managing its financial affairs, and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

5.      On June 17, 2009, my husband and I filed a voluntary petition.  We are operating our business, managing our financial affairs, and operating our bankruptcy estate as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6.      ADV is the operator of a 37 acre, fully operational vineyard and winery, featuring daily wine tasting and tours, and a gourmet gift shop.

7.      In 1999, we, along with our partner, Ray Watt, through his various entities and affiliates including Narcissa Estates, Inc. ("Narcissa"), founded ADV when we discovered that the forty acre property that we originally acquired for real estate development had ideal soil and climate conditions for growing world-class grapes.  This property, which is located at 9640 and 9830 Sierra Highway, Agua Dulce, California 91390, houses ADV's winery, a residence occupied by us and our 4 minor children, and planted vineyards (the "ADV Property").

8.      In December 2005, we bought out Ray Watt's interest in ADV (which at that point was held entirely through Narcissa) for approximately $6.5 million.  Our buyout of Mr. Watt's interest was financed in part through a hard money loan from KSI Capital Corporation ("KSI") for approximately $5.6 million (the "KSI Loan"), and in part through a promissory note

1   in favor of Narcissa in the sum of $992,290, which was subsequently increased to $1,356,000,

2   secured by a deed of trust against the ADV Property.

3       9.      Following the buyout of Ray Watt's interest in ADV in December 2005, ADV

4   leased a 53 acre parcel of vacant land adjoining the ADV Property located at 10124 Sierra

5   Highway, Agua Dulce, California 91390 (the "Bank Property" and together with the ADV

6   Property, the "Properties") from Narcissa to expand ADV's planted vineyards.  ADV acquired

7   the Bank Property from Narcissa in October 2007.  ADV's acquisition of the Bank Property was

8   financed in part through a loan from Western Commercial Bank ("Bank") in the principal

9   amount of $1 million (the "$1M Loan"), which loan was secured by a first priority deed of trust

10  against the Bank Property, and in part through a promissory note in favor of Narcissa in the sum

11  of $3,100,000, secured by a second priority deed of trust against the Bank Property.

12      10.     In 2007, ADV entered into a series of loan agreements with Bank, including the

13  (a) $1M Loan and, (b) a loan in the principal amount of $6 million (the "$6M Loan), which loan

14  was secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other

15  monetary liens and encumbrances on the ADV Property, and (ii) senior liens on substantially all

16  of ADV's other assets.  Since Bank did not provide enough funding to completely retire the KSI

17  Loan, we executed a new note in the amount of $400,000 in favor of KSI (the "New KSI Loan").

18      11.     Although ADV's business experienced robust and steady growth, at a rate of 10%

19  each year from 2001 to 2007, the partner buyout and the purchase of the Bank Property increased

20  ADV's debt load, creating cash flow issues when ADV's revenue was not sufficient to service all

21  of ADV's debts.

22      12.     In an effort to increase its revenue, ADV attempted to expand its existing in-home

23  wine parties division, called "Agua Dulce Wine Adventures," which eventually partnered up

24  with Suzanne Somers' direct selling company.  This partnership was then picked up by a

25  company called Youngevity, which had at the time over 300,000 consultants worldwide

26  (primarily in the United States and Asia).  Although ADV hoped that its in-home wine parties

27

28

1    division would benefit from the Youngevity network, it ultimately did not result in the increase

2    in sales and revenue that ADV had expected.

3        13.    Although ADV began increasing its revenues by, among other things, selling its

4    wine in bulk, ADV suffered a huge setback in 2008 when a large number of its Wine Club

5    members were repeatedly invoiced in error by ADV's credit card processing system.  In the

6    normal course of business, ADV's Wine Club members receive six bottles of wine every three

7    months and ADV's credit card processing system automatically debits the payment for the wine

8    from the members' credit cards on file.  In early 2008, ADV's credit card processing software

9    was upgraded, causing a glitch that resulted in repeated debiting from the Wine Club members'

10   credit cards.  In an effort to salvage its relationships with the Wine Club members, ADV paid

11   refunds directly to many of the members.  In the meantime, members who had also contacted

12   their credit card companies obtained refunds directly from their credit card companies, who then

13   turned around and debited the refund amounts from ADV's bank accounts.  This resulted in a

14   double hit to ADV's bank accounts, leaving ADV's accounts overdrawn approximately

15   $287,000 by the end of the summer.

16       14.    As a result of the credit card processing fiasco, ADV faced a cash flow crisis,

17   causing ADV to fall behind on its accounts payable and prompting ADV to seek an additional

18   loan from Bank.  In November 2008, after contracting with a new credit card processing

19   company, ADV obtained a loan from Bank in the principal amount of $750,000 (the "$750K

20   Loan").  ADV's obligations to Bank under the $750K Loan are secured by a security interest in

21   off-site and on-site bottled wines, in-tank or in-barrel.  The documents underlying the $750K

22   Loan allowed Bank to create a reserve (the "Reserve Funds") from 30% of ADV's credit card

23   deposits up to $100,000 to cover chargebacks from the credit card processor.  This caused a

24   severe cash flow crunch for ADV.  Pursuant to Bank's various loans to ADV, Bank provided

25   financing to ADV in the total principal sum of $8.1 million and obtained a security interest in

26   substantially all of ADV's assets, including the ADV Property and the Bank Property.  One of

27

28

1  the goals of these loans was to retire the KSI Loan.  On March 4, 2009, Bank filed and recorded

2  a Notice of Default against ADV to initiate a foreclosure proceeding against the Bank Property.

3      15.    As a result of all of the foregoing, ADV was forced to seek protection under

4  Chapter 11 of the Bankruptcy Code in order to gain control over its cash (including the Reserve

5  Funds) and operations, to have the opportunity to implement business strategies targeted at

6  increasing revenue – including working with wine brokers and national distributors to increase

7  sales of its wine, at both the bulk sales level and direct sales level, to restructure its existing debt

8  and emerge a stronger and profitable company.

9      16.    We personally guarantied ADV's obligations to Bank. We also personally

10 guarantied a number of other ADV business debts.  Additionally, we are liable on the New KSI

11 Loan.

12     17.    As a result of ADV's financial difficulties and inability to remain current on its

13 debt obligations, including those for the payment of our salaries, (a) a number of ADV creditors

14 made demands and initiated litigation against us based on our guaranty obligations, and (b) we

15 were unable to remain current on the New KSI Loan.  Based on the foregoing events, among

16 others, we were forced to seek protection under chapter 11 of the Bankruptcy Code in order to

17 gain control over our assets, to continue to work towards reorganization in the ADV bankruptcy

18 case, and to restructure our existing debts.

19     18.    After the Debtors' bankruptcy cases were filed, Bank obtained relief from stay

20 and foreclosed on the Bank Property.

21     19.    In consideration of the foregoing, and after considering its options, I, in an

22 exercise of my business judgment, have concluded that a sale of the ADV Property and

23 substantially all of ADV's other assets (excluding cash and avoidance causes of action) (the

24 "Other Assets" and, together with the ADV Property (the "ADV Assets") is in the best interests

25 of ADV and the creditors of its estate.

26     20.    After substantial arms-length negotiations between Debtors and Bank, the parties

27 negotiated a series of documents (the "Sale Documents") to effectuate a joint sale of the Bank

28

1   Property and the ADV Assets (collectively, the "Assets").  I believe that a joint sale of the Assets

2   will provide the most benefit to the estate by, among other things, increasing the sale price for

3   the Assets due to synergies between the Bank Property, the ADV Property, and the Other Assets,

4   which should provide the maximum possible debt reduction and recovery for the Debtors'

5   estates.

6       21.    The Sale Documents include, but are not limited to, the following primary

7   documents:

8           a.   Agreement to Sell Property and Assets (the "Agreement to Sell") – a true and

9                correct copy of the Agreement to Sell in substantially the form to be used by

10               the parties is attached hereto as Exhibit "1;"

11          b.   Auction Sale Agreement (the "Auction Agreement") – a true and correct copy

12               of the Auction Agreement in substantially the form to be used by the parties is

13               attached as Exhibit "B" to the Agreement to Sell;

14          c.   Purchase and Sale Agreement and Joint Escrow Instructions [Western

15               Commercial Bank Property] (the "Bank APA") – a true and correct copy of

16               the Bank APA in substantially the form to be used is attached as Exhibit "B"

17               to the Auction Agreement;

18          d.   Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce

19               Vineyards] (the "ADV APA") – a true and correct copy of the ADV APA in

20               substantially the form to be used by the parties is attached as Exhibit "C" to

21               the Auction Agreement; and

22          e.   Due Diligence and Confidentiality Agreement (the "Confidentiality

23               Agreement") – a true and correct copy of the Confidentiality Agreement in

24               substantially the form to be used by the parties is attached as Exhibit "D" to

25               the Auction Agreement.

26

27

28

22.     In summary,[2] under the Sale Documents, ADV is required to obtain (a) an order of the Court (the "Bid Procedures Order") approving the sale procedures set forth in this Sale Procedures Motion, and, (b) an order of the Court (the "Sale Order") approving a sale motion (the "Sale Motion") to be filed by ADV providing for, among other things, (i) the sale of the ADV Assets free and clear of all liens, claims, encumbrances or interests to Bank, subject to overbid after auction, pursuant to Section 363(f) of the Bankruptcy Code together with a good faith finding pursuant to Section 363(m) of the Bankruptcy Code, (ii) the assumption by ADV and assignment to Bank or a successful overbidder of executory contracts and unexpired leases designated in the Sale Documents pursuant to Section 365 of the Bankruptcy Code.

23.     If either (a) none of the bid amounts for the Assets is greater than the Minimum Overbid Amount (as defined below), or (b) the accepted bidder does not purchase all of the Assets for any reason, other than a breach or default by Bank of the Sale Documents, then Bank shall purchase the ADV Assets pursuant to the ADV APA by offsetting $6.1 million from the $6M Loan.  In the event Bank purchases the ADV Assets, Bank shall be responsible to pay the (a) all amounts Bank has agreed to pay Kennedy Wilson Auction Group, Inc. ("KW") in connection with the auction of the Assets (the "KW Fees"), (b) Bank Breakup Fees (as defined below), title costs, escrow costs, transfer taxes (to the extent owed), and certain professional fees Bank has agreed to pay (the "Professional Fees").  Bank shall not pay, and shall purchase the ADV Assets subject to, all outstanding property taxes to the extent due and payable by bank following its acquisition of the ADV Assets.

24.     In connection with any accepted bidder other than Bank purchasing the Assets, Bank and ADV agree to divide, allocate, and pay the accepted bid amount pursuant to Section 6 of the Agreement to Sell.

25.     If Bank purchases the ADV Assets as described in Section 6.2 of the Agreement to Sell, Bank will pay the unpaid attorneys' fees and costs incurred by counsel to ADV, as approved

---

[2] The summary description of the proposed transaction under the Sale Documents is for informational purposes only.  To the extent there is any inconsistency between the summary and the Sale Documents, the Sale Documents shall govern.

by the Court (the "Professional Fees") incurred from and after December 1, 2009 (the "Post-December Professional Fees"), up to a maximum amount of $150,000.00.

26.    If an accepted bidder purchases the Assets, Bank will pay the Post-December Professional Fees and twenty-five percent (25%) of the attorneys' fess and costs incurred by counsel to ADV incurred after the petition date and prior to December 1, 2009 (the "Pre-December Professional Fees"), up to the aggregate, maximum amount of $150,000.00; provided, however, that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the loans from Bank to ADV, Bank shall instead pay seventy-five percent (75%) rather than twenty-five percent (25%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $200,000.00.

27.    If the Court does not grant this Motion and/or the Sale Motion, Bank shall use commercially reasonable efforts to foreclose all of its security interest in and to the ADV Assets under applicable non-bankruptcy law in a commercially-reasonable period of time following Bank's termination of the Agreement to Sell unless there is reasonable cause for Bank not to foreclose, including, by way of example but not limitation, the discovery of material environmental contamination on the ADV Property or the imposition of an stay or injunction prohibiting Bank from doing so.  Notwithstanding any provision of the Agreement to Sell, provided (a) we, ADV, and our attorneys, have provided genuine cooperation and diligent, good faith, and best efforts to obtain approval of this Motion and the Sale Motion, and (b) we, ADV, and our attorneys have not directly, indirectly, or collusively interfered with Bank's efforts to foreclose upon any of the ADV Assets, upon completion of the foreclosure sales of the ADV Assets or termination of the Agreement to Sell, Bank shall pay the Post-December Professional Fees to the appropriate parties up to a maximum amount of $100,000.00.

28.    **Marketing** – As soon as practicable, but in no event later than May 10, 2010, and continuing for thirty (30) calendar days thereafter, KW will market the Assets (the "Marketing Period").

During the Marketing Period, KW will market the Assets by (a) delivering a notice of offering letter to as many potential bidders as possible, (b) listing and advertising the Assets for sale at an estimated price of between $10-$15 million (the "Auction Estimate Range") on various internet sites, and with various brokerage and/or listing services, that list and offer for sale real property and assets, similar to the Assets; and (c) submitting advertisements for the sale of the Assets at the Auction Estimate Range in trade or industry newspapers and other print media.

In conjunction with the foregoing marketing efforts by KW, KW shall provide reasonable assistance to potential bidders to enable such potential bidders to review, inspect, and evaluate the Assets during the Marketing Period.  Without limiting the generality of the foregoing, during the Marketing Period, KW shall (a) make information regarding the Assets available to potential bidders that have completed, executed, and delivered to KW and Bank a due diligence and confidentiality agreement, (b) coordinate with Bank and Debtors to permit potential bidders to access the Assets for purposes of conducting site visits, and (c) receive written questions from potential bidders with respect to the Assets and the auction, seek answers to the same from Bank and Debtors, and provide written answers to such questions, as approved by Bank and Debtors, to all potential bidders.

29.    **Bids** – KW will require all potential bidders to submit their bids to KW on or before the business day following the end of the Marketing Period (the "Bid Submission Date"). KW may, in its reasonable discretion, (a) advise any Qualified Bidder (as defined below), who submit bids prior to the Bid Submission Date with bid amounts that are less than threshold minimum price equal to approximately $9.2 million (the "Minimum Overbid Amount"), which is the sum of the amounts of the $6.1 million Bank credit bid for the ADV Assets, the $2.6 million offering price for Bank Property, the KW Fees, cooperating broker fees, and Bank Breakup Fees, that such bid amounts are less than the Minimum Overbid Amount and will not be accepted, and that a higher amount may be submitted prior to the Bid Submission Date, and (b) extend the Bid Submission Date for any bid that is not received by the Bid Submission Date if the reason for such failure was beyond the reasonable control of the applicable Potential Bidder.

KW shall review each bid to determine if the person submitting the bid is a Qualified Bidder. If, in KW's reasonable determination, the person submitting the bid appears to be a Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may notify such person and provide a one-time opportunity to submit additional information demonstrating that it is a Qualified Bidder. Bids from all persons that are not Qualified Bidders shall be set aside and not evaluated or considered further in the auction.

KW shall review and evaluate the bids submitted by Qualified Bidders and provide a summary and analysis of the same to Bank and Debtor within one (1) Business Day after the Bid Submission Date (as defined below).

If as part of its bid, any Qualified Bidder requests any insertions, deletions, or other modifications to the Bank APA or the Debtor APA ("<u>PSA Comments</u>"), such bid shall be considered non-conforming, unless and until such PSA Comments are approved by Bank or Debtor, as applicable. At the request of the applicable seller, KW shall notify the Qualified Bidder as to which PSA Comments, if any, are approved by the applicable seller and permit the Qualified Bidder to revise, amend, or withdraw its bid with respect thereto.

30.    **Qualification of Bidders** – In order to bid for the assets, a person must be a qualified bidder (a "Qualified Bidder"). A Qualified Bidder is a person, other than Bank, that:

      a.    Has submitted a bid to purchase the Assets;

      b.    Has provided reasonably-detailed, credible, written evidence verifying its ability to pay the applicable bid amount, in cash or other immediately available funds, which such evidence may include, without limitation, (i) statements of third-party deposit account balances showing readily-available, liquid funds in the excess of the bid amount, (ii) letters of credit or unconditional commitment letters from banks, credit unions, or other financial institutions, and/or (iii) other written information demonstrating that the Qualified Bidder has the financial ability to pay the bid amount; and

c.    Is otherwise ready, willing, and permitted to purchase the Assets pursuant to the Sale Documents.

31.    **Auction** – Bank and ADV Parties shall review the summary of the bids prepared by KW.  Unless Bank and Debtor otherwise agree, and direct KW, in writing to the contrary:

a.    If only one (1) Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then such bid shall be deemed the accepted bid;

b.    If more than one Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then following Bank's and Debtors' review of the submitted bids, Bank and Debtors shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Assets (the "Live Auction").  In respect of the Live Auction, (i) all Qualifies Bidders that submitted bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (ii) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and Debtors agree that KW's services shall not be required for the Live Auction, (iii) the Live Auction shall be held at the location agreed upon by Bank and Debtors, with the offices of the Court, the ADV Property, and the offices of the Debtors' attorneys being approved locations for the Live Auction, and (iv) all other matters with respect to the Live Auction shall be agreed to by Bank and Debtors, with the advice and input from KW.  The Qualified Bidder submitting the highest bid amount in excess of the Minimum Overbid Amount at the Live Auction shall be the accepted bid.

If a Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, ADV will seek final approval of the Sale Motion providing for a sale of the Assets to such Qualified Bidder.  Upon such approval, Bank and ADV shall promptly sign and date the applicable purchase agreements submitted by the successful

1    Qualified Bidder, deliver the same to the escrow agent, and consummate the sale of the Assets

2    pursuant to the terms and conditions of the Sale Documents.

3        If no Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of

4    the Marketing Period or the Live Auction, as applicable, or if a Qualified Bidder does not purchase

5    the Assets for any reason, other than a breach or default of the Bank APA by Bank, ADV will seek

6    final approval of the Sale Motion, pursuant to which (a) Bank shall continue to own, and not sell

7    the Bank Property, and (b) Bank and ADV Parties shall enter into the ADV APA, and consummate

8    the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV

9    APA.

10        32.    **Bank Breakup Fees** – The sale procedures requested above contemplate an auction

11    with Bank as a stalking horse bidder.  The breakup fees to be paid to Bank (the "Bank Breakup

12    Fees") are in an amount equal to the fees and costs owed to Bank's attorneys incurred in

13    connection with Debtors' bankruptcy cases on and after December 1, 2009, the date the parties

14    began talking in earnest about the proposed sale, which include, without limitation, the fees and

15    costs of Bank's attorneys incurred pursuant to the transactions set forth herein.  As of April 13,

16    2010, the Bank Breakup Fees were equal to approximately $23,000.  This fee will only be paid if a

17    Qualified Overbidder purchases the Assets.  ADV believes that the existence of a stalking horse

18    bidder will generate additional interest in the purchase of the ADV Assets and spur multiple bids at

19    the auction, because the existence of a party willing and able to purchase the ADV Assets for an

20    established price helps provide additional potential buyers with an idea of the true market value of

21    the asset being sold and lends credibility to the sale of the ADV Assets.  Moreover, as discussed

22    above, due to synergies among the Bank Property, the ADV Property, and the Other Assets (e.g.,

23    the fact that the Bank Property, which is adjacent to the ADV Property, provides additional

24    vineyard acreage and has active water wells necessary for the operation of both properties), ADV

25    believes that offering the ADV Assets and the Bank Property together will result in ADV obtaining

26    a higher and better price for the ADV Assets.

27

28

33.     The Bank Breakup Fees were requested by Bank and agreed to by Debtors in the course of negotiations, for several reasons: (1) having invested significant time and financial resources in this transaction, including by assisting in the drafting of term sheets and the Sale Documents, in the event of a successful overbid, Bank wanted to recoup its time, effort, costs and expenses and ensure that it would not lose money as a result of its efforts to acquire the Assets while simultaneously cooperating with ADV regarding continued cash collateral use and forbearing from taking action to obtain relief from stay and foreclose on the ADV Assets during the extended Marketing Period, (2) to the extent other bidders extend qualifying bids, it was Bank's belief that such qualifying bids would be premised, in large measure, upon Bank being locked-in as a buyer and "legitimizing" the sale, such that Bank should be compensated in the event a qualifying bid other than Bank's bid is rendered a successful bid; and (3) ADV and Bank were concerned about unqualified or unserious bidders upsetting the proposed sale to obtain a competitive advantage or some other economic benefit at the ADV's (and Bank's) expense; the Bank Breakup Fees were therefore designed to ensure that only serious, financially qualified potential bidders would participate in the bidding process.  In short, the Bank Breakup Fees were designed to ensure that Bank would not retract its offer, establish a bid standard, and attract qualified additional bidders.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 26th day of April 2010, at Agua Dulce, California.

_____
CATHERINE P. MACADAM

# EXHIBIT "1"

## AGREEMENT TO SELL PROPERTY AND ASSETS

This AGREEMENT TO SELL PROPERTY AND ASSETS ("Agreement") is made this
_____ day of _____, 2010, by and among WESTERN COMMERCIAL BANK, a California
banking corporation ("Bank"), on the one hand, and AGUA DULCE VINEYARDS LLC, a
California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D.
MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), and SWEETWATER
VINEYARDS, LLC, a California limited liability company ("Sweetwater", and together with D.
MacAdam and C. MacAdam, individually and collectively, "Guarantor" and together with ADV, the
"ADV Parties"), on the other hand, with respect to the following facts:

## RECITALS

A.    Bank has heretofore made the following loans (collectively, the "Loans") to ADV:

1.    $350M Loan.

a.    On or about August 14, 2007, Bank made a loan (the "$350M Loan")
to ADV in the original principal amount of $200,000.00, as evidenced by that certain Promissory
Note, dated August 14, 2007 (the "$350M Note"), made by ADV for the benefit of Bank. Pursuant
to the $350M Note, ADV was required to repay the $350M Loan to Bank by November 14, 2007
(the "$350M Maturity Date").

b.    On or about November 14, 2007, and again on December 20, 2007,
Bank and ADV executed those certain Change In Terms Agreements (each a "$350M CIT"),
pursuant to which, among other things, Bank agreed to (i) increase the principal amount of the
$350M Loan from $200,000.00 to $300,000.00, and (ii) extend the $350M Maturity Date from
November 14, 2007 to November 14, 2008.

c.    On or about August 8, 2008, Bank and ADV entered into that certain
Change In Terms Agreement (also a "$350M CIT"), pursuant to which, among other things, (i) Bank
agreed to increase the principal amount of the $350M Loan from $300,000.00 to $350,000.00, (ii)
Bank agreed to extend the $350M Maturity Date to October 29, 2012, (iii) the parties entered into
that certain Business Loan Agreement, dated August 8, 2008 (the "$350M Loan Agreement"),
setting forth certain terms and conditions with respect to the $350M Loan, (iv) ADV granted Bank a
security interest in and to that certain real property located at 9830 Sierra Highway, Agua Dulce,
California (the "ADV Property"), as further described on Exhibit A-1 of the Auction Sale
Agreement, attached hereto as Exhibit B, and made a part hereof (the "Auction Sale Agreement"),
junior in priority only to the $6MM DOT (defined below) and the $6MM Assignment (defined
below), and made pursuant to (1) that certain Deed of Trust, dated August 8, 2008, made by ADV
for the benefit of Bank, and recorded on August 25, 2008, in the Official Records of Los Angeles
County, California, as Instrument Number 2008-1528562 (the "$350M DOT"), and (2) that certain
Assignment of Rents, dated August 8, 2008, made by ADV for the benefit of Bank, and recorded on
August 25, 2008, in the Official Records of Los Angeles County, California, as Instrument Number
2008-1528564 (the "$350M Assignment"), (v) ADV granted Bank a security interest in certain
existing and future bottling contracts, pursuant to, and as further described in, that certain
Commercial Security Agreement, dated August 8, 2008 (the "$350M Security Agreement"), made

1

by ADV for the benefit of Bank, and (vi) the indebtedness and other obligations of ADV under the $350M Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated August 14, 2008 (individually and collectively, the "$350M Guaranty").

    d. As of ██████, 2010, the $350M Loan has an unpaid principal balance of $█████, plus accrued and unpaid interest thereon in the amount of $█████, plus fees, costs, and expenses in the amount of $█████.

    e. As used herein, the term "$350M Loan Documents" shall mean, collectively, the $350M Note, $350M CITs, $350M Loan Agreement, $350M DOT, $350M Assignment, $350M Security Agreement, $350M Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $350M Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

    2. $6MM Loan.

    a. On or about October 29, 2007, Bank made a loan (the "$6MM Loan") to ADV in the original principal amount of $6,000,000.00, as evidenced by that certain Promissory Note, dated October 29, 2007 (the "$6MM Note"), made by ADV for the benefit of Bank.

    b. The $6MM Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated October 29, 2007 (the "$6MM Loan Agreement"), executed by ADV and Bank.

    c. The $6MM Loan was secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other monetary liens and encumbrances on the ADV Property, and made pursuant to that certain Deed of Trust, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number 2007-2457263 (the "$6MM DOT"), and (ii) security interests, senior in priority to all other security interests, granted by ADV to Bank in and to, among other things, certain farm products, inventory, equipment, accounts, accessions, fixtures, and general intangibles, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated October 29, 2007 (the "$6MM Security Agreement").

    d. The indebtedness and other obligations under the $6MM Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated October 29, 2007 (individually and collectively, the "$6MM Guaranty").

    e. As of ████, 2010, the $6MM Loan has an unpaid principal balance of $█████, plus accrued and unpaid interest thereon in the amount of $████, plus fees, costs, and expenses in the amount of $████.

    f. As used herein, the term "$6MM Loan Documents" shall mean, collectively, the $6MM Note, $6MM Loan Agreement, $6MM DOT, $6MM Security Agreement, $6MM Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $6MM Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

3.    $1MM Loan.

a.      On or about October 29, 2007, Bank made a loan (the "$1MM Loan") to ADV in the original principal amount of $1,000,000.00, as evidenced by that certain Promissory Note, dated October 29, 2007 (the "$1MM Note"), made by ADV for the benefit of Bank.

b.      The $1MM Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated October 29, 2007 (the "$1MM Loan Agreement"), executed by ADV and Bank.

c.      The $1MM Loan was secured by, among other things, (i) a lien on that certain vacant land described on Exhibit A-2 of the Auction Sale Agreement (the "Bank Property"), and made pursuant to that certain Deed of Trust, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number 2007-2457271 (the "$1MM DOT"), and that certain Assignment of Rents, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number: 2007-2457272 (the "$1MM Assignment"), and (ii) security interests granted by ADV to Bank in and to, among other things, certain farm products, inventory, equipment, accounts, accessions, fixtures, and general intangibles, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated October 29, 2007 (the "$1MM Security Agreement").

d.      The indebtedness and other obligations under the $1MM Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated October 29, 2007 (individually and collectively, the "$1MM Guaranty").

e.      As of ▓▓▓▓▓▓▓▓, 2010, the $1MM Loan has an unpaid principal balance of $▓▓▓▓▓▓▓▓, plus accrued and unpaid interest thereon in the amount of $▓▓▓▓▓▓, plus fees, costs, and expenses in the amount of $▓▓▓▓▓▓▓. ADV's obligations under the $1MM Loan are limited by law as a result of the Non-Judicial Foreclosure (defined below).

f.      As used herein, the term "$1MM Loan Documents" shall mean, collectively, the $1MM Note, $1MM Loan Agreement, $1MM DOT, $1MM Assignment, $1MM Security Agreement, $1MM Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $1MM Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

4.    $750M Loan.

a.      On or about November 18, 2008, Bank made a loan (the "$750M Loan") to ADV in the original principal amount of $750,000.00, as evidenced by that certain Promissory Note, dated November 18, 2008 (the "$750M Note"), made by ADV for the benefit of Bank.

b.      The $750M Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated November 18, 2008 (the "$750M Loan Agreement"), executed by ADV and Bank.

c.    The $750M Loan was secured by, among other things, security interests granted by ADV to Bank in and to certain farm products, inventory, equipment, accounts, accessions, fixtures, general intangibles, off-site and on-site bottled wines, tanks, and barrels, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated November 18, 2008 (the "$750M Security Agreement").

d.    The indebtedness and other obligations under the $1MM Loan was guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated November 18, 2008 (individually and collectively, the "$750M Guaranty").

e.    As of ▓▓▓▓▓▓, 2010, the $750M Loan has an unpaid principal balance of $▓▓▓▓▓▓, plus accrued and unpaid interest thereon in the amount of $▓▓▓▓▓, plus fees, costs, and expenses in the amount of $▓▓▓▓▓▓.

f.    As used herein, the term "$750M Loan Documents" shall mean, collectively, $750M Note, the $750M Loan Agreement, $750M Security Agreement, $750M Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $750M Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

B.    As used in this Agreement, the term "Loan Documents" shall mean, collectively, the $350M Loan Documents, $6MM Loan Documents, $1MM Loan Documents, and the $750M Loan Documents.

C.    ADV, D. MacAdam, and C. MacAdam are the debtor in those certain bankruptcy proceedings, styled as *In re Agua Dulce Vineyards, LLC, a California limited liability company*, Case No. 1:09-bk-15207-MT, and *In re Catherine P. MacAdam and Donal J. MacAdam*, Case No. 1:09-bk-17476-MT (collectively, the "Bankruptcy"), filed in the United States Bankruptcy Court, Central District of California, San Fernando Valley Division (the "Court"), and Bank is a creditor in the Bankruptcy.

D.    Bank has completed a non-judicial foreclosure of the Bank Property under the $1MM Deed of Trust (the "Non-Judicial Foreclosure"), and Bank is the grantee under that certain Trustee's Deed Upon Sale, dated September 28, 2009, and recorded on October 8, 2009, in the Official Records of Los Angeles County, California, as Instrument Number 2009-1532940 ("Trustee's Deed"), with respect to the Bank Property.

E.    ADV Parties are in default of their obligations under the Loan Documents as a result of, among other things, failing to make payments due under the Loan Documents as and when required (collectively, the "Existing Defaults"). As a result of the Existing Defaults, and in accordance with the Loan Documents, and subject to the limitations imposed at law as a result of the Non-Judicial Foreclosure with respect to the $1MM Loan, Bank has accelerated the unpaid balance due and owing under each of the Loans, and all amounts thereunder are due and payable.

F.    ADV Parties, directly or indirectly, are the owners of that certain business which, among other things, consists of a winery, vineyard, and gift shop (the "Business") located at or near the ADV Property.

681123.6                                4

G.     In an effort to resolve Bank's claims in the Bankruptcy, and to maximize the value received from the sale of the Bank Property, ADV Property, and all assets of ADV Parties used in connection with the Business (collectively, the "Auctioned Property"), Bank and ADV Parties have agreed to offer the Auctioned Property for sale pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement.

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Obligations Conditioned Upon Court Approval; Notices; Termination Right.

1.1     Bid Procedures Motion. The effectiveness of this Agreement, and all rights and obligations of all parties hereto are subject to, and conditioned upon, the Court granting a motion (the "Bid Procedures Motion") approving the sale of the Auctioned Property pursuant to the procedures set forth in the Auction Sale Agreement (the "Bid Procedures Motion Approval"). A copy of the Bid Procedures Motion Approval, once received, shall be attached to this Agreement as Exhibit A, and by this reference, is incorporated herein. Following receipt of Bid Procedures Motion Approval, each of the parties hereto shall undertake and perform its obligations as and when required pursuant to the terms and conditions of this Agreement. The "Effective Date" of this Agreement shall mean the later of (a) the date hereof, and (b) the date that Bid Procedures Motion Approval has been obtained.

1.2     Sale Motion. Promptly following the Bid Procedures Motion Approval, the parties shall file with the Court a motion (the "Sale Motion"), in form and content acceptable to Bank and the Bank's title insurance company, in its and their sole, reasonable discretion, approving the sale of the ADV Assets (defined below) to Bank subject to the acceptance of the Accepted Bid, if any, from a Qualified Bidder pursuant to the Auction Sale Agreement (the "Sale Motion Approval"). The Sale Motion shall, among other things, provide for (a) the Court's finding that the Bank or the Accepted Bidder, as applicable, is a "good faith purchaser" within the meaning of 11 U.S.C. Section 363(m), (b) the Court's approval of the assumption by ADV, and the assignment to Bank or the Accepted Bidder (defined below, as applicable), of the Required Contracts and Optional Contracts (as defined and described in the Auction Sale Agreement and the ADV Purchase Agreement), and (c) the Court's approval of the sale of the ADV Assets, free and clear of all Encumbrances (as defined in the ADV Purchase Agreement, which is defined in the Auction Sale Agreement), including, without limitation, any and all restrictions, agreements, judgments, injunctions, orders, decrees, or awards that are binding upon ADV or the ADV Assets, including, without limitation, any covenant not to compete that limits or impairs any activity of the Business, any acquisition of property by the Business, or the overall conduct of the Business, and any Taxes (defined in the ADV Purchase Agreement), including, without limitation, all payroll, employment, sales, and income Taxes, except real property taxes and assessments attributable to the ADV Property, and sales taxes, if any, to the extent arising from the transactions being consummated pursuant to the ADV Purchase Agreement, and any liabilities, obligations, or commitments of any nature relating to the Business, and any successor liability that does, may, or could be attributed to Bank or the Accepted Bidder, as applicable, following the acquisition of the ADV Assets, whether any of the foregoing are known or

unknown, absolute, accrued, contingent, matured, or unmatured, except to the extent that any of the foregoing are expressly assigned to, and assumed by the Bank or Accepted Bidder, as applicable, under the ADV Purchase Agreement. Any hearing related to the Sale Motion shall be continued until the conclusion of the Auction, at which time, the parties shall seek final approval by the Court of, as applicable, the sale of the Auctioned Property to the Accepted Bidder or the transfer of the ADV Assets to Bank, pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement.

1.3     Notice to Creditors. ADV shall provide notice of the Bid Procedures Motion and the Sale Motion as required by Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, the Local Bankruptcy Rules, or as otherwise required by the Court; provided, however, that notwithstanding the foregoing, ADV shall provide notice of the Sale Motion by certified mail, return receipt requested, (a) to all parties that have recorded a lien or encumbrance on the ADV Property, and (b) to all parties that Bank's title insurance company requires such notice, and (c) to all federal, state, and local taxing authorities for which the Sale Motion Approval will eliminate successor liability, to Bank or the Accepted Bidder, as applicable, for Taxes due or owed by ADV. ADV represents and warrants to Bank that a true and complete list of the name and address of all known interested parties with respect to the ADV Bankruptcy, including, without limitation, all persons, entities, agencies, or organizations that hold, or purport to hold, any right, title, interest, claim to, or lien upon any of the ADV Assets, is set forth on Schedule 2, attached hereto and made a part hereof.

1.4     Termination Right. If (a) the Court does not grant the Bid Procedures Motion Approval and/or the Sale Motion Approval, or (b) the Bid Procedures Motion Approval and/or Sale Motion Approval are granted and subsequently timely appealed, or (c) the sale of the ADV Assets to Bank, or the Auctioned Property to an Accepted Bidder, as applicable, is not, or, in Bank's reasonable determination, will not be, consummated by June 30, 2010 pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement, Bank may, in its discretion, by written notice to ADV Parties terminate this Agreement, the Auction Sale Agreement, and any other written documents, instruments, and/or agreements entered into, or made in connection with, this Agreement and/or the Auction Sale Agreement.

2.     Recitals. The Recitals set forth in this Agreement above are incorporated herein by this reference. ADV Parties, and each of them, represent and warrant to Bank that the information set forth in the each of the Recitals is true and complete, including, without limitation, the amounts set forth in paragraphs A.1.d, A.2.e, A.3.e, and A.4.e of the Recitals. Each of ADV Parties is in default of its obligations under the Loan Documents; provided, however, that ADV Parties' obligations under the $1MM Loan Documents are limited as provided by law with respect to the Non-Judicial Foreclosure. Except as specified herein, all of the terms and conditions of the Loan Documents, and each of them, shall remain in full force and effect.

3.     Reaffirmation of Loan. This Agreement is, in part, a reaffirmation of the obligations by ADV Parties to Bank as evidenced by each of the Loan Documents to which each of the ADV Parties is a party. Accordingly, subject to the limitations provided by law of ADV Parties' obligations under the $1MM Loan following the Non-Judicial Foreclosure, (a) each of ADV Parties represents, warrants, covenants, and agrees that all of the terms and conditions of each of the Loan Documents to which it is a party is in full force and effect, without waiver or modification of any kind whatsoever, (b) each of the ADV Parties acknowledges that all amounts required to be paid

under the Loan Documents are, and have been, due, and shall continue to be due notwithstanding the terms and provisions of this Agreement, and (c) ADV Parties further acknowledge that interest shall continue to accrue on any and all amounts outstanding as set forth in the Loan Documents, and ADV shall remain obligated to pay, and Guarantors shall be and remain obligated to guaranty the payment of, all such interest and principal amounts due as required under Loan Documents. Bank enters into this Agreement without waiver of any term, covenant, or condition required to be performed or satisfied by ADV Parties, or any of them, pursuant to any of the Loan Documents and without waiver or release of any breach or default under the Loan Documents, or any rights or remedies of Bank with respect thereto.

4.    Auction Sale Agreement. On, before, or promptly following, the Effective Date, Bank and ADV Parties shall execute and deliver, and Bank shall cause KENNEDY WILSON AUCTION GROUP INC., a California corporation ("KW"), to execute and deliver, the Auction Sale Agreement.

5.    Conditions Precedent. The obligations of Bank hereunder are expressly conditioned upon the following having occurred, or Bank having received all of the following agreements, documents, and/or instruments, each in form and content satisfactory to Bank, in its reasonable discretion, opinion, and judgment, by no later than the Effective Date:

        5.1    This Agreement, executed by each of the ADV Parties;

        5.2    The Auction Sale Agreement, executed by each of the ADV Parties and KW; and

        5.3    Such additional agreements, reports, approvals, instruments, documents, and consents as Bank may request, in its reasonable discretion, opinion, and judgment, in connection with this Agreement.

6.    Allocation of Proceeds.

        6.1    Definitions. As used in this Agreement, the following terms shall have the following meanings:

        (a)    "Accepted Bid Amount" shall have the meaning set forth in the Auction Sale Agreement.

        (b)    "ADV Assets" shall have the meaning set forth in the Auction Sale Agreement.

        (c)    "Auction" shall have the meaning set forth in the Auction Sale Agreement.

        (d)    "Bank Breakup Fees" means the fees and costs owed to Bank's attorneys incurred in connection with the Bankruptcy on and after December 1, 2009, which include, without limitation, the fees and costs of Bank's attorneys incurred pursuant to the transactions set forth herein, the Auction Sale Agreement, and the Purchase Agreements. As of April 13, 2010, the Bank Breakup Fees are equal to approximately $23,000.

(e)     "Bank Credit Bid Amount" means Six Million One Hundred Thousand and No/100 Dollars ($6,100,000.00).

(f)     "Bank Property Costs" means all costs, expenses, and other amounts paid or incurred by Bank in connection with the Bank Property on and after December 1, 2009.

(g)     "Broker Fees" shall have the meaning set forth in the Auction Sale Agreement.

(h)     "Escrow Costs" means the amounts owed by Bank and ADV under the applicable Purchase Agreement to the applicable Escrow Agent (as defined in each Purchase Agreement).

(i)     "Minimum Overbid Amount" means the sum total of the following amounts: (a) Bank Credit Bid Amount, (b) $2,600,000.00, (c) KW Fees, (d) Broker Fees, (e) Bank Breakup Fees, and (f) Bank Property Costs.

(j)     "KW Fees" means all amounts Bank has agreed to pay to KW in connection with the Auction, which are expected to be equal to the sum of the following amounts:

(i)     Actual third-party costs and expenses incurred by KW in connection with the marketing for the Auction, in accordance with a marketing budget approved by Bank, in its sole discretion, which costs and expenses shall not, in aggregate, exceed $30,500.00;

(ii)     A base fee in the amount of $125,000.00; and

(iii)     An incentive fee equal to either (A) 3% of the difference between the Accepted Bid Amount and $5,000,000.00 if an Accepted Bidder (as defined in the Auction Sale Agreement), other than Bank, purchases all of the Auctioned Property as described in this Agreement and the Auction Sale Agreement, or (B) $33,000.00 if Bank purchases the ADV Assets as described in this Agreement and the Auction Sale Agreement, which amount is equal to 3% of the difference between the Bank Credit Bid Amount and $5,000,000.00.

(k)     "Post-December Professional Fees" means the Professional Fees incurred from and after December 1, 2009.

(l)     "Pre-December Professional Fees" means the Professional Fees incurred after the petition date under the Bankruptcy and prior to December 1, 2009.

(m)     "Professional Fees" means the unpaid attorneys' fees and costs actually and reasonably charged by counsel to ADV in connection with the Bankruptcy, as approved by the Court.

(n)     "Property Taxes" means, collectively, (i) any and all general and special real property taxes and assessments (including, without limitation, delinquent, defaulted, and prorated taxes and assessments) levied against the Bank Property and ADV Property that are due or owed by the Bank and ADV Parties, respectively, under the applicable Purchase Agreement, and (ii)

any sale and/or use taxes that are due or owed by ADV Parties under the ADV Purchase Agreement (as defined in the Auction Sale Agreement) in connection with the sale of the ADV Assets.

(o)    "Purchase Agreements" shall have the meaning set forth in the Auction Sale Agreement.

(p)    "Title Costs" means the amounts Bank and ADV Parties are required to pay under the Purchase Agreements to any title company or title insurance company, or otherwise with respect to any title policy or title endorsement, or in connection with the recordation of any agreements, documents, or instruments with respect to the Bank Property and ADV Property.

(q)    "Transfer Taxes" means any and all city and county documentary transfer taxes paid by Bank and ADV Parties under any Purchase Agreement in connection with the sale and transfer of any of the Real Property.

6.2    Bank As Purchaser. As described in the Auction Sale Agreement, if either (a) none of the Bid Amounts (defined in the Auction Sale Agreement) is greater than the Minimum Overbid Amount, or (b) the Accepted Bidder (defined in the Auction Sale Agreement) does not purchase all of the Auctioned Property for any reason, other than a breach or default by Bank of the Bank Purchase Agreement (defined in the Auction Sale Agreement), then Bank shall purchase the ADV Assets pursuant to the ADV Purchase Agreement (as defined in the Auction Sale Agreement) by offsetting from the $6MM Loan an amount equal to the Bank Credit Bid Amount. Any amounts paid as damages by the Accepted Bidder under either or both of the Purchase Agreements (including, without limitation, any liquidated damages) shall be paid and allocated to Bank and not considered a reduction in indebtedness owed by any of the ADV Parties. In the event Bank purchases the ADV Assets as described in this Section 6.2, Bank shall be responsible to pay the KW Fees, Bank Breakup Fees, Title Costs, Escrow Costs, Transfer Taxes (to the extent owed), and the Professional Fees, subject to the limitations set forth in Section 6.4 of this Agreement. Seller and ADV Parties acknowledge that Bank shall not pay, and shall purchase the ADV Assets subject to, all outstanding Property Taxes to the extent due and payable by Bank following its acquisition of the ADV Assets.

6.3    Third Party As Purchaser. In connection with any Accepted Bidder purchasing the Auctioned Property, Bank and ADV Parties agree to divide, allocate, and pay the Accepted Bid Amount in the following manner and in the following order of priority:

(a)    All Escrow Costs and Title Costs arising from the Purchase Agreements shall be paid to the applicable Escrow Agents and Title Companies identified thereunder, and all Transfer Taxes shall be paid to the applicable public agencies.

(b)    Bank shall be paid an amount equal to (i) $6,100,000.00, which amount shall be allocated to a reduction in the indebtedness owed by ADV Parties under the $6MM Loan, plus (ii) $2,600,000.00, which amount shall be allocated to the sale of the Bank Property and not credited as a reduction in indebtedness under any of the Loans, plus (iii) the Bank Breakup Fees, and plus (iv) the Bank Property Costs.

(c)    The KW Fees will be paid to KW; provided, however, that any portion of the KW Fees paid in advance by Bank shall be paid to Bank;

(d)    If applicable, the Broker Fees will be paid to the cooperating broker representing the Accepted Bidder, if any;

(e)    The "Remaining Amount," if any, equal to the Accepted Bid Amount less the amounts allocated and paid as described in Sections 6.3(a), 6.3(b), 6.3(c), and 6.3(d), above shall be divided and paid as follows:

(i)    Thirty percent (30%) of the Remaining Amount will be paid to Bank in consideration for the sale of the Bank Property. Such amounts shall not be considered a reduction in the indebtedness owed by ADV Parties to Bank. From the amounts received by Bank under this Section 6.3(e)(i), Bank shall be responsible to pay all Property Taxes attributable to the Bank Property; and

(ii)    Seventy percent (70%) of the Remaining Amount will be allocated to the sale of the ADV Assets, and shall be paid in the following order of priority: (A) first to the appropriate governmental agencies to pay all Property Taxes owed in connection with the sale of the ADV Assets; provided, however, that if the amounts allocated to this Section 6.3(e)(ii)(A) are insufficient funds to pay all Property Taxes owed in connection with the sale of the ADV Assets, then such Property Taxes shall be paid pursuant to Section 6.3(a) above, but only to the extent of such deficiency, (B) second to Bank as a reduction of indebtedness owed by the ADV Parties until Bank has been indefeasibly paid in full for all principal, interest, costs, expenses, and other amounts owed to Bank in connection with all of the Loans, and (C) third to the Bankruptcy estate as directed by the Court.

6.4    Professional Fees.

(a)    If Bank purchases the ADV Assets as described in Section 6.2 of this Agreement, Bank will pay the Post-December Professional Fees to the appropriate parties up to a maximum amount of $150,000.00.

(b)    If the Accepted Bidder purchases the Auctioned Property, Bank will pay the Post-December Professional Fees and twenty-five percent (25%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $150,000.00; provided, however, that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the Loans, as described in Section 6.3(e)(ii)(B) of this Agreement, Bank shall instead pay seventy-five percent (75%) rather than twenty-five percent (25%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $200,000.00. To the maximum extent possible, all amounts paid by Bank pursuant to this Section 6.4(b) shall be paid from the amounts allocated to the Bank Property as described in Section 6.3(e)(i) of this Agreement. At Bank's election, Bank may pay the Professional Fees identified in this Section 6.4(b) directly from the Escrow identified and described in the Bank Purchase Agreement (defined in the Auction Sale Agreement).

(c)    If the Court does not grant the Bid Procedures Motion Approval and/or the Sale Motion Approval, Bank shall use commercially reasonable efforts to foreclose all of its security interest in and to the ADV Assets under applicable non-bankruptcy law in a commercially-reasonable period of time following the Bank's termination of this Agreement unless there is reasonable cause for Bank not to foreclose, including, by way of example but not limitation, the

discovery of material environmental contamination on the ADV Property or the imposition of an stay or injunction prohibiting the Bank from doing so. Notwithstanding any provision of this Agreement, including Section 1.1 of this Agreement, provided (i) the ADV Parties, and their attorneys, have provided genuine cooperation and diligent, good faith, and best efforts to obtain the Bid Procedures Motion Approval and the Sale Motion Approval, and (ii) the ADV Parties, and their attorneys, have not directly, indirectly, or collusively interfered with the Bank's efforts to foreclose upon any of the ADV Assets, within ten (10) days following the completion of the foreclosure sales of the ADV Assets, Bank shall pay the Post-December Professional Fees to the appropriate parties up to a maximum amount of $100,000.00.

      7.    <u>Representations and Warranties</u>. ADV Parties, and each of them, individually and collectively, jointly and severally, hereby make the following representations and warranties to Bank:

      7.1    Each of the ADV Parties that is an entity has been duly formed under the state in which it was organized and is in good standing and qualified to conduct business in the State of California. Each person executing this Agreement in a representative capacity has been duly authorized and empowered to do so.

      7.2    Subject to the Court granting the Bid Procedures Motion Approval and the Sale Motion Approval, ADV Parties, and each of them, have full legal right, power, and authority to enter into and perform its and their obligations under this Agreement and the Ancillary Documents (defined below). The execution and delivery of this Agreement and the Ancillary Documents by ADV Parties, and the consummation by ADV Parties of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action by, or on behalf of, each of ADV Parties, and do not (a) require any consent or approval not heretofore obtained, (b) result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others, or any encumbrance of any nature, (c) violate any provision of any laws, or of any order, writ, judgment, injunction, decree, determination, or award, or (d) result in a breach of, or constitute a default under, or cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement, or any other agreement, lease, or instrument to which any of ADV Parties is a party or by which any of their property or assets is bound or affected. The Loan Documents constitute legal, valid, and binding obligations of ADV Parties enforceable in accordance with their terms. Subject to the execution by ADV Parties, and the Court granting the Bid Procedures Motion Approval, the Auction Sale Agreement, the ADV Purchase Agreement (as defined in the Auction Sale Agreement), and any and all financing statements, assignments, agreements, reports, approvals, instruments, documents, and consents made in connection with and of the foregoing (collectively, the "<u>Ancillary Documents</u>"), constitute legal, valid, and binding obligations of ADV Parties enforceable in accordance with their terms.

      7.3    ADV Parties have received independent legal advice from attorneys of their choice with respect to the advisability of executing this Agreement and the Ancillary Documents, and prior to the execution of this Agreement and the Ancillary Documents, their attorneys reviewed this Agreement and the Ancillary Documents and made all desired changes. This Agreement and the Ancillary Documents have been carefully read, the contents hereof are known and understood, and it is signed freely, by ADV Parties, and each of them.

7.4     Except as expressly set forth in this Agreement and any of the Ancillary Documents, neither Bank nor any other person or entity has made any statement, representation, or promise to ADV Parties, or any of them, regarding facts relied upon by any of them.

7.5     This Agreement and the releases contained herein are intended to be final and binding against ADV Parties, and ADV Parties acknowledge that Bank is expressly relying on the finality of this Agreement as a substantial, material factor to induce Bank to enter into this Agreement.

7.6     Other than the Bankruptcy, and the matters set forth on <u>Schedule 1</u>, attached hereto and made a part hereof, there are no actions, suits, or proceedings pending or, to the knowledge of any of ADV Parties, threatened, against or affecting any of ADV Parties in relation to its or their obligations to Bank, or involving the validity or enforceability of this Agreement, the Loan Documents, or the Ancillary Documents, or the ability of any of them to perform their obligations to Bank under this Agreement, the Loan Documents, or the Ancillary Documents, or the priority of any liens thereof, at law or in equity, or before or by any governmental entity.

7.7     Subject to the limitations imposed at law as a result of the Non-Judicial Foreclosure of the $1MM Loan, Bank's security interests in the ADV Property, and any and all other security for the obligations evidenced by this Agreement, the Loan Documents, and the Ancillary Documents, are valid, perfected, and are not subject to avoidance, elimination, or reduction in any manner whatsoever.

7.8     ADV Parties acknowledge and agree that any amounts advanced or paid by Bank to KW in connection with the Auction Sale Agreement, or otherwise in connection with the Auctioned Property, shall be an advance under the $6MM Loan, secured by the $6MM DOT, $6MM Assignment, $6MM Security Agreement, and all other security interest, pledges, grants, and assignments made for the benefit of Bank under the $6MM Loan Documents. ADV shall be obligated to pay such amounts to Bank pursuant to the terms and conditions of the $6MM Loan Documents. However, claims for such advances shall not be treated as an administrative claim in the Bankruptcy.

7.9     The representations, warranties, and agreements set forth herein shall be cumulative, and in addition to any and all other representations, warranties, and agreements which ADV Parties gave, or cause to be given, to Bank, either now or hereafter.

7.10     All covenants, representations, and warranties of ADV Parties herein are incorporated by reference and hereby made a part of the Loan Documents.

7.11     ADV is the sole owner of all right, title, and interest in and to all of the ADV Assets, and D. MacAdam, C. MacAdam, and Sweetwater have no right, title, or interest therein or thereto.

7.12     D. MacAdam, C. MacAdam, and Sweetwater each represent and warrant to Bank that he, she, or it has reviewed the representations and warranties being made by ADV in the ADV Purchase Agreement, and to the best of his, her, or its knowledge and belief, no representation or warranty made by ADV in the ADV Purchase Agreements is false or misleading in any material respect.

8.      Reservation of Rights.  Except as otherwise expressly provided in this Agreement, Bank specifically reserves all of its rights, interests, and remedies, regardless of whether such rights, interests, or remedies have been undertaken prior to the date hereof, or may be undertaken following the date hereof, at law and in equity, or otherwise, with respect to, in connection with, or relating to this Agreement, the Loan Documents, the Ancillary Documents, and any other agreements, instruments, facts, or matters pertaining or relating to any of the foregoing.  This reservation of rights is not intended, and shall not be construed, as exclusive.  Without limiting the generality of the foregoing, (a) Bank reserves all rights and remedies, and does not waive, and this Agreement shall not be deemed as a cure or waiver of, the Existing Defaults, (b) Bank shall not be required to take any action, or refrain from taking any action, in respect of the Bankruptcy, and (c) Bank shall not be restrained or prevented, or required to delay or refrain, from taking any action (or failing to take any action) with respect to (i) any matter related to any judicial or non-judicial foreclosure of any of the ADV Property, (ii) any foreclosure of any other collateral or security interest granted, pledged, assigned, or otherwise made under this Agreement or any of the Loan Documents, or (iii) any other right, interest, or remedy available to Bank under the Loan Documents, or otherwise at law or in equity, all such rights, interests, and remedies being expressly reserved hereby.

9.      No Joint Venture, Management, or Control.  Notwithstanding any provision of this Agreement, the Loan Documents, the Ancillary Documents, or the Purchase Agreements to the contrary:  (a) Bank is not, and shall not be, construed to be a partner, joint venture, alter ego, manager, controlling person, or other business associate or participant of any kind of ADV Parties, or any of them, or any other person or entity; (b) Bank shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of ADV Parties, or any of them; and (c) ADV Parties do not have any claims, causes of action, or defenses to their obligations to Bank based on any allegations of management or control exercised by Bank.  Each of ADV Parties acknowledge and agree that Bank does not manage or control it in any way.

10.     Release of Bank.

10.1    Effective as of the Effective Date, and except for the obligations of Bank hereunder, ADV Parties, and each of them, each on behalf of itself, and each of its and their successors and assigns, and each of its and their past and present attorneys, accountants, representatives, affiliates, parents, partners, shareholders, officers, directors, managers, and employees (individually and collectively, "Releasor"), jointly and severally, shall and do hereby forever relieve, release, and discharge Bank, and its successors and assigns, and each of its and their past and present attorneys, accountants, representatives, affiliates, parents, partners, officers, directors, employees, managers, and shareholders (the "Released Parties") from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions, and causes of actions, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, including, without limitation, by reason of any acts, facts, transactions, or any circumstances whatsoever occurring or existing through the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Loan Documents, or the provisions of this Agreement, the Auction Sale Agreement, the Purchase Agreements, or the other Ancillary Documents, the facts pertaining to this Agreement, the Auction Sale Agreement, the Purchase Agreements, Loan Documents, or any of the other Ancillary Documents, any collateral granted to Bank in connection with Loan Documents, any other

obligations of any of Releasor owed to Bank, or the lending arrangements between Bank and any Releasor.

10.2    Releasor, and each of them, expressly waive and release any right or benefit which it has, or may have, under Section 1542 of the California Civil Code, or any similar statute, code, law, and/or regulation of the United States, or any state thereof, to the full extent that it may waive all such rights and benefits pertaining to the matters released herein.  Section 1542 of the California Civil Code provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

10.3    In connection with each such waiver and relinquishment set forth herein, Releasor, and each of them, acknowledge that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to, or different from, those which it now knows or believes to be true.  Nevertheless, it is the intention of Releasor, and each of them, through this Agreement, to fully, finally, and forever release, waive, and relinquish all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed.  In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

10.4    In entering into the release provided for in this Agreement, Releasor, and each of them, recognize that no facts or representations are ever absolutely certain, and Releasor, and each of them, assumes the risk of any mistake.  If Releasor should subsequently discover that any understanding of the facts or of the law was incorrect, Releasor shall not be entitled to set aside this release by reason thereof, regardless of any mistake of fact or law.

10.5    Releasor, and each of them, is the sole and lawful owner of all right, title, and interest in and to every claim and other matter which it purports to release herein, and it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released.  Releasor, individually and jointly, shall and hereby does indemnify, defend, and hold the Released Parties harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys' fees), based upon, or arising in connection with, any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

11.    Intentionally Omitted.

12.    <u>Miscellaneous</u>.

12.1    <u>No Waiver</u>.  This Agreement is not a novation, nor is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan Documents, except as expressly set forth herein.  No failure or delay on the part of Bank in the exercise of any right, power, or privilege hereunder, or under the documents or instruments referred

to herein, shall operate as a waiver hereof or thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

12.2    Survival of Warranties. All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

12.3    Applicable Law. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed in accordance with, the laws of the State of California. ADV Parties, and each of them, and Bank hereby submit to the jurisdiction of the Court regarding any disputes arising under this Agreement, the Auction Sale Agreement, the Purchase Agreements, and any Ancillary Documents.

12.4    Assignability. This Agreement shall be binding upon and inure to the benefit of Bank and ADV Parties, and their respective successors and assigns, except that none of ADV Parties' rights hereunder are assignable, and none of ADV Parties' obligations hereunder are delegable, without the prior written consent of Bank, which consent may be granted or withheld in Bank's sole and absolute discretion. If Bank assigns any of its rights hereunder, including, without limitation, in connection with the sale of the Loans, Bank shall require the assignee thereof (the "Bank Assignee") to assume the obligations of Bank hereunder. Following such assumption by the Bank Assignee, Bank shall be released from all of its obligations hereunder and all documents, instruments, and agreements executed in connection herewith, and ADV Parties shall look solely to Bank Assignee in respect of the obligations of Bank hereunder and all documents, instruments, and agreements executed in connection herewith.

12.5    Attorneys' Fees and Costs. The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

12.6    Modifications and Amendments. This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

12.7    Severability. If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable. This Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision, or by severance from this Agreement.

12.8    Acknowledgment of Waiver. The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing, and with an understanding of their significance and consequence, and that they are reasonable.

12.9    Headings. The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

12.10   Time of Essence. The parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

12.11   Execution in Counterpart. This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.

12.12   Conflict. To the extent that any term, provision, or condition of any of the Loan Documents conflicts with this Agreement, the term, provision, or condition of this Agreement shall control.

12.13   Neutral Interpretation. This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

12.14   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY

SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

_____        _____        _____
Bank Initials          ADV Initials           D. MacAdam Initials


_____        _____
C. MacAdam Initials    Sweetwater Initials

     12.15  Notices.  Any notice required to be given hereunder shall be given at the address for each respective party as provided in the Loan Documents. Any notice given by U.S. mail shall be deemed given no later than three (3) days after placed in the U.S. mail; any notice given by facsimile, messenger, or hand delivery, when sent; and any notice by overnight mail service such as FedEx, the following day.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**ADV Parties:**

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Title: _____


_____
DONAL J. MACADAM, an individual


_____
CATHERINE P. MACADAM, an individual


SWEETWATER VINEYARDS, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

**BANK:**

WESTERN COMMERCIAL BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

**EXHIBIT A**
**TO AGREEMENT TO SELL PROPERTY**

**COURT APPROVAL**
[SEE ATTACHED]

**TO FOLLOW**

**EXHIBIT B**
**TO AGREEMENT TO SELL PROPERTY**

**AUCTION SALE AGREEMENT**
[SEE ATTACHED]

## AUCTION SALE AGREEMENT

This AUCTION SALE AGREEMENT ("Agreement") is made this _____ day of _____, 2010 ("Effective Date"), by and among (a) WESTERN COMMERCIAL BANK, a California banking corporation ("Bank"), (b) AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D. MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), and SWEETWATER VINEYARDS, LLC, a California limited liability company ("Sweetwater", and together with ADV, D. MacAdam, and C. MacAdam, individually and collectively, "ADV Parties"), and (c) KENNEDY WILSON AUCTION GROUP INC., a California corporation ("KW"), with respect to the following facts:

## RECITALS

A.      ADV Parties are the owners of that certain business which, among other things, consists of a winery, vineyard, and gift shop (the "Business") located at or near 9640 Sierra Highway, Agua Dulce, California, as further described on Exhibit A-1, attached hereto and made a part hereof (the "ADV Property").

B.      ADV, D. MacAdam, and C. MacAdam are the debtor in those certain bankruptcy proceedings, styled as *In re Agua Dulce Vineyards, LLC, a California limited liability company*, Case No. 1:09-bk-15207-MT, and *In re Catherine P. MacAdam and Donal J. MacAdam*, Case No. 1:09-bk-17476-MT (collectively, the "Bankruptcy"), filed in the United States Bankruptcy Court, Central District of California, San Fernando Valley Division (the "Court").

C.      Bank is a secured creditor in the Bankruptcy, having heretofore made four separate loans (collectively, the "Loans") to ADV, as further described in that certain Agreement To Sell Property and Assets, dated _____, 2010, by and between Bank and ADV Parties (the "Agreement To Sell Property And Assets").

D.      Bank is the grantee under that certain Trustee's Deed Upon Sale, dated September 28, 2009, and recorded on October 8, 2009, in the Official Records of Los Angeles County, California, as Instrument Number 2009-1532940 ("Trustee's Deed"), with respect to that certain vacant land described on Exhibit A-2, attached hereto and made a part hereof (the "Bank Property" and together with the ADV Property, the "Real Property").

E.      KW provides brokerage and auction services in connection with sale and auctioning of real property and other assets.

F.      In an effort to resolve Bank's claims in the Bankruptcy, and to maximize the value received from the sale of the Auctioned Property (defined below), Bank and ADV Parties have agreed, pursuant and subject to the terms and conditions of this Agreement, (i) to jointly offer, with the assistance of KW, the Auctioned Property for sale to Qualified Bidders (defined below), and (ii) if no Qualified Bids (defined below) are received for the Auctioned Property in excess of the Minimum Overbid Amount (defined below), Bank shall purchase the ADV Assets from the ADV Parties pursuant to the terms and conditions of the ADV Purchase Agreement (defined below).

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

1.1    "Accepted Bid" means the Bid accepted by Bank and ADV Parties to purchase the Auctioned Property pursuant to the Auction.

1.2    "Accepted Bid Amount" means the Bid Amount of the Accepted Bid.

1.3    "Accepted Bidder" means the Qualified Bidder that made the Accepted Bid.

1.4    "ADV Assets" means all Assets (as defined in the ADV Purchase Agreement) of ADV Parties being sold, assigned, and conveyed under the ADV Purchase Agreement.

1.5    "ADV Purchase Agreement" means that certain Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards], attached hereto as Exhibit C, and made a part hereof.

1.6    "Auction" means the terms, conditions, and procedures describing and governing the purchase and sale of the Auctioned Property pursuant to a sealed-bid auction, in compliance with the terms and conditions of this Agreement and all other agreements related hereto and/or referenced herein.

1.7    "Auction Estimate Range" shall mean $10,000,000 to $15,000,000, which is the range of prices agreed to by the parties that KW will disclose to the Potential Bidders as the estimated range of prices for the Auctioned Property.

1.8    "Auctioned Property" means, collectively, the Bank Property and the ADV Assets.

1.9    "Bank Credit Bid Amount" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.10    "Bank Property" means all of the real and personal property of Bank being sold, assigned, and conveyed under the Bank Purchase Agreement.

1.11    "Bank Purchase Agreement" means that certain Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], attached hereto as Exhibit B, and made a part hereof.

1.12    "Bid" means a sealed, written bid from a Qualified Bidder offering to purchase the Auctioned Property pursuant to the terms and conditions of the Auction, together with (a) such written documentation demonstrating that the Person submitting the Bid is a Qualified Bidder, and (b) two (2) originals of both Purchase Agreements, executed by the Qualified Bidder,

containing any modifications or comments to any Purchase Agreement, if any. A Bid, if selected as the Accepted Bid, shall be paid in cash or other immediately available federal funds, in accordance with the Bank Purchase Agreement and the ADV Purchase Agreement.

1.13    "Bid Amount" means the amount that a Qualified Bidder offers to pay to purchase the Auctioned Property pursuant to its Bid.

1.14    "Bid Submission Date" means the date the first Business Day following the expiration of the Marketing Period.

1.15    "Broker Fees" means amounts owed to any cooperating broker that represents the Accepted Bidder; provided, however, that (a) no Broker Fees shall be paid unless the Accepted Bidder actually purchases all of the Auctioned Property pursuant to the Purchase Agreements, and (b) the total amount of the Broker Fees shall not exceed one and one-half percent (1.5%) of the Accepted Bid Amount.

1.16    "Business Day" means any day other than a Saturday, Sunday, or a California or federal holiday.

1.17    "Due Diligence and Confidentiality Agreement" means that certain form of Due Diligence and Confidentiality Agreement, attached hereto as Exhibit D, and made a part hereof.

1.18    "Escrow Agent" means the escrow officer identified in each Purchase Agreement.

1.19    "KW Fees" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.20    "Marketing Period" shall mean the time period commencing as soon as possible following the date hereof, but in no event later than May 10, 2010, and continuing for thirty (30) calendar days thereafter.

1.21    "Minimum Overbid Amount" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.22    "Notice of Offering Letter" shall mean a letter to Potential Bidders prepared by KW, and approved by Bank and ADV Parties, describing the sale of the Auctioned Property, the procedures for the Auction, and the Auction Estimate Range. In the event of any inconsistencies between the provisions of the Notice of Offering Letter and this Agreement, the provisions of this Agreement shall control.

1.23    "Person" means an individual, corporation, limited liability company, partnership, joint venture, trust, or unincorporated organization.

1.24    "Potential Bidders" means any Person that is interested, or may be interested, in submitting a Bid under the Auction.

1.25  "Property Information" means all agreements, instruments, reports, analysis, studies, statements, explanations, documents, and other written information (including, without limitation, such information described on Exhibit E, attached hereto and made a part hereof), to the extent such information is the in possession of the parties hereto, with respect to the Auctioned Property made available to Potential Bidders that have executed a Due Diligence and Confidentiality Agreement during the Marketing Period and Bank.

1.26  "Purchase Agreement" means, individually and collectively, the Bank Purchase Agreement and the ADV Purchase Agreement.

1.27  "Qualified Bidder" shall mean a Person, other than Bank, that:

(a)    Has submitted a Bid to purchase the Auctioned Property pursuant to the Auction;

(b)    Has provided reasonably-detailed, credible, written evidence verifying its ability to pay the applicable Bid Amount, in cash or other immediately available funds, which such evidence may include, without limitation, (i) statements of third-party deposit account balances showing readily-available, liquid funds in the excess of the Bid Amount, (ii) letters of credit or unconditional commitment letters from banks, credit unions, or other financial institutions, and/or (iii) other written information demonstrating that the Qualified Bidder has the financial ability to pay the Bid Amount pursuant to the Purchase Agreements; and

(c)    Is otherwise ready, willing, and permitted to purchase the Auctioned Property pursuant to the Purchase Agreements.

1.28  "Seller" means, individually and collectively, Bank, with respect to the Bank Purchase Agreement, and ADV Parties, with respect to the ADV Purchase Agreement.

2.    Property Information.

2.1  Property Information. Commencing prior to the date hereof, and continuing from time to time until the Bid Submission Date, Bank shall, with respect to the Bank Property, and ADV Parties shall, with respect to the ADV Assets, each at their own cost, deliver the Property Information to KW, and otherwise assist KW in collecting such Property Information as KW reasonable determines to be necessary to conduct the Auction. Without limiting the generality of the foregoing, during the Marketing Period, ADV shall reasonably cooperate with KW to provide updated financial information with respect to the ADV Assets for release and distribution to Potential Bidders and Bank.

2.2  Contracts. Commencing on or before the Effective Date, and continuing through the Marketing Period, ADV Parties shall permit Bank and Potential Bidders to contact all counterparties to, and otherwise make available to Bank and Potential Bidders such information with respect to, any and all Contracts (as defined in the ADV Purchase Agreement) for purposes of, among other things, (a) determining and/or confirming the terms and conditions of such Contracts, including, but not limited to, any limitations with respect to the assignment of such Contracts, (b) identifying any breaches or defaults, and the requirements to cure any breaches or defaults, under the Contracts, (c) negotiating terms upon which the assignment and/or assumption of the Contracts shall

occur, and (d) otherwise determining the value and benefit of such Contracts to Bank and the Potential Bidders. In connection with the foregoing, following the Effective Date, Bank shall determine, in Bank's sole and absolute discretion, (i) which, if any, Contracts Bank will take an assignment from ADV Parties if Bank purchases the ADV Assets as described in Section 5.2 of this Agreement ("Bank Assumed Contracts"), and (ii) what amounts, if any, Bank will pay to cure any breaches or defaults by any of the ADV Parties under the Bank Assumed Contracts. All Bank Assumed Contracts, and all amounts Bank has agreed to pay to cure any breaches or defaults thereunder, shall be set forth on Schedule 2 attached to the ADV Purchase Agreement. All Potential Bidders shall be required to assume the Bank Assumed Contracts, and pay the amounts that Bank has elected to pay to cure any breaches or defaults thereunder. Bank and/or Potential Bidders shall be permitted to enter into written agreements with the counterparties to the Contracts (including, without limitation, the Bank Assumed Contracts) with respect to the matters described in this Section 2.2. Any assumption and assignment of the Bank Assumed Contracts or other Contracts shall be subject to the Sale Motion Approval, as defined and described in the Agreement To Sell Property And Assets.

2.3    Other Liens. Commencing on or before the Effective Date, ADV Parties shall notify Bank of all Persons other than Bank (the "Other Lienholders") that hold any liens, encumbrances, pledges, collateral assignments, and/or security interests, including, without limitation, pursuant to the Uniform Commercial Code (the "Other Liens"), with respect to any of the ADV Assets, including, without limitation, with respect to any equipment owned or leased by any of the ADV Parties. ADV Parties hereby authorize Bank to contact the Other Lienholders, and Bank may, at its option and in its sole and absolute discretion, negotiate and/or reach an agreements (each a "Lien Agreement") with any of the Other Lienholder with respect to the disposition of any of the Other Liens, subject to the condition that Bank acquires the ADV Assets as described in Section 5.2 of this Agreement, and provided that such Lien Agreement does not create any new claim against, or obligation for, the ADV Parties or the Bankruptcy estates. Bank may, in its discretion, make the Potential Bidders the beneficiaries of all rights of Bank under any of the Lien Agreements subject to the condition that a Potential Bidder is the Accepted Bidder and purchases all of the Auctioned Property as described in Section 5.1 of this Agreement, in which event Bank may make the applicable Lien Agreements available to Potential Bidders as a Property Information hereunder.

2.4    Future Services. As part of the Property Information, ADV Parties may, in its or their discretion, make written offers to (a) provide consulting and/or employment services to the Accepted Bidder following the sale of the Auctioned Property, and/or (b) lease some or all of the Real Property from the Accepted Bidder following the consummation of the sale of the Auctioned Property; provided, however, that (i) no Potential Bidder shall be obligated to accept any such offer of consulting or employment services from, or lease any of the Real Property to, any of the ADV Parties as a condition to making its Bid, and (ii) KW shall inform the Potential Bidders that the acceptance or rejection, in whole or in part, of any such offer of consulting or employment services or lease shall have no bearing on whether any Bid is accepted as the Accepted Bid.

2.5    Estoppel Certificates.

(a)    Bank and ADV Parties shall cause all Persons (other than the ADV Parties) that lease, license, rent, or otherwise occupy or use any portion of the Auctioned Property ("Tenants") to execute, and deliver as Property Information hereunder, an estoppel certificate

acknowledging that that such Tenant's rights to occupy and/or use the Auctioned Property shall terminate thirty (30) calendar days following the effective dates of the Purchase Agreements (as applicable), unless otherwise agreed by Bank or the Accepted Bidder, in the event that Bank or the Accepted Bidder, respectively, purchases the ADV Assets or Auctioned Property, respectively, pursuant to Section 5 of this Agreement.

(b)     ADV Parties shall execute, and deliver as Property Information hereunder, an estoppel certificate acknowledging that all of their rights to occupy and/or use the Auctioned Property shall terminate ninety (90) calendar days following the effective date of the Purchase Agreements (as applicable), unless otherwise agreed by Bank or the Accepted Bidder, in the event that Bank or the Accepted Bidder, respectively, purchases the ADV Assets or Auctioned Property, respectively, pursuant to Section 5 of this Agreement.

(c)     All estoppel certificates to be executed and delivered pursuant to this Section 2.5 shall be in form and content acceptable to Bank, in its reasonable opinion and judgment.

3.     Marketing Period.

3.1     Solicitation Efforts.  The parties desire to solicit as many Potential Bidders, and to receive as many Bids, to purchase the Auctioned Property as possible.  Accordingly, during the Marketing Period, KW will undertake the following:

(a)     Deliver the Notice of Offering Letter to as many Potential Bidders as possible;

(b)     List and advertise the Auctioned Property for sale at the Auction Estimate Range of prices on various internet sites, and with various brokerage and/or listing services, that list and offer for sale real property and assets, similar to the Auctioned Property; and

(c)     Submit advertisements for the sale of the Auctioned Property at the Auction Estimate Range of prices in various trade or industry newspapers and other print media.

At the request of Bank or ADV Parties, KW shall provide a description of the individuals and entities solicited with respect to the sale of the Auctioned Property during the Marketing Period.

3.2     KW Assistance.  KW shall provide reasonable assistance to Potential Bidders to enable such Potential Bidders to review, inspect, and evaluate the Auctioned Property during the Marketing Period.  Without limiting the generality of the foregoing, during the Marketing Period, KW shall:

(a)     Make the Property Information available to such Potential Bidders that have completed, executed, and delivered to KW a Due Diligence and Confidentiality Agreement and to Bank;

(b)     Coordinate with Bank and ADV Parties to permit Potential Bidders to access the Real Property and the ADV Assets for purposes of conducting site visits; and

(c)     Receive written questions from the Potential Bidders with respect to the Auctioned Property and the Auction, seek answers to the same from Bank and ADV Parties, and provide written answers to such questions, as approved by Bank and ADV Parties, to all Potential Bidders.

4.      Bids.

4.1     Receipt. KW will require all Potential Bidders to submit their Bids to KW on or before the Bid Submission Date, time being of the essence with respect thereto. KW may, in its reasonable discretion, (a) advise Qualified Bidders, who submit Bids prior to the Bid Submission Date with Bid Amounts that are less than the Minimum Overbid Amount, that such Bid Amounts are less than the Minimum Overbid Amount and will not be accepted, and that a higher amount may be submitted prior to the Bid Submission Date, and (b) extend the Bid Submission Date for any Bid that is not received by the Bid Submission Date if the reason for such failure was beyond the reasonable control of the applicable Potential Bidder.

4.2     Qualification. KW shall review each Bid to determine if the Person submitting the Bid is a Qualified Bidder. If, in KW's reasonable determination, the Person submitting the Bid appears to be a Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may notify such Person and provide a one-time opportunity to submit additional information demonstrating that it is a Qualified Bidder. KW acknowledges that the Bank and ADV Parties consider the prompt payment of the Accepted Bid Amount, in cash or other immediately available funds, under each Purchase Agreement to be a critical component of the Auction, and accordingly, KW agrees to carefully inspect and review the financial qualifications of each Person submitting a Bid under the Auction. Bids from all Persons that are not Qualified Bidders shall be set aside and not evaluated or considered further in the Auction.

4.3     Bids.

(a)     KW Review. KW shall review and evaluate the Bids submitted by Qualified Bidders under the Auction, and provide a summary and analysis of the same to Bank and ADV Parties within one (1) Business Day after the Bid Submission Date.

(b)     PSA Comments. If as part of its Bid, any Qualified Bidder requests any insertions, deletions, or other modifications to either Purchase Agreement ("PSA Comments"), such Bid shall be considered non-conforming, unless and until such PSA Comments are approved by the applicable Seller. At the request of the applicable Seller, KW shall notify the Qualified Bidder as to which PSA Comments, if any, are approved by the applicable Seller and permit the Qualified Bidder to revise, amend, or withdraw its Bid with respect thereto.

(c)     Accepted Bid. Bank and ADV Parties shall review the summary of the Bids prepared by KW. Unless Bank and ADV Parties otherwise agree, and direct KW, in writing to the contrary:

(i)     If only one (1) Qualified Bidder submits a Bid in excess of the Minimum Overbid Amount, then such Bid shall be deemed the Accepted Bid.

(ii)    If more than one Qualified Bidder submit Bids in excess of the Minimum Overbid Amount, then following Bank's and ADV Parties' review of the submitted Bids, Bank and ADV Parties shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Auctioned Property (the "Live Auction"). In respect of the Live Auction, (A) all Qualifies Bidders that submitted Bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (B) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and ADV Parties agree that KW's services shall not be required for the Live Auction, (C) the Live Auction shall be held at the location agreed upon by Bank and ADV Parties, with the Court, the ADV Property, and the offices of the ADV Parties' attorneys being approved locations for the Live Auction, and (D) all other matters with respect to the Live Auction shall be agreed to by Bank and ADV Parties, with the advice and input from KW. The Qualified Bidder submitting the highest Bid Amount in excess of the Minimum Overbid Amount at the Live Auction shall be the Accepted Bid.

(iii)    Notwithstanding any provision of this Agreement to the contrary, if none of the Bid Amounts submitted by Qualified Bidder is greater than the Minimum Overbid Amount, then no Bid shall be selected as the Accepted Bid, and Bank shall purchase the ADV Assets as described in Section 5.2 of this Agreement.

5.    Sale of Auctioned Property.

5.1    Sale to Accepted Bidder. If an Accepted Bidder is identified pursuant to Section 4 of this Agreement, following all requisite approval by the Court, each Seller shall promptly sign and date the applicable Purchase Agreement submitted by the Accepted Bidder, deliver the same to Escrow Agent, and consummate the sale of the Auctioned Property pursuant to the terms and conditions of the Purchase Agreements. The Accepted Bid Amount shall be divided, allocated, and paid pursuant to Section 6 of the Agreement To Sell Property And Assets.

5.2    Sale to Bank. If no Accepted Bidder is identified pursuant to Section 4 of this Agreement, or if an Accepted Bidder does not purchase all of the Auctioned Property for any reason, other than a breach or default of the Bank Purchase Agreement by Bank, (a) Bank shall continue to own, and not sell the Bank Property, and (b) Bank and ADV Parties shall enter into the ADV Purchase Agreement, and consummate the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV Purchase Agreement for a purchase price equal to the Bank Credit Bid Amount. For sake of clarity, and as set forth in the ADV Purchase Agreement, Bank shall not make a payment of the Bank Credit Bid Amount to ADV Parties under the ADV Purchase Agreement, but instead, Bank shall offset the Bank Credit Bid Amount from amounts owed by ADV Parties to Bank under the Loans effective as of the date Bank takes title to the ADV Assets.

6.    Intentionally Omitted.

7.    Miscellaneous.

7.1    No Waiver. No failure or delay on the part of any party in the exercise of any right, power, or privilege hereunder, or under the documents or instruments referred to herein, shall operate as a waiver hereof or thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

7.2 <u>Survival of Warranties</u>. All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

7.3 <u>Applicable Law</u>. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed in accordance with, the laws of the State of California. ADV Parties, and each of them, Bank, and KW hereby submit to the jurisdiction of the Court regarding any disputes arising under this Agreement.

7.4 <u>Assignability</u>. This Agreement shall be binding upon and inure to the benefit of Bank, ADV Parties, KW, and their respective successors and assigns; provided, however, that no party hereto may assign any rights, or delegate any obligations, to any other person or entity without the prior, written consent of the other parties.

7.5 <u>Attorneys' Fees and Costs</u>. The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

7.6 <u>Modifications and Amendments</u>. This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

7.7 <u>Integration</u>. This Agreement constitute the entire agreement of the parties hereto relative to the subject matter hereof. No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Agreement.

7.8 <u>Severability</u>. If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable. This Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision, or by severance from this Agreement.

7.9 <u>Acknowledgment of Waiver</u>. The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing, and with an understanding of their significance and consequence, and that they are reasonable.

7.10 <u>Headings</u>. The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

7.11 <u>Time of Essence</u>. The parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

7.12    Execution in Counterpart. This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.

7.13    Neutral Interpretation. This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

7.14    WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION    SHALL    BE    DECIDED    BY    COURT    TRIAL    WITHOUT    A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN

EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR
RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING
THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF
SUCH JURY TRIAL WAIVER.

| _____ | _____ | _____ |
|---|---|---|
| Bank Initials | ADV Initials | D. MacAdam Initials |

| _____ | _____ | _____ |
|---|---|---|
| C. MacAdam Initials | Sweetwater Initials | KW Initials |

7.15    Notices.  Any notice, request, or demand required or permitted by this
Agreement to be given by any party hereto shall be deemed delivered if (a) transmitted by telecopier
or similar facsimile transmission to the telecopier number of the receiving party specified below,
with original copy thereof to be deposited within twenty-four (24) hours after such transmission in
the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address
specified below; (b) deposited in the U.S. Mail, first class postage prepaid, and addressed to the
receiving party at the address specified below; (c) deposited with a reputable overnight private
commercial delivery service and addressed to the receiving party at the address specified below; or
(d) given by personal delivery, by the party giving notice directly or through commercial messenger
or courier service, at the receiving party's address specified below.  If notice is given by deposit in
the U.S. Mail as herein provided, delivery shall not be deemed to be effective until forty-eight (48)
hours after such deposit; if deposited with an overnight courier or delivery service as herein provided
prior to any applicable deposit deadline for guaranteed overnight delivery, delivery shall be deemed
effective twenty-four (24) hours after such deposit; if transmitted by telecopier or personal delivery,
delivery shall be deemed to be effective upon receipt, if transmitted or delivered during normal
business hours of the receiving party, otherwise on the next business day of the receiving party.  No
notice of termination shall impair the rights or priorities of any party created or acquired prior to the
receipt of such notice.

For Bank:
      WESTERN COMMERCIAL BANK

      _____

      Attention: _____
      Facsimile No.: (_____) _____

With a copy to:
      FRANDZEL ROBINS BLOOM & CSATO, L.C.
      6500 Wilshire Blvd., 17th Floor
      Los Angeles, CA 90048-4920
      Attention: Ken R. Russak, Esq.
      Facsimile No.: (323) 658-9620

For ADV Parties:
      AGUA DULCE VINEYARDS LLC
      9640 Sierra Highway

Agua Dulce, CA  91390
Attention:  Catherine P. MacAdam
Facsimile No.:  (661) 268-7450

With a copy to:

LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
10250 Constellation Blvd, Suite 1700
Los Angeles, CA  90067
Attention:  Martin J. Brill, Esq.
Facsimile No.:  (310) 229-1244

For KW:

KENNEDY WILSON AUCTION GROUP INC.

_____
_____
Attention: _____
Facsimile No.:  (____) _____

With a copy to:

_____
_____
_____
Attention: _____
Facsimile No.:  (____) _____

Any party may change its address for purposes of this Section upon delivery to the other party of a notice of a change of address in the manner provided for notices hereunder.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**ADV Parties:**

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

By: _____
        DONAL J. MACADAM, an individual


By: _____
        CATHERINE P. MACADAM, an individual

SWEETWATER VINEYARDS, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

**BANK:**

WESTERN COMMERCIAL BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

**KW:**

KENNEDY WILSON AUCTION GROUP INC.
a California corporation

By: _____
Name: _____
Title: _____

**EXHIBIT A-1**
**TO AUCTION SALE AGREEMENT**

**ADV PROPERTY**

[TO BE INSERTED]

**TO FOLLOW**

**EXHIBIT A-2**
**TO AUCTION SALE AGREEMENT**

**BANK PROPERTY**
[TO BE INSERTED]

**TO FOLLOW**

**EXHIBIT B**
**TO AUCTION SALE AGREEMENT**

**BANK PURCHASE AGREEMENT**
[SEE ATTACHED]

## PURCHASE AND SALE AGREEMENT
## AND JOINT ESCROW INSTRUCTIONS
### [Western Commercial Bank Property]

This PURCHASE AND SALE AGREEMENT AND JOINT ESCROW INSTRUCTIONS (this "Agreement") is made and entered into this ___ day of _____, 2010 ("Effective Date"), by and between WESTERN COMMERCIAL BANK, a California banking corporation ("Seller"), and the undersigned party identified on the signature page hereto as the "Buyer", with respect to the following facts:

A.    Seller is the grantee under that certain Trustee's Deed Upon Sale, dated September 28, 2009, and recorded in the Official Records of Los Angeles, California, on October 8, 2009, as Instrument Number 2009-1532940 (the "Trustee's Deed"). The Trustee's Deed describes certain real property located in the County of Los Angeles, State of California, and legally described on Exhibit A, attached hereto and incorporated herein by this reference (hereinafter sometimes referred to as the "Real Property").

B.    Seller is selling the Property (hereinafter defined) pursuant to a sealed-bid auction, and has received multiple offers to purchase the Property from various parties. Buyer desires to purchase all of Seller's right, title, and interest in and to the Property, and is offering to purchase the Property, upon and subject to the covenants, terms, and conditions contained in this Agreement, as evidenced by Buyer's execution and delivery of this Agreement to Seller. This Agreement shall not be binding upon either Buyer or Seller unless Seller, in its sole and absolute discretion, accepts Buyer's offer to purchase the Property by executing and delivering this Agreement to Escrow Agent (defined below). If, for any reason, Seller does not execute or deliver this Agreement to Escrow Agent, Seller shall not have accepted, or be deemed to have accepted, Buyer's offer to purchase the Property pursuant to this Agreement, and neither Buyer nor Seller shall be bound by any term, covenant, or obligation set forth in this Agreement.

## AGREEMENT

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Purchase and Sale. Upon and subject to the covenants and conditions hereinafter provided, and all exceptions, exclusions, and reservations hereunder, Seller hereby agrees to sell, convey, and transfer to Buyer, and Buyer agrees to purchase, acquire, and accept from Seller, any and all of Seller's right, title, and interest in and to the following described property (hereinafter collectively called the "Property"):

1.1    Land. All that certain land (the "Land") located in the County of Los Angeles, State of California, comprising a portion of the Real Property described on Exhibit A, attached hereto and made a part hereof.

1.2    Easements. All easements, if any, benefiting the Land or the Improvements (as hereinafter defined).

1.3    Rights and Appurtenances. All rights and appurtenances pertaining to the Land, including any right, title, and interest of Seller in and to adjacent streets, alleys, or rights-of-way, and any and all appurtenant water rights, to the extent constituting real property

     1.4    <u>Improvements</u>. All improvements and related amenities (the "<u>Improvements</u>") in and on the Land, if any.

     1.5    <u>Tangible Personal Property</u>. To the extent owed by Seller, any machinery, equipment (including, without limitation, all pumps, pumping facilities, purification and filtration equipment, mains, pipes, fire cisterns, basins, fountains, troughs, meters, wells, hydrants, equipment, machinery, tools, dies, spare parts, materials, water supplies, fixtures and improvements, construction in progress, jigs, molds, patterns, gauges and production fixtures, and other equipment related to any water system located on the Real Property, and/or used in connection with the Property, the "<u>Water System</u>"), tools, parts, supplies, appliances, fixtures, furniture, carpets, drapes, farm products, crops (whether grown, growing, or to be grown), seeds, fertilizer, products of crops, vines, grapes, wines and juices (however stored, including, without limitation, bottled, in tanks, or in barrels), work in process, water rights (to the extent considered personal property), and other personal property, if any, located on or about the Real Property.

     1.6    <u>Intangible Property</u>. To the extent assignable without the consent of third parties, all intangible property (the "<u>Intangible Property</u>"), if any, owned by Seller and pertaining to the Land, the Improvements, or the Tangible Personal Property including, without limitation, transferable utility contracts, transferable telephone exchange numbers, plans and specifications, engineering plans and studies, warranties, entitlements and government approvals, floor plans, landscape plans, licenses, trade names, permits, franchises, and license agreements.

     2.    <u>Purchase Price</u>. The purchase price for the Property shall be _____ and No/Hundreds Dollars ($_____.00) (the "<u>Purchase Price</u>"), plus such additional sums as shall be required to be paid by Buyer as Buyer's Closing Funds (hereinafter defined). The Purchase Price shall be payable by Buyer to Seller through Escrow (hereinafter defined), in cash or other immediately available federal funds, as follows:

     2.1    <u>Deposit</u>. Within one (1) Business Day (defined below) of Seller's execution and delivery of this Agreement to Escrow Agent (defined below), Buyer shall deposit with Escrow Agent the amount equal to ten percent (10%) of the Purchase Price, in the amount of $_____ (the "<u>Deposit</u>"), in cash or other immediately available federal funds. Immediately following receipt of the Deposit, Escrow Agent shall release the Deposit to Seller without further instructions, consents, or approvals from Buyer, whereupon the entirety of the Deposit released to Seller shall be applicable to the Purchase Price at the Closing (at hereinafter defined), and deemed earned by Seller and non-refundable to Buyer.

     2.2    <u>Closing Funds</u>. Buyer shall deposit, or cause to be deposited, with Escrow Agent, by confirmed wire transfer of cash or other immediately available federal funds to a deposit account designated by Escrow Agent for its use in connection with this Agreement, the remaining balance of the Purchase Price, together with Escrow Agent's estimate of Buyer's share of closing costs, prorations, adjustments, and charges payable by Buyer pursuant to this Agreement and pursuant to the Escrow Instructions (hereinafter defined) (the balance of the Purchase Price, together with all such additional required deposits by Buyer with Escrow Agent are sometimes referred to in this Agreement as "<u>Buyer's Closing Funds</u>"). Buyer's Closing Funds shall be deposited with Escrow Agent at least one (1) Business Day prior to the Closing Date (hereinafter defined), or such earlier date as Escrow Agent shall require in order to satisfy all conditions to the Close of Escrow (hereinafter defined) on or before the Closing Date.

                     

3.    Condition of Property.

3.1    "As-Is" Purchase and Sale.    Buyer agrees that Buyer will purchase and accept the Property in its condition as of Closing, and all of the Property is and shall be transferred by Seller to Buyer in an **"AS IS, WHERE IS, WITH ALL FAULTS, LIABILITIES, DEFICIENCIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** condition, whatever that condition may be.    Buyer acknowledges and agrees that Seller makes no representation, warranty, covenant, or agreement regarding the condition of the Property as of the date hereof, or as of the date of Closing, and Buyer hereby assumes the full risk of loss, damage, injury, expense, or liability whatsoever relating to the physical condition of the Property.    Buyer acknowledges and agrees that prior to the Effective Date, Buyer made such inspections, as it required, and has satisfied itself regarding all matters relating to the condition of the Property, and the feasibility, utility, and marketability of the Property for any purpose. Buyer further acknowledges that Seller has made no representation or warranty, express or implied, regarding the Property or any release or the presence of any Hazardous Materials (hereinafter defined), waste, or other similar substance upon, within, about, or under the surface of the Property.    Except as otherwise provided in this Agreement, Buyer further assumes all risk of loss, damage, expense, and liability whatsoever in connection with the Property (or any portion thereof) from and after the Closing, and Seller shall not be liable for any lack of repair, maintenance, or improvements to the Property.

3.2    Property Documents.    As used herein, the term "Property Documents" shall mean any and all documents, instruments, agreements, and statements delivered or provided, or made available, to Buyer by Seller in respect of the Property prior to, on, or after the Effective Date.    All Property Documents have been, and/or will be, provided, or made available, by Seller to Buyer on an **"AS IS, WHERE IS, WITH ALL FAULTS, LIABILITIES, DEFICIENCIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** basis, without any representations or warranties as to the accuracy or completeness thereof, and Seller expressly disclaims any and all liability for information contained in the Property Documents, or in any other written or oral communications provided or made available to Buyer by Seller, and for all representations and warranties, express or implied, in connection with, or related to, such information or otherwise attributable to Seller.    Buyer shall keep and maintain all Property Documents disclosed by Seller in confidence pursuant to the provisions of Section 14.16 of this Agreement.

4.    Condition of Title.

4.1    Title Insurance.    Prior to the Effective Date, Seller made available to Buyer a preliminary title report (the "Title Report") issued by a title company selected by Seller ("Title Company") concerning the Real Property.    Prior to the Effective Date, Buyer reviewed and approved the title condition of the Property.    Seller makes no warranty, express or implied, regarding Seller's title to, any security interests in, liens upon, or the physical condition of, any of the Property.

4.2    Possession.    Possession of the Property shall be delivered to Buyer immediately following the Close of Escrow, subject to any and all possessory interests thereon as of the date hereof.

5.    Inspections.

5.1    Buyer's Review and Inspection of the Property.  Prior to the Effective Date, Buyer reviewed, inspected, investigated, and approved all aspects of the Property, including, but not limited to, the feasibility, suitability, utility, profitability, marketability of the Property, and the physical, legal, land use, permitting, zoning, environmental, and other condition of the Property, and including, without limitation, (a) the legal description of the Property, (b) all reports of investigations of the Property, including such soil, environmental, geological and engineering tests and reports, and other inspections of the Property as Buyer deemed necessary in order to determine whether the Property is suitable, feasible, marketable, profitable, and financially viable for Buyer's intended use, (c) all legal, land use, and similar matters with respect to the Property, including, without limitation, zoning requirements, federal, state, and local laws, ordinances, rules, regulations, permits, licenses, approvals, and orders applicable to the Property, (d) all cost studies, bids, proposals, and/or agreements relating to the completed, and to be completed, improvements to the Property, (e) all licenses, permits, maps, encumbrances, and covenants, conditions, and restrictions affecting the Property, including but not limited to, the any parcel map for the Property, (f) comprehensive land use plan for the Property and/or commercial subdivision in which the Property is located, if any, and (g) documentation, invoices, statements, and other relevant information pertaining to the operations of the Property (all of the foregoing shall at times hereinafter be referred to as the "Due Diligence Materials").

5.2    Buyer Acknowledgements.  Buyer acknowledges Seller acquired title to the Property pursuant to the Trustee's Deed following non-judicial foreclosure proceedings. Given the brief tenure of Seller's ownership of the Property, and the manner in which Seller acquired title to the Property, Seller has very limited knowledge about the condition of the Property, the operations of the Property, and all other matters with respect to the Property. Buyer has agreed to rely solely upon Buyer's inspections, investigations, and review of the Property, rather than any representations, warranties, disclosures, or other information provided by Seller in connection with the Property.

5.3    Natural Hazard Disclosure.  Prior to the Effective Date, Buyer received and reviewed a natural hazard disclosure report identifying natural hazards with respect to the Property pursuant to the Natural Hazard Disclosure Act, California Government Code Sections 8589.3, 8589.4, and 51183.5, and California Public Resources Code Sections 2621.9, 2694, and 4136, and any successor statutes or laws (the "Natural Hazards Disclosure Report"). Buyer acknowledges that Seller did not prepare the Natural Hazards Disclosure Report, and if the matters set forth therein change prior to the Closing Date, Seller shall have no obligation to update, modify, or supplement the Natural Hazard Disclosure Report.

5.4    No Due Diligence Contingency.  Buyer acknowledges that prior to the Effective Date, Buyer inspected, investigated, and reviewed the Property in its entirety and to its complete satisfaction, and under this Agreement, Buyer does not have any condition, contingency, or right of termination as a result of any further inspection, investigation, review, approval, or disapproval of the Property, or any condition or aspect thereof, following the Effective Date.

5.5    Disclaimer.

(a)    BUYER ACKNOWLEDGES AND AGREES THAT SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS, ANY AND ALL REPRESENTATIONS, WARRANTIES, PROMISES,

COVENANTS, AGREEMENTS, OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, OR FUTURE, OF, AS TO, CONCERNING, OR WITH RESPECT TO THE PROPERTY, INCLUDING, BUT NOT LIMITED TO, (A) THE VALUE, NATURE, QUALITY, OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL, AND GEOLOGY OF OR BELOW THE SURFACE OF THE PROPERTY, (B) ANY INCOME BEING, OR THAT MAY BE, DERIVED FROM THE PROPERTY, (C) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER OR ANY TENANT MAY CONDUCT THEREON, (D) THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES, OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (E) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY (BUYER AFFIRMING THAT BUYER HAS NOT RELIED ON SELLER'S SKILL OR JUDGMENT TO SELECT OR FURNISH THE PROPERTY FOR ANY PARTICULAR PURPOSE, AND THAT SELLER MAKES NO WARRANTY THAT THE PROPERTY IS FIT FOR ANY PARTICULAR PURPOSE), (F) THE MANNER OR QUALITY OF THE CONSTRUCTION OR MATERIALS, IF ANY, INCORPORATED INTO THE PROPERTY, INCLUDING ANY IMPROVEMENTS THERETO, (G) THE MANNER, QUALITY, STATE OF REPAIR, OR LACK OF REPAIR OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ANY PATENT OR LATENT DEFECTS OR DEFICIENCIES WITH RESPECT TO THE PROPERTY, (H) COMPLIANCE WITH ANY ENVIRONMENTAL REQUIREMENTS (DEFINED BELOW), ENVIRONMENTAL PROTECTION, POLLUTION, OR LAND USE LAWS, RULES, REGULATIONS, ORDERS, OR OTHER REQUIREMENTS, INCLUDING THE EXISTENCE IN, ON, UNDER, ABOUT, OR IN THE VICINITY OF THE PROPERTY OF HAZARDOUS MATERIALS (DEFINED BELOW), (I) ZONING TO WHICH THE PROPERTY, OR ANY PORTION THEREOF, MAY BE SUBJECT, (J) THE AVAILABILITY OF ANY UTILITIES TO THE PROPERTY OR ANY PORTION THEREOF, INCLUDING, WITHOUT LIMITATION, WATER, SEWAGE, GAS, AND ELECTRICITY, (K) USAGES OF ANY ADJOINING PROPERTY, (L) ACCESS TO, AND EASEMENTS AND RIGHTS OF WAY WHICH ARE A BURDEN UPON OR WHICH BENEFIT THE PROPERTY OR ANY PORTION THEREOF, (M) THE VALUE, COMPLIANCE WITH THE PLANS AND SPECIFICATIONS, SIZE, LOCATION, AGE, USE, DESIGN, QUALITY, DESCRIPTION, DURABILITY, STRUCTURAL INTEGRITY, OPERATION, TITLE TO, OR PHYSICAL OR FINANCIAL CONDITION OF THE PROPERTY OR ANY PORTION THEREOF, OR ANY INCOME, EXPENSES, CHARGES, LIENS, ENCUMBRANCES, RIGHTS, OR CLAIMS ON OR AFFECTING OR PERTAINING TO THE PROPERTY OR ANY PART THEREOF, (N) THE CONDITION OR USE OF THE PROPERTY OR COMPLIANCE OF THE PROPERTY WITH ANY OR ALL PAST, PRESENT, OR FUTURE FEDERAL, STATE, OR LOCAL ORDINANCES, RULES, REGULATIONS, OR LAWS, BUILDING, FIRE, OR ZONING ORDINANCES, CODES, OR OTHER SIMILAR LAWS, (O) THE EXISTENCE OR NON-EXISTENCE OF ABOVEGROUND OR UNDERGROUND STORAGE TANKS UPON OR BENEATH THE SURFACE OF THE PROPERTY, (P) ANY OTHER MATTER AFFECTING THE STABILITY OR INTEGRITY OF THE PROPERTY, (Q) THE POTENTIAL FOR FURTHER DEVELOPMENT OF THE PROPERTY, (R) THE EXISTENCE OF VESTED LAND USE, ZONING, OR BUILDING ENTITLEMENTS AFFECTING THE PROPERTY, OR (S) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.

(b)     ADDITIONALLY, BUYER ACKNOWLEDGES AND AGREES THAT NO PERSON ACTING ON BEHALF OF SELLER IS AUTHORIZED TO MAKE, AND, BY EXECUTION HEREOF, BUYER ACKNOWLEDGES THAT NO PERSON HAS MADE, ANY REPRESENTATION, AGREEMENT, STATEMENT, WARRANTY, GUARANTY, OR PROMISE REGARDING THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREIN, AND NO SUCH REPRESENTATION, WARRANTY, AGREEMENT, GUARANTY, STATEMENT, OR PROMISE, IF ANY, MADE BY ANY PERSON ACTING ON BEHALF OF SELLER SHALL BE VALID OR BINDING UPON SELLER UNLESS EXPRESSLY SET FORTH HEREIN.

(c)     BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT, INVESTIGATE, AND REVIEW ALL ASPECTS OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, ALL PHYSICAL, ENVIRONMENTAL, TITLE, LEGAL, ENTITLEMENT STATUS, MARKETABILITY, AND FINANCIAL ASPECTS OF THE PROPERTY, AND BUYER IS RELYING SOLELY ON ITS OWN INSPECTION, INVESTIGATION, AND REVIEW OF THE PROPERTY, AND NOT UPON ANY INFORMATION PROVIDED, OR TO BE PROVIDED, BY SELLER, AND AGREES TO ACCEPT THE PROPERTY AT CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY HAZARDOUS MATERIALS ON THE PROPERTY.

(d)     BUYER FURTHER ACKNOWLEDGES AND AGREES THAT ANY INFORMATION PROVIDED, OR TO BE PROVIDED, WITH RESPECT TO THE PROPERTY BY SELLER WAS OBTAINED FROM A VARIETY OF SOURCES, AND SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION. ACCORDINGLY, SELLER MAKES NO, AND HEREBY DISCLAIMS ALL, REPRESENTATIONS AS TO THE ACCURACY, TRUTHFULNESS, OR COMPLETENESS OF SUCH INFORMATION, WHICH INCLUDES, WITHOUT LIMITATION, ALL VERBAL AND WRITTEN COMMUNICATIONS, AGREEMENTS, INSTRUMENTS, DOCUMENTS, REPORTS, AND OTHER MATTERS. SELLER SHALL NOT BE LIABLE FOR ANY NEGLIGENT MISREPRESENTATION OR ANY FAILURE TO INVESTIGATE THE PROPERTY, NOR SHALL SELLER BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENT, REPRESENTATION, OR INFORMATION PERTAINING TO THE PROPERTY, OR THE OPERATION THEREOF, FURNISHED BY SELLER OR ANY REAL ESTATE BROKER, CONTRACTOR, AGENT, EMPLOYEE, SERVANT, OR OTHER PERSON.

(e)     BUYER FURTHER ACKNOWLEDGES AND AGREES THAT TO THE MAXIMUM EXTENT PERMITTED BY LAW, THE SALE OF THE PROPERTY AS PROVIDED FOR HEREIN IS MADE ON AN **"AS IS, WHERE IS, WITH ALL FAULTS, LIABILITIES, DEFICIENCIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** BASIS. IT IS UNDERSTOOD AND AGREED THAT THE PROPERTY IS SOLD BY SELLER, AND PURCHASED BY BUYER, SUBJECT TO THE FOREGOING AND THAT THE PURCHASE PRICE HAS BEEN ADJUSTED BY PRIOR NEGOTIATION TO REFLECT THAT ALL OF THE PROPERTY IS SOLD BY SELLER, AND PURCHASED BY BUYER, SUBJECT TO THE FOREGOING.

(f)    BUYER HEREBY AGREES TO INDEMNIFY, PROTECT, DEFEND, SAVE, AND HOLD HARMLESS SELLER, AND EVERY ENTITY AFFILIATED WITH SELLER, AND ALL OF THEIR OFFICERS, DIRECTORS, SHAREHOLDERS, EMPLOYEES, AGENTS, ATTORNEYS, PARTICIPANTS, AND INDEPENDENT CONTRACTORS, AND THE SUCCESSOR AND ASSIGN OF EACH AND EVERY ONE OF THEM (COLLECTIVELY, THE "SELLER PARTIES"), FROM AND AGAINST ANY AND ALL DEBTS, DUTIES, OBLIGATIONS, LIABILITIES, SUITS, CLAIMS, DEMANDS, CAUSES OF ACTION, DAMAGES, LOSSES, FEES AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES AND COURT COSTS) IN ANY WAY RELATING TO, OR IN CONNECTION WITH OR ARISING OUT OF BUYER'S INSPECTION, ACQUISITION, OWNERSHIP, LEASING, USE, OPERATION, MANAGEMENT, AND/OR MAINTENANCE OF THE PROPERTY, THE CONDITION OF THE PROPERTY, AND ANY OTHER MATTERS WITH RESPECT TO THE PROPERTY ARISING EITHER BEFORE OR AFTER THE CLOSE OF ESCROW.

(g)    BUYER FURTHER ACKNOWLEDGES AND AGREES THAT BUYER IS A SOPHISTICATED INVESTOR, KNOWLEDGEABLE IN THE PURCHASE AND OPERATION OF THE PROPERTY AND HAS BEEN GIVEN THE OPPORTUNITY TO INSPECT ALL ASPECTS OF THE  PROPERTY, INCLUDING, WITHOUT LIMITATION, ALL PHYSICAL, ENVIRONMENTAL, TITLE, LEGAL, ENTITLEMENT STATUS, MARKETABILITY, AND FINANCIAL ASPECTS OF THE  PROPERTY, AND BUYER IS RELYING SOLELY ON ITS OWN INSPECTION, INVESTIGATION, AND REVIEW OF THE PROPERTY AND NOT ON ANY INFORMATION PROVIDED, OR TO BE PROVIDED, BY SELLER, AND AGREES TO ACCEPT THE PROPERTY AT THE CLOSING AND WAIVE ALL OBJECTIONS OR CLAIMS AGAINST SELLER (INCLUDING, BUT NOT LIMITED TO, ANY RIGHT OR CLAIM OF CONTRIBUTION) ARISING FROM OR RELATED TO THE PROPERTY, INCLUDING, WITHOUT LIMITATION, WITH RESPECT TO ANY HAZARDOUS MATERIALS ON THE PROPERTY.

(h)    BUYER HEREBY, EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MIGHT HAVE REGARDING ANY OTHER FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, RELATING TO THE PROPERTY. SUCH WAIVER IS ABSOLUTE, COMPLETE, TOTAL, IRREVOCABLE, UNCONDITIONAL, AND UNLIMITED IN EVERY WAY. SUCH WAIVER INCLUDES, BUT IS NOT LIMITED TO, A WAIVER OF EXPRESS WARRANTIES OTHER THAN THOSE EXPRESSLY PROVIDED IN THIS AGREEMENT, IMPLIED WARRANTIES, WARRANTIES OF FITNESS FOR A PARTICULAR USE OR PURPOSE, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF HABITABILITY, STRICT LIABILITY RIGHTS, CLAIMS, DEMANDS, OR CAUSES OF ACTION, WHETHER STATUTORY, CONTRACTUAL, OR UNDER TORT PRINCIPLES, AT LAW OR IN EQUITY, INCLUDING, BUT NOT LIMITED TO, CLAIMS REGARDING DEFECTS WHICH WERE NOT, OR ARE NOT, DISCOVERABLE, AND ANY AND ALL CLAIMS UNDER ANY ENVIRONMENTAL REQUIREMENTS.

(i)    THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR ANY EARLIER TERMINATION OF THIS AGREEMENT. SELLER HAS

GIVEN BUYER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR BUYER AGREEING TO THE PROVISIONS OF THIS SECTION 5.5. SELLER AND BUYER HAVE EACH INITIALED THIS SECTION 5.5 TO FURTHER INDICATE THEIR AWARENESS AND ACCEPTANCE OF EACH AND EVERY PROVISION HEREOF.

Buyer's initials:_____          Seller's initials:_____

(j)    Defined Terms.

(i)    Hazardous Materials.  For purposes of this Agreement, "Hazardous Materials" shall mean any hazardous or toxic materials, substances, or wastes, including, without limitation, (a) substances defined as "hazardous substances," "hazardous materials," "hazardous waste," "pollutant," "infectious waste," or "toxic substances," or words of similar meaning or regulatory effect under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Federal Water Pollution Control Act (33 U. S. C. § 1251, et seq.), the Clean Air Act (42 U. S. C. § 740 1, et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601, et seq.), the Refuse Act (33 U.S.C. § 407), Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health and Safety Code §§ 25300, et seq., Hazardous Substance Cleanup Bond Act of 1984, California Health and Safety Code §§ 25385, et seq., and related statutes including sections 25356.1-25356.4 of the California Health and Safety Code, Porter-Cologne Water Quality Control Act, California Water Code §§ 13000 et seq., as any or all of such acts are amended from time to time; (b) those materials identified in §§ 66680 through 66685 and §§ 66693 through 66740 of Title 22 of the California Administrative Code, Division 4, Chapter 30, as amended from time to time; (c) any substance defined as a "hazardous substance", "hazardous waste", "extremely hazardous waste", "RCRA hazardous waste", "waste" or "hazardous material" in §§ 25115, 25117, 25122.7, 25120.2, 25124, 25281, 25316 or 25501 of the California Health and Safety Code, as amended, or listed pursuant to § 25140 of the California Health and Safety Code, as amended; (d) any chemical or other substance regulated by the California Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code § 25249.5, et seq., as amended; (e) any substance defined as a "waste" or "hazardous substance" in § 13050 of the California Water Code, as amended; (f) any substance listed in California Labor Code §§ 6501.7 or 9004, as amended; (g) any materials, substances, or wastes which are toxic, ignitable, corrosive, or reactive, and which are regulated by any local governmental authority, any agency of the State of California, or any agency of the United States of America; (h) any substance the presence of which at the Property causes, or threatens to cause, a nuisance and/or a trespass upon the Property, or to adjacent properties, or poses, or threatens to pose, a hazard to the health or safety of human beings; (i) asbestos (including, without limitation, asbestos containing materials), petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls (PCBs), Freon and other chlorofluorocarbons, flammable, explosive, infectious, carcinogenic, mutagenic, or radioactive materials, petroleum or any substance containing or consisting of petroleum hydrocarbons (including, without limitation, gasoline, diesel fuel, motor oil, waste oil, grease or any other fraction of crude oil), paints and solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonium compounds, polychlorinated biphenyls, radon and radon gas, and electromagnetic or magnetic materials, substances, or emissions; and (j) those substances defined

as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws and regulations.

(ii)     <u>Environmental Requirements</u>. For purposes of this Agreement, the term "<u>Environmental Requirements</u>" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Property, the Property, or the use of the Property, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, ground water, land or soil).

5.6     <u>BUYER'S WAIVER AND RELEASE</u>.

(a)     AS PART OF BUYER'S AGREEMENT TO PURCHASE AND ACCEPT THE PROPERTY ON AND **"AS IS, WHERE IS, WITH ALL FAULTS, LIABILITIES, DEFICIENCIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** BASIS, AND NOT AS A LIMITATION ON SUCH AGREEMENT, EXCEPT FOR SELLER'S REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT, BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED, OF ANY KIND OR TYPE, RELATING TO THE PROPERTY. SUCH WAIVER IS ABSOLUTE, COMPLETE, TOTAL, AND UNLIMITED IN EVERY WAY. SUCH WAIVER INCLUDES, BUT IS NOT LIMITED TO, A WAIVER OF EXPRESS WARRANTIES, IMPLIED WARRANTIES, WARRANTIES OF FITNESS FOR A PARTICULAR USE OR PURPOSE, WARRANTIES OF MERCHANTABILITY, WARRANTIES OF HABITABILITY, STRICT LIABILITY RIGHTS, AND CLAIMS, LIABILITIES, DEMANDS, OR CAUSES OF ACTION OF EVERY KIND AND TYPE, WHETHER STATUTORY, CONTRACTUAL, OR UNDER TORT PRINCIPLES, AT LAW OR IN EQUITY, INCLUDING, BUT NOT LIMITED TO, CLAIMS REGARDING DEFECTS WHICH MIGHT HAVE BEEN DISCOVERABLE, CLAIMS REGARDING DEFECTS WHICH WERE NOT OR ARE NOT DISCOVERABLE, PRODUCT LIABILITY CLAIMS, PRODUCT LIABILITY TYPE CLAIMS, ALL OTHER EXTANT OR LATER CREATED OR CONCEIVED OF STRICT LIABILITY OR STRICT LIABILITY TYPE CLAIMS AND RIGHTS, AND ANY AND ALL CLAIMS UNDER CERCLA AND RCRA OR ANY OTHER ENVIRONMENTAL REQUIREMENT. EFFECTIVE UPON THE CLOSING DATE, AND TO THE FULLEST EXTENT PERMITTED BY LAW, BUYER HEREBY RELEASES, DISCHARGES, AND FOREVER ACQUITS SELLER AND EVERY SELLER PARTY, FROM ALL DEMANDS, CLAIMS, LIABILITIES, OBLIGATIONS, COSTS, AND EXPENSES WHICH BUYER MAY SUFFER OR INCUR RELATING TO THE PROPERTY, AND ANY AND ALL OTHER ASPECT OF THE PROPERTY. AS PART OF THE PROVISIONS OF THIS SECTION 5.6, BUT NOT AS A LIMITATION THEREON, BUYER HEREBY AGREES, REPRESENTS, AND WARRANTS THAT THE MATTERS RELEASED HEREIN ARE NOT LIMITED TO MATTERS WHICH ARE KNOWN OR DISCLOSED, AND BUYER HEREBY WAIVES ANY AND ALL RIGHTS AND BENEFITS WHICH IT NOW HAS, OR IN THE FUTURE MAY HAVE

CONFERRED UPON IT, BY VIRTUE OF THE PROVISIONS OF FEDERAL, STATE, OR LOCAL LAW, RULES, OR REGULATIONS, INCLUDING WITHOUT LIMITATION, SECTION 1542 OF THE CIVIL CODE OF THE STATE OF CALIFORNIA, WHICH PROVIDES AS FOLLOWS:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

(b)    IN ACCORDANCE WITH THE FOREGOING, AND TO THE MAXIMUM EXTENT PERMITTED BY LAW, BUYER HEREBY AGREES, REPRESENTS, AND WARRANTS THAT IT UNDERSTANDS THAT FACTUAL MATTERS NOW UNKNOWN TO BUYER MAY HAVE GIVEN, OR MAY HEREAFTER GIVE, RISE TO CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES, OR EXPENSES WHICH ARE PRESENTLY UNKNOWN, UNANTICIPATED, AND UNSUSPECTED, AND BUYER FURTHER AGREES, REPRESENTS, AND WARRANTS THAT THE WAIVERS AND RELEASES HEREIN HAVE BEEN NEGOTIATED AND AGREED UPON IN LIGHT OF THAT REALIZATION, AND THAT BUYER NEVERTHELESS HEREBY INTENDS TO RELEASE, DISCHARGE, AND ACQUIT SELLER FROM ANY SUCH UNKNOWN CAUSES OF ACTION, CLAIMS, DEMANDS, DEBTS, CONTROVERSIES, DAMAGES, COSTS, LOSSES, AND EXPENSES WHICH MIGHT IN ANY WAY BE INCLUDED IN THE WAIVERS AND MATTERS RELEASED AS SET FORTH IN THIS SECTION 5.6.    THE PROVISIONS OF THIS SECTION 5.6 ARE MATERIAL AND INCLUDED AS A MATERIAL PORTION OF THE CONSIDERATION GIVEN TO SELLER BY BUYER IN EXCHANGE FOR SELLER'S PERFORMANCE HEREUNDER.

(c)    SELLER HAS GIVEN BUYER MATERIAL CONCESSIONS REGARDING THIS TRANSACTION IN EXCHANGE FOR BUYER AGREEING TO THE PROVISIONS OF THIS SECTION 5.6.  BUYER HAS INITIALED THIS SECTION 5.6 TO FURTHER INDICATE ITS AWARENESS AND ACCEPTANCE OF EACH AND EVERY PROVISION HEREOF.  THE PROVISIONS OF THIS SECTION 5.6 SHALL SURVIVE THE CLOSING OR THE EARLIER TERMINATION OF THIS AGREEMENT.

BUYER'S INITIALS:  _____

6.    Buyer's Entry and Inspection.

6.1    If, prior to the Closing, following receipt of approval from Seller, Buyer, or any of its agents, employees, and consultants, enters the Property for any reason Buyer shall not cause any adverse impact to the Property and will restore the Property in a timely manner at Buyer's sole cost to the condition that existed immediately prior Buyer's entry onto the Property. Without limiting the generality of the foregoing sentence, Buyer shall keep the Property free and clear of all mechanics' and/or materialmen's liens arising from, or related to, the inspections, investigations, or review of the Property by Buyer, and shall take all necessary actions, at Buyer's sole cost and expense, to remove any such liens that encumber the Property. Buyer shall not disturb the physical condition of the Property or conduct any soil testing, removal, or borings upon or within the Property, including, without limitation, conducting any Phase II

environmental site assessment. Buyer hereby indemnifies and shall defend and hold harmless Seller and each of the Seller Parties from and against any and all liens, claims, liabilities, costs, and expenses, including attorneys' fees and court costs, and other damages arising out of or in any way relating to the entry and performance of any such inspection, investigations, and review by Buyer of the Property, or by any other person or entity acting on behalf of, or at the request of Buyer, prior to the Close of Escrow. The foregoing indemnity by Buyer shall survive the Closing or earlier termination of this Agreement. Buyer shall carry, or Buyer shall require anyone acting on Buyer's behalf to carry, policies of liability, worker's compensation, and other applicable insurance defending and protecting Seller from liability for any injuries to persons or property occurring during any work done on the Property at Buyer's direction prior to Close of Escrow.

6.2    Buyer agrees to keep confidential, and not disclose, the results of its investigations, inspections, and review of the Property, or the contents of any analyses, reports, surveys, or other documents made with respect thereto, to any third party other than Buyer's employees, attorneys, consultants, and lenders in connection with Buyer's purchase of the Property or as may be required by applicable law; provided that Buyer shall ensure that each such employee, attorney, and consultant is advised of and agrees to the confidentiality requirements in this section 6.2. If Buyer determines that Buyer is required by applicable law to notify a federal, state, or local governmental agency or authority, or any other party, with respect to any condition of the Property, Buyer shall immediately notify Seller, and Seller shall make such disclosure as Seller determines appropriate.

6.3    Prior to the Closing, Buyer shall not enter into, or make any commitments with, any Public Agency (defined below), and shall expressly disclaim to any Public Agency the right to enter into or make commitments, in respect of the Property that are or could be binding on the Property or Seller prior to the Closing ("Commitments"). As used in this Agreement, "Public Agency" shall mean any officer, employee, supervisor, consultant, council member, agent, or other representative of any public agency or governmental authority with jurisdiction over the Property. Buyer shall, and hereby does, indemnify, defend, protect, and hold harmless Seller and each of the Seller Parties from and against any and all claims, demands, losses, damages, obligations, liabilities, causes of action, liens, costs, and expenses (including, without limitation, attorneys' fees and expenses) arising from any acts or omissions by Buyer or its employees, agents, consultants, or representatives related to, or in connection with, any Commitments or any discussions or meetings by Buyer with any Public Agency that are made in violation of the foregoing provisions. The foregoing indemnity shall survive the Closing or earlier termination of this Agreement.

7.    Escrow.

7.1    Definitions. The following terms used in this Agreement shall have the following meanings:

(a)    "Business Day" shall mean any day which is not a Saturday or Sunday and is not a public holiday in California, or a day on which businesses are required or requested to close by government proclamation.

(b)    "Closing Date" shall mean the date upon which the grant deed ("Grant Deed") conveying the Property to Buyer pursuant to this Agreement is recorded in the

Official Records of Los Angeles County, California. The term "Close of Escrow" or "Closing" shall mean the event of recording said Grant Deed.

(c)    "Escrow" shall mean an escrow transaction established for the purpose of consummating the transactions contemplated by this Agreement.

(d)    "Escrow Agent" shall mean _____, located at the address set forth on the signature page of this Agreement.

(e)    "Scheduled Closing Date" shall mean the date that is three (3) Business Days after the Effective Date; provided, however, that the Closing Date shall occur no later than June 28, 2010 unless otherwise agreed to in writing by Seller.

7.2    Opening of Escrow.  Prior to the Effective Date, an Escrow has been opened for purposes of consummating the transfer of the Property pursuant to this Agreement. If Seller, in its sole and absolute discretion, elects to execute this Agreement and deliver it to Escrow Agent, the "Opening of Escrow" shall be deemed to have occurred on the date Escrow Agent receives a true and complete, fully-executed copy of this Agreement from Seller.  The parties shall execute, deliver, and be bound by any and all reasonable and customary supplemental escrow instructions ("Escrow Instructions") of Escrow Agent, and all such other documents and instruments as may be reasonably required by Escrow Agent, in order to consummate the transactions contemplated by this Agreement.  Escrow Agent shall accept the escrow provisions of this Agreement as provided immediately after the signatures of the parties hereto.  The Escrow Instructions shall not conflict with, amend, or supersede any portion of the Agreement, unless expressly agreed by written instruments signed by all parties to this Agreement, specifically providing that said Escrow Instructions shall have such effect.  Except as otherwise provided herein, in the event of any inconsistency or conflict between the provisions of the Escrow Instructions and this Agreement, the provisions of this Agreement shall control.

7.3    Closing Date.  Except as otherwise herein provided, the Closing shall occur no later than the Scheduled Closing Date, provided that all conditions of this Agreement have been satisfied.  In the event that Escrow does not close for any reason on or before the Scheduled Closing Date, Escrow Agent shall nevertheless proceed to Close the Escrow at the earliest practicable time thereafter upon satisfaction of all conditions to the Close of Escrow, unless Escrow Agent receives written notice from either party directing Escrow Agent not to Close the Escrow.  Upon Escrow Agent's receipt of a written notice of termination as hereinabove provided, the Escrow shall be deemed to be canceled without the requirement for any further notice or instruction to Escrow Agent or to the other parties.  In order to be effective, notice to the Escrow Agent by either party to this Agreement shall be also given to the other party in the manner herein provided for notices.

7.4    Deliveries Through Escrow.

(a)    Seller Deliveries.  At least one (1) Business Day prior to the Closing, Seller shall have executed, and where applicable, duly acknowledged, and deposited with Escrow Agent, the following documents (collectively, "Seller's Closing Documents"):

(i)    The Grant Deed transferring the Property to Buyer in the form of Exhibit B, attached hereto and incorporated herein by reference;

(ii)     The Bill of Sale, Assignment and Assumption Agreement in the form of <u>Exhibit C</u>, attached hereto and incorporated herein by reference (the "<u>Bill of Sale</u>");

(iii)    The certificate of non-foreign status (the "<u>Certificate</u>"), as may be required or permitted by applicable federal and/or state law in order to avoid or satisfy any duty or obligation of Escrow Agent, Seller, or Buyer to withhold any portion of the Purchase Price or other funds in such party's possession or control, which Certificate shall be in the form of <u>Exhibit D</u>, attached hereto and incorporated herein by reference; and

(iv)    All such other documents, instruments, and agreements as Escrow Agent shall reasonably require in order to comply with this Agreement and the Escrow Instructions within the time and in the manner herein provided.

(b)    <u>Buyer Deliveries</u>.   At least one (1) Business Day prior to the Closing, Buyer shall deliver to Escrow Agent:

(i)     Buyer's Closing Funds, which will include the balance of the Purchase Price and all other amounts required of Buyer hereunder;

(ii)    A counterpart copy of the Bill of Sale, executed by Buyer;

(iii)    A preliminary change of ownership report with respect to the transfer of the Property in form and content required by Los Angeles County, California, completed and executed by Buyer; and

(iv)    All other documents, instruments, and agreements as Escrow Agent shall reasonably require in order to comply with this Agreement and the Escrow Instructions within the time and in the manner herein provided, which, together with the documents listed in Sections 7.4(b)(ii), 7.4(b)(iii), and 7.4(b)(iv), are referred to herein as the "<u>Buyer's Closing Documents</u>".

7.5    <u>Prorations and Charges</u>.

(a)    The following items shall be prorated and/or adjusted between the parties by Escrow Agent as of the Close of Escrow, in addition to such other items as are customarily subject to proration and adjustment, as shall be provided in a settlement statement prepared by Escrow Agent prior to the Closing:

(i)     Real property taxes and assessments which are a lien upon the Real Property as of the Close of Escrow; and

(ii)    Rent, revenues, and any security deposit, if any, received by Seller in advance, or on account from, any tenant or occupant of the Property, to the extent Seller is not permitted to retain the same for purposes of compensating Seller for expenses and/or losses previously incurred by Seller prior to the Close of Escrow.

(iii)    Pre-paid, or paid in advance, costs and expenses paid by Seller prior to the Closing Date that are applicable to the time period on or after the Closing Date, including, but not limited to, utility contracts, maintenance contracts, and other services provided to the Property applicable to the time period following the Closing Date.

(b)     Seller shall pay the title insurance premium for a CLTA owner's coverage of title insurance with a policy limit in the amount of the Purchase Price ("Title Policy"); documentary transfer taxes payable in connection with the recording of the Grant Deed; the cost of recording the Grant Deed; and fifty percent (50%) of the cost of Escrow Agent. In the event Buyer requests the ALTA Title Policy instead of the CLTA Title Policy, Buyer shall pay the difference between the cost of the CLTA Title Policy and the ALTA Title Policy.  In addition, Buyer shall pay the cost of (i) any and all endorsements to the Title Policy, and (ii) any ALTA/ACSM survey to be conducted in connection with the issuance of the Title Policy. Buyer shall also pay fifty percent (50%) of the cost of Escrow Agent, and all costs and expenses associated with Buyer's lenders and investors in connection with the transactions set forth herein.

(c)     All utilities and other public services, if any, furnished to the Property in the name, or for the account of, Seller shall be terminated as of the Close of Escrow, and Buyer assumes responsibility for transferring or recommencing any and all such services in the name, or for the account of, Buyer, and for terminating any and all maintenance and other service contracts pertaining to the Property.  Buyer hereby indemnifies and holds harmless Seller and each of the Seller Parties from and against any claim, loss, expense, damages, or liability relating to the termination or continuation of such services to the Property, all of which shall be Buyer's sole responsibility and liability after the Close of Escrow, if applicable.

7.6     Closing.  At the Close of Escrow, Escrow Agent shall:

(a)     Record the Grant Deed conveying the Real Property to Buyer as herein provided, together with all such other instruments and documents which may he delivered to Escrow Agent in order to enable Escrow Agent to comply with this Agreement and the Escrow Instructions.

(b)     (i) Disburse to Seller, pursuant to the Seller's written wiring instructions, funds in the amount of the Purchase Price, less the Deposit to the extent already received by Seller, less, if applicable, the Broker's Commission to be paid pursuant to Section 13.1 of this Agreement, less the closing costs owed by Seller as set forth herein, and as otherwise adjusted in accordance with this Agreement, and pursuant to the settlement statement prepared by Escrow Agent and approved by Seller; (ii) distribute, if applicable, the Broker's Commission to Buyer's Broker pursuant to Section 13.1 below; (iii) disburse to Title Company and Escrow Agent amounts sufficient to pay the respective costs and expenses of the Title Company and Escrow Agent arising under this Agreement; (iv) disburse to the appropriate public agencies amounts sufficient to pay all recording fees and transfer taxes arising from or related to this Agreement; and (v) return all funds remaining in Escrow to Buyer.

(c)     Deliver to Seller, the Buyer's Closing Documents, together with a conformed copy of the Grant Deed, and deliver to Buyer, the Certificate and Seller's counterpart copy of the Bill of Sale.

(d)     Cause the Title Policy to be issued and delivered to Buyer.

7.7     Conditions to Close of Escrow.

(a)     Conditions to Buyer's Obligations.  The obligations of Buyer to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 7.7(a), each

of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in its sole discretion.

(i)     The Title Company shall be unconditionally committed to issue the Title Policy, subject to the exceptions and other items set forth therein.

(ii)     The representations and warranties of Seller contained in this Agreement shall be true on and as of the Close of Escrow as if the same were made on and as of the Close of Escrow.

(iii)     Seller shall have executed and deposited with Escrow Agent all of Seller's Closing Documents.

(iv)     Seller shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Seller on or prior to the Closing Date.

(v)     The transactions set forth in that certain Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards], of approximately even date herewith, by and between AGUA DULCE VINEYARDS LLC, a California limited liability company, DONAL J. MACADAM, an individual, CATHERINE P. MACADAM, an individual, and SWEETWATER VINEYARDS, LLC, a California limited liability company, on the one hand, and Buyer, on the other hand, shall be consummated currently with the Closing under this Agreement.

(b)     <u>Conditions to Seller's Obligations</u>.   The obligations of Seller to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 7.7(b), each of which is for the sole benefit of Seller, and any one or more of which may be waived in whole or in part by Seller in its sole discretion.

(i)     Buyer shall have deposited the Purchase Price with Escrow Agent, together with all other Buyer's Closing Funds, and any and all additional funds required to pay any costs, fees, expenses, or prorations payable by Buyer hereunder.

(ii)     The representations and warranties of Buyer contained in this Agreement shall be true on and as of the Close of Escrow as if the same were made on and as of the date thereof.

(iii)     Buyer shall have executed and deposited with Escrow Agent all of Buyer's Closing Documents.

(iv)     Buyer shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Buyer on or prior to the Closing Date.

(v)     The transactions set forth in that certain Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards], of even date herewith, by and between AGUA DULCE VINEYARDS LLC, a California limited liability company, DONAL J. MACADAM, an individual, CATHERINE P. MACADAM, an individual, and SWEETWATER

VINEYARDS, LLC, a California limited liability company, on the one hand, and Buyer, on the other hand, shall be consummated currently with the Closing under this Agreement.

(vi)    Seller shall have executed and delivered this Agreement to Escrow Agent.

8.    Representations and Warranties and Covenants.

8.1    Seller's Representations and Warranties. Seller represents and warrants to Buyer that (a) Seller has the full right, power, and authority, without the joinder of any other person or entity, to enter into, execute, and deliver this Agreement, and to perform all duties and obligations imposed on Seller under this Agreement;  (b) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement conflict with, or will result in the breach of, any of the terms, conditions, or provisions of any agreement or instrument to which Seller is a party or by which Seller or any of Seller's assets is bound; and (c) this Agreement constitutes a legal, valid, and binding obligation of Seller enforceable against Seller in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to, or affecting, the enforcement of creditors' rights and general equitable principles.

8.2    Buyer's Representations and Warranties. As of the date of this Agreement and as of the Closing Date, Buyer represents and warrants to Seller that (a) Buyer has the full right, power, and authority, without the joinder, consent, or authorization of any other person or entity, to enter into, execute, and deliver this Agreement, and to perform all duties and obligations imposed upon Buyer under this Agreement; (b) this Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to, or affecting, the enforcement of creditors' rights and general equitable principles; (c) neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of, or compliance with, the terms and conditions of this Agreement conflict with, or will result in, the breach of any of the terms, conditions, or provisions of any agreement, instrument, writ, order, judgment, injunction, decree, determination, or award to which Buyer, or any partner or related entity or affiliate of Buyer, is a party or by which Buyer, any partner, or related entity or affiliate of Buyer, or Buyer's assets, is bound; (d) Buyer has such knowledge and experience in financial and business matters that Buyer is capable of evaluating the merits and risks relating to Buyer's purchase of the Property and making an informed purchase and investment decision in connection therewith; (e) Buyer has made such examination, review, inspection, and investigation of the facts and circumstances necessary to evaluate the Property as Buyer has deemed necessary or appropriate to form a basis for Buyer's evaluation of a purchase of the Property; (f) Buyer acknowledges that the Property will have limited liquidity, and Buyer has the financial wherewithal to hold the Property for an indefinite period of time and to bear the economic risk of an outright purchase of the Property; (g) no petition has been filed by or against Buyer for the commencement of a case under the U.S. Bankruptcy Code with respect to Buyer, and Buyer has sufficient capital or net worth to meet Buyer's obligations, including payment of the Purchase Price, under this Agreement; (h) neither Buyer, nor any partner, related entity, or affiliate of Buyer is in any way affiliated with Seller or any affiliate of Seller; and (i) Buyer, and any person or entity controlling, or controlled by, or having a beneficial interest in, Buyer, and any person or entity for whom Buyer is acting as agent or nominee in connection with this

transaction, is not an OFAC Prohibited Person (defined below). All of the representations and warranties of Buyer set forth in this Section 8.2 shall survive the Closing and the delivery of the Grant Deed to Buyer, or the earlier termination of this Agreement.

(a)    As used herein, the term "OFAC Prohibited Person" shall mean a country, territory, individual, or person (i) listed on, included within, or associated with any of the countries, territories, individuals, or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within, or associated with, any of the countries, territories, individuals, or entities referred to in, or prohibited by, United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), or any other Anti-Money Laundering Laws (defined below), or (ii) which is obligated or has any interest to pay, donate, transfer, or otherwise assign any property, money, goods, services, or other benefits directly or indirectly, to any countries, territories, individuals, or entities on, or associated with, anyone on such list or in such laws.

(b)    As used herein, the term "Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities, and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers, and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

9.    Risk of Loss.

9.1    Condemnation. If, prior to the Closing Date, action is initiated to take any of the Property by eminent domain proceedings, or by deed in lieu thereof, Buyer and Seller shall consummate the Closing, and all of Seller's assignable right, title, and interest in and to the award of the condemning authority shall, to the extent of the Purchase Price, be assigned to Buyer at the Closing, and there shall be no reduction in the Purchase Price.

9.2    Casualty. Except as otherwise provided in this Agreement, Seller assumes all risks and liability for damage to, or injury occurring to, the Property by fire, storm, accident, or any other casualty until the Closing has been consummated, and thereafter Buyer assumes all such risks and liability. If the Property, or any part thereof, suffers any damage in the amount of $50,000 or greater prior to the Closing from fire or other casualty, and which Seller, at its sole option, does not elect to repair completely by the Closing Date, Buyer, upon written notice delivered both to Seller and to the Escrow Agent prior to the Closing Date, may either (a) terminate this Agreement and pay all of Escrow Agent's and Title Company's cancellation fees and costs, or (b) proceed with the Close of Escrow without reduction in the Purchase Price and with all of Seller's right, title, and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Property and any portion of such proceeds paid, or to be paid, on account of the loss of rents or other income from the Property for the period prior to and including the Closing Date all of

which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, shall be assigned to Buyer at the Closing.

10.   Indemnification.

10.1   Buyer's Indemnity.   Buyer shall indemnify, protect, defend, and hold harmless Seller and each of the Seller Parties against and from (a) any Claim (as hereinafter defined) made on or after the Closing Date, regardless of when the same arises or accrues, related to the Property or any condition of the Property, except for any matters which constitute a breach of any representation or warranty of Seller specifically set forth in Section 8.1 of this Agreement, (b) any Claim in any way arising from Buyer's inspections or examinations of the Property prior to the Closing Date, and (c) any Claim in any way arising as a result of any breach of this Agreement by Buyer, subject to the provisions of Section 12.1 below.

10.2   Generally.   Buyer's indemnification obligations under this Agreement shall be subject to the following provisions:

(a)   Seller shall notify Buyer of any such Claim against Seller within forty-five (45) days after Seller has notice of such Claim, but failure to notify Buyer shall in no case prejudice the rights of Seller under this Agreement unless Buyer shall be prejudiced by such failure and then only to the extent of such prejudice. Should Buyer fail to discharge or undertake to defend Seller against such liability (with counsel approved by Seller), within twenty (20) days after Seller gives Buyer written notice of the same, then Seller may settle such Claim, and Buyer's liability to Seller shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the reasonable costs and expenses, including attorneys' fees, incurred by Seller in effecting such settlement.

(b)   Buyer's indemnification obligations under this Agreement shall cover the costs and expenses of Seller, including reasonable attorneys' fees, related to any actions, suits, or judgments incident to any of the matters covered by such indemnities.

(c)   Buyer's indemnification obligations under this Agreement shall also extend to any present or future advisor, trustee, director, officer, partner, employee, beneficiary, shareholder, participant, or agent of or in Seller or any entity now or hereafter having a direct or indirect ownership interest in Seller.

(d)   Buyer's indemnification obligations under this Agreement shall survive the Closing of the transaction contemplated hereunder.

(e)   This Section 10 shall survive the Closing and the earlier termination of this Agreement.

10.3   Definition.   As used in this Agreement, the term "Claim" means any obligation, liability, claim (including any claim for damage to property or injury to, or death of, any persons), lien or encumbrance, loss, damage, cost, or expense, including reasonable attorneys' fees.

11.   Events of Default.   In addition to all defaults and events of default as defined and/or described in this Agreement, Buyer agrees that each of the following events shall constitute an event of default for purposes of this Agreement:

11.1    Buyer shall commit any breach or default of any covenant, term, or condition contained in this Agreement;

11.2    Any representation or warranty made by Buyer shall prove to have been false or misleading;

11.3    Buyer shall make an assignment for the benefit of creditors; or

11.4    A petition or action for relief shall be filed by or against Buyer pursuant to the U.S. Bankruptcy Code (Title 11, U.S. Codes) in effect from time to time, or under any other law relating to bankruptcy, insolvency, reorganization, moratorium, creditor composition, arrangement or other relief for debtors; the appointment of a receiver, trustee, custodian, or liquidator of or for any of Buyer's assets; or upon the death, incapacity, insolvency, dissolution, or termination of any Buyer or the business of Buyer.

12.    <u>Remedies</u>.

12.1    <u>Liquidated    Damages</u>.    BUYER    AND    SELLER    HEREBY ACKNOWLEDGE AND AGREE THAT IN THE EVENT OF A DEFAULT OR BREACH BY BUYER IN THE PERFORMANCE OF BUYER'S OBLIGATIONS OR COVENANTS, OR THE BREACH BY BUYER OF ANY OF BUYER'S REPRESENTATIONS OR WARRANTIES, HEREUNDER, SELLER'S DAMAGES WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS AGREEMENT FAILS TO BE CONSUMMATED, AND THUS SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT. BUYER AND SELLER AGREE THAT, AS LIQUIDATED DAMAGES FOR SUCH BREACH AND/OR DEFAULT BY BUYER, SELLER SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO TERMINATE THE AGREEMENT AND RECEIVE FROM BUYER AND FROM THE DEPOSIT AND CLOSING FUNDS THE ABOVE LIQUIDATED SUM, IN FULL, AND SUCH LIQUIDATED DAMAGES SHALL BE SELLER'S SOLE REMEDY AT LAW OR IN EQUITY FOR SUCH BREACH OR DEFAULT BY BUYER; PROVIDED THAT NOTHING HEREIN CONTAINED SHALL BE DEEMED TO IN ANY WAY SATISFY, DISCHARGE, OR TERMINATE BUYER'S AGREEMENTS HEREIN TO INDEMNIFY SELLER AND THE PROPERTY AND TO HOLD SELLER AND THE PROPERTY HARMLESS, AS SPECIFICALLY STATED IN SECTION 10 AND ELSEWHERE IN THIS AGREEMENT, AND SELLER'S RIGHTS AND REMEDIES ARISING OUT OF SUCH INDEMNITY AND HOLD HARMLESS AGREEMENTS SHALL SURVIVE AND SHALL BE IN ADDITION TO THIS LIQUIDATED DAMAGES PROVISION. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, BUYER AND SELLER AGREE THAT (A) IT WOULD BE IMPRACTICAL OR IMPOSSIBLE TO PRESENTLY PREDICT WHAT MONETARY DAMAGES SELLER WOULD SUFFER IN THE EVENT OF A BUYER DEFAULT, (B) THE PAYMENT OF THE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE §§ 3275 OR 3369, BUT IT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE §§ 1671, 1676 AND 1677, (C) BUYER DESIRES TO LIMIT THE MONETARY DAMAGES FOR WHICH IT MIGHT BE LIABLE HEREUNDER, AND (D) BUYER AND SELLER DESIRE TO AVOID THE COSTS AND DELAYS THAT

WOULD BE INCURRED IF A LAWSUIT WERE COMMENCED TO RECOVER DAMAGES, SEEK EQUITABLE RELIEF, OR OTHERWISE ENFORCE SELLER'S RIGHTS UNDER THIS AGREEMENT. THE PARTIES ACKNOWLEDGE AND AGREE TO THIS PROVISION BY PLACING THEIR INITIALS BELOW:

BUYER'S INITIALS: _____        SELLER'S INITIALS: _____

12.2  <u>Seller Default; Limitation of Remedies</u>.  Buyer and Seller hereby acknowledge and agree that in the event of a default or breach by Seller in the performance of Seller's obligations or covenants, or the breach by Seller of any of Seller's representations or warranties, hereunder prior to the Closing, and provided all contingencies set forth herein for the benefit of Seller have been met and are satisfied, a "<u>Seller Default</u>" under this Agreement shall have been deemed to have occurred. In the event of a Seller Default, Buyer's sole and exclusive remedy shall be a claim for, and recovery of, such monetary damages against Seller to which Buyer shall be entitled by law, and Buyer acknowledges and agrees that the right to obtain monetary damages against Seller is a full and adequate remedy to protect its rights and interests under this Agreement. Without limiting the generality of the foregoing, Buyer waives all rights to the right to seek declaratory and/or injunctive relief, equitable relief, or specific performance of Seller's obligations under this Agreement and to record a *lis pendens* or notice of pendency of action or similar notice against any portion of the Property. In respect of any Seller Default, Buyer agrees that it will commence, and thereafter diligently prosecute, the enforcement of Buyer's rights under this Agreement in a court or other proceeding, within ninety (90) days of the date Buyer first becomes aware of such Seller Default, or Buyer shall be deemed to have forever waived its rights to enforce its rights under this Agreement with respect to the Seller Default. Buyer shall not assert, and does hereby waive, any and all rights and remedies at law or in equity or otherwise to redress any breach by Seller of Seller's obligations arising under this Agreement, including, without limitation, the right to seek declaratory and/or injunctive relief, equitable relief, or specific performance in any action which Buyer may bring arising out of or relating to this Agreement, except in the event Buyer shall have actually performed or tendered performance of all duties and obligations of Buyer under this Agreement and shall have satisfied all conditions of Seller's performance hereto (whether or not Buyer would otherwise be excused from such performance or condition) strictly within the times and in the manner herein provided for Buyer's performance and satisfaction of all such covenants and conditions. Notwithstanding any provision to the contrary contained in this Agreement, in no event shall the aggregate amount of actual damages which Buyer may be entitled to recover against Seller pursuant to this Section 12.2 exceed an amount equal to the amount of the Deposit, and in no event shall Seller be liable to Buyer or any other party for any punitive, speculative, special, or consequential damages.

13.  <u>Brokers</u>.

13.1  The parties acknowledge that no person or entity has any right to any commission, finder's fee, or other compensation based upon the transactions contemplated by this Agreement other than the Seller's broker, KENNEDY WILSON AUCTION GROUP, INC. ("<u>Seller's Broker</u>"), and Buyer's broker , _____ ("<u>Buyer's Broker</u>").  Seller shall be responsible for the payment of any commissions or fees of Seller's Broker pursuant to a written agreement between Seller and Seller's Broker, and Seller will be responsible for the payment of commissions and fees to Buyer's Broker in the amount of $_____ ("<u>Broker's Commission</u>").  If, for any reason, the Closing fails to

occur, no Broker's Commission to Buyer's Broker, or any other amount, shall be due or payable pursuant to this Agreement.

13.2    Except as provided in Section 13.1 of this Agreement, Buyer and Seller (each an "Indemnifying Party") hereby indemnify and shall hold one another (the "Indemnified Party") harmless from and against any and all claims, demands, damages, losses, costs and expenses, including, without limitation all attorneys' fees and related costs, incurred by the Indemnified Party in connection with any claim or demand for brokerage commissions or finders' fees made by any broker, agent, or other person alleged to have been engaged or hired by the Indemnifying Party, and any and all brokers or others claiming to have dealt with any party other than the Indemnified Party in connection with the transactions contemplated by this Agreement.

14.    Miscellaneous.

14.1    Notices.  Any notice, request, or demand required or permitted by this Agreement to be given by either party hereto to the other (or by or to Escrow Agent, as the case may be), shall be deemed delivered if (a) transmitted by telecopier or similar facsimile transmission to the telecopier number of the receiving party specified on the signature page of this Agreement, with original copy thereof to be deposited within twenty-four (24) hours after such transmission in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified on the signature page of this Agreement; (b) deposited in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified on the signature page of this Agreement; (c) deposited with a reputable overnight private commercial delivery service and addressed to the receiving party at the address specified on the signature page of this Agreement; or (d) given by personal delivery, by the party giving notice directly or through commercial messenger or courier service, at the receiving party's address specified on the signature page of this Agreement.  If notice is given by deposit in the U.S. Mail as herein provided, delivery shall not be deemed to be effective until forty-eight (48) hours after such deposit; if deposited with an overnight courier or delivery service as herein provided prior to any applicable deposit deadline for guaranteed overnight delivery, delivery shall be deemed effective twenty-four (24) hours after such deposit; if transmitted by telecopier or personal delivery, delivery shall be deemed to be effective upon receipt, if transmitted or delivered during normal business hours of the receiving party, otherwise on the next Business Day of the receiving party.  No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice.  Either party may change its address for purposes of this Section upon delivery to the other party of a notice of a change of address in the manner provided for notices hereunder.

14.2    Entire Agreement.  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes all other agreements, oral or written, between the parties hereto with respect to the subject matter.  No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against either party, except upon the basis of a written instrument executed by or on behalf of such party.  The Recitals set forth in this Agreement are incorporated herein by this reference.

14.3    Successors and Assigns.  Buyer shall not assign or transfer this Agreement or any right or obligation hereunder without the prior written consent of Seller, which consent Seller may withhold in its sole and absolute opinion and judgment.  Subject to the foregoing, the

provisions of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.

14.4    Headings. The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

14.5    Time. Time is, and shall be, of the essence of each and every provision of this Agreement.

14.6    Governing Law. This Agreement is and shall be governed by and construed in accordance with the laws of the State of California.

14.7    Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be an original, and all of which together shall constitute the same agreement.

14.8    Neutral Interpretation. This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

14.9    Attorneys' Fees and Costs. The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

14.10    Joint and Several Obligations. In the event this Agreement is executed by more than one person or entity as Buyer, the obligations of those persons or entities are, and shall be, joint and several obligations.

14.11    Severability. In the event any provision of this Agreement, or any agreement or document to which this Agreement refers, is held to be invalid, prohibited, or unenforceable to any extent in any jurisdiction, such invalidity, prohibition, or unenforceability shall apply only to such jurisdiction, and said provision and all other provisions of this Agreement shall otherwise be and remain valid and enforceable.

14.12    No Waiver. No failure or delay on the part of Seller in the exercise of any right, power, or privilege hereunder, or under any other agreement entered into in connection herewith, shall operate as a waiver thereof, and no single or partial exercise of any such right, power, or privilege shall preclude a further exercise thereof or of any other right, power, or privilege.

14.13    Relationship of Parties. The parties intend that the relationship existing between them shall be solely that of seller and buyer, subject to the provisions of this Agreement. Nothing in this Agreement, or in any other document or instrument entered into in connection

with this Agreement, shall be deemed or construed to create a principal/agent, partnership, joint tenancy, joint venture, or co-ownership relationship between the parties. Seller shall not in any way be responsible or liable for the debts, losses, obligations, or duties of Buyer with respect to the Property or otherwise.

14.14   No Third Parties Benefited.   This Agreement is made for the sole benefit and protection of the parties hereto, and Seller's successors and assigns, and no other person shall have any right of action or right to rely thereon, and the parties hereto agree that nothing contained in this Agreement shall be construed to vest in any other person or entity, any interest in, or claim upon, the rights and interests of the parties hereunder or in any proceeds thereof.

14.15   Duty of Cooperation.   Each of the parties to this Agreement shall at all times fully cooperate with each other, and shall cause their respective agents and attorneys to cooperate, in a prompt and timely manner, in connection with the performance of all obligations of the parties pursuant to this Agreement, and which may otherwise be necessary or appropriate to carry out and enforce the provisions of this Agreement. Each party shall execute and deliver to the other party all such documents, notices, and agreements (including agreements in recordable form) which the requesting party shall reasonably require in order to establish, confirm, affirm, perfect, and secure all rights, interests, title, and benefits accruing to each party pursuant to this Agreement.

14.16   Confidentiality.   Prior to the Effective Date, Buyer executed that certain Due Diligence and Confidentiality Agreement for the benefit of Seller (the "Confidentiality Agreement"). This Agreement shall be deemed Confidential Information, as such term is defined in the Confidentiality Agreement, and subject to the terms and conditions of the Confidentiality Agreement.

14.17   No Recording.   Neither this Agreement nor any memorandum of this Agreement shall be recorded in the Office of any County Recorder, or other official records, or otherwise filed in any public record. Buyer hereby waives any right Buyer shall otherwise have to record a notice of pending action in any such action or proceedings to enforce this Agreement. Buyer acknowledges and agrees that Buyer's only remedy for a breach by Seller hereunder shall be an action for money damages, if any, as hereinabove provided.

14.18   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH, RELATED, OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR

DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

| _____ | _____ |
| Seller's Initials | Buyer's Initials |

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**Buyer**:

_____

By: _____
Name: _____
Title: _____

Address: _____

_____
_____
_____
Attention: _____
Facsimile No.: (___) ___-___ _____

With a copy to:

_____
_____
_____
Attention: _____
Facsimile No.: (___) ___-___ _____


For Escrow Agent:

_____
_____
_____
_____

**Seller:**

WESTERN COMMERCIAL BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

Address:

WESTERN COMMERCIAL BANK

_____
_____
Attention: _____
Facsimile No.: (___) ___-____

With a copy to:

Frandzel Robins Bloom & Csato, L.C.
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920
Attention: Kenneth N. Russak, Esq.
Facsimile No.: (323) 658-9620

## ACCEPTANCE BY ESCROW AGENT

The undersigned, Escrow Agent, identified in the foregoing Purchase and Sale Agreement and Joint Escrow Instructions ("Instructions"), hereby accepts the Instructions and agrees to be bound thereby, subject to such additional or supplemental instructions and general provisions as Escrow Agent shall require which shall not be inconsistent or in conflict with the Instructions.

By:_____      Date: _____, 2010
    Authorized Officer

# EXHIBIT A

LEGAL DESCRIPTION OF REAL PROPERTY


APN: _____

**EXHIBIT B**

GRANT DEED

[SEE FOLLOWING PAGE]

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

_____

_____

_____

Attention: _____

APN: _____

In accordance with §11932 of the California Revenue and Taxation Code, Grantor has declared the amount of the transfer tax which is due by a separate statement which is not being recorded with this Grant Deed.

## GRANT DEED

      FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, WESTERN COMMERCIAL BANK, a California banking corporation ("Grantor"), hereby grants to _____, a _____ ( "Grantee"), all of Grantor's right, title, and interest in and to the real property located in the County of Los Angeles, State of California, and more particularly described in Exhibit A, attached hereto and made a part hereof, subject to all covenants, conditions, easements, encumbrances, and all other matters of record (the "Real Property").

      This Grant Deed is made and given in connection with that certain Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], dated _____, 2010, by and between Grantor, on the one hand, and _____, on the other hand, and is subject to the terms thereof.

**Grantor**

**WESTERN COMMERCIAL BANK**
a California banking corporation

By: _____
Name: _____
Title: _____

STATE OF CALIFORNIA          )
COUNTY OF _____   )

     On _____ before me, _____
a   Notary   Public   in   and   for   said   County   and   State,   personally   appeared
_____ who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

     I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____

**EXHIBIT A**
**LEGAL DESCRIPTION**


APN: _____

## EXHIBIT C

## BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT

FOR VALUABLE CONSIDERATION, receipt and adequacy of which are hereby acknowledged, WESTERN COMMERCIAL BANK, a California banking corporation ("Assignor"), hereby sells, transfers, assigns, and conveys to _____, a _____ ("Assignee"), the following:

1.      All right, title, and interest of Assignor, if any, in and to all tangible personal property ("Personal Property") located on, and used in connection with, the operation of that certain land and improvements, located in the County of Los Angeles, State of California, as more particularly described in Exhibit A, attached hereto and made a part hereof ("Real Property"), but excluding tangible personal property owned by, or leased from, third parties by tenants of the Real Property under Tenant Leases (defined below), if any.

2.      All right, title, and interest of Assignor, if any, as lessor in and to all leases ("Tenant Leases") relating to the leasing of space in the Real Property and all of the rights, interests, benefits, obligations, and privileges of the lessor thereunder, and to the extent Assignee has not received a credit therefor under the Purchase Agreement (defined below), all prepaid rents and security and other deposits actually received and held by Assignor under the Tenant Leases and not credited or returned to tenants or applied to rents past due prior to the date hereof, but subject to all terms, conditions, reservations, and limitations set forth in the Tenant Leases.

3.      To the extent assignable without the consent of third parties, all right, title, and interest of Assignor, if any, in and to all intangible property ("Intangible Property") owned or held solely for use in connection with the Real Property or the Personal Property for any business or businesses conducted thereon or with the use thereof (other than those businesses conducted by tenants of the Real Property under Tenant Leases), including, but not limited to, leases (other than Tenant Leases), contract rights and agreements (including, but not limited to, service agreements), building and trade names, trademarks, business licenses, warranties, rent lists, advertising materials, telephone exchange numbers, plans and specifications, governmental approvals and development rights, related solely to the Real Property or the Personal Property or any part thereof.

4.      This Bill of Sale, Assignment, and Assumption Agreement is given pursuant to that certain agreement Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], dated as of _____, 2010 ("Purchase Agreement"), by and between Assignor and _____, a _____, providing for, among other things, the conveyance of the Personal Property, the Tenant Leases, and the Intangible Property.

5.      The covenants, agreements, representations, warranties, and indemnities made by Buyer under, and limitations provided in, the Purchase Agreement with respect to the property conveyed hereunder (including, without limitation, the limitations of Assignor's liability provided in the Purchase Agreement), are hereby incorporated herein by this reference as if herein set out in full, and shall inure to the benefit of, and shall be binding upon, Assignee and Assignor and their respective successors and assigns.  Without limiting the generality of the foregoing, as set forth in Sections 3 and 5 of the Purchase Agreement, which are hereby incorporated by this reference as if herein set out in full, the property conveyed hereunder is

conveyed by Assignor, and accepted by Assignee, AS IS, WHERE IS, AND WITHOUT ANY WARRANTIES OF WHATSOEVER NATURE, EXPRESS OR IMPLIED, IT BEING THE INTENTION OF ASSIGNOR AND ASSIGNEE EXPRESSLY TO NEGATE AND EXCLUDE ALL WARRANTIES, INCLUDING WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR ANY PARTICULAR PURPOSE, WARRANTIES CREATED BY ANY AFFIRMATION OF FACT OR PROMISE, OR BY ANY DESCRIPTION OF THE PROPERTY CONVEYED HEREUNDER, OR BY ANY SAMPLE OR MODEL THEREOF, AND ALL OTHER WARRANTIES WHATSOEVER CONTAINED IN OR CREATED BY THE CALIFORNIA COMMERCIAL CODE.

6.      This Bill of Sale, Assignment, and Assumption Agreement may be executed in one or more identical counterparts, each of which such counterpart shall be deemed an original for all purposes and all such counterparts collectively consisting of one such instrument.

IN WITNESS WHEREOF, Assignor has executed this Bill of Sale, Assignment, and Assumption Agreement as of _____, 2010.

**WESTERN COMMERCIAL BANK,**
a California banking corporation

By: _____
Name: _____
Its: _____

## ASSUMPTION

AS OF THE DATE ABOVE WRITTEN, ASSIGNEE HEREBY ACCEPTS THE FOREGOING BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT AND HEREBY ASSUMES AND AGREES TO DISCHARGE, IN ACCORDANCE WITH THE TERMS THEREOF, ALL OF THE BURDENS AND OBLIGATIONS OF ASSIGNOR RELATING TO THE PERSONAL PROPERTY, THE TENANT LEASES, AND THE INTANGIBLE PROPERTY, FIRST ARISING AND ACCRUING ON AND AFTER THE EFFECTIVE DATE OF THE FOREGOING BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT; SUBJECT, HOWEVER, TO ANY PROVISIONS IN THE TENANT LEASES WHICH LIMIT THE LIABILITY TO THE LESSOR THEREUNDER.

_____,
a _____

By: _____
Name: _____
Title: _____

# EXHIBIT A
## LEGAL DESCRIPTION OF REAL PROPERTY

## EXHIBIT D
## CERTIFICATE OF NONFOREIGN STATUS

    <u>Federal FIRPTA Certificate</u>.  Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____ ("<u>Transferee</u>"), that withholding of tax is not required upon the disposition of a U.S. real property interest by WESTERN COMMERCIAL BANK, a California banking corporation ("<u>Transferor</u>"), Transferor hereby swears, affirms and certifies the following to Transferee:

    1.  Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

    2.  Transferor's U.S. employer identification number is: _____.

    3.  Transferor's office address is: _____.

    4.  Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

    5.  Transferor understands that Transferee is relying on this certification in determining whether withholding is required upon said transfer.

    <u>State of California-California Resident/Non-Resident Affidavit</u>.  California Revenue and Taxation Code Section 18662 requires that any seller who is not a California resident must authorize Escrow Holder to forward 3 1/3% of the sales price of the California real property conveyed to the Franchise Tax Board unless the sales price of the property is less than $100,000.00.

    1.  Transferor hereby certifies that Transferor is a California banking corporation which is and shall be qualified to do business in California after the transfer.

    2.  Transferor understands that this certificate may be disclosed to the Franchise Tax Board of California by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

    Under the penalties of perjury, the undersigned declares that he/she has examined this certification and to the best of his/her knowledge and belief, it is true, correct, and complete, and he/she further declares that he/she has the authority to sign this document on behalf of Transferor.

Executed as of the ___ day of _____, 2010.

                         WESTERN COMMERCIAL BANK,
                         a California banking corporation

                         By: _____
                         Name: _____
                         Its: _____

**EXHIBIT C**
**TO AUCTION SALE AGREEMENT**

**ADV PURCHASE AGREEMENT**
[SEE ATTACHED]

## ASSET PURCHASE AGREEMENT AND
## JOINT ESCROW INSTRUCTIONS
## [AGUA DULCE VINEYARDS]

THIS ASSET PURCHASE AGREEMENT AND JOINT ESCROW INSTRUCTIONS ("Agreement") is entered into as of _____, 2010 (the "Effective Date"), by and between AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV" or "Seller") and DONAL J. MACADAM, an individual ("D. MacAdam"), on the one hand, and the undersigned party identified on the signature page hereto as the "Buyer", with respect to the following facts:

## RECITALS

A.    Seller owns and operates a business which, among other things, consists of a winery, vineyard, and gift shop (the "Business") located at or near 9640 Sierra Highway, Agua Dulce, California.

B.    Seller is selling substantially all of its Assets (hereinafter defined) used in connection with the Business pursuant to a sealed-bid auction. Buyer desires to purchase all of Seller's right, title, and interest in and to the Assets, and is offering to purchase the Assets, upon and subject to the covenants, terms, and conditions contained in this Agreement, as evidenced by Buyer's execution and delivery of this Agreement to Seller. This Agreement shall not be binding upon either Buyer or Seller unless Seller, in its sole and absolute discretion, accepts Buyer's offer to purchase the Assets by executing and delivering this Agreement to Escrow Agent (defined below). If, for any reason, Seller does not execute or deliver to this Agreement to Escrow Agent, Seller shall not have accepted, or be deemed to have accepted, Buyer's offer to purchase the Assets pursuant to this Agreement, and neither Buyer nor Seller shall be bound by any term, covenant, or obligation set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.    Purchase And Sale. On, and subject to, the terms and conditions set forth in this Agreement, Seller shall sell, convey, transfer, and assign to Buyer, all of Seller's right, title, and interest of every kind and nature, in and to all properties, assets, rights, and interests, and wherever located and by whomever possessed, owned by Seller at the Closing related to, arising from, or used in connection with, the Business (the "Assets"). The Assets are further described in Section 1.1 below, and on Schedule 1, attached hereto and made a part hereof.

1.1    Assets. The Assets include, without limitation, the following:

(a)    Land. All that certain land located in the County of Los Angeles, State of California, described on Exhibit A, attached hereto and made a part hereof (the "Land"), together with all Improvements (defined below), fixtures, easements rights of way, water rights, water lines, rights of possession and use, licenses, leaseholds, privileges, and other

appurtenances thereto or otherwise related to the Business (such as appurtenant rights in and to public streets) and all other rights representing less than fee ownership (the "Real Property").

   (b) Improvements. All improvements, fixtures, and related amenities in and on the Real Property and/or owned, leased, licensed, or used in connection with the Business (the "Improvements"), including, but not limited to, the winery, gift shop, residential structures, barns, cellars, sheds, storage facilities, and other buildings, structures, and improvements located on the Real Property.

   (c) Tangible Personal Property. All tangible personal property pertaining or related to the Business and other Assets (the "Tangible Property"), including, but not limited to, all machinery, equipment (including, without limitation, all pumps, pumping facilities, hoses, purification and filtration equipment, mains, pipes, fire cisterns, basins, fountains, troughs, meters, wells, hydrants, equipment, machinery, tools, dies, spare parts, materials, water supplies, fixtures and improvements, construction in progress, jigs, molds, patterns, gauges and production fixtures, and other equipment related to any water system located on the Real Property, and/or used in connection with the Business, the "Water System"), tools, parts, supplies, appliances, fixtures, desks, chairs, cabinets, furniture, carpets, drapes, improvements, vehicles, tractors, farm products, crops (whether grown, growing, or to be grown), seeds, fertilizer, pesticides, livestock, products of crops or livestock, vines, grapes, wines and juices (however stored, including, without limitation, bottled, in tanks, or in barrels, and whether located on the Real Property or off-site), work in process, inventory, water rights (to the extent constituting personal property), customer lists, distributor lists, supplier lists, computers, computer software, rents, issues, accessions, profits, proceeds, revenue, royalties, bonuses, cash (except for reasonable reserves necessary to pay Court-approved administrative expenses in connection with the Seller's Bankruptcy (defined below), including U.S. Trustee fees), cash equivalents, security, utility, and customer deposits, books, records, record systems, information, documents, data, sales literature, promotional materials, and other personal property located on or about, or used in connection with, any of the Assets, or used in connection with the Business or the Business operations. Notwithstanding any provision herein to the contrary, the Tangible Personal Property and the Assets do not include personal items of D. MacAdam, C. MacAdam, and their children, such as clothing, household furniture, keepsakes, and similar items.

   (d) Contracts. All contracts and agreements pertaining or related to the Business and Assets, including, without limitation, management contracts, service contracts, supply agreements, distribution agreements, bottling contracts (whether "private label" or "agua dulce" label), sales agreements, leases (including vehicle leases), licenses, liens, Uniform Commercial Code filings, equipment leases, and maintenance contracts (collectively, "Contracts"). Notwithstanding any provision hereof to the contrary, Buyer shall purchase and assume responsibility only for (i) the Contracts identified in the "*Required Contracts*" section of Schedule 2, attached hereto and made a part hereof (the "Required Contracts"), and (ii) the Contracts identified in the "*Optional Contracts*" section of Schedule 2, attached hereto and made a part hereof, which lists those Contracts in addition to the Required Contracts that Buyer has elected to assume, in its sole and absolute discretion (the "Optional Contracts"). In addition to the Purchase Price, Buyer shall pay the amounts required to cure certain breaches and/or defaults by Seller under the Required Contracts and Optional Contracts as identified on Schedule 2, attached hereto and made a part hereof (the "Cure Amounts"), so as to allow Seller to assume

and assign such Required Contracts and Optional Contracts pursuant to 11 U.S.C. Section 365 in the Bankruptcy. Buyer hereby acknowledges that Seller shall have no obligation to pay the Cure Amounts, or otherwise take any actions, to cure any breaches or defaults by Seller under the Required Contracts and/or Optional Contracts, and Buyer shall be solely responsible for the payment of all Cure Amounts and the undertaking of all such actions. All assumptions and assignments of the Required Contracts and Optional Contracts are subject to Seller's ability to assume and assign such Required Contracts and Optional Contracts pursuant to 11 U.S.C. Section 365 in the Bankruptcy. Seller will remain responsible for all Contracts not assumed by Buyer.

(e) <u>Intangible Property</u>. All intangible personal property used in connection with the Business and Assets (the "<u>Intangible Property</u>"), including, but not limited to, all of Seller's right to operate the Business, goodwill, software licenses, copyrights, patent rights, trademarks, service marks, intellectual property rights, accounts (including deposit accounts), accounts receivables, claims, documents, information, instruments, receivables, utility contracts, telephone exchange numbers, plans and specifications, engineering plans and studies, warranties, guaranties, rebates, refunds, insurance claims, proceeds, permits, permissions, approvals, entitlements, floor plans, landscape plans, licenses, liquor licenses, trade names, franchises, and license agreements.

1.2   <u>No Assumed Liabilities</u>. The only liabilities of Seller that Buyer shall assume are (i) secured and unsecured real property taxes not yet assessed and payable for the Real Property on a pro-rated basis commencing after the Closing Date, and (ii) liabilities and obligations of Seller first arising after the Closing under the Contracts expressly assumed by Buyer hereunder, or with respect to the Assets. Except as set forth in the preceding sentence, Buyer shall not assume or be liable for any obligation or liability of Seller, of any kind or nature, known, unknown, contingent, or otherwise (collectively, the "<u>Excluded Liabilities</u>"), including, without limitation: (a) any liability or obligation of Seller arising out of any Contract or agreement, other than the Cure Amounts and the liabilities or obligations first arising out of the Required Contracts and Optional Contracts after the Closing; (b) any obligations to any former or present employees or independent contractors of Seller, including without limitation, any obligations arising under any employee program; (c) any litigation, proceeding, claim by any Person (defined below) or other obligation of Seller relating to the Business or the Assets prior to the Closing Date, whether or not such litigation, proceeding, claim, or obligation is pending, threatened, or asserted before, on, or after the Closing Date; (d) any liability of Seller for Taxes (defined below), whether relating to periods before or after the Closing Date; (e) all accounts payable in connection with purchases made, or services received, by Seller on or prior to the Closing Date; and (f) any obligations of Seller arising prior to the Closing, under any law, including but not limited to antitrust, civil rights, health, safety, labor, discrimination, and environmental laws. Seller shall be solely responsible for, and agrees to pay, any and all Excluded Liabilities as and when they become due.

2.   <u>Purchase Price</u>. The purchase price for the Assets shall be _____ and No/Hundreds Dollars ($_____.00) (the "<u>Purchase Price</u>"), plus such additional sums as shall be required to be paid by Buyer as Buyer's Closing Funds (hereinafter defined). The Purchase Price shall be payable by Buyer to Seller

through Escrow (hereinafter defined), in cash or other immediately available federal funds, as follows:

2.1     Deposit.   Within one (1) Business Day (defined below) of Seller's execution and delivery of this Agreement to Escrow Agent (defined below), Buyer shall deposit with Escrow Agent the amount equal to ten percent (10%) of the Purchase Price, in the amount of $_____ (the "Deposit"), in cash or other immediately available federal funds.  Immediately following receipt of the Deposit, Escrow Agent shall release the Deposit to Bank (defined below) without further instructions, consents, or approvals from Buyer, whereupon the entirety of the Deposit shall be applicable to the Purchase Price at the Closing (hereinafter defined), and deemed earned and non-refundable to Buyer.

2.2     Closing Funds.   Buyer shall deposit, or cause to be deposited, with Escrow Agent, by confirmed wire transfer of cash or other immediately available federal funds to a deposit account designated by Escrow Agent for its use in connection with this Agreement, the remaining balance of the Purchase Price, together with the Cure Amounts and Escrow Agent's estimate of Buyer's share of closing costs, prorations, adjustments, and charges payable by Buyer pursuant to this Agreement and pursuant to the Escrow Instructions (hereinafter defined), which, together with the balance of the Purchase Price, all such additional required deposits by Buyer with Escrow Agent are sometimes referred to in this Agreement as "Buyer's Closing Funds".  Buyer's Closing Funds shall be deposited with Escrow Agent at least one (1) Business Day prior to the Closing Date (hereinafter defined), or such earlier date as Escrow Agent shall require in order to satisfy all conditions to the Close of Escrow (hereinafter defined) on or before the Closing Date as herein provided.

2.3     Western Commercial Bank As Buyer.   Notwithstanding any provision of this Agreement to the contrary, if the Buyer hereunder is Western Commercial Bank, a California banking corporation ("Bank"), then (a) the Purchase Price shall be equal to the Bank Credit Bid Amount, as set forth and defined in that certain Agreement To Sell Property And Assets, dated _____, 2010, by and between Seller and Bank (the "Agreement To Sell Property And Assets"), (b) except as otherwise expressly provided herein, the Purchase Price, and all other closing costs, prorations, adjustments, charges, amounts, and other Buyer's Closing Funds due, owed, or required by Buyer under this Agreement shall not be paid in cash, or other federal funds, by Bank as the Buyer hereunder, but instead shall be offset from certain indebtedness and obligations that Seller owes to Bank as described in the Agreement To Sell Property And Assets (the "Debt"), (c) except as otherwise expressly provided herein, Seller shall be solely responsible to fund the cash amount of all fees, charges, payments, and other amounts owed in connection with this Agreement by either Buyer or Seller, including, but not limited to, all amounts owed to Escrow Agent, Title Company, Buyer's Broker, Los Angeles County, California, and all other governmental and public agencies in connection with this Agreement, and except as otherwise expressly provided herein, to the extent Buyer is responsible for any of such foregoing amounts pursuant to this Agreement, such amounts shall be offset from the Debt, and (d) Bank shall not be required to pay any Deposit under this Agreement.

2.4     Allocation of Purchase Price.   The Purchase Price shall be allocated among the Assets as determined by Buyer by written notice to Seller, and Buyer and Seller shall not take any position on any tax return filed by either Buyer or Seller inconsistent with such allocation.

3.    <u>Seller Representations and Warranties</u>.  Seller represents and warrants to Buyer that the statements contained in this Section 3 are true, correct, and complete as of the Effective Date and the Closing Date.  Any claims for damages arising from the breach of any of the representations and warranties set forth in Sections 3.4(a) and 3.14 of this Agreement shall be administrative claims in the ADV Bankruptcy that are subordinate to all other administrative claims under the ADV Bankruptcy, unless and except for any breach that arises from fraud or intentional misrepresentation on the part of Seller and/or its attorneys, or with respect to a matter that Seller and/or its attorney knew, or should have known after reasonable inspection and investigation.

3.1    <u>Organization; Capacity</u>.    Seller is a limited liability company, duly organized and validly existing under the laws of the State of California, and is qualified to do business, and is in good standing, as a foreign company in all jurisdictions in which the ownership of the Assets required or requires Seller to be so qualified.  Seller has all requisite power and authority and all permits and licenses necessary to own and operate the Assets.

3.2    <u>Authority</u>.    This Agreement and all other documents, certificates, instruments, and agreements delivered or deliverable in connection herewith (the "<u>Transaction Documents</u>") when executed and delivered by Seller, shall constitute the legal, valid, and binding obligation of Seller in accordance with the terms of each such instrument, and Seller's execution, delivery, and performance of each Transaction Document to which it is a party:  (a) are within the power of Seller; (b) to the extent applicable, have been duly authorized as required by Seller's management, board, members, and owners, as required by Seller's governing instruments and applicable law; (c) do not violate any provision of any of the governing instruments of Seller or any other agreements, contracts, or obligations of Seller; and (d) will not result in the creation or imposition of any mortgage, pledge, claim, lien, option, charge, easement (including, without limitation, any prescriptive easement), adverse possession, security interest, deed of trust, right of way, encroachment, building or use restriction, conditional sales agreement, encumbrance, or other right of third parties, whether voluntarily incurred or arising by operation of law, including, without limitation, any agreement to give any of the foregoing in the future, and any contingent sale or other title retention agreement or lease in the nature thereof (each, an "<u>Encumbrance</u>") of any nature whatsoever upon the Business or the Assets.

3.3    <u>No Violation or Conflict</u>.    The execution and delivery by Seller of the Transaction Documents, and the consummation by Seller of the transactions contemplated by the Transaction Documents, will not (a) conflict with or violate any law, order, or permit applicable to Seller or by which the Assets are bound or affected, or (b) result in any breach, or violation of, or constitute a default (or an event that with notice or lapse of time or both would become a breach, violation, or default) under, or impair Seller's rights, or alter the rights or obligations of any third party under, or give to others any rights of termination, amendment, acceleration, or cancellation of, or result in the creation of any lien on, any of the Assets pursuant to, any contract or other instrument or obligation to which Seller is a party or by which Seller or the Assets are bound or affected.  Seller has obtained all required consents and approvals in connection with the execution and delivery of this Agreement and the Transaction Documents by Seller.

3.4    <u>Assets</u>.

(a)     The Assets include, without limitation, all assets necessary for the conduct of the Business being sold to Buyer, as it is presently conducted.

(b)     (i) Seller is the sole and exclusive owner of, and possesses all right, title, and interest in and to, the Assets, and as of the Closing, the Assets will be free and clear of all liens, encumbrances, security agreements, equities, licenses, options, mortgages, claims, charges, restrictions, and adverse claims; and (ii) except as described in Sections 5.3 and 5.4 of this Agreement, there is no impediment to, or restriction upon, Seller's conveyance of such Assets to Buyer as contemplated in this Agreement. Schedule 1, attached to this Agreement, and made a part hereof, sets forth a true and complete list of all of the Assets.

(c)     Seller is the exclusive owner of all right, title, and interest in and to each of the Assets, and prior to the Closing, the Assets will not cease to be valid rights of the Seller by reason of the execution, delivery, and performance of this Agreement, or the consummation of the transactions contemplated hereby.

(d)     Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, and subject to the provisions of Sections 5.3 and 5.4 of this Agreement, Buyer will own, with proper and valid title, the Assets, free and clear of liens and encumbrances, and without incurring any penalty or other adverse consequence, including, without limitation, any rentals, royalties, or license or other fees imposed as a result of, or arising from, the consummation of the transactions contemplated by this Agreement on or before the Closing Date.

(e)     With respect to each of the Assets, as of the Closing Date, and except as disclosed on Schedule 1, attached hereto:  (i) there are no licenses, sublicenses, or agreements related to such Assets, (ii) other than the Bankruptcy, none of the Assets are subject to any outstanding injunction, judgment, order, decree, or ruling, (iii) neither the Seller nor any other affiliate of Seller, nor any other party has granted any license, sublicense, or similar right with respect to any Assets, or sold, assigned, licensed, transferred (whether as a gift or for consideration), granted any option or right to purchase, or otherwise disposed of, or abandoned, any Asset, or allowed any Asset to lapse, or agreed to do any of the foregoing which such agreement shall be binding following the Closing, except for the sale of Assets comprising Seller's inventory in the ordinary course of the Business, and (iv) other than the Bankruptcy, or as identified on Schedule 1, attached hereto and made a part hereof, no action, suit, proceeding, hearing, investigation, or complaint is pending or, to Seller's knowledge, threatened, nor has any claim or demand been made that challenges the legality, validity, enforceability, use, or misuse, or ownership of such Assets.

(f)     Other than the Bankruptcy, or as identified in Schedule 1, attached hereto and made a part hereof, Seller has not received any notice of invalidity or infringement of any rights of others with respect to any of the Assets, nor is Seller aware of any facts that would cause Seller's rights thereunder to be or become invalid.  Seller has not asserted any claim against any third party relating to infringement, or inappropriate use, of the Assets.

3.5     Real and Tangible Property.

(a)    One or more of Seller owns and has good, valid, and marketable title, or has a valid and enforceable right to use, or a valid and enforceable leasehold interest in, all the Real Property used in the conduct of the Business as such Business is now being conducted.

(b)    Seller knows of no facts or circumstances related to environmental, water supply, water quality, regulatory or other matters in connection with the operation of the Water System or concerning the Real Property that are reasonably likely to result in any material reduction in the quality or quantity of water available for the operation of the Business.

(c)    All of the Tangible Property is in a condition and repair sufficient to operate the Business, and none of Seller has received notice that any of its Tangible Property is in violation of any Regulation (defined below).

(d)    As of the Closing Date, there shall be no tenants or other occupants with any right to use or occupy any portion of the Real Property or any of the other Assets, except for D. MacAdam, Catherine MacAdam, an individual, and their children, who shall have the right to occupy and/or use the Real Property for a period of ninety (90) days following the Effective Date.    Seller has not granted, assigned, conveyed, or otherwise transferred to any person or entity any title, right, or interest in or to the Real Property or any of the other Assets, or any future right to acquire any title, right, or interest in or to the Real Property or any of the other Assets.

(e)    Seller has not received any notice of any kind from any insurance broker, agent, or underwriter that any noninsurable condition exists, in, on, or about the Real Property, or any part thereof, or in respect of any of the other Assets.

(f)    To the best of the Seller's knowledge, there are no environmental or biological characteristics of the Real Property or adjacent properties which under existing law will adversely affect the development of the Real Property, including, without limitation, the taking, or diminution, of a habitat of an endangered or threatened species of animal, plant, or insect.

(g)    To the best of Seller's knowledge, there are (i) no pending widening, modification, or realignment of any street or highway contiguous to the Real Property, (ii) no existing or proposed, or to Seller's knowledge, threatened, action in condemnation, eminent domain, or any other type of proceeding similar thereto that would result in a taking or condemnation of all or any part of the Real Property, and (iii) no general plan, land use, or zoning action or proceeding with respect to the Real Property, or any part thereof.  To the best of Seller's knowledge, no supplemental real property taxes have been, or will be, levied against or assessed with respect to the Real Property or any part thereof based on any change in ownership or new construction or other event or occurrence relating to the Real Property before the Closing Date, except any such supplemental real property taxes as have been paid in full and discharged.

(h)    Seller is not a "foreign person" as defined in Section 1445 of the Code, and no California withholding of tax or reporting pursuant to applicable California law will be required with respect to the sale of any of the Real Property or other Assets.

3.6    Contracts. To the best of Seller's knowledge, the Required Contracts and Optional Contracts are in full force and effect and are the valid and binding obligations of Seller, and are enforceable obligations of the parties thereto in accordance with their respective terms, subject to any material breaches or defaults disclosed with respect thereto in writing by Seller on Schedule 1, attached hereto and made a part hereof. Except as disclosed in writing by Seller on Schedule 1, attached hereto and made a part hereof, (a) no Required Contracts or Optional Contracts have been materially breached in any respect or canceled by any party thereto, (b) Seller has performed all material obligations required to be performed under each Required Contract and Optional Contract, and (c) Seller has not received any notice of breach or default under any Required Contract and Optional Contract.

3.7    Permits. Schedule 1, attached hereto and made a part hereof, describes all licenses (including, but not limited to, liquor licenses), permits, franchises, orders, permissions, and approvals of any federal, state, local or foreign governmental or regulatory body, that are material to the conduct and operation of the Business and/or the ownership or use of the Assets (collectively, "Permits"). Seller holds all Permits necessary to operate the Business as presently conducted. The Permits are in full force and effect, and subject to Sections 5.3 and 5.4 of this Agreement, and except for any local business licenses of Seller, such Permits will be transferred to Buyer as part of the Assets to the maximum extent possible under the applicable laws related to such Permits. No violations are or have been recorded with any governmental or regulatory body in respect of any Permit, and no proceeding is pending or, to the best of Seller's knowledge, threatened by any Person, to revoke, limit, delay, or prevent the renewal of any Permit.

3.8    Subsidiaries or Other Interests.    There are no other corporations, partnerships, joint ventures, associations, or other entities in which Seller owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire any of the same. Seller is not a member of, nor is any part of the Business conducted through, any partnership, nor is Seller a participant in any joint venture or similar arrangement.

3.9    Financial Statements. Seller has heretofore made available to Buyer certain financial statements with respect to the Business ("Financial Statements"). Such Financial Statements were created in the normal course of business, and, as of their respective dates, are true and correct in all material respects. There are no events or circumstances that have occurred, or come into existence, since the date of the most recent Financial Statements that may reasonably be expected, individually or in the aggregate, to have or constitute a Material Adverse Change (defined below). For purposes of this Agreement. "Material Adverse Change" shall mean, when used with respect to the Business or Seller means any result, occurrence, fact, change, event, or effect that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, or effects, is or would reasonably be expected to have a materially adverse effect on (a) the business, operations, prospects, assets, liabilities, condition (financial or otherwise), results of operations, or cash flow of the Business taken as a whole or (b) the ability of Seller to consummate any transaction contemplated by this Agreement or any Transaction Documents, or any event or condition which would, with the passage of time, constitute a Material Adverse Change.

3.10    Litigation. Except with respect to *In re Agua Dulce Vineyards, LLC, a California limited liability company,* Case No. 1:09-bk-15207-MT, and *In re Catherine P. MacAdam and Donal J. MacAdam,* Case No. 1:09-bk-17476-MT (collectively, the "Bankruptcy"), filed in the United States Bankruptcy Court, Central District of California, San Fernando Valley Division (the "Court"), or otherwise disclosed on Schedule 1, attached hereto and made a part hereof, Seller is not aware of any litigation or investigation pending or threatened against, or otherwise adversely affecting, the Assets or rights of the Seller relating thereto before any court or governmental authority, nor to the knowledge of Seller, does there exist any reasonable basis for any such litigation.

3.11    Compliance with Laws. To the best of Seller's knowledge, Seller has not violated, and Seller is in compliance with, all Regulations relating to the Assets and the Business. Seller has not received any notice to the effect, or otherwise been advised, that Seller is not in compliance with any Regulations, and Seller has no reason to anticipate that any existing circumstances are likely to result in violations of any Regulations.    For purposes of this Agreement, "Regulations" shall mean any and all laws, statutes, ordinances, regulations, executive orders, rules, notice requirements, court decisions, agency guidelines, principles of law, and orders of any foreign, federal, state, or local government, and any other governmental department or agency, including, without limitation, Environmental Requirements (defined below), energy, motor vehicle safety, public utility, zoning, building and health codes, occupational health and safety, affirmative action, equal employment opportunity, employee documentation, terms and conditions of employment and wages and hours.

3.12    Intentionally Omitted.

3.13    Insurance. Schedule 1, attached hereto and made a part hereof, sets forth a list of all policies or binders of fire, liability, product liability, workmen's compensation, vehicular, directors and officers, and other insurance held by or on behalf of the Seller ("Insurance").    Such Insurance policies are "claims incurred" policies covering all claims, occurrences, and omissions arising or occurring prior to the Closing Date. The policies of such Insurance are in full force and effect with all premiums with respect thereto having been paid current, are reasonably believed to be adequate for the Business, and are in conformity with the requirements of all Contracts, and to the best knowledge of Seller, are valid and enforceable in accordance with their terms. Seller has not received notice of cancellation or nonrenewal of any such Insurance.

3.14    Hazardous Materials. To the best of Seller's knowledge, Seller has not generated, used, or handled any Hazardous Materials (as defined below) other than in compliance with all Environmental Requirements, nor has Seller treated, stored, or disposed of any Hazardous Materials at any site owned or leased by Seller (including, without limitation, on any of the Real Property), or used pursuant to an easement, or shipped any Hazardous Materials for treatment, storage, or disposal at any other site or facility, other than in compliance with all Environmental Requirements.    To the best of Seller's knowledge, no other Person has ever generated, used, handled, stored, or disposed of any Hazardous Materials at any site owned, or premises leased, by Seller, or used pursuant to an easement, during the period of such party's ownership, lease, or use, nor has there been, or is there threatened, any release of any Hazardous Materials on or at any such site or premises, other than in compliance with all Environmental

Requirements. No lien has ever been imposed by any governmental agency on any Assets owned, operated, leased, or used by Seller in connection with the presence of any Hazardous Materials. No action, proceeding, revocation proceeding, amendment procedure, writ, injunction, or claim is pending, or to the knowledge of Seller, threatened concerning an environmental permit or approval or any Hazardous Materials, and to the best of Seller's knowledge, there is no fact or circumstance which could reasonably be expected to involve Seller in litigation relating to Hazardous Materials or compliance with any Environmental Requirements. Seller has made available to Buyer copies of all material documents, records, and information concerning any environmental or health and safety matter relevant to the Assets, whether generated by Seller or others, including, without limitation, environmental audits, environmental risk assessments, site assessments, documentation regarding off-site disposal of Hazardous Materials, spill control plans, and reports, correspondence, permits, licenses, approvals, consents and other authorizations related to environmental or health and safety matters issued by any governmental agency.

        (a)    Hazardous Materials. For purposes of this Agreement, "Hazardous Materials" shall mean any hazardous or toxic materials, substances, or wastes, including, without limitation, (i) substances defined as "hazardous substances," "hazardous materials," "hazardous waste," "pollutant," "infectious waste," or "toxic substances," or words of similar meaning or regulatory effect under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. § 9601 et seq.) ("CERCLA"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 et seq.) ("RCRA"), the Hazardous Materials Transportation Act (49 U.S.C. § 1801, et seq.), the Federal Water Pollution Control Act (33 U. S. C. § 1251, et seq.), the Clean Air Act (42 U. S. C. § 740 1, et seq.), the Toxic Substances Control Act (15 U.S.C. § 2601, et seq.), the Refuse Act (33 U.S.C. § 407), Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health and Safety Code §§ 25300, et seq., Hazardous Substance Cleanup Bond Act of 1984, California Health and Safety Code §§ 25385, et seq., and related statutes including sections 25356.1-25356.4 of the California Health and Safety Code, Porter-Cologne Water Quality Control Act, California Water Code §§ 13000 et seq., as any or all of such acts are amended from time to time; (ii) those materials identified in §§ 66680 through 66685 and §§ 66693 through 66740 of Title 22 of the California Administrative Code, Division 4, Chapter 30, as amended from time to time; (iii) any substance defined as a "hazardous substance", "hazardous waste", "extremely hazardous waste", "RCRA hazardous waste", "waste" or "hazardous material" in §§ 25115, 25117, 25122.7, 25120.2, 25124, 25281, 25316 or 25501 of the California Health and Safety Code, as amended, or listed pursuant to § 25140 of the California Health and Safety Code, as amended; (iv) any chemical or other substance regulated by the California Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code § 25249.5, et seq., as amended; (v) any substance defined as a "waste" or "hazardous substance" in § 13050 of the California Water Code, as amended; (vi) any substance listed in California Labor Code §§ 6501.7 or 9004, as amended; (vii) any materials, substances, or wastes which are toxic, ignitable, corrosive, or reactive, and which are regulated by any local governmental authority, any agency of the State of California, or any agency of the United States of America; (viii) any substance the presence of which at the Property causes, or threatens to cause, a nuisance and/or a trespass upon the Property, or to adjacent properties, or poses, or threatens to pose, a hazard to the health or safety of human beings; (ix) asbestos (including, without limitation, asbestos containing materials), petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls

(PCBs), Freon and other chlorofluorocarbons, flammable, explosive, infectious, carcinogenic, mutagenic, or radioactive materials, petroleum or any substance containing or consisting of petroleum hydrocarbons (including, without limitation, gasoline, diesel fuel, motor oil, waste oil, grease or any other fraction of crude oil), paints and solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonium compounds, polychlorinated biphenyls, radon and radon gas, and electromagnetic or magnetic materials, substances, or emissions; and (x) those substances defined as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws and regulations.

(b)    Environmental Requirements. For purposes of this Agreement, the term "Environmental Requirements" shall mean all laws, ordinances, statutes, codes, rules, regulations, agreements, judgments, orders, and decrees, now or hereafter enacted, promulgated, or amended, of the United States, the states, the counties, the cities, or any other political subdivisions in which the Property is located, and any other political subdivision, agency or instrumentality exercising jurisdiction over the owner of the Assets, the Assets, or the use of the Assets, relating to pollution, the protection or regulation of human health, natural resources, or the environment, or the emission, discharge, release or threatened release of pollutants, contaminants, chemicals, or industrial, toxic, or hazardous substances or waste or Hazardous Materials into the environment (including, without limitation, ambient air, surface water, groundwater, land, or soil).

3.15    Intentionally Omitted.

3.16    Employees. Effective as of the Closing Date, Seller has terminated, or will terminate, all employment arrangements, and consulting, management, and agency agreements, in respect of the Business. Buyer is not assuming, and shall not have any liabilities or obligations in connection with or relating to, any of Seller's current or former employees, compensation and/or benefits owed to any of Seller's current or former employees, employee benefit plans, employee insurance policies, severance, or other termination obligations, including obligations under the Worker Adjustment and Retraining Notification Act of 1988, and any similar federal, state, or local Regulations, or other employment related matters (all of which will be deemed to constitute Excluded Liabilities).

3.17    Absence of Changes.

(a)    To the best of Seller's knowledge, since December 1, 2009, each of Seller has, and as of the Closing Date, Seller has:  (i) carried on the Business as presently conducted and only in the usual and ordinary course; (ii) used its best efforts to preserve the Assets intact, and to preserve the goodwill of its suppliers and customers; and (iii) not incurred any Liability or made any commitment or entered into any other transaction outside the ordinary course of business as it affects the Assets.

(b)    For purposes of this Agreement, the term "Liability" shall mean any direct or indirect liability, indebtedness, obligation, responsibility, commitment, expense, claim, deficiency, guaranty, or endorsement of or by any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, court or other entity or governmental body

(each, a "Person"), of any type, whether accrued, absolute, contingent, matured, unmatured or otherwise, including, but not limited to, (i) any liability or obligation of a Person arising under any employee benefit plan, and any liability or obligation with respect to any employee or former employee of a Person, (ii) any liability or obligation arising under any Regulation, and (iii) any liability or obligation for Taxes.

3.18    Disclosure.   No representation or warranty by Seller contained in this Agreement or in any other Transaction Document or in any schedule, attachment, or exhibit hereto or thereto contains any untrue statement of a material fact or omits a material fact necessary to make the statements contained herein or therein, in light of the circumstances in which they were made, not misleading.

4.    Buyer Representations and Warranties.   Buyer represents and warrants to Seller that the statements contained in this Section 4 are true, correct, and complete as of the Effective Date and the Closing Date.

4.1    Buyer has the full right, power, and authority, without the joinder, consent, or authorization of any other person or entity, to enter into, execute, and deliver this Agreement, and to perform all duties and obligations imposed upon Buyer under this Agreement.

4.2    This Agreement constitutes a legal, valid, and binding obligation of Buyer enforceable against Buyer in accordance with its terms, except as limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting the enforcement of creditors' rights and general equitable principles.

4.3    Neither the execution nor the delivery of this Agreement, nor the consummation of the purchase and sale contemplated hereby, nor the fulfillment of, or compliance with, the terms and conditions of this Agreement conflict with, or will result in, the breach of any of the terms, conditions, or provisions of any agreement, instrument, writ, order, judgment, injunction, decree, determination, or award to which Buyer, or any partner or related entity or affiliate of Buyer, is a party or by which Buyer, any partner or related entity or affiliate of Buyer, or Buyer's assets, is bound.

4.4    Buyer has such knowledge and experience in financial and business matters that Buyer is capable of evaluating the merits and risks relating to Buyer's purchase of the Assets and making an informed purchase and investment decision in connection therewith.

4.5    Buyer has, or will have, made such examination, review, inspection, and investigation of the facts and circumstances necessary to evaluate the Assets as Buyer has deemed necessary or appropriate to form a basis for Buyer's evaluation of a purchase of the Assets.

4.6    Buyer, and any person or entity controlling, or controlled by, or having a beneficial interest in, Buyer, and any person or entity for whom Buyer is acting as agent or nominee in connection with this transaction, is not an OFAC Prohibited Person (defined below).

(a)    As used herein, the term "OFAC Prohibited Person" shall mean a country, territory, individual, or person (i) listed on, included within, or associated with any of

the countries, territories, individuals, or entities referred to on The Office of Foreign Assets Control's List of Specially Designated Nationals and Blocked Persons or any other prohibited person lists maintained by governmental authorities, or otherwise included within, or associated with, any of the countries, territories, individuals, or entities referred to in, or prohibited by, United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), or any other Anti-Money Laundering Laws (defined below), or (ii) which is obligated or has any interest to pay, donate, transfer, or otherwise assign any property, money, goods, services, or other benefits directly or indirectly, to any countries, territories, individuals, or entities on, or associated with, anyone on such list or in such laws.

(b)     As used herein, the term "Anti-Money Laundering Laws" shall mean the USA Patriot Act of 2001, the Bank Secrecy Act, as amended through the date hereof, Executive Order 1 3324—Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, as amended through the date hereof, and other federal laws and regulations and executive orders administered by OFAC which prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities, and individuals (such individuals include specially designated nationals, specially designated narcotics traffickers, and other parties subject to OFAC sanction and embargo programs), and such additional laws and programs administered by OFAC which prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on any of the OFAC lists.

5.     Covenants.

5.1     Seller's Pre-Closing Covenants. From the Effective Date and continuing through the Closing, Seller shall maintain and preserve all of the Assets and other properties which are necessary for the conduct of the Business, and preserve its present business relationships (including its customer, supplier, and distributor relationships), and continue to compensate its agents in accordance with past custom and practice.

5.2     Mutual Covenants. From and after the Effective Date, and as continuing obligations following the Closing, Buyer and Seller will:

(a)     Work together, and cooperate in good faith, to transfer to Buyer all utilities and other public services, if any, furnished to the Business in the name, or for the account of, Seller.

(b)     Use all reasonable and good faith efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, and execute and deliver such documents and other papers, as may be required or desirable to carry out the provisions of this Agreement and the transactions contemplated herein.

(c)     Execute and deliver, and shall cause their officers and employees (when appropriate) to execute and deliver, in a form reasonably acceptable to the parties hereto, such instruments of sale, transfer, conveyance, assignment, and confirmation as may reasonably be required, and shall take such other action as either party may reasonably request, to more effectively transfer, convey, and assign to Buyer all of Seller's right, title, and interest in the

Assets, and to confirm such sale, transfer, conveyance, and assignment by Seller to Buyer pursuant to this Agreement. In the event that a party becomes aware of any asset that is covered by the definition of Assets but which is not currently listed on Schedule 1, such asset shall automatically be added to Schedule 1, and shall be deemed to constitute a Asset for all purposes hereunder, and to the extent applicable, Seller shall promptly deliver such additional Asset to Buyer.

       5.3    Water System. The parties acknowledge and agree that the transfer of the Water System from Seller to Buyer pursuant to this Agreement will not occur until Buyer obtains all necessary and required Permits to operate and use the Water System. Accordingly:

       (a)    Promptly following the Closing Date, and as a continuing obligation thereafter, Buyer shall seek and obtain, at Buyer's sole cost and expense, all Permits necessary or required to own, operate, and use the Water System, including, but not limited to, such Permits required by the Los Angeles County Department of Public Health ("Health Department").

       (b)    As a continuing obligation following the Closing Date, Seller shall cooperate with Buyer, at no material cost to Seller, with Buyer's efforts to obtain all Permits necessary or required to own, operate, and use the Water System, including, without limitation, seeking approval from the Health Department for the sale and transfer of the Water System from Seller to Buyer pursuant to this Agreement.

       (c)    From and after the Closing, D. MacAdam shall, at no cost to Buyer, (i) keep and maintain his license enabling him to operate the Water System with Buyer to pay any required licensing fees in an amount not to exceed $       , and (ii) operate the Water System as the licensed operator thereof on behalf of the Buyer in connection with Buyer's operation of the Business, until the earlier of the date that (A) Buyer obtains all Permits necessary or required for the ownership, operation, and use of the Water System as described above, (B) Buyer informs Seller, by written notice, that it no longer requires D. MacAdam to be the licensed operator of the Water System, and (C) is twelve (12) months following the Closing Date.

       (d)    Effective as of Buyer's receipt of all Permits required for the ownership of the Water System, Buyer shall automatically be deemed the owner of all right, title, and interest in and to the Water System, without the need for any further writing or instrument between the parties hereto.

       5.4    Liquor License. Promptly following the Closing Date, and as a continuing obligation thereafter, Seller will cooperate with Buyer, at no material cost to Seller, in connection with the transfer, sale, and assignment from Seller to Buyer of any and all liquor licenses used in connection with the Business (the "Liquor Licenses"). Without limiting the generality of the foregoing, to the extent necessary, Buyer and Seller agree to comply with all requirements of the State of California (including, but not limited to, the California Department of Alcohol Beverage Control) and Los Angeles County, California, in connection with the transfer of the Liquor Licenses, including, but not limited to, filing such applications with the appropriate agencies, posting and recording such notices as required by all applicable

Regulations, and agreeing to hold open Escrow for purposes of transferring the Liquor Licenses following the Closing to the extent required. If, Bank is the Buyer, and for any reason, Bank is unable to acquire all of Seller's right, title, and interest in and to the Liquor Licenses as described in this Section 5.4, Seller shall continue to own and hold such Liquor Licenses for the benefit of Bank for a period of up to eighteen (18) months following the Closing Date, and upon Bank's written request, Buyer shall cooperate with the transfer of the Liquor Licenses to the Person designated by Bank.

6.   Indemnification.

6.1   General Indemnity. Seller shall indemnify, protect, and defend, Buyer and the Buyer Parties (defined below) against, and shall hold each of Buyer and Buyer Parties harmless from any and all Claims (defined below) incurred or suffered by Buyer or any of the Buyer Parties arising out of, related to, or in connection with:  (a) any breach by Seller of any representation or warranty set forth in this Agreement or the agreements, documents, instruments, or certificates made or delivered by Seller in connection with this Agreement; (b) any Excluded Liability; (c) any failure by Seller to perform any covenant or obligation of Seller set forth in this Agreement or the agreements, documents, instruments, or certificates made or delivered by Seller in connection with this Agreement; and (d) Seller's operation of the Business prior to the Closing Date.

(a)   Buyer shall notify Seller of any such Claim against Buyer within forty-five (45) days after Buyer has notice of such Claim, but failure to notify Seller shall in no case prejudice the rights of Buyer under this Agreement unless Seller shall be prejudiced by such failure, and then only to the extent of such prejudice. Should Seller fail to discharge or undertake to defend Buyer against such liability (with counsel approved by Buyer), within twenty (20) days after Buyer gives Seller written notice of the same, then Buyer may settle such Claim, and Seller's liability to Buyer shall be conclusively established by such settlement, the amount of such liability to include both the settlement consideration and the reasonable costs and expenses, including attorneys' fees, incurred by Buyer in effecting such settlement.

(b)   Seller's indemnification obligations under this Agreement shall cover the costs and expenses of Buyer, including reasonable attorneys' fees, related to any actions, suits, or judgments incident to any of the matters covered by such indemnities.

(c)   Seller's indemnification obligations under this Agreement shall also extend to any present or future advisor, trustee, director, officer, partner, employee, beneficiary, shareholder, participant, or agent of or in Buyer or any entity now or hereafter having a direct or indirect ownership interest in Buyer (the "Buyer Parties").

(d)   Seller's indemnification obligations under this Agreement, and the provisions of this Section 6, shall survive the Closing of the transaction contemplated hereunder.

(e)   As used in this Agreement, the term "Claim" means any obligation, liability, claim (including any claim for damage to property or injury to, or death of, any persons), lien or encumbrance, loss, damage, cost, or expense, including reasonable attorneys' fees.

6.2    <u>Tax Indemnity</u>. Without limiting the generality of Section 6.1 of this Agreement, Seller shall indemnify, protect, defend, and hold Buyer and the Buyer Parties harmless from and against the entirety of any Taxes (defined below) which Seller is responsible or required to pay under any provision of this Agreement or with respect to the Assets or the Business on or before the Closing Date, and from and against any Claims that the Buyer may suffer resulting from, arising out of, relating to, in the nature of or caused by any liability of Buyer for any such Taxes; any liability with respect to any such Taxes arising from any changes made on examination or audit; and any liability for Taxes which would not be owed if all warranties and representations of Seller hereunder had been true, complete, and correct in all respects.   Any indemnification pursuant hereto shall also include reasonable costs incurred by Buyer (including reasonable fees and disbursements of attorneys, accountants, and expert witnesses) in connection with such indemnification claim.

(a)    As used in this Agreement, the term "<u>Tax</u>" or "<u>Taxes</u>" shall mean (whether or not disputed) taxes of any kind, levies, or other like assessments, customs, duties, imposts, charges, or fees, including, without limitation, income taxes, gross receipts, ad valorem, value added, excise, real property, personal property, occupancy, asset, sales, use, license, payroll, transaction, capital, capital stock, net worth, estimated, withholding, employment, social security, unemployment, unemployment compensation, workers' compensation, disability, utility, severance, production, environmental, energy, business, occupation, mercantile, franchise, premium, profits, windfall profits, documentary, stamp, registration, transfer and gains taxes, toll charges (for example, toll charges under Sections 367 and 1492 of the Internal Revenue Code of 1986, as amended, "<u>IRC</u>"), or other taxes of any kind whatsoever, imposed by or payable to the United States, or any state, country, local, or foreign government or subdivision, instrumentality, authority, or agency thereof, or under any treaty, convention, or compact between or among any of them, and in each instance such term shall include any interest (including interest on deferred tax liability under Section 453A(c) of the IRC and "look-back" interest under Section 460 of the IRC and similar amounts of interest imposed by the IRC), penalties, additions to tax or similar charges imposed in lieu of a Tax or attributable to any Tax.

7.    <u>Escrow and Closing</u>.

7.1    <u>Definitions</u>. The following terms used in this Agreement shall have the following meanings:

(a)    "<u>Business Day</u>" shall mean any day which is not a Saturday or Sunday and is not a public holiday in California, or a day on which businesses are required or requested to close by government proclamation.

(b)    "<u>Close of Escrow</u>" or "<u>Closing</u>" shall mean the consummation of the transactions set forth herein.

(c)    "<u>Closing Date</u>" shall mean the date upon which the Closing occurs.

(d)    "<u>Escrow</u>" shall mean an escrow transaction established for the purpose of consummating the transactions contemplated by this Agreement.

(e)    "Escrow Agent" shall mean _____,
located at the address set forth on the signature page of this Agreement.

(f)    "Scheduled Closing Date" shall mean the date that is three (3)
Business Days after the Effective Date; provided, however, that the Closing Date shall occur no
later than June 28, 2010 unless otherwise agreed to in writing by Bank.

(g)    "Title Company" shall mean _____, located
at the address set forth on the signature page of this Agreement.

7.2    Opening of Escrow.  Prior to the Effective Date, an Escrow has been
opened for purposes of consummating the transfer of the Assets pursuant to this Agreement.  If
Seller, in its sole and absolute discretion, elects to execute this Agreement and deliver it to
Escrow Agent, the "Opening of Escrow" shall be deemed to have occurred on the date Escrow
Agent receives a true and complete, fully-executed copy of this Agreement from Seller.  The
parties shall execute, deliver, and be bound by any and all reasonable and customary
supplemental escrow instructions ("Escrow Instructions") of Escrow Agent, and all such other
documents and instruments as may be reasonably required by Escrow Agent, in order to
consummate the transactions contemplated by this Agreement.  Escrow Agent shall accept the
escrow provisions of this Agreement as provided immediately after the signatures of the parties
hereto.  The Escrow Instructions shall not conflict with, amend, or supersede any portion of the
Agreement, unless expressly agreed by written instruments signed by all parties to this
Agreement, specifically providing that said Escrow Instructions shall have such effect.  Except
as otherwise provided herein, in the event of any inconsistency or conflict between the
provisions of the Escrow Instructions and this Agreement, the provisions of this Agreement shall
control.

7.3    Closing Date.  Except as otherwise herein provided, the Closing shall
occur no later than the Scheduled Closing Date, provided that all conditions of this Agreement
have been satisfied.  In the event that Escrow does not close for any reason on or before the
Scheduled Closing Date, Escrow Agent shall nevertheless proceed to Close the Escrow at the
earliest practicable time thereafter upon satisfaction of all conditions to the Close of Escrow,
unless Escrow Agent receives written notice from either party directing Escrow Agent not to
Close the Escrow.  Upon Escrow Agent's receipt of a written notice of termination as
hereinabove provided, the Escrow shall be deemed to be canceled without the requirement for
any further notice or instruction to Escrow Agent or to the other parties.  In order to be effective,
notice to the Escrow Agent by either party to this Agreement shall be also given to the other
party in the manner herein provided for notices.

7.4    Deliveries Through Escrow.

(a)    Seller Deliveries.  At least one (1) Business Day prior to the
Closing, Seller shall have executed, and where applicable, duly acknowledged, and deposited
with Escrow Agent, the following documents (collectively, "Seller's Closing Documents"):

(i)    The Grant Deed transferring the Real Property to Buyer in
the form of Exhibit B, attached hereto and incorporated herein by reference;

(ii)     The Bill of Sale, Assignment, and Assumption Agreement in the form of <u>Exhibit C</u>, attached hereto and incorporated herein by reference (the "<u>Bill of Sale</u>");

(iii)     The certificate of non-foreign status (the "<u>Certificate</u>"), as may be required or permitted by applicable federal and/or state law in order to avoid or satisfy any duty or obligation of Escrow Agent, Seller, or Buyer to withhold any portion of the Purchase Price or other funds in such party's possession or control, which Certificate shall be in the form of <u>Exhibit D</u>, attached hereto and incorporated herein by reference; and

(iv)     All such other documents, instruments, and agreements as Escrow Agent shall reasonably require in order to comply with this Agreement and the Escrow Instructions within the time and in the manner herein provided.

(b)     <u>Buyer Deliveries</u>.    At least one (1) Business Day prior to the Closing, Buyer shall deliver to Escrow Agent:

(i)     Buyer's Closing Funds, which will include the balance of the Purchase Price and all other amounts required of Buyer hereunder;

(ii)     A counterpart copy of the Bill of Sale, executed by Buyer;

(iii)     A preliminary change of ownership report with respect to the transfer of the Real Property in form and content required by Los Angeles County, California, completed and executed by Buyer; and

(iv)     All other documents, instruments, and agreements as Escrow Agent shall reasonably require in order to comply with this Agreement and the Escrow Instructions within the time and in the manner herein provided (collectively, with the documents listed in Sections 7.4(b)(ii), 7.4(b)(iii), and 7.4(b)(iv) are referred to herein as the "<u>Buyer's Closing Documents</u>").

7.5     <u>Prorations and Charges</u>.

(a)     <u>Real Property Taxes</u>.    All real property taxes and assessments which are a lien upon the Real Property as of the Close of Escrow shall be prorated and/or adjusted between the parties by Escrow Agent as of the Close of Escrow.

(b)     <u>Transfer Taxes</u>. Seller shall be solely responsible for all sales, use, transfer, documentary, and stamp taxes and recording and filing fees applicable to any of the Assets, the transfer of the Assets pursuant to this Agreement, and the transactions contemplated by this Agreement.

(c)     <u>Title Policy</u>.    Seller shall pay the title insurance premium for a CLTA owner's coverage of title insurance with a policy limit in the amount of the Purchase Price allocated to the Real Property ("<u>Title Policy</u>").    In the event Buyer requests an ALTA Title Policy instead of a CLTA Title Policy, Buyer shall pay the difference between the cost of the CLTA Title Policy and the ALTA Title Policy.

(d)     Escrow Agent.  Seller and Buyer shall each be responsible for fifty percent (50%) of the cost of Escrow Agent.

(e)     Bank As Buyer.  Notwithstanding the foregoing provisions of this Section 7.5, if Bank is the Buyer hereunder, Bank shall pay all amounts required of Seller as set forth in Sections 7.5(b), 7.5(c), and 7.5(d) above; provided, however, that (i) Bank shall not pay, and shall acquire the Real Property subject to, all real property taxes and assessments, including, without limitation, such real property taxes and assessments that are delinquent and/or in default, and (ii) Bank shall not be liable for any sales, use, transfer, documentary, and stamp taxes not due or payable by Bank as a result of the transactions set forth herein.

7.6     Closing.  At the Close of Escrow, Escrow Agent shall:

(a)     Record the Grant Deed conveying the Real Property to Buyer as herein provided, together with all such other instruments and documents which may be delivered to Escrow Agent in order to enable Escrow Agent to comply with this Agreement and the Escrow Instructions.

(b)     Except as otherwise provided in Section 2.3 of this Agreement, (i) disburse to Seller, pursuant to the Seller's written wiring instructions, funds in the amount of the Purchase Price, less the Deposit to the extent already received by Seller, less, if applicable, the Broker's Commission to be paid pursuant to Section 10.1 of this Agreement, less the closing costs owed by Seller as set forth herein, and as otherwise adjusted in accordance with this Agreement, and pursuant to the settlement statement prepared by Escrow Agent and approved by Seller; (ii) distribute, if applicable, the Broker's Commission to Broker pursuant to Section 10.1 below; (iii) disburse to Title Company and Escrow Agent amounts sufficient to pay the respective costs and expenses of the Title Company and Escrow Agent arising under this Agreement; (iv) disburse to the appropriate public agencies amounts sufficient to pay all recording fees and transfer taxes arising from or related to this Agreement; and (v) return all funds remaining in Escrow to Buyer.

(c)     Deliver to Seller, the Buyer's Closing Documents, together with a conformed copy of the Grant Deed, and deliver to Buyer, the Certificate and Seller's counterpart copy of the Bill of Sale.

(d)     Cause the Title Policy to be issued and delivered to Buyer.

7.7     Conditions to Close of Escrow.

(a)     Conditions to Buyer's Obligations.  The obligations of Buyer to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 7.7(a), each of which is for the sole benefit of Buyer, and any one or more of which may be waived in whole or in part by Buyer in its sole discretion.

(i)     The Title Company shall be unconditionally committed to issue the Title Policy, subject to the exceptions and other items set forth therein.

(ii)     The representations and warranties of Seller contained in this Agreement shall be true on and as of the Close of Escrow as if the same were made on and as of the Close of Escrow.

(iii)     Seller shall have executed and deposited with Escrow Agent all of Seller's Closing Documents.

(iv)     Seller shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Seller on or prior to the Closing Date.

(v)     The transactions set forth in that certain Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], of even date herewith, by and between Bank and Buyer, shall be consummated currently with the Closing under this Agreement; provided, however, that if Bank is the Buyer, the condition set forth in this Section 7.7(a)(v) shall be deemed waived by Buyer and be of no force or effect.

Buyer acknowledges that prior to the Effective Date, Buyer inspected, investigated, and reviewed the Assets in their entirety, and to Buyer's complete satisfaction, and under this Agreement, Buyer does not have any condition, contingency, or right of termination as a result of any further inspection, investigation, review, approval, or disapproval of the Assets, or any condition or aspect thereof, following the Effective Date.

(b)     <u>Conditions to Seller's Obligations</u>.  The obligations of Seller to consummate the transaction contemplated by this Agreement are, in addition to the other terms and conditions of this Agreement, subject to the conditions set forth in this Section 7.7(b), each of which is for the sole benefit of Seller, and any one or more of which may be waived in whole or in part by Seller in its sole discretion.

(i)     Buyer shall have deposited the Purchase Price with Escrow Agent, together with all other Buyer's Closing Funds, and any and all additional funds required to pay any costs, fees, expenses, or prorations payable by Buyer hereunder; provided, however, that if Bank is the Buyer, the condition set forth in this Section 7.7(b)(i) shall be deemed waived by Seller and be of no force or effect.

(ii)     The representations and warranties of Buyer contained in this Agreement shall be true on and as of the Close of Escrow as if the same were made on and as of the date thereof.

(iii)     Buyer shall have executed and deposited with Escrow Agent all of Buyer's Closing Documents.

(iv)     Buyer shall have fully and timely performed, in all material respects, all covenants and obligations required by this Agreement to be performed by Buyer on or prior to the Closing Date.

(v)     The transactions set forth in that certain Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], of even date

herewith, by and between Bank and Buyer, shall be consummated currently with the Closing under this Agreement; provided, however, that if Bank is the Buyer, the condition set forth in this Section 7.7(b)(v) shall be deemed waived by Seller and be of no force or effect.

(vi)    Seller shall have executed and delivered this Agreement to Escrow Agent.

8.    Risk of Loss.

8.1    Condemnation. If, prior to the Closing Date, action is initiated to take any of the Real Property or other Assets by eminent domain proceedings, or by deed in lieu thereof, Buyer and Seller shall consummate the Closing, and all of Seller's assignable right, title, and interest in and to the award of the condemning authority shall, to the extent of the Purchase Price, be assigned to Buyer at the Closing, and there shall be no reduction in the Purchase Price.

8.2    Casualty. Except as otherwise provided in this Agreement, Seller assumes all risks and liability for damage to, or injury occurring to, the Assets by fire, storm, accident, or any other casualty until the Closing has been consummated, and thereafter Buyer assumes all such risks and liability. If the Assets, or any part thereof, suffers any damage in the amount of $50,000 or greater prior to the Closing from fire or other casualty, and which Seller, at its sole option, does not elect to repair completely by the Closing Date, Buyer, upon written notice delivered both to Seller and to the Escrow Agent prior to the Closing Date, may either (a) terminate this Agreement and pay all of Escrow Agent's and Title Company's cancellation fees and costs, or (b) proceed with the Close of Escrow without reduction in the Purchase Price and with all of Seller's right, title, and interest in and to the proceeds of any insurance covering such damage (less an amount equal to any expenses and costs incurred by Seller to repair or restore the Assets and any portion of such proceeds paid, or to be paid, on account of the loss of rents or other income from the Assets for the period prior to and including the Closing Date all of which shall be payable to Seller), to the extent the amount of such insurance does not exceed the Purchase Price, shall be assigned to Buyer at the Closing.

9.    Liquidated Damages. BUYER AND SELLER HEREBY ACKNOWLEDGE AND AGREE THAT IN THE EVENT OF A DEFAULT OR BREACH BY BUYER IN THE PERFORMANCE OF BUYER'S OBLIGATIONS OR COVENANTS, OR THE BREACH BY BUYER OF ANY OF BUYER'S REPRESENTATIONS OR WARRANTIES, HEREUNDER, SELLER'S DAMAGES WOULD BE EXTREMELY DIFFICULT OR IMPOSSIBLE TO DETERMINE, THAT THE AMOUNT OF THE DEPOSIT IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES SELLER WOULD SUFFER IN THE EVENT THE TRANSACTION PROVIDED FOR IN THIS AGREEMENT FAILS TO BE CONSUMMATED, AND THUS SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT. BUYER AND SELLER AGREE THAT, AS LIQUIDATED DAMAGES FOR SUCH BREACH AND/OR DEFAULT BY BUYER, SELLER SHALL HAVE THE RIGHT, BUT NOT THE OBLIGATION, TO TERMINATE THE AGREEMENT AND RECEIVE FROM BUYER AND FROM THE DEPOSIT AND CLOSING FUNDS THE ABOVE LIQUIDATED SUM, IN FULL, AND SUCH LIQUIDATED DAMAGES SHALL BE SELLER'S SOLE REMEDY AT LAW OR IN EQUITY FOR SUCH BREACH OR DEFAULT BY BUYER. WITHOUT

LIMITING THE GENERALITY OF THE FOREGOING, BUYER AND SELLER AGREE THAT (A) IT WOULD BE IMPRACTICAL OR IMPOSSIBLE TO PRESENTLY PREDICT WHAT MONETARY DAMAGES SELLER WOULD SUFFER IN THE EVENT OF A BUYER DEFAULT, (B) THE PAYMENT OF THE DEPOSIT AS LIQUIDATED DAMAGES IS NOT INTENDED AS A FORFEITURE OR PENALTY WITHIN THE MEANING OF CALIFORNIA CIVIL CODE §§ 3275 OR 3369, BUT IT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE §§ 1671, 1676 AND 1677, (C) BUYER DESIRES TO LIMIT THE MONETARY DAMAGES FOR WHICH IT MIGHT BE LIABLE HEREUNDER, AND (D) BUYER AND SELLER DESIRE TO AVOID THE COSTS AND DELAYS THAT WOULD BE INCURRED IF A LAWSUIT WERE COMMENCED TO RECOVER DAMAGES, SEEK EQUITABLE RELIEF, OR OTHERWISE ENFORCE SELLER'S RIGHTS UNDER THIS AGREEMENT.   THE PARTIES ACKNOWLEDGE AND AGREE TO THIS PROVISION BY PLACING THEIR INITIALS BELOW:

BUYER'S INITIALS: _____     SELLER'S INITIALS: _____

10.    Brokers.

10.1   The parties acknowledge that no person or entity has any right to any commission, finder's fee, or other compensation based upon the transactions contemplated by this Agreement other than the Seller's broker, KENNEDY WILSON AUCTION GROUP, INC. ("Seller's Broker"), and Buyer's broker, _____ ("Buyer's Broker"). Seller shall be responsible for the payment of any commissions or fees of Seller's Broker pursuant to a written agreement between Seller and Seller's Broker, and Seller will be responsible for the payment of commissions and fees to Buyer's Broker in the amount of $_____ ("Broker's Commission"). If, for any reason, the Closing fails to occur, no Broker's Commission to Buyer's Broker, or any other amount, shall be due or payable pursuant to this Agreement. Notwithstanding the foregoing, if Bank is the Buyer, there shall be no Buyer's Broker, and Bank shall pay all amounts owed to Seller's Broker.

10.2   Except as provided in Section 10.1 of this Agreement, Buyer and Seller (each an "Indemnifying Party") hereby indemnify and shall hold one another (the "Indemnified Party") harmless from and against any and all claims, demands, damages, losses, costs, and expenses, including, without limitation all attorneys' fees and related costs, incurred by the Indemnified Party in connection with any claim or demand for brokerage commissions or finders' fees made by any broker, agent, or other person alleged to have been engaged or hired by the Indemnifying Party, and any and all brokers or others claiming to have dealt with any party other than the Indemnified Party in connection with the transactions contemplated by this Agreement.

11.    Miscellaneous.

11.1   Notices.  Any notice, request, or demand required or permitted by this Agreement to be given by either party hereto to the other (or by or to Escrow Agent, as the case may be), shall be deemed delivered if (a) transmitted by telecopier or similar facsimile transmission to the telecopier number of the receiving party specified on the signature page of

this Agreement, with original copy thereof to be deposited within twenty-four (24) hours after such transmission in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified on the signature page of this Agreement; (b) deposited in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified on the signature page of this Agreement; (c) deposited with a reputable overnight private commercial delivery service and addressed to the receiving party at the address specified on the signature page of this Agreement; or (d) given by personal delivery, by the party giving notice directly or through commercial messenger or courier service, at the receiving party's address specified on the signature page of this Agreement. If notice is given by deposit in the U.S. Mail as herein provided, delivery shall not be deemed to be effective until forty-eight (48) hours after such deposit; if deposited with an overnight courier or delivery service as herein provided prior to any applicable deposit deadline for guaranteed overnight delivery, delivery shall be deemed effective twenty-four (24) hours after such deposit; if transmitted by telecopier or personal delivery, delivery shall be deemed to be effective upon receipt, if transmitted or delivered during normal business hours of the receiving party, otherwise on the next Business Day of the receiving party. No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice. Either party may change its address for purposes of this Section upon delivery to the other party of a notice of a change of address in the manner provided for notices hereunder.

       11.2   <u>Survival</u>. All representations and warranties set forth herein shall survive the Closing and shall not merge with any instrument delivered at the Closing.

       11.3   <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes all other agreements, oral or written, between the parties hereto with respect to the subject matter. No claim of waiver, modification, consent, or acquiescence with respect to any provision of this Agreement shall be made against either party, except upon the basis of a written instrument executed by or on behalf of such party. The Recitals set forth in this Agreement are incorporated herein by this reference.

       11.4   <u>Successors and Assigns</u>. Buyer shall not assign or transfer this Agreement or any right or obligation hereunder without the prior written consent of Seller, which consent Seller may withhold in its sole and absolute opinion and judgment. Subject to the foregoing, the provisions of this Agreement shall be binding upon and inure to the benefit of each of the parties hereto, and their respective successors in interest, assigns, heirs, and personal representatives.

       11.5   <u>Headings</u>. The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

       11.6   <u>Time</u>. Time is, and shall be, of the essence of each and every provision of this Agreement.

       11.7   <u>Governing Law</u>. This Agreement is and shall be governed by and construed in accordance with the laws of the State of California.

11.8    Counterparts.  This Agreement may be executed and delivered in any number of counterparts, each of which, when executed and delivered, shall be an original, and all of which together shall constitute the same agreement.

11.9    Neutral Interpretation.  This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

11.10   Attorneys' Fees and Costs.   The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

11.11   Severability.   In the event any provision of this Agreement, or any agreement or document to which this Agreement refers, is held to be invalid, prohibited, or unenforceable to any extent in any jurisdiction, such invalidity, prohibition, or unenforceability shall apply only to such jurisdiction, and said provision and all other provisions of this Agreement shall otherwise be and remain valid and enforceable.

11.12   No Waiver.  No failure or delay on the part of Seller in the exercise of any right, power, or privilege hereunder, or under any other agreement entered into in connection herewith, shall operate as a waiver thereof, and no single or partial exercise of any such right, power, or privilege shall preclude a further exercise thereof or of any other right, power, or privilege.

11.13   Relationship of Parties.  The parties intend that the relationship existing between them shall be solely that of seller and buyer, subject to the provisions of this Agreement. Nothing in this Agreement, or in any other document or instrument entered into in connection with this Agreement, shall be deemed or construed to create a principal/agent, partnership, joint tenancy, joint venture, or co-ownership relationship between the parties.

11.14   No Third Parties Benefited.  This Agreement is made for the sole benefit and protection of the parties hereto, and Seller's successors and assigns, and no other person shall have any right of action or right to rely thereon, and the parties hereto agree that nothing contained in this Agreement shall be construed to vest in any other person or entity, any interest in, or claim upon, the rights and interests of the parties hereunder or in any proceeds thereof.

11.15   Duty of Cooperation.  Each of the parties to this Agreement shall at all times fully cooperate with each other, and shall cause their respective agents and attorneys to cooperate, in a prompt and timely manner, in connection with the performance of all obligations of the parties pursuant to this Agreement, and which may otherwise be necessary or appropriate to carry out and enforce the provisions of this Agreement.  Each party shall execute and deliver

to the other party all such documents, notices, and agreements (including agreements in recordable form) which the requesting party shall reasonably require in order to establish, confirm, affirm, perfect, and secure all rights, interests, title, and benefits accruing to each party pursuant to this Agreement.

11.16  WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH, RELATED, OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

ADV and D. McDonal Initials

_____

Buyer's Initials

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written.

**Buyer:**                                             **Seller:**

_____          AGUA DULCE VINEYARDS LLC,
                                                       a California limited liability company

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

Address:                                               With respect to Sections 5.3 and 11.16 of this
                                                       Agreement only.

_____
_____          By: _____
_____                Donal J. MacAdam, an individual
Attention: _____
Facsimile No.: (___) ___-___ _____          Address:

With a copy to:                                        AGUA DULCE VINEYARDS LLC
                                                       9640 Sierra Highway
_____          Agua Dulce, CA  91390
_____          Attention:  Catherine P. MacAdam
_____          Facsimile No.: (661) 268-7450
Attention: _____
Facsimile No.: (___) ___-___ _____          With a copy to:

                                                       LEVENE, NEALE, BENDER, RANKIN &
                                                       BRILL, L.L.P.
                                                       10250 Constellation Blvd, Suite 1700
                                                       Los Angeles, CA  90067
                                                       Attention:  Martin J. Brill
For Escrow Agent:                                      Facsimile No.: (310) 229-1244

_____
_____
_____
_____

## ACCEPTANCE BY ESCROW AGENT

The undersigned, Escrow Agent, identified in the foregoing Asset Purchase Agreement and Joint Escrow Instructions ("Instructions"), hereby accepts the Instructions and agrees to be bound thereby, subject to such additional or supplemental instructions and general provisions as Escrow Agent shall require which shall not be inconsistent or in conflict with the Instructions.


By:_____        Date: _____, 2010
   Authorized Officer

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**


APN: _____

**EXHIBIT B**
**GRANT DEED**

[SEE FOLLOWING PAGE]

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO

_____

_____

_____

Attention: _____

APN: _____

In accordance with §11932 of the California Revenue and Taxation Code, Grantor has declared the amount of the transfer tax which is due by a separate statement which is not being recorded with this Grant Deed.

## GRANT DEED

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, AGUA DULCE VINEYARDS LLC, a California limited liability company ("Grantor"), hereby grants to _____, a _____ ( "Grantee"), all of Grantor's right, title, and interest in and to the real property located in the County of Los Angeles, State of California, and more particularly described in Exhibit A, attached hereto and made a part hereof, subject to all covenants, conditions, easements, encumbrances, and all other matters of record (the "Real Property").

This Grant Deed is made and given in connection with that certain Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards Property], dated _____, 2010, by and between Grantor, on the one hand, and _____, on the other hand, and is subject to the terms thereof.

**Grantor**

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

684106.6

STATE OF CALIFORNIA                           )
COUNTY OF _____               )


On _____ before me, _____
a   Notary   Public   in   and   for   said   County   and   State,   personally   appeared
_____ who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.


I certify under PENALTY OF PERJURY under the laws of the State of California that
the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature _____

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**

APN: _____

## EXHIBIT C

## BILL OF SALE, ASSIGNMENT, AND ASSUMPTION AGREEMENT

FOR VALUABLE CONSIDERATION, receipt and adequacy of which are hereby acknowledged, the undersigned, AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D. MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), and SWEETWATER VINEYARDS, LLC, a California limited liability company ("Sweetwater" and together with ADV, D. MacAdam, and C. MacAdam, individually and collectively, "Assignor"), on the one hand, and _____, a _____ ("Assignee"), on the other hand, enter into this Bill of Sale, Assignment, and Assumption Agreement ("Agreement"), dated _____, 2010, on the following terms and conditions:

1.      Assignor hereby sells, transfers, assigns, and conveys to Assignee, the following assets (the "Assets"), as such Assets are further described and defined on Schedule 1, attached hereto and made a part hereof:

        a.      Tangible Personal Property. All tangible personal property used in connection with the Business (as such term is defined in that certain Asset Purchase Agreement and Joint Escrow Instructions, dated _____, 2010, by and between Assignor and Assignee, the "Asset Purchase Agreement") and/or the Assets (the "Tangible Property"), including, but not limited to, all machinery, equipment (including, without limitation, all pumps, pumping facilities, purification and filtration equipment, mains, pipes, fire cisterns, basins, fountains, troughs, meters, wells, hydrants, equipment, machinery, tools, dies, spare parts, materials, water supplies, fixtures and improvements, construction in progress, jigs, molds, patterns, gauges and production fixtures, and other equipment related to any water system located on that certain real property described on Exhibit A, attached hereto and made a part hereof, and/or used in connection with the Business, the "Water System"), tools, parts, supplies, appliances, fixtures, desks, chairs, cabinets, furniture, carpets, drapes, improvements, vehicles, tractors, farm products, crops (whether grown, growing, or to be grown), seeds, fertilizer, pesticides, livestock, products of crops or livestock, vines, grapes, wines and juices (however stored, including, without limitation, bottled, in tanks, or in barrels, and whether located on the Land or off-site), work in process, inventory, water rights (to the extent considered personal property), customer lists, distributor lists, supplier lists, computers, computer software, rents, issues, accessions, profits, proceeds, revenue, royalties, bonuses, cash (except for reasonable reserves necessary to pay Court-approved administrative expenses in connection with the Bankruptcy, including U.S. Trustee fees), cash equivalents, security, utility, and customer deposits, books, records, record systems, information, documents, data, sales literature, promotional materials, and other personal property located on or about, or used in connection with, any of the Real Property or Assets, or used in connection with the Business or the Business operations.    Notwithstanding any provision herein to the contrary, the Tangible Personal Property and the Assets do not include personal items of D. MacAdam, C. MacAdam, and their children, such as clothing, household furniture, keepsakes, and similar items.

        b.      Contracts. Those contracts and agreements pertaining to the Business and identified on Schedule 2, attached hereto and made a part hereof (collectively, "Contracts").

        c.      Intangible Property. All intangible personal property used in connection with the Business and Assets (the "Intangible Property"), including, but not limited to, all of

684106.6

Assignor's right to operate the Business, goodwill, software licenses, copyrights, patent rights, trademarks, service marks, intellectual property rights, accounts (including deposit accounts), accounts receivable, documents, information, instruments, receivables, utility contracts, telephone exchange numbers, plans and specifications, engineering plans and studies, warranties, guaranties, rebates, refunds, insurance claims, proceeds, permits, permissions, approvals, entitlements, floor plans, landscape plans, licenses, liquor licenses, trade names, franchises, and license agreements.

2.     Limited Assumption. Effective as of the date hereof, Assignee accepts the Assets, and assumes and agrees to discharge, in accordance with the terms thereof, all burdens and obligations of Assignor related to the Assets first arising or accruing on or after the date hereof. Notwithstanding the foregoing, Assignor and Assignee hereby agree that Assignee shall not assume or be liable for any Excluded Liabilities (as such term is defined in that certain Asset Purchase Agreement).

3.     Asset Purchase Agreement. This Agreement is pursuant to the Asset Purchase Agreement, the terms and conditions of which are incorporated herein by this reference.

4.     Miscellaneous. This Agreement may be executed in one or more counterparts, each of which such counterpart shall be deemed an original for all purposes and all such counterparts shall collectively consist of one instrument.

*[Signatures On Following Page]*

IN WITNESS WHEREOF, Assignor and Assignee have executed this Agreement as of the date first written above.

**Buyer**:                                        **Seller:**

_____          AGUA DULCE VINEYARDS LLC,
                                                  a California limited liability company

By: _____          By: _____
Name: _____          Name: _____
Title: _____          Title: _____

**EXHIBIT A**
**LEGAL DESCRIPTION OF REAL PROPERTY**

**TO FOLLOW**

**SCHEDULE 1**
**ASSETS**

**TO FOLLOW**

**SCHEDULE 2**
**CONTRACTS**

## SCHEDULE 2
## ASSUMED CONTRACTS

Required Contracts

[Bank to list Required Contracts and amounts required to cure breaches or defaults thereunder.]

Optional Contracts  [*Buyer to complete*]

## EXHIBIT D
## CERTIFICATE OF NONFOREIGN STATUS

**Federal FIRPTA Certificate.** Section 1445 of the Internal Revenue Code provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. To inform _____, a _____ ("Transferee"), that withholding of tax is not required upon the disposition of a U.S. real property interest by AGUA DULCE VINEYARDS LLC, a California limited liability company ("Transferor"), Transferor hereby swears, affirms and certifies the following to Transferee:

1. Transferor is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

2. Transferor's U.S. employer identification number is: _____.

3. Transferor's office address is: _____.

4. Transferor understands that this certification may be disclosed to the Internal Revenue Service by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

5. Transferor understands that Transferee is relying on this certification in determining whether withholding is required upon said transfer.

**State of California-California Resident/Non-Resident Affidavit.** California Revenue and Taxation Code Section 18662 requires that any seller who is not a California resident must authorize Escrow Holder to forward 3 1/3% of the sales price of the California real property conveyed to the Franchise Tax Board unless the sales price of the property is less than $100,000.00.

1. Transferor hereby certifies that Transferor is a California banking corporation which is and shall be qualified to do business in California after the transfer.

2. Transferor understands that this certificate may be disclosed to the Franchise Tax Board of California by Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under the penalties of perjury, the undersigned declares that he/she has examined this certification and to the best of his/her knowledge and belief, it is true, correct, and complete, and he/she further declares that he/she has the authority to sign this document on behalf of Transferor.

Executed as of the ___ day of _____, 2010.

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Its: _____

## SCHEDULE 1
### ASSETS, LITIGATION, CLAIMS, PERMITS, INSURANCE

**TO FOLLOW**

**EXHIBIT D**
**TO AUCTION SALE AGREEMENT**

**DUE DILIGENCE AND CONFIDENTIALITY AGREEMENT**
[SEE ATTACHED]

# DUE DILIGENCE AND CONFIDENTIALITY AGREEMENT

This DUE DILIGENCE AND CONFIDENTIALITY AGREEMENT ("Agreement") is made by the undersigned ("Recipient") for the benefit of WESTERN COMMERCIAL BANK, a California banking corporation ("Bank"), AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D. MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), SWEETWATER VINEYARDS, LLC, a California limited liability company ("Sweetwater"), and KENNEDY WILSON AUCTION GROUP INC., a California corporation ("KW" and together with Bank, ADV, D. MacAdam, C. MacAdam, and Sweetwater, individually and collectively "Disclosing Party"), on the following terms and conditions:

1.     Background.   Recipient desires to receive certain confidential information (the "Confidential Information") from Disclosing Party, and to make certain site visits, investigations, and inspections (the "Due Diligence") of that certain real property and assets located at or near 9830 Sierra Highway, Agua Dulce, California (the "Auctioned Property"), for the sole purpose of determining whether to make an offer to purchase the Auctioned Property. Disclosing Party is willing to disclose such Confidential Information and permit Recipient to conduct the Due Diligence pursuant to the terms and conditions of this Agreement.

2.     Confidential Information.

2.1     Defined.   As used in this Agreement, the term "Confidential Information" shall mean and include all information, whether written or verbal, disclosed, or made available, by any of the Disclosing Party about the condition of the Auctioned Property, the operations of the Auctioned Property, and any and all other aspects of the Auctioned Property, other than such Confidential Information that (a) become generally available to the public other than, directly or indirectly, by Recipient's or Recipient's representatives' unauthorized disclosure of Confidential Information or breach of this Agreement, (b) is known to Recipient prior to disclosure by Disclosing Party, or (c) becomes available to Recipient on a non-confidential basis from a source other than Disclosing Party, which is entitled to disclose such Confidential Information.

2.2     Permitted Use; No Disclosure.

(a)     Recipient agrees that the Confidential Information is disclosed by Disclosing Party hereunder solely for its use in determining whether to make an offer to purchase the Auctioned Property, and no other purpose. Any unauthorized use of the Confidential Information by Recipient or any of Recipient's representatives is strictly prohibited.

(b)     Recipient, on behalf of itself and each of its officers, employees, consultants, agents, directors, managers, and representatives, agrees not to disclose any of the Confidential Information to any person other than to Recipient's representatives who have a need to know such Confidential Information for purposes of assisting Recipient in the performance of the evaluation and analysis of the Auctioned Property, and provided that such representatives agree to be bound by the terms of this Agreement.

(c)      Recipient and its representatives shall use appropriate precautions (at least as great as precautions as Recipient takes to protect Recipient's own confidential information) in handling the Confidential Information and, in accordance with safe and sound procedures, shall keep the Confidential Information confidential.

(d)      Recipient shall notify Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Recipient, or Recipient's employees, consultants, or representatives, and Recipient will cooperate with Disclosing Party in every reasonable way to help Disclosing Party regain possession of the Confidential Information and to prevent its further unauthorized disclosure or use.

(e)      Recipient will return or destroy all tangible materials embodying Confidential Information (in any form, and including, without limitation, all summaries, copies, and excerpts of Confidential Information) promptly following the termination of this Agreement (for whatever cause) and/or upon Disclosing Party's written request, unless retention of such Confidential Information is required by a governmental entity having jurisdiction over Recipient, or is otherwise required by law or regulation.

(f)      If Recipient, or any of Recipient's representatives, officers, directors, employees, or agents, are requested or required in a legal proceeding, or pursuant to any legal process to disclose any Confidential Information, then Recipient shall notify Disclosing Party within five (5) days of receipt of any such request, so that Disclosing Party may seek a protective order and/or take any other mutually agreed action to protect the confidential nature of the Confidential Information. If, in the absence of a protective order or the receipt of a waiver hereunder, Recipient is nonetheless, in the judgment of Recipient's counsel, compelled to disclose such Confidential Information, Recipient shall use all reasonable efforts to inform Disclosing Party as far in advance of such disclosure as practicable.

(g)      <u>Indemnity</u>.  Recipient hereby agrees to indemnify, defend with counsel selected by Disclosing Party, and hold Disclosing Party harmless from and against any and all claims, liabilities, costs, and expenses, including attorney's fees and court costs, and other damages arising out of, or in any way relating to, Recipient's use and/or possession of the Confidential Information, the unauthorized disclosure of Confidential Information, or any breach of this Agreement by Recipient or Recipient's representatives.

2.3      <u>AS-IS Disclosure</u>.  Recipient acknowledges that any Confidential Information provided, or to be provided, by Disclosing Party was obtained from a variety of sources, and Disclosing Party has not made any independent investigation or verification of such Confidential Information. Accordingly, Disclosing Party makes no, and hereby disclaims all, representations as to the accuracy, truthfulness, or completeness of such information, which includes, without limitation, all verbal and written communications, agreements, instruments, documents, reports, and other matters. All Confidential Information is provided hereunder on an **"AS IS, WHERE IS, WITH ALL FAULTS, LIABILITIES, DEFICIENCIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** basis.

3.      <u>Due Diligence</u>.

3.1     Property Investigations. Recipient, and its employees, consultants, and agents, shall not enter the Auctioned Property without the prior approval of Disclosing Party, which approval may be permitted or denied by Disclosing Party in its sole opinion and judgment. In connection with its entry onto the Auctioned Property and its Due Diligence, Recipient shall not cause any adverse impact to the Auctioned Property and will restore the Auctioned Property in a timely manner at Recipient's sole cost to the condition that existed immediately prior Recipient's entry onto the Auctioned Property. Without limiting the generality of the foregoing sentence, Recipient shall keep the Auctioned Property free and clear of all mechanics' and/or materialmen's liens arising from or related to the inspections, investigations, or review of the Auctioned Property by Recipient, and shall take all necessary actions, at Recipient's sole cost and expense, to remove any such liens that encumber the Auctioned Property. Recipient shall not disturb the physical condition of the Auctioned Property or conduct any soil testing, removal, or borings upon or within the Auctioned Property, including, without limitation, conducting any Phase II environmental site assessment.

3.2     Indemnity; Insurance. Recipient shall indemnify, defend, and hold harmless Disclosing Party, and each of its and their shareholder, directors, officers, employees, consultants, and agents (the "Additional Parties"), from and against any and all liens, claims, liabilities, costs, and expenses, including attorneys' fees and court costs, and other damages arising out of, or in any way relating to, the entry and performance of any such inspection, investigations, and review by Recipient of the Auctioned Property, or by any other person or entity acting on behalf of, or at the request of, Recipient. Recipient shall carry, or Recipient shall require anyone acting on Recipient's behalf to carry, policies of liability, worker's compensation, and other applicable insurance defending and protecting Disclosing Party from liability for any injuries to persons or property occurring during any work done on the Auctioned Property at Recipient's direction.

3.3     No Commitments. Unless and until Recipient becomes the owner of the Auctioned Property, Recipient shall not enter into, or make any commitments with, any Public Agency (defined below), and shall expressly disclaim to any Public Agency the right to enter into or make commitments, in respect of the Auctioned Property that are or could be binding on the Auctioned Property or any of the Disclosing Parties ("Commitments"). As used in this Agreement, "Public Agency" shall mean any officer, employee, supervisor, consultant, council member, agent, or other representative of any public agency or governmental authority with jurisdiction over the Property. Recipient shall, and hereby does, indemnify, defend, protect, and hold harmless Disclosing Party and each of the Additional Parties from and against any and all claims, demands, losses, damages, obligations, liabilities, causes of action, liens, costs, and expenses (including, without limitation, attorneys' fees and expenses) arising from any acts or omissions by Recipient, or its employees, agents, consultants, or representatives, related to, or in connection with, any Commitments or any discussions or meetings by Recipient with any Public Agency that are made in violation of the foregoing provisions.

3.4     Confidentiality. Recipient agrees to keep confidential, and not disclose, the results of its investigations, inspections, and review of the Auctioned Property, or the contents of any analyses, reports, surveys, or other documents made with respect thereto, to any third party other than Recipient's employees, attorneys, consultants, and lenders in connection with Recipient's offer to purchase of the Auctioned Property or as may be required by applicable law; provided that Recipient shall ensure that each such employee, attorney, and consultant is advised of and agrees to

the confidentiality requirements in this Agreement. If Recipient determines that Recipient is required by applicable law to notify a federal, state, or local governmental agency or authority, or any other party, with respect to any condition of the Auctioned Property, Recipient shall immediately notify Disclosing Party, and Disclosing Party shall make such disclosure as Disclosing Party determines appropriate.

    4.    <u>Miscellaneous</u>.

    4.1    <u>Survival</u>. The obligations of Recipient under this Agreement shall survive until the date that is the earlier of (a) the date that Recipient becomes the owner of the Auctioned Property, or (b) twenty-four (24) months following the date hereof; provided, however, that the indemnification, defense, and hold harmless obligations of Recipient under this Agreement shall survive for twenty-four (24) months following the date hereof regardless of whether Recipient becomes the owner of the Auctioned Property.

    4.2    <u>Injunctive Relief</u>. Recipient acknowledge that disclosure or use of Confidential Information in violation of this Agreement could cause irreparable harm to Disclosing Party for which monetary damages may be difficult to ascertain or an inadequate remedy. Recipient therefore agrees that Disclosing Party will have the right, in addition to its other rights and remedies, to seek injunctive relief for any violation of this Agreement. Disclosing Party shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

    4.3    <u>Binding Effect</u>. Recipient acknowledges and agrees that this Agreement shall be binding upon and inure to the benefit of Disclosing Party and Recipient, and its and their respective parent entities, if any, subsidiaries and affiliates, and their respective successors and assignees; provided however, that Recipient shall not assign Recipient's obligations, rights, or privileges hereunder to any other parties without the prior written consent of Disclosing Party.

    4.4    <u>Governing Law</u>. The interpretation of the enforcement of this Agreement shall be governed by the laws of the State of California without reference to the conflict of law principles thereof.

    4.5    <u>No Commitment</u>. This Agreement does not create any commitment on the part of Disclosing Party to sell the Auctioned Property to Recipient. Consequently, Recipient understand that any other opportunities Recipient may forego and any expenses Recipient incurs on account of Recipient's decision to evaluate whether to purchase the Auctioned Property are incurred at Recipient's own risk.

    4.6    <u>Entire Agreement</u>. Recipient acknowledges and agrees that this Agreement expresses the entire agreement and understanding of Disclosing Party and Recipient with respect to the subject matter hereof, and supersedes any and all prior oral or written agreements, commitments, and understandings pertaining to the subject matter hereof. This Agreement shall not be modified or changed in any manner except in a writing signed by Disclosing Party and Recipient.

    4.7    <u>Attorneys' Fees</u>. The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or

parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

    4.8     Effectiveness of Agreement.  This Agreement shall be effective upon the execution hereof by Recipient, without regard to the fact that this Agreement has not been executed by any of Disclosing Party.

    IN WITNESS WHEREOF, Disclosing Party executes this Agreement as of the day and year specified below:

DISCLOSING PARTY:

_____
a _____

By: _____
Name:_____
Title: _____

Date: _____

Address:

_____
_____
_____

## EXHIBIT E
## TO AUCTION SALE AGREEMENT

## DUE DILIGENCE CHECKLIST

1. <u>Financial Statements</u>.
    1.1    Audited financial statements for three years, together with the auditor's report.
    1.2    The most recent unaudited statements, with comparable statements to the prior year.
    1.3    Auditor's letters and replies for the past five years.
    1.4    The Company's credit report, if available.
    1.5    Any projections, capital budgets and strategic plans.
    1.6    Analyst reports, if available.
    1.7    A schedule of all indebtedness and contingent liabilities.
    1.8    A schedule of inventory.
    1.9    A schedule of accounts receivable.
    1.10    A schedule of accounts payable.
    1.11    A description of depreciation and amortization methods and changes in accounting methods over the past five years.
    1.12    Any analysis of fixed and variable expenses.
    1.13    Any analysis of gross margins.
    1.14    The Company's general ledger.
    1.15    A description of the Company's internal control procedures.

2. <u>Physical Assets</u>.
    2.1    A schedule of fixed assets and tangible property, and the locations thereof.
    2.2    All U.C.C. filings.
    2.3    All leases of equipment and property.
    2.4    A schedule of sales and purchases of capital equipment during last three years.

3. <u>Real Estate</u>.
    3.1    A schedule of the Company's business locations.
    3.2    Copies of all real estate leases, deeds, mortgages, title policies, surveys, zoning approvals, variances or use permits.

4. <u>Intellectual Property</u>.
    4.1    A schedule of domestic and foreign patents and patent applications.
    4.2    A schedule of trademark and trade names.
    4.3    A schedule of copyrights.
    4.4    A description of important technical know-how.
    4.5    A description of methods used to protect trade secrets and know-how.
    4.6    Any "work for hire" agreements.
    4.7    A schedule and copies of all consulting agreements, agreements regarding inventions, and licenses or assignments of intellectual property to or from the Company.
    4.8    Any patent clearance documents.
    4.9    A schedule and summary of any claims or threatened claims by or against the Company regarding intellectual property.

5.    <u>Employees and Employee Benefits</u>.

    5.1    A list of employees including positions, current salaries, salaries and bonuses paid during last three years, and years of service.

    5.2    All employment, consulting, nondisclosure, nonsolicitation or noncompetition agreements between the Company and any of its employees.

    5.3    Resumes of key employees.

    5.4    The Company's personnel handbook and a schedule of all employee benefits and holiday, vacation, and sick leave policies.

    5.5    Summary plan descriptions of qualified and non-qualified retirement plans.

    5.6    Copies of collective bargaining agreements, if any.

    5.7    A description of all employee problems within the last three years, including alleged wrongful termination, harassment, and discrimination.

    5.8    A description of any labor disputes, requests for arbitration, or grievance procedures currently pending or settled within the last three years.

    5.9    A list and description of benefits of all employee health and welfare insurance policies or self-funded arrangements.

    5.10    A description of worker's compensation claim history.

    5.11    A description of unemployment insurance claims history.

    5.12    Copies of all stock option and stock purchase plans and a schedule of grants thereunder.

6.    <u>Licenses and Permits</u>.

    6.1    Copies of any governmental licenses, permits, or consents.

    6.2    Any correspondence or documents relating to any proceedings of any regulatory agency.

7.    <u>Environmental Issues</u>.

    7.1    Environmental audits, if any, for each property leased by the Company.

    7.2    A listing of hazardous substances used in the Company's operations.

    7.3    A description of the Company's disposal methods.

    7.4    A list of environmental permits and licenses.

    7.5    Copies of all correspondence, notices and files related to EPA, state, or local regulatory agencies.

    7.6    A list identifying and describing any environmental litigation or investigations.

    7.7    A list identifying and describing any known superfund exposure.

    7.8    A list identifying and describing any contingent environmental liabilities or continuing indemnification obligations.

8.    <u>Taxes</u>.

    8.1    Federal, state, local, and foreign income tax returns for the last three years.

    8.2    States sales tax returns for the last three years.

    8.3    Any audit and revenue agency reports.

    8.4    Any tax settlement documents for the last three years.

    8.5    Employment tax filings for three years.

8.6    Excise tax filings for three years.

8.7    Any tax liens.

9.    <u>Contracts.</u>

9.1    A schedule of all subsidiary, partnership, or joint venture relationships and obligations, with copies of all related agreements.

9.2    Copies of all contracts between the Company and any officers, directors, 5-percent shareholders or affiliates.

9.3    All loan agreements, bank financing arrangements, line of credit, or promissory notes to which the Company is a party.

9.4    All security agreements, mortgages, indentures, collateral pledges, and similar agreements.

9.5    All guaranties to which the Company is a party.

9.6    Any installment sale agreements.

9.7    Any distribution agreements, sales representative agreements, marketing agreements, and supply agreements.

9.8    Any letters of intent, contracts, and closing transcripts from any mergers, acquisitions, or divestitures within last five years.

9.9    Any options and stock purchase agreements involving interests in other companies.

9.10    The Company's standard quote, purchase order, invoice and warranty forms.

9.11    All nondisclosure or noncompetition agreements to which the Company is a party.

9.12    All other material contracts and agreements, including, without limitation, any agreement requiring the consent of a third party to the proposed transactions, or any agreement as to which a default may occur as a result of the proposed transactions, and also including, without limitation, any agreement or understanding restricting in any way competition between the Company and any actual or potential competitor.

10.    <u>Product or Service Lines.</u>

10.1    A list of all existing products or services and products or services under development.

10.2    Copies of all correspondence and reports related to any regulatory approvals or disapprovals of any Company's products or services.

10.3    A summary of all complaints or warranty claims.

10.4    A summary of results of all tests, evaluations, studies, surveys, and other data regarding existing products or services and products or services under development.

11.    <u>Customer Information.</u>

11.1    A schedule of the Company's twelve largest customers in terms of sales thereto and a description of sales thereto over a period of two years.

11.2    Any supply or service agreements.

11.3    A description or copy of the Company's purchasing policies.

11.4    A description or copy of the Company's credit policy.

11.5    A schedule of unfilled orders.

11.6    A list and explanation for any major customers lost over the last two years.

11.7    All surveys and market research reports relevant to the Company or its products or services.

11.8    The Company's current advertising programs, marketing plans and budgets, and printed marketing materials.

11.9    A description of the Company's major competitors.

11.10   List of sources of supplies of principal items.

11.11   Copies of purchase and supply contracts and description of their terms, including price determination, conditions, special concessions, etc.

11.12   All marketing, sales, franchise, distribution, commission, agency or representative agreements, and a list of independent sales persons or distributors.

11.13   Description of controls of purchases and regulations of inventories.

11.14   Standard forms used in connection with the sale of Company products, including, without limitation, purchase orders, sales orders, quotation forms, etc.

11.15   All documents creating any express or implied warranty with respect to products manufactured or distributed by the Company.

11.16   All written agreements with respect to advertising, promotion or public relations and copies of all advertising copy.

11.17   Any written description of credit or collection policies.

11.18   All secrecy and noncompetition agreements.

11.19   Membership agreements or arrangements with trade associations, barter organizations or advertising cooperatives.

12.    <u>Litigation.</u>

12.1    A schedule of all pending litigation.

12.2    A description of any threatened litigation.

12.3    Copies of insurance policies possibly providing coverage as to pending or threatened litigation.

12.4    Documents relating to any injunctions, consent decrees, or settlements to which the Company is a party.

12.5    A list of unsatisfied judgments.

12.6    Any notices of default, claims, demands, or cancellation under any material agreement.

13.    <u>Insurance Coverage.</u>

13.1    A schedule and copies of the Company's general liability, personal and real property, product liability, errors and omissions, key-man, directors and officers, worker's compensation, and other insurance.

13.2    A schedule of the Company's insurance claims history for past three years.

14.    <u>Professionals.</u>  A schedule of all law firms, accounting firms, consulting firms, and similar professionals engaged by the Company during past five years.

15.    <u>Articles and Publicity.</u>  Copies of all articles and press releases relating to the Company within the past three years.

**SCHEDULE 1**
**LITIGATION DISCLOSURE**

**TO FOLLOW**

## SCHEDULE 2
## NAME AND ADDRESS OF INTERESTED PARTIES

**TO FOLLOW**

| In re:<br>AGUA DULCE VINEYARDS, LLC<br><br>                                                Debtor(s). | Chapter 11<br>Lead Case No. 1:09-bk-15207-MT (Jointly Administered with Catherine P. MacAdam and Donal J. MacAdam – Case No. 1:09-bk-17476-MT) |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067.

A true and correct copy of the foregoing document described as **NOTICE OF MOTION AND MOTION FOR ORDER ESTABLISHING PROCEDURES FOR THE SALE OF ESTATE PROPERTY; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATIONS IN SUPPORT THEREOF** will be served on the Judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **April 26, 2010**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- Melody G Anderson     manderson@hemar.com
- Todd M Arnold     tma@lnbrb.com
- Martin J Brill     mjb@lnbrb.com
- Katherine Bunker     kate.bunker@usdoj.gov
- Lesley A Hawes     lhawes@mckennalong.com, pcoates@mckennalong.com
- Kenneth N Russak     krussak@frandzel.com, banderson@frandzel.com;efiling@frandzel.com
- Ramesh Singh     claims@recoverycorp.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **April 26, 2010**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

<u>Via Overnight Mail</u>
The Hon. Maureen Tighe
United States Bankruptcy Court
21041 Burbank Boulevard
Woodland Hills, CA 91367

31

1

2

3
AGUA DULCE VINEYARDS
RSN LIST
SERVICE BY OVERNIGHT MAIL
OR SERVICE BY **NEF** *

4

5
Katherine Bunker
Ofc of the U.S. Trustee
21051 Warner Center Dr., Suite 115
Woodland Hills, CA 91367

6

**Counsel for Western Comm. Bank**
Attn: Timothy Lambirth, Esq.
c/o Marcin Lambirth et al
16830 Ventura Blvd., #320
Encino, CA 91436

Richard W. Noble, CEO
BCC Merchant Solutions
105 East 5th St., 5th Floor
Kansas City, MO 64106

7

8

9
**Counsel for Merchant eSolutions**
Lesley Anne Hawes **NEF** *
McKenna Long & Aldridge LLP
444 South Flower Street, 8th Fl
Los Angeles, CA 90071

**Counsel for Western Comm. Bank**
Kenneth N. Russak Esq. **NEF** *
Frandzel, Robins et al
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

LA County Treasurer and
Tax Collector
PO Box 54110
Los Angeles, CA 90054-0110

10

11

12
Counsel for Newmark
Communications
Thomas M. Brown/Stewart J. Powell
Brown, White & Newhouse LLP
333 South Hope Street, 40th Floor
Los Angeles, CA 90071

Catherine P. MacAdam
Donal MacAdam
Agua Dulce Vineyards
9640 Sierra Highway
Agua Dulce, CA 91390

13

14

15
AGUA DULCE VINEYARDS
Secured Creditors
SERVICE BY OVERNIGHT MAIL
**OR NEF MARKED WITH** *

16

17

18
I.R.S.
P.O. Box 21126
Philadelphia, PA 19114

Axis Capital, Inc.
308 N. Locust St., Ste 100
Grand Island, NE 68801

Leaf Funding
2005 Market Street
14th Floor
Philadelphia, PA 19103

19

20

21
Key Equipment Finance
c/o Hemar & Associates
2001 Wilshire Blvd., #300
Santa Monica, CA 90403

Western Commercial Bank
Attn: Timothy Lambirth, Esq.
c/o Marcin Lambirth et al
16830 Ventura Blvd., #320
Encino, CA 91436

Western Commercial
Bank
21550 Oxnard St.
Ste 100
Woodland Hills, CA 91367

22

23

24
Narcissa Estates, Inc.
2716 Ocean Park Blvd.
Ste 2025
Santa Monica, CA 90405

New address:
Pentech Financial Svcs
Attn:  Larry Blazek
240 East Hacienda Ave., Suite 100
Campbell, CA 95008

Prospero Equipment Corp
123 Castleton St
Pleasanton, NY 10570

25

26

27
First Private Bank & Trust
16000 Ventura Blvd
Encino, CA 91436

Counsel for Western Commercial Bank
Kenneth N. Russak Esq. **NEF**\*
Frandzel, Robins et al
6500 Wilshire Blvd., 17th Floor
Los Angeles, CA 90048-4920

County of Los Angeles
Dept of Treasurer
Tax Collector
PO Box 54027
Los Angeles, CA 90054-0027

28

1

☐ Service information continued on attached page

2

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for
each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, **2009** I
served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in
writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here
constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after
the document is filed.*

Service by E-Mail
    Bruce A Hatkoff, Esq.
    Bruce A. Hatkoff, A Law Corporation
    16633 Ventura Blvd., Suite 940
    Encino, CA 91436
    Phone: (818)990-5180
    Fax:  (818)990-2463
    email: Bhatkoff@hatkofflaw.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
and correct.

| April 26, 2010 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
*January 2009*                                                                                                     **F 9013-3.1**