1  MARTIN J. BRILL (SBN 53220)
   TODD M. ARNOLD (SBN 221868)
2  LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
4  Telephone: (310) 229-1234
   Facsimile: (310) 229-1244
5  Email: mjb@lnbrb.com, tma@lnbrb.com

6
   Counsel for Debtors and Debtors in Possession
7
                    UNITED STATES BANKRUPTCY COURT
8                     CENTRAL DISTRICT OF CALIFORNIA
                      SAN FERNANDO VALLEY DIVISION
9

10  In re                              )  Lead Case No. 1:09-bk-15207-MT
                                       )  (Jointly Administered with  Catherine P.
11  AGUA DULCE VINEYARDS, LLC, a       )  MacAdam and Donal J. MacAdam – Case No.
    California limited liability company,  )  1:09-bk-17476-MT)
12                                      )
                    Debtor.            )  Chapter 11 Cases
13  —————————————————————             )
                                       )
14  In re                              )  **DEBTORS' MOTION TO APPROVE:**
                                       )
15  CATHERINE P. MACADAM and           )  **(1)  THE SALE OF SUBSTANTIALLY ALL**
    DONAL J. MACADAM,                  )  **OF THE ASSETS OF AGUA DULCE**
16                                      )  **VINEYARDS, LLC FREE AND CLEAR OF**
                    Debtors.           )  **LIENS, CLAIMS, INTERESTS AND**
17  —————————————————————             )  **ENCUMBRANCES;**
                                       )  **(2)  THE ASSUMPTION AND ASSIGNMENT**
18  ⊠  Affects All Debtors             )  **OF CERTAIN UNEXPIRED LEASES AND**
                                       )  **EXECUTORY CONTRACTS; AND**
19  ☐  Affects Agua Dulce Vineyards, LLC )  **(3)  THE EMPLOYMENT AND PAYMENT**
    only                               )  **OF KENNEDY WILSON AUCTION GROUP,**
20                                      )  **INC. AND ANY COOPERATING BROKER**
    Affects Catherine P. MacAdam and   )  **IN CONJUNCTION WITH THE SALE;**
21      Donal J. MacAdam only          )  **MEMORANDUM OF POINTS AND**
                                       )  **AUTHORITIES AND DECLARATIONS OF**
22                                      )  **CATHY MACADAM AND CLIFFORD**
                                       )  **SMITH IN SUPPORT THEREOF**
23                                      )
                                       )  <u>Hearing</u>:
24                                      )  Date:  June 14, 2010
                                       )  Time:  11:00 a.m.
25                                      )  Place:  Courtroom "301"
                                       )          21041 Burbank Boulevard
26                                      )          Woodland Hills, California 91367
                                       )
27                                      )
                                       )
28  —————————————————————             )

1    Agua Dulce Vineyards, LLC, a California limited liability company ("ADV"), and

2    Catherine P. and Donal J. MacAdam (the "MacAdams"), debtors and debtors in possession in the

3    above-captioned, jointly administered Chapter 11 cases ("Debtors"), hereby move the Court, by

4    way of this motion (the "Sale Motion"), for an order, in substantially the form attached hereto as

5    Exhibit "1:"

6    (1)    approving the sale of substantially all of ADV's assets to Western Commercial

7    Bank ("Bank"), ADV's primary secured creditor, for a credit bid purchase price of $6.1 million

8    (subject to certain credits and adjustments), subject to overbid, free and clear of all liens, claims,

9    interests, and encumbrances, pursuant to 11 U.S.C. § 363(f), on the terms set forth herein and in

10   the attached agreements regarding the sale (collectively, the "Sale Documents"), which include

11   the following primary documents and any exhibits and schedules attached thereto:

12   a.    Agreement to Sell Property and Assets (the "Agreement to Sell") – a true and

13   correct copy of the Agreement to Sell in substantially the form to be used by

14   the parties is attached hereto as Exhibit "2;"

15   b.    Auction Sale Agreement (the "Auction Agreement") – a true and correct copy

16   of the Auction Agreement in substantially the form to be used by the parties is

17   attached as Exhibit "B" to the Agreement to Sell;

18   c.    Purchase and Sale Agreement and Joint Escrow Instructions [Western

19   Commercial Bank Property] (the "Bank APA") – a true and correct copy of

20   the Bank APA in substantially the form to be used is attached as Exhibit "B"

21   to the Auction Agreement;

22   d.    Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce

23   Vineyards] (the "ADV APA") – a true and correct copy of the ADV APA in

24   substantially the form to be used by the parties is attached as Exhibit "C" to

25   the Auction Agreement;

26   e.    Due Diligence and Confidentiality Agreement (the "Confidentiality

27   Agreement") – a true and correct copy of the Confidentiality Agreement in

28

1     substantially the form to be used by the parties is attached as Exhibit "D" to

2     the Auction Agreement; and

3          f.   List of "Assumed Contracts," listing (i) the executory contracts and unexpired

4     leases (collectively the "Contracts") ADV is seeking to assume and assign to

5     the Bank, and (ii) the cure amounts for the Contracts (the "Cure Amounts");

6     (2)   approving the assumption of the Contracts by ADV and the assignment thereof to

7 Bank or an accepted bidder pursuant to 11 U.S.C. § 365;

8     (3)   approving the Cure Amounts for the Contracts and deeming the failure of a

9 counter-party to a particular Contract to object to the proposed Cure Amount and assumption and

10 assignment to be a waiver of such objection;

11     (4)   approving the employment and payment of  Kennedy Wilson Auction Group, Inc.

12 ("KW") and any cooperating broker in conjunction with the proposed sale;

13     (5)   waiving the 14-day stay periods set forth in Federal Rules of Bankruptcy

14 Procedure 6004(h) and 6006(d);

15     (6)   authorizing Debtors to take all necessary and reasonable steps to consummate the

16 sale of the assets and the assumption and assignment of the Contracts; and

17     (7)   granting such other relief as is just and proper under the circumstances.

18 Dated:  May 24, 2010          AGUA DULCE VINEYARDS, LLC,
                        a California limited liability company
19

20                       CATHERINE P. MACADAM and
                       DONAL J. MACADAM
21

22                       By:___*/s/ Martin J. Brill*_____

23                       MARTIN J. BRILL
                       TODD M. ARNOLD
24                       LEVENE, NEALE, BENDER, RANKIN
                         & BRILL L.L.P.
25                       Attorneys for Debtors and

26

27

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES

I.      STATEMENT OF FACTS ........................................................................................ 3

     A. THE DEBTORS AND THE FILING OF THE DEBTORS' CHAPTER 11
        BANKRUPTCY CASES .................................................................................... 3

     B. EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11
        BANKRUPTCY CASES .................................................................................... 4

     C. A SUMMARY OF THE PROPOSED SALE...................................................... 6

     D. THE PROPOSED SALE PROCEDURES ..................................................... 9

     E. CLAIMS ALLEGEDLY SECURED BY THE ADV ASSETS ............................... 13

     F. THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND
        RELATED CURE AMOUNTS........................................................................ 17

     G. THE EMPLOYMENT AND PAYMENT OF KW AND ANY
        COOPERATING BROKER .......................................................................... 19

II.     DISCUSSION ................................................................................................... 20

     A. ADV SHOULD BE AUTHORIZED TO SELL THE ADV ASSETS FREE
        AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND
        ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363 AND THE TERMS
        OF THE SALE DOCUMENTS....................................................................... 20

        1. ADV Should be Authorized to Sell the ADV Assets ........................................ 20

            a.  Sound Business Purpose ........................................................................ 21

            b.  Fair and Reasonable Price........................................................................ 21

            c.  Adequate Marketing................................................................................ 22

            d.  Accurate and Reasonable Notice ................................................................ 23

            e.  Good Faith ............................................................................................ 23

        2. ADV Should Be Authorized to Sell the ADV Assets Free and Clear
          of Liens, Claims, Interests, and Encumbrances ................................................... 25

            a.  ADV Property ........................................................................................ 25

            b.  Other Assets .......................................................................................... 28

i

B. ADV SHOULD BE AUTHORIZED TO ASSUME AND
ASSIGN THE CONTRACTS......................................................................... 29

C. THE COURT SHOULD APPROVE THE EMPLOYMENT AND
PAYMENT OF KW AND ANY COOPERATING BROKER................................ 31

D. THE COURT SHOULD WAIVE THE FOURTEEN-DAY WAITING
PERIODS SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d)......... 33

III.    CONCLUSION........................................................................................ 33

DECLARATION OF CATHERINE P. MACADAM.................................................. 35

DECLARATION OF CLIFFORD R. SMITH........................................................... 57

1

2

# **<u>TABLE OF AUTHORITIES</u>**

3

**Page(s)**

**FEDERAL CASES**

4

5
Big Shanty Land Corp. v. Comer Properties, Inc.
    61 B.R. 272 (Bankr. N.D. Ga. 1985) ......................................................................21

6
Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC)
    391 B.R. 25 (9th Cir. B.A.P. 2008)..............................................................25, 26, 27

7

8
In re Abbotts Dairies of Pennsylvania, Inc.
    788 F.2d 143 (3rd Cir. 1986) ...........................................................................23, 24

9

In re Alpha Industries, Inc.
10
    84 B.R. 703 (Bankr. Mont. 1988) ....................................................................21, 24

11
In re Apex Oil Co.
12
    92 B.R. 847 (Bankr. E.D.Mo. 1988) .....................................................................24

13
In re Canyon Partnership
    55 B.R. 520 (Bankr. S.D. Cal. 1985) .....................................................................21

14

15
In re Central Fla. Metal Fabrication, Inc.
    190 B.R. 119 (Bankr. N.D. Fla. 1995) ...................................................................29

16
In re Continental Country Club, Inc.
    114 B.R. 763 (Bankr. M.D. Fla. 1990) ...................................................................30

17

18
In re Gucci
    193 B.R. 411 (S.D.N.Y. 1996).........................................................................29, 30

19
In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc.
20
    77 B.R. 15 (Bankr. E.D. Pa. 1987) ........................................................................24

21
In re Jolan, Inc.
    2009 WL 1163928 (Bankr. W.D. Wash. 2009) ................................................26, 27

22

23
In re Klein Sleep Products, Inc.
    78 F.3d 18 (2d. Cir. 1996) ...................................................................................29

24

25
In re The Landing
    156 B.R. 246 (Bankr. E.D. Mo. 1993) ...................................................................20

26
In re Lionel Corp.
    722 F.2d 1063 (2d Cir. 1983)................................................................................20

27

28

In re Mama's Original Foods, Inc.
    234 B.R. 500 (C.D. Cal. 1999) ...........................................................................20

In re Prime Motors Inns
    124 B.R. 378 (Bankr. S.D. Fla. 1991) ...............................................................30

In re Rock Indus. Mach. Corp.
    572 F.2d 1195 (7th Cir. 1978) ...........................................................................24

In re Wilde Horse Enterprises, Inc.
    136 B.R. 830 (Bankr. C.D. Cal. 1991)........................................................20, 21, 24

Walter v. Sunwest Bank (In re Walter)
    83 B.R. 14 (9th Cir. BAP 1988)..........................................................................20


**FEDERAL STATUTES**

11 U.S.C. § 101 ......................................................................................... passim
11 U.S.C. § 327 ..............................................................................................31
11 U.S.C. § 327(a) ........................................................................19, 31, 32, 33
11 U.S.C. § 327(c) ........................................................................24, 31, 32
11 U.S.C. § 328 ..............................................................................................31, 32
11 U.S.C. § 328(a) ........................................................................19, 31, 32, 33
11 U.S.C. § 363 ..............................................................................................20, 25
11 U.S.C. § 363(b) ........................................................................20, 21, 24
11 U.S.C. § 363(b)(1) ....................................................................................20, 23
11 U.S.C. § 363(f) ........................................................................................... passim
11 U.S.C. § 363(f)(2) ....................................................................25, 28, 29
11 U.S.C. § 363(f)(5) ........................................................................................ passim
11 U.S.C. § 363(f)(4) ......................................................................................28
11 U.S.C. § 363(m), and (ii) ..........................................................................7, 24
11 U.S.C. § 365 ..............................................................................................3, 7, 30, 34
11 U.S.C. § 365(a) ........................................................................................29
11 U.S.C. § 365(b) ........................................................................................30
11 U.S.C. § 365(b)(2) ....................................................................................29
11 U.S.C. § 1107(a) ......................................................................................20

**CALIFORNIA STATUTES**
Cal.Civ.Code § 2924.......................................................................................27
Cal.Com.Code § 9617......................................................................................27

**OTHER AUTHORITIES**

Fed.R.Bankr.P. 1107 and 1108 .......................................................................3
Fed.R.Bankr.P. 2002(a)(2), (c)(1), (i) and (k), 6004, and 6006....................23

Fed.R.Bankr.P. 2014...................................................................................................31
Fed.R.Bankr.P. 2014...................................................................................................31
Fed.R.Bankr.P. 6004(h) and 6006(d).................................................................3, 33, 34
Fed.R.Bankr.P. 6004(h).............................................................................................33
Fed.R.Bankr.P 6006(d)..............................................................................................33

L.B.R. 2002-1, 2002-2, 6004-1 and 9013-1..............................................................23
L.B.R. 2014-1........................................................................................................31, 32
L.B.R. 2014-1(b)(3)....................................................................................................31
L.B.R. 6007-1(f).........................................................................................................23
L.B.R. 6007-1(h)................................................................................19, 31, 32, 33

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF FACTS

**A.     THE DEBTORS AND THE FILING OF THE DEBTORS' CHAPTER 11 BANKRUPTCY CASES.**

1.     On May 4, 2009, ADV filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").[1]  ADV is operating its business, managing its financial affairs, and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108.

2.     On June 17, 2009, the MacAdams filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  The MacAdams are operating their business, managing their financial affairs, and operating their bankruptcy estate as debtors in possession pursuant to Sections 1107 and 1108.

3.     ADV is the operator of a 37 acre, fully operational vineyard and winery, featuring daily wine tasting and tours, and a gourmet gift shop.

4.     In 1999, the MacAdams, along with their partner, Ray Watt, through his various entities and affiliates including Narcissa Estates, Inc. ("Narcissa"), founded ADV when they discovered that the forty acre property that they originally acquired for real estate development had ideal soil and climate conditions for growing world-class grapes.  This property, which is located at 9640 and 9830 Sierra Highway, Agua Dulce, California 91390, houses ADV's winery, a residence occupied by the MacAdams and their 4 minor children, and planted vineyards (the "ADV Property").

5.     In December 2005, the MacAdams bought out Ray Watt's interest in ADV (which at that point was held entirely through Narcissa) for approximately $6.5 million.  The MacAdams' buyout of Mr. Watt's interest was financed in part through a hard money loan from KSI Capital Corporation ("KSI") for approximately $5.6 million (the "KSI Loan"), and in part through a

---

[1] Unless otherwise stated, all section references herein are to the Bankruptcy Code.

1  promissory note in favor of Narcissa in the sum of $992,290, which was subsequently increased to

2  $1,356,000, secured by a deed of trust against the ADV Property.

3        6.    Following the buyout of Ray Watt's interest in ADV in December 2005, ADV

4  leased a 53 acre parcel of vacant land adjoining the ADV Property located at 10124 Sierra

5  Highway, Agua Dulce, California 91390 (the "Bank Property" and together with the ADV

6  Property, the "Properties") from Narcissa to expand ADV's planted vineyards.  ADV acquired the

7  Bank Property from Narcissa in October 2007.  ADV's acquisition of the Bank Property was

8  financed in part through a loan from Western Commercial Bank ("Bank") in the principal amount

9  of $1 million (the "$1M Loan"), which loan was secured by a first priority deed of trust against the

10  Bank Property, and in part through a promissory note in favor of Narcissa in the sum of

11  $3,100,000, secured by a second priority deed of trust against the Bank Property.

12        7.    In 2007, ADV entered into a series of loan agreements with Bank, including the (a)

13  $1M Loan and, (b) a loan in the principal amount of $6 million (the "$6M Loan), which loan was

14  secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other

15  monetary liens and encumbrances on the ADV Property, and (ii) senior liens on substantially all of

16  ADV's other assets.  Since Bank did not provide enough funding to completely retire the KSI

17  Loan, the MacAdams executed a new note in the amount of $400,000 in favor of KSI (the "New

18  KSI Loan").

19  **B.**     **EVENTS LEADING TO THE FILING OF THE DEBTORS' CHAPTER 11**

20          **BANKRUPTCY CASES.**

21        8.    Although ADV's business experienced robust and steady growth, at a rate of 10%

22  each year from 2001 to 2007, the partner buyout and the purchase of the Bank Property increased

23  ADV's debt load, creating cash flow issues when ADV's revenue was not sufficient to service all

24  of ADV's debts.

25        9.    In an effort to increase its revenue, ADV attempted to expand its existing in-home

26  wine parties division, called "Agua Dulce Wine Adventures," which eventually partnered up with

27  Suzanne Somers' direct selling company.  This partnership was then picked up by a company

28

called Youngevity, which had at the time over 300,000 consultants worldwide (primarily in the United States and Asia).  Although ADV hoped that its in-home wine parties division would benefit from the Youngevity network, it ultimately did not result in the increase in sales and revenue that ADV had expected.

10.    Although ADV began increasing its revenues by, among other things, selling its wine in bulk, ADV suffered a huge setback in 2008 when a large number of its Wine Club members were repeatedly invoiced in error by ADV's credit card processing system.  In the normal course of business, ADV's Wine Club members receive six bottles of wine every three months and ADV's credit card processing system automatically debits the payment for the wine from the members' credit cards on file.  In early 2008, ADV's credit card processing software was upgraded, causing a glitch that resulted in repeated debiting from the Wine Club members' credit cards.  In an effort to salvage its relationships with the Wine Club members, ADV paid refunds directly to many of the members.  In the meantime, members who had also contacted their credit card companies obtained refunds directly from their credit card companies, who then turned around and debited the refund amounts from ADV's bank accounts.  This resulted in a double hit to ADV's bank accounts, leaving ADV's accounts overdrawn approximately $287,000 by the end of the summer.

11.    As a result of the credit card processing fiasco, ADV faced a cash flow crisis, causing ADV to fall behind on its accounts payable and prompting ADV to seek an additional loan from Bank.  In November 2008, after contracting with a new credit card processing company, ADV obtained a loan from Bank in the principal amount of $750,000 (the "$750K Loan").  ADV's obligations to Bank under the $750K Loan are secured by a security interest in off-site and on-site bottled wines, in-tank or in-barrel.  The documents underlying the $750K Loan allowed Bank to create a reserve (the "Reserve Funds") from 30% of ADV's credit card deposits up to $100,000 to cover chargebacks from the credit card processor.  This caused a severe cash flow crunch for ADV.  Pursuant to Bank's various loans to ADV, Bank provided financing to ADV in the total principal sum of $8.1 million and obtained a security interest in substantially all of ADV's assets,

1    including the ADV Property and the Bank Property.  One of the goals of these loans was to retire

2    the KSI Loan.  On March 4, 2009, Bank filed and recorded a Notice of Default against ADV to

3    initiate a foreclosure proceeding against the Bank Property.

4        12.    As a result of all of the foregoing, ADV was forced to seek protection under

5    Chapter 11 of the Bankruptcy Code in order to gain control over its cash (including the Reserve

6    Funds) and operations, to have the opportunity to implement business strategies targeted at

7    increasing revenue – including working with wine brokers and national distributors to increase

8    sales of its wine, at both the bulk sales level and direct sales level, to restructure its existing debt

9    and emerge a stronger and profitable company.

10        13.    The MacAdams personally guarantied ADV's obligations to Bank. The MacAdams

11    also personally guarantied a number of other ADV business debts.  Additionally, the MacAdams

12    are liable on the New KSI Loan.

13        14.    As a result of ADV's financial difficulties and inability to remain current on its debt

14    obligations, including those for the payment of the MacAdams' salaries, (a) a number of ADV

15    creditors made demands and initiated litigation against the MacAdams based on their guaranty

16    obligations, and (b) the MacAdams were unable to remain current on the New KSI Loan.  Based

17    on the foregoing events, among others, the MacAdams were forced to seek protection under

18    Chapter 11 of the Bankruptcy Code in order to gain control over their assets, to continue to work

19    towards reorganization in the ADV bankruptcy case, and to restructure their existing debts.

20    **C.    A SUMMARY OF THE PROPOSED SALE.**

21        15.    After Debtors' bankruptcy cases were filed, Bank obtained relief from stay and

22    foreclosed on the Bank Property.

23        16.    In consideration of the foregoing, and after considering its options, ADV has

24    concluded, in an exercise of its business judgment, that a sale of the ADV Property and

25    substantially all of ADV's other assets (excluding cash and avoidance causes of action) (the "Other

26    Assets" and, together with the ADV Property (the "ADV Assets") in a joint sale with the Bank

27    Property (together with the ADV Assets, the "Assets") is in the best interests of ADV and the

28

1    creditors of its estate.  ADV believes that a joint sale of the Assets will provide the most benefit to

2    the estate by, among other things, increasing the sale price for the Assets due to synergies between

3    the Bank Property, the ADV Property, and the Other Assets, which should provide the maximum

4    possible debt reduction and recovery for Debtors' estates.

5         17.    After substantial arms-length negotiations among Debtors, Bank, and KW, the

6    parties negotiated the Sale Documents to effectuate a joint sale of the Assets.  A true and correct

7    copy of the Sale Documents in substantially the form to be used by the parties is attached hereto as

8    Exhibit "2."

9         18.    In summary,[2] under the Sale Documents, (a) ADV was required to obtain an order

10   of the Court (the "Bid Procedures Order") approving sale procedures set forth in the Sale

11   Documents and in a motion to approve bid procedures previously filed by Debtors (the "Sale

12   Procedures Motion"), which has now been granted, and (b) ADV is required to obtain a Sale Order

13   of the Court approving this Sale Motion and providing for, among other things, (i) the sale of the

14   ADV Assets free and clear of all liens, claims, encumbrances or interests to Bank, subject to

15   overbid, pursuant to Section 363(f), together with a good faith finding pursuant to Section 363(m),

16   and (ii) the assumption by ADV and assignment to Bank or an accepted bidder of the Contracts

17   designated in the Sale Documents pursuant to Section 365.

18        19.    If either (a) none of the bid amounts for the Assets is greater than the Minimum

19   Overbid Amount (as defined below), or (b) the accepted bidder does not purchase all of the Assets

20   for any reason, other than a breach or default by Bank of the Bank APA, then Bank shall purchase

21   the ADV Assets pursuant to the ADV APA by offsetting $6.1 million from the $6M Loan.  In the

22   event Bank purchases the ADV Assets, Bank shall be responsible to pay the KW Fees (as defined

23   below), Bank has agreed to pay KW in connection with the auction of the Assets, the title costs,

24   escrow costs, transfer taxes (to the extent owed), the Cure Amounts, and certain professional fees

25

26   ---

[2] The summary description of the proposed transaction under the Sale Documents is for informational purposes
27   only.  To the extent there is any inconsistency between the summary and the Sale Documents, the Sale Documents
     shall govern.

28

1    Bank has agreed to pay (the "Professional Fees").  Bank shall not pay, and shall purchase the ADV

2    Assets subject to, all outstanding property taxes.

3         20.    In connection with any accepted bidder other than Bank purchasing the Assets,

4    Bank and ADV agree to divide, allocate, and pay the accepted bid amount pursuant to Section 6 of

5    the Agreement to Sell.  In addition to the bid amount, any accepted bidder will also be responsible

6    for paying the Cure Amounts.

7         21.    If Bank purchases the ADV Assets as described in Section 6.2 of the Agreement to

8    Sell, Bank will pay the unpaid attorneys' fees and costs incurred by counsel to ADV, as approved

9    by the Court (the "Professional Fees") incurred from and after December 1, 2009 (the "Post-

10   December Professional Fees"), up to a maximum amount of $150,000.00.

11        If an accepted bidder purchases the Assets, Bank will pay the Post-December

12   Professional Fees and twenty-five percent (25%) of the attorneys' fess and costs incurred by

13   counsel to ADV incurred after the petition date and prior to December 1, 2009 (the "Pre-December

14   Professional Fees"), up to the aggregate, maximum amount of $150,000.00; provided, however,

15   that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the

16   loans from Bank to ADV, instead of the foregoing, Bank shall pay the Post-December Professional

17   Fees and seventy-five percent (75%) of the Pre-December Professional Fees, up to the aggregate,

18   maximum amount of $200,000.00.

19        If the Court does not grant this Sale Motion, Bank shall use commercially

20   reasonable efforts to foreclose all of its security interest in and to the ADV Assets under applicable

21   non-bankruptcy law in a commercially-reasonable period of time following Bank's termination of

22   the Agreement to Sell unless there is reasonable cause for Bank not to foreclose, including, by way

23   of example but not limitation, the discovery of material environmental contamination on the ADV

24   Property or the imposition of an stay or injunction prohibiting Bank from doing so.

25   Notwithstanding any provision of the Agreement To Sell, provided (a) ADV and the MacAdams,

26   and their attorneys, have provided genuine cooperation and diligent, good faith, and best efforts to

27   obtain approval of this Sale Motion, and (b) ADV and the MacAdams, and their attorneys, have

28

1  not directly, indirectly, or collusively interfered with Bank's efforts to foreclose upon any of the

2  ADV Assets, upon completion of the foreclosure sales of the ADV Assets or termination of the

3  Agreement to Sell, Bank shall pay the Post-December Professional Fees to the appropriate parties

4  up to a maximum amount of $100,000.00.

5  **D.**     **THE PROPOSED SALE PROCEDURES.**

6      22.     **Sale Procedures Motion** – Pursuant to the Sale Procedures Motion, ADV sought

7  and obtained approval of the following sale procedures (the "Sale Procedures"):

8      23.     **Marketing** – Commencing on May 13, 2010, and continuing until June 24, 2010,

9  KW will market the Assets (the "Marketing Period").

10      During the Marketing Period, KW will market the Assets by (a) delivering a notice of

11  offering letter to as many potential bidders as possible, (b) listing and advertising the Assets for

12  sale at an estimated price of between $10-$15 million (the "Auction Estimate Range") on various

13  internet sites, and with various brokerage and/or listing services, that list and offer for sale real

14  property and assets, similar to the Assets; and (c) submitting advertisements for the sale of the

15  Assets at the Auction Estimate Range in trade or industry newspapers and other print media.

16      In conjunction with the foregoing marketing efforts by KW, KW shall provide reasonable

17  assistance to potential bidders to enable such potential bidders to review, inspect, and evaluate the

18  Assets during the Marketing Period.  Without limiting the generality of the foregoing, during the

19  Marketing Period, KW shall (a) make information regarding the Assets available to potential

20  bidders that have completed, executed, and delivered to KW a Confidentiality Agreement, (b)

21  coordinate with Bank and Debtors to permit potential bidders to access the Assets for purposes of

22  conducting site visits, and (c) receive written questions from potential bidders with respect to the

23  Assets and the auction, seek answers to the same from Bank and Debtors, and provide written

24  answers to such questions, as approved by Bank and Debtors, to all potential bidders.

25      24.     **Bids** – KW will require all potential bidders to submit their bids to KW on or

26  before the first business day following the end of the Marketing Period (the "Bid Submission

27  Date").  KW may, in its reasonable discretion, (a) advise any Qualified Bidder (as defined below),

28

1  who submit bids prior to the Bid Submission Date with bid amounts that are less than threshold

2  minimum price equal to approximately $9.3 million (the "Minimum Overbid Amount"), which is

3  the sum of the amounts of the $6.1 million Bank credit bid for the ADV Assets, the $2.6 million

4  offering price for Bank Property, the KW Fees, the cooperating Broker Fees, the Bank Breakup

5  Fees, and the costs and expenses incurred by Bank in connection with the Bank Property on or

6  after December 1, 2009, and will not be accepted, and that a higher amount may be submitted prior

7  to the Bid Submission Date, and (b) extend the Bid Submission Date for any bid that is not

8  received by the Bid Submission Date if the reason for such failure was beyond the reasonable

9  control of the applicable Potential Bidder.

10      KW shall review each bid to determine if the person submitting the bid is a Qualified

11  Bidder.  If, in KW's reasonable determination, the person submitting the bid appears to be a

12  Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may

13  notify such person and provide a one-time opportunity to submit additional information

14  demonstrating that it is a Qualified Bidder.  Bids from all persons that are not Qualified Bidders

15  shall be set aside and not evaluated or considered further in the auction.

16      KW shall review and evaluate the bids submitted by Qualified Bidders and provide a

17  summary and analysis of the same to Bank and Debtors within one (1) Business Day after the Bid

18  Submission Date (as defined below).

19      If as part of its bid, any Qualified Bidder requests any insertions, deletions, or other

20  modifications to the Bank APA or the Debtor APA ("PSA Comments"), such bid shall be

21  considered non-conforming, unless and until such PSA Comments are approved by Bank or

22  Debtors, as applicable.  At the request of the applicable seller, KW shall notify the Qualified

23  Bidder as to which PSA Comments, if any, are approved by the applicable seller and permit the

24  Qualified Bidder to revise, amend, or withdraw its bid with respect thereto.

25      25.    **Qualification of Bidders** – In order to bid for the assets, a person must be a

26  qualified bidder (a "Qualified Bidder").  A Qualified Bidder is a person, other than Bank, that:

27          a.      Has submitted a bid to purchase the Assets;

28

b.    Has provided reasonably-detailed, credible, written evidence verifying its ability to pay the applicable bid amount, in cash or other immediately available funds, which such evidence may include, without limitation, (i) statements of third-party deposit account balances showing readily-available, liquid funds in the excess of the bid amount, (ii) letters of credit or unconditional commitment letters from banks, credit unions, or other financial institutions, and/or (iii) other written information demonstrating that the Qualified Bidder has the financial ability to pay the bid amount; and

c.    Is otherwise ready, willing, and permitted to purchase the Assets pursuant to the Sale Documents.

26.    **Auction** – Bank and ADV Parties shall review the summary of the bids prepared by KW.  Unless Bank and Debtor otherwise agree, and direct KW, in writing, to the contrary:

a.    If only one (1) Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then such bid shall be deemed the accepted bid;

b.    If more than one Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then following Bank's and Debtors' review of the submitted bids, Bank and Debtors shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Assets (the "Live Auction").  In respect of the Live Auction, (i) all Qualified Bidders that submitted bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (ii) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and Debtors agree that KW's services shall not be required for the Live Auction, (iii) the Live Auction shall be held at the location agreed upon by Bank and Debtors, with the Courtroom of the Bankruptcy Court, the ADV Property, and the offices of the Debtors' attorneys being approved locations for the Live Auction, and (iv) all other

matters with respect to the Live Auction shall be agreed to by Bank and Debtors, with the advice and input from KW. The Qualified Bidder submitting the highest bid amount in excess of the Minimum Overbid Amount at the Live Auction shall be the accepted bid.

If no Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, or if a Qualified Bidder does not purchase the Assets for any reason, other than a breach or default of the Bank APA by Bank, pursuant to the Sale Order, (a) Bank shall continue to own, and not sell the Bank Property, (b) Bank and Debtors shall enter into the ADV APA, and consummate the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV APA, and (c) as discussed below, ADV will be deemed to have assumed and assigned those Contracts to Bank that Bank has elected to accept, upon payment of the Cure Amounts by Bank.

If a Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, ADV will seek final approval of the Sale Motion providing for a sale of the Assets, and the assumption and assignment of the Contracts, to such Qualified Bidder, upon payment of the Cure Amounts. Upon such approval, Bank and ADV shall promptly sign and date the applicable purchase agreements submitted by the successful Qualified Bidder, deliver the same to the escrow agent, and consummate the sale of the Assets pursuant to the terms and conditions of the Sale Documents.

27. **Bank Breakup Fees** – The Sale Procedures contemplate an auction with Bank as a stalking horse bidder. The breakup fees to be paid to Bank (the "Bank Breakup Fees") are in an amount equal to the fees and costs owed to Bank's attorneys incurred in connection with Debtors' bankruptcy cases on and after December 1, 2009, the date the parties began talking in earnest about the proposed sale, which include, without limitation, the fees and costs of Bank's attorneys incurred pursuant to the transactions set forth herein. As of April 13, 2010, the Bank Breakup Fees were equal to approximately $23,000. This fee will only be paid if a Qualified Overbidder purchases the Assets. ADV believes that the existence of Bank as stalking horse bidder will

1   generate additional interest in the purchase of the ADV Assets and spur multiple bids at the

2   auction, because the existence of a party willing and able to purchase the ADV Assets for an

3   established price helps provide additional potential buyers with an idea of the true market value of

4   the asset being sold and lends credibility to the sale of the ADV Assets.  Moreover, as discussed

5   above, due to synergies among the Bank Property, the ADV Property, and the Other Assets (e.g.,

6   the fact that the Bank Property, which is adjacent to the ADV Property, provides additional

7   vineyard acreage and has active water wells necessary for the operation of both properties), ADV

8   believes that offering the ADV Assets and the Bank Property together will result in ADV obtaining

9   a higher and better price for the ADV Assets.

10  **E.    CLAIMS ALLEGEDLY SECURED BY THE ADV ASSETS.**

11        28.    Based on ADV's review of title reports, UCC filings, and other information

12  available, ADV believes that the following creditors allege that they have claims secured by the

13  ADV Assets:

14        a.    ADV Property (i.e., real property):

15        In conjunction with the filing of its bankruptcy case, on April 21, 2009, ADV obtained a

16  Title Report showing all encumbrances on the ADV Property.  A true and correct copy of the Title

17  Report is attached hereto as Exhibit "3."  The Title Report and the other information available to

18  ADV shows the following claims are allegedly secured by the ADV Property:

19

| Purported Creditor | Nature of Interest | Alleged Claim |
|---|---|---|
| Bank | 1st Deed of Trust (through subordination agreements) | $7,182,944 (approx.) |
| Bank | 2nd Deed of Trust (through subordination agreements) | $374,250 (approx.) |
| Narcissa | 3rd Deed of Trust (through subordination agreements) | $1,356,000 (approx) |

| Purported Creditor | Nature of Interest | Alleged Claim |
|---|---|---|
| County of Los Angeles (the "County") | Taxes | $17,408.89[3] |
| Franchise Tax Board (the "FTB") | Taxes | $0[4] |
| Newmark Communications ("Newmark") | Judgment | $0[5] |

      b.   Other Assets (i.e., personal property):

29.     In conjunction with the filing of its bankruptcy case, on April 10, 2009, ADV obtained a summary report regarding all UCC-1 Financing Statements that could conceivably relate to ADV and the back-up documentation regarding such UCC-1 Financing Statements (collectively, the "UCC Information").  A true and correct copy of the UCC Information is attached hereto as Exhibit "4."  The UCC Information and the other information available to ADV show that some of the following claims are allegedly secured by the Other Assets:

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| Encino State Bank | Terminated | N/A – Terminated |
| Global Vintage Ltd. Tustin Community Bank | Lapsed | N/A – Lapsed |
| Global Vintage Ltd. Tustin Community Bank | Terminated | N/A – Terminated |
| IRS | Terminated | N/A – Terminated |
| Narcissa as assignee or | Active | $1,356,000 (approx) |

---

[3] The County filed Proof of Claim No. 7 asserting a secured claim in the amount of $48,531.36.  However, the APN numbers referenced in that Proof of Claim do not relate to the ADV Property.  Therefore, ADV disputes this Proof of Claim from the County.  On the other hand, the amount listed here is the amount of the recorded tax liens appearing on the Title Report.
[4] The FTB filed Proof of Claim No. 52 asserting a secured in the amount of $9,565.5.  However, the FTB does not appear on the Title Report for the ADV Property.  FTB is only listed here in an abundance of caution and in the interests of full disclosure.
[5] Newmark filed Proof of Claim No. 48 asserting a general unsecured claim in the amount of $48,531.36, and Newmark does not appear on the Title Report for the ADV Property.  Newmark is only listed here in an abundance of caution and in the interests of full disclosure.

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| successor in interest to First Private Bank & Trust | 2nd Priority Security Interest in Modular Barn (original 1st priority lien subordinated to Bank liens) | |
| Leaf Funding, Inc. ("Leaf") as assignee or successor in interest to Axis Capital Inc. ("Axis") assigned to | Active

1st Priority Security Interest in Equipment Leased Pursuant to Lease No. 91092 (the "Leaf Lease") | $18,855 - Estimated cure amount through July 31, 2010

ADV scheduled Axis with a secured claim in the amount of $36,467.

Leaf filed Proof of Claim No. 18 asserting a secured claim in the amount of $15,000 and a general unsecured claim in the amount of $21,467.71.

The Leaf Lease will either be (1) assumed by ADV and assigned to the Bank or an accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Leaf. |
| KSI Funding, Inc. | Terminated | N/A – Terminated |
| Pentech Financial Services, Inc. ("Pentech") as assignee or successor in interest to Capital Network Leasing Corp. | Active

1st Priority Security Interest in Barrels Leased Pursuant to Lease No. 15606 (the "Pentech Lease") | $38,205 - Estimated cure amount through July 31, 2010

ADV scheduled Pentech with a secured claim in the amount of $60,517.  Pentech filed Proof of Claim No. 24 asserting a secured claim in the amount of $57,841.55.

The Pentech Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Pentech. |

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| Associated Winery Systems, Inc. ("AWS") as assignee or successor in interest to Prospero Equipment Corp. | Active<br><br>1st Priority Security Interest in Bottling Line Equipment Pursuant to Lease (the "AWS Lease") and/or Stipulated Judgment regarding the AWS Lease | $22,500 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled AWS with a secured claim in the amount of $90,000. AWS filed Proof of Claim No. 47 asserting a secured claim in the amount of $333,062.85.<br><br>Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount.<br><br>The Court entered an agreed order (1) providing AWS with relief from stay if required payments under the stipulated judgment were not made in a timely manner going forward, and (2) requiring that the balance owed to AWS under the Stipulated Judgment be paid by October 31, 2010, unless otherwise agreed in a writing signed by the parties, by ADV or any purchaser of the Debtor's assets.<br><br>The AWS Lease and/or if necessary, the Stipulated Judgment, will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount/ purchase price set forth above, or (2) rejected with the underlying equipment returned to AWS. |
| Bank | Active<br><br>1st Priority Security Interest in All Personal Property Not Subject to Senior Purchase Money Liens | $7,182,944 (approx.) |
| Key Equipment Finance, | Active | ADV scheduled Key with a secured claim in |

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| Inc. ("Key") | 2nd Priority Security Interest in All Personal Property Not Subject to Senior Purchase Money Liens Pursuant to Judgment Lien | the amount of $59,696.34.  Key filed Proof of Claim No. 21 asserting a secured claim in the amount of $59,696.34. |
| Bank | Active<br><br>Assignment of existing or future Bottling Contracts. | $374,250 (approx.) |
| Bank | Active<br><br>Priority Security Interest in All Bottled, Tank, and Barrel Wine and/or Juice Not Subject to Senior Liens on All Personal Property | $763,864 (approx.) |

**F.    THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND RELATED CURE AMOUNTS.**

30.    As discussed above, ADV intends to assume and assign to Bank those Contracts that Bank has agreed to accept in connection with any purchase of the ADV Assets.  Under the Sale Documents, the buyer, whether Bank or some other successful accepted bidder, will be responsible for paying the Cure Amounts.  To the extent required by any party to a Contract, Bank or any successful accepted bidder will provided adequate assurance of future performance under such Contract.

17

31.    ADV understands that the Bank would be willing to pay the following Cure Amounts:

| Lease / Contract | Estimated Cure Amount |
|---|---|
| The Leaf Lease | $14,000 - Estimated cure amount through closing<br><br>The Leaf Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Leaf. |
| The Pentech Lease | $27,000 - Estimated cure amount through closing<br><br>The Pentech Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Pentech. |
| AWS Lease | $20,000 - Estimated cure amount through closing<br><br>Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount.<br><br>The Court entered an agreed order (1) providing AWS with relief from stay if required payments under the stipulated judgment were not made in a timely manner going forward, and (2) requiring that the balance owed to AWS under Stipulated Judgment be paid by October 31, 2010, unless otherwise agreed in a writing signed by the parties, by ADV or any purchaser of the Debtor's assets.<br><br>The AWS Lease and/or, if necessary, the Stipulated Judgment, will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount/ purchase price set forth above, or (2) rejected with the underlying equipment returned to AWS. |

## G.    THE EMPLOYMENT AND PAYMENT OF KW AND ANY COOPERATING BROKER.

32.    The Sale Documents define "KW Fees" as all amounts Bank has agreed to pay to KW in connection with the sale, which are expected to be equal to the sum of the following amounts: (i) actual third-party costs and expenses incurred by KW in connection with the marketing for the sale, in accordance with a marketing budget approved by Bank, in its sole discretion, which costs and expenses shall not, in aggregate, exceed $30,500.00, (ii) a base fee in the amount of $125,000.00, and (iii) an incentive fee equal to either (y) 3% of the difference between the accepted bid amount and $5,000,000.00 if an accepted bidder, other than Bank, purchases all of the assets, or (z) $33,000.00 if Bank purchases the ADV Assets, which amount is equal to 3% of the difference between the Bank $6.1 million credit bid amount and $5,000,000.00.

33.    The Sale Documents define "Broker Fees" as amounts owed to any cooperating broker that represents any accepted bidder; provided, however, that (a) no Broker Fees shall be paid unless the accepted bidder actually purchases all of the assets pursuant to the Sale Documents, and (b) the total amount of the Broker Fees shall not exceed one and one-half percent (1.5%) of the Accepted Bid Amount.

34.    The Sale Documents provide that (a) if Bank is the buyer of the ADV Assets, Bank will pay the KW Fees and no Broker Fees will be owed, (b) if an accepted bidder buys all of the Assets, a portion of the sale proceeds will be used to pay the KW Fees and the Broker Fees; in that case, ADV hereby seeks to (i) employ and pay KW the KW fees, and (ii) employ and pay any cooperating broker the Broker Fees pursuant to Bankruptcy Code Sections 327(a) and 328(a), and L.B.R. 6007-1(h), without further order of the Court.  Collectively attached hereto as Exhibit "5" is some general information about KW, general information about the

proposed sale (as posted in KW's website), my personal résumé, and the professional résumés of other KW personnel that are principally involved with the proposed sale.

## II.

## DISCUSSION

A.  **ADV SHOULD BE AUTHORIZED TO SELL THE ADV ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES PURSUANT TO 11 U.S.C. § 363 AND THE TERMS OF THE SALE DOCUMENTS.**

1.     **ADV Should be Authorized to Sell the ADV Assets.**

Pursuant to Sections 363(b)(1) and 1107(a), a debtor in possession, "after notice and a hearing, may . . . sell . . . other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(1).  As a general matter, a Court determining a Section 363(b) motion to sell property of the estate should determine, based on the evidence presented, that there is a "good business reason" to grant such motion.  In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).  In addition, the court must further find it is in the best interest of the estate.  To make this determination, the Court should consider whether:

> (1)     the sale is fair and reasonable, i.e., the price to be paid is adequate;
> (2)     the property has been given adequate marketing;
> (3)     the sale is in good faith, i.e., there is an absence of any lucrative deals with insiders, and
> (4)     adequate notice has been provided to creditors.

In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841-42 (Bankr. C.D. Cal. 1991); In re The Landing, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993); In re Mama's Original Foods, Inc., 234 B.R. 500, 502-505 (C.D. Cal. 1999).  As described in detail below, ADV's proposed sale of the ADV Assets to Bank, subject to overbid, is appropriate and should be approved by the Court.

a.    Sound Business Purpose.

In Walter v. Sunwest Bank (In re Walter), 83 B.R. 14, 19 (9th Cir. BAP 1988), the Ninth Circuit Bankruptcy Appellate Panel adopted a flexible case-by-case test to determine whether the business purpose for a proposed sale justifies disposition of property of the estate under Section 363(b). The facts pertaining to ADV's proposed sale of the ADV Assets amply substantiate ADV's business decision that proceeding with such sale is in the best interest of this estate and merits the approval of this Court.

In this case, as a result of, among other things, (a) the factors discussed above regarding the reasons for the filing of ADV's bankruptcy case, which ADV never fully recovered from, (b) ADV's inability to obtain additional funding and/or an equity investment, (c) a general downturn in the economy inhibiting ADV's ability to increase revenue so that it can operate on a net-profit basis and remain current on a number of leases necessary for continued operations, and (d) the loss of the Bank Property to foreclosure, which substantially reduced ADV's ability to produce additional wine on a cost-effective basis by benefiting from the economies of scale arising from the operation of two adjacent vineyards, ADV has determined that an immediate sale of the ADV Assets to Bank, subject to overbid, is in the best interests of ADV and the creditors of the estate. In the absence of the asset sale to be effectuated pursuant to the Sale Documents, the ADV Assets will likely lose value, and the Bank may foreclose on the ADV Assets, which will be to the detriment of the ADV and the creditors of the ADV's estate, as it would foreclose the possibility of selling the ADV Assets after marketing and an opportunity for overbids, which should maximize the sale price and, therefore, the benefit from disposing of the ADV Assets.

b.    Fair and Reasonable Price.

In order for a sale to be approved under Section 363(b), the purchase price must be fair and reasonable. See generally, In re Canyon Partnership, 55 B.R. 520 (Bankr. S.D. Cal. 1985). The trustee (or debtor in possession) is given substantial discretion in this regard. Id. In addition, courts have broad discretion with respect to matters under section 363(b). See Big Shanty Land Corp. v. Comer Properties, Inc., 61 B.R. 272, 278 (Bankr. N.D. Ga. 1985). In any

21

1    sale of estate assets, the ultimate purpose is to obtain the highest price for the property sold.

2    Wilde Horse Enterprises, Inc., 136 B.R. at 841 (citing In re Chung King, Inc., 753 F.2d 547 (7th

3    Cir. 1985)), In re Alpha Industries, Inc., 84 B.R. 703, 705 (Bankr. Mont. 1988).

4      In this case, the terms of the Sale Documents, as well as the sale procedures previously

5    approved by the Court, ensure that ADV will obtain a fair and reasonable price for the ADV

6    Assets under the circumstances.    That is, there will be substantial marketing by KW during the

7    forty-five (45) day Marketing Period, which should be enough time to identify any parties

8    interested in bidding on the assets, especially considering that, in advance of the Marketing

9    Period, KW will have set up a "document room" with all pertinent information regarding the

10   assets, which potential bidders will have access to after signing a Confidentiality Agreement.

11   After the Marketing Period, qualified bidders will be allowed to bid on the asset.  In the event

12   there is more than one qualified overbid, then an auction will be held whereby bidders will have

13   an opportunity to make higher bids until the highest price is obtained.  In addition, the multi-

14   layered fee structure for KW set forth in the Sale Documents provides a substantial motivation

15   for KW to obtain the best possible price for the ADV Assets.

16     c.    Adequate Marketing.

17     Prior to the Marketing Period, KW established a "document room" with all pertinent

18   information regarding the assets.  During the forty-five (45) day Marketing Period, KW, among

19   other things (1) has made, or will make, information in the "document room" available to all

20   potential bidders that have completed, executed, and delivered to KW and Bank a Confidentiality

21   Agreement, (2) has delivered, or will deliver, a "Notice of Offering Letter" to as many potential

22   bidders as possible, (3) has listed and advertised, or will list and advertise, the Assets for sale at the

23   Auction Estimate Range of prices on various internet sites, and with various brokerage and/or

24   listing services, that list and offer for sale real property and assets, similar to the Assets, (4) has

25   submitted, or will submit, advertisements for the sale of the Assets at the Auction Estimate Range

26   of prices in various trade or industry newspapers and other print media, (5) has coordinated, or will

27   coordinate, with Bank and Debtors to permit potential bidders to access the Assets for purposes of

28

1    conducting site visits, and (6) has received, or will receive, written questions from potential bidders

2    with respect to the Assets and the Live Auction, has sought, or will seek, answers to the same from

3    Bank and Debtors, and has provided, or will provide, written answers to such questions, as

4    approved by Bank and Debtors, to all potential bidders.

5                    d.    <u>Accurate and Reasonable Notice</u>.

6              Pursuant to Fed.R.Bankr.P 2002(a)(2), (c)(1), (i) and (k), 6004, and 6006, L.B.R. 2002-1,

7    2002-2, 6004-1 and 9013-1, and certain requirements of the Sale Documents, concurrently with

8    the filing of the instant Sale Motion, ADV (1) served the Sale Motion on the Office of the United

9    States Trustee, Bank, KW, other parties to the Contracts, parties on the Notice of Electronic

10   Filing List, and parties requesting special notice by regular mail or Notice of Electronic Filing, as

11   applicable, (2) served the Sale Motion on parties asserting liens, encumbrances, or other interests

12   against the ADV Property, and all federal, state, and local taxing authorities for which the Sale

13   Motion will eliminate successor liability, by certified mail, return receipt requested, and (3)

14   served its notice of the date, time, and place of the Sale Motion summarizing the proposed terms

15   of the sale and the assumption and assignment of the Contracts (the "Sale Notice") on all of the

16   foregoing parties pursuant to the methods discusses above, and on all other creditors and parties

17   in interest in ADV's bankruptcy case by regular mail.  ADV will also file a separate notice of the

18   proposed sale and a court-approved form F 6004-2, as required by L.B.R. 6007-1(f).   ADV

19   believes that the foregoing notice procedure satisfies the requirements of Fed.R.Bankr.P

20   2002(a)(2), (c)(1), (i) and (k), 6004, and 6006, L.B.R. 2002-1, 2002-2, 6004-1 and 9013-1 and

21   demonstrates that there was adequate and reasonable notice of the Sale Motion.

22                    e.    <u>Good Faith</u>.

23             When a bankruptcy court authorizes a sale of assets pursuant to Section 363(b)(1), it is

24   required to make a finding with respect to the "good faith" of the purchaser.  <u>In re Abbotts</u>

25   <u>Dairies of Pennsylvania, Inc.</u>, 788 F.2d 143, 149 (3rd Cir. 1986).  Such a procedure ensures that

26   Section 363(b)(1) will not be employed to circumvent the creditor protections of Chapter 11,

27   and, as such, it mirrors the requirement of Section 1129 that the Bankruptcy Court independently

28

1  scrutinizes the proposed sale and makes a finding that it has been proposed in good faith. Id. at

2  150.

3      "Good faith" encompasses fair value, and further speaks to the integrity of the

4  transaction. Wilde Horse, 136 B.R. at 842. With respect to the debtor's conduct in conjunction

5  with the sale, the good faith requirement "focuses principally on the element of special treatment

6  of the debtor's insiders in the sale transaction." See In re Industrial Valley Refrigeration and Air

7  Conditioning Supplies, Inc., 77 B.R. 15, 17 (Bankr. E.D. Pa. 1987). With respect to the buyer's

8  conduct, this Court should consider whether there is any evidence of "fraud, collusion between

9  the purchaser and other bidders or the [debtor], or an attempt to take grossly unfair advantage of

10  other bidders." Abbotts Dairies, 788 F.2d at 147, In re Rock Indus. Mach. Corp., 572 F.2d 1195,

11  1198 (7th Cir. 1978); see Wilde Horse, 136 B.R. at 842; In re Alpha Industries, Inc., 84 B.R.

12  703, 706 (Bankr. D. Mont. 1988). In short, "[l]ack of good faith is generally determined by

13  fraudulent conduct during the sale proceedings." In re Apex Oil Co., 92 B.R. 847, 869 (Bankr.

14  E.D.Mo. 1988) (citing In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983)).

15      ADV submits that the proposed sale of the ADV Assets has been, and will be, conducted

16  in good faith. As set forth herein above and below, the Sale Documents were negotiated at arms-

17  length over a protracted period of time, and ADV believes that the Sale Documents and sale

18  procedures will result in ADV obtaining the highest and best price for the ADV Assets.

19  Moreover, KW is a "disinterested person" as that term is defined in Section 101(14). Therefore,

20  other than being employed by Bank (which in and of itself is not a disqualifying factor per

21  Section 327(c)), KW has no connections to ADV, any creditors of ADV, or any other party in

22  interest in this case. In addition, as set forth above, the terms of the Sale Documents ensure that

23  KW will be motivated to obtain the best possible price for the Assets. Finally, ADV does not

24  contemplate that the Assets will be sold to ADV's insiders, as that term is defined by Section

25  101(31)(B). Accordingly, ADV submits that Bank or any successful accepted bidder is entitled

26  to a good faith finding pursuant to Section 363(m).

27

28

Based on all of the foregoing, ADV submits that all of the requirements for a sale under Section 363(b) have been satisfied.

**2.** **ADV Should Be Authorized to Sell the ADV Assets Free and Clear of Liens, Claims, Interests, and Encumbrances.**

Section 363(f) provides, in relevant part, as follows:

> The [debtor in possession] may sell property under subsection (b) . . . of this section free and clear of any interest in such property of an entity other than the estate, only if—
>
> (1)  applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
> (2)  such entity consents;
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4)  such interest is in bona fide dispute; or
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. §363(f).

Section 363(f) was drafted in the disjunctive.  Thus, ADV needs to satisfy only one of the five subsections of Section 363(f) in order for the auction sale to be free and clear of all interests.  In this case, Section 363 is satisfied with respect to each creditor asserting an alleged lien, claim, interest, or encumbrance against any of the ADV Assets, as follows:

**a.**     **ADV Property**

**Bank** – Bank is a party to the Sale Documents and consents to the sale of the ADV Assets.  Therefore, Section 363(f)(2) is satisfied with respect to Bank.

**Narcissa** – ADV has contacted Narcissa and is informed and believes that Narcissa consents to the sale of the ADV Assets.  Based on the foregoing, and in the absence of an objection to the sale from Narcissa, Section 363(f)(2) is satisfied with respect to Narcissa.

In addition, the ADV Property can be sold free and clear if any interest of Narcissa in the ADV Property pursuant to Section 362(f)(5).  The Bankruptcy Appellate Panel

1  for the Ninth Circuit recently scrutinized section 363(f)(5) in the context of the sale of real

2  property.  See Clear Channel Outdoor, Inc. v. Knupfer (In re PW, LLC), 391 B.R. 25 (9th Cir.

3  B.A.P. 2008).  In Clear Channel, the senior secured creditor attempted to purchase the debtor's

4  real property by way of a credit bid, free and clear of the interest of a nonconsenting junior

5  lienholder outside of a plan of reorganization.  The Bankruptcy Court approved the sale to the

6  senior lender under section 363(f)(5) of the Bankruptcy Code, finding that section 363(f)(5)

7  permits a sale free and clear of the creditor's interest in property "whenever a claim can be paid

8  with money."  Clear Channel, 391 B.R. at 42.

9         In reversing the Bankruptcy Court's decision, the Bankruptcy Appellate Panel

10  found that section 363(f)(5) requires that "(1) a proceeding exists or could be brought, in which

11  (2) the non-debtor could be compelled to accept a money satisfaction of (3) its interest."  Id. at

12  41.  Taking up these factors in reverse order, the Bankruptcy Appellate Panel concluded that a

13  lien, such as the lien of Narcissa, constitutes an "interest" for purposes of section 363(f)(5).

14  With respect to the second factor, the Bankruptcy Appellate Panel ruled that section 363(f)(5)

15  refers to those proceedings in which the creditor "could be compelled to take *less* than the value

16  of the claim secured by the interest."  Id.  In order to approve a sale free and clear under section

17  363(f)(5), the Court must "make a finding of the existence of … a mechanism [to address

18  extinguishing the lien or interest without paying such interest in full] and the [debtor in

19  possession] must demonstrate how satisfaction of the lien 'could be compelled.'"  Id. at 45.

20  Finally, the Bankruptcy Appellate Panel held that section 363(f)(5) requires that there be, "or that

21  there be the possibility of, some proceeding, either at law or at equity, in which the non-debtor

22  could be forced to accept money in satisfaction of its interest."  Id.

23         Here, all of the factors set forth in Clear Channel for a sale free and clear of

24  Narcissa's lien are satisfied.  Specifically, any party who asserts an "interest" in the ADV

25  Property which is junior to Bank's lien, could be compelled, in a legal or equitable proceeding,

26  to accept a money satisfaction of its interest.  Recently, the Bankruptcy Court in In re Jolan, Inc.,

27  2009 WL 1163928 (Bankr. W.D. Wash. 2009) provided an analysis of the Bankruptcy Appellate

28

Panel's decision in <u>Clear Channel</u> and suggested that the scope of the Bankruptcy Appellate Panel's ruling in <u>Clear Channel</u> should be narrowly construed to the facts of that particular case. The Court in <u>Jolan</u> noted that the appellees defending the sale free and clear in <u>Clear Channel</u> never argued that there were any qualifying "legal or equitable proceedings" beyond cramdown under Section 1129 and that the Bankruptcy Appellate Panel, in turn, exercised its prerogative to limit its ruling to the arguments presented by the parties. <u>Id.</u> at 3. Accordingly, the Bankruptcy Appellate Panel in <u>Clear Channel</u> did not address whether any non-contractual mechanisms exist whereby a lienholder might get less than full payment yet lose the lien. <u>Id.</u> at 3. The Court in <u>Jolan</u>, however, did address the issue and concluded that there are a number of legal and equitable proceedings available in Washington in which a junior lienholder could be compelled to accept a money satisfaction including, without limitation, "a senior secured party's disposition of collateral under the default remedies provided in part VI of Article 9" of Washington's Uniform Commercial Code (specifically, RCW 62A.9A-617), and the disposition of real property through "judicial and nonjudicial foreclosures, which operate to clear junior lienholders' interests, with their liens attaching to proceeds in excess of the costs of sale and the obligation or judgment foreclosed." <u>Id.</u> at 3-4. There are legal and equitable proceedings available in California which parallel the proceedings discussed by the Court in <u>Jolan</u>.[6] Based on the foregoing, ADV respectfully submits that any party who asserts a junior lien against any of the ADV Assets, including the ADV Property and Other Assets, could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. Accordingly, ADV can sell the ADV Property free and clear of any interest of Narcissa in the ADV Property pursuant to Section 363(f)(5).

**County** – As discussed above, in the event Bank buys the ADV Property upon which the County has liens, Bank proposes to have such liens remain with and attach to the ADV Property such that a sale free and clear of the County's lien on the ADV Property would not be

---

[6]  Specifically, a junior lienholder in California could be compelled to accept a money satisfaction upon a senior secured party's disposition of collateral under the default remedies provided in Cal.Com.Code § 9617, and upon the judicial or nonjudicial foreclosure of real property under applicable California law, including Cal.Civ.Code § 2924.

required.  Alternatively, if an accepted bidder purchases the ADV Property, the Sale Documents provide that outstanding real property taxes owed to the County and secured by the ADV Property will be paid by such accepted bidder such that a sale free and clear of the County's lien on the ADV Property is not required.

**Newmark** – As discussed above, Newmark filed a Proof of Claim asserting a general unsecured claim in the amount of $48,531.36.  Thus, by Newmark's own admission, it does not have a claim secured by an interest in the ADV Property.  Moreover, despite the fact that there is a recorded abstract of judgment attached to Newmark's Proof of Claim, Newmark does not appear on the Title Report for the ADV Property.  Therefore, there is a bona <u>fide</u> <u>dispute</u> concerning any alleged interest of Newmark in the ADV Property.  Based on the foregoing, Section 363(f)(4) is satisfied with respect to Newmark.

In addition, based on the discussion above regarding a sale free and clear of Narcissa's interest, ADV can also sell the ADV Property free and clear of any interest Newmark in such property pursuant to Section 363(f)(5).

**b.        Other Assets**

**Narcissa** – Again, ADV has contacted Narcissa and is informed and believes that Narcissa consents to the sale of the Other Assets.  Based on the foregoing, and in the absence of an objection to the sale from Narcissa, Section 363(f)(2) is satisfied with respect to Narcissa's interest in certain of the Other Assets.  However, even if Narcissa does not consent based on the discussion above regarding a sale free and clear of Narcissa's real property interests, ADV can also sell the ADV Assets free and clear of any interest of Narcissa in such property pursuant to Section 363(f)(5).

**Leaf** – As discussed above, the Leaf Lease will either be (1) assumed and assigned, with the Cure Amount paid, or (2) rejected with the underlying equipment returned to Leaf such that a sale free and clear of Leaf's lien on certain of the Other Assets is not required.

**Pentech** – As discussed above, the Pentech Lease will either be (1) assumed and assigned, with the Cure Amount paid, or (2) rejected with the underlying equipment returned to

1    Pentech such that a sale free and clear of the Pentech's lien on certain of the Other Assets is not

2    required.

3         **AWS** – As discussed above, the AWS Lease and/or, if necessary, the Stipulated

4    Judgment, will either be (1) assumed and assigned, with the required Cure Amount / purchase price

5    paid, or (2) rejected with the underlying equipment returned to AWS such that a sale free and clear

6    of the AWS's lien on certain of the Other Assets is not required.

7         **Bank** – Bank is a party to the Sale Documents and consents to the sale of the ADV

8    Assets.  Therefore, Section 363(f)(2) is satisfied with respect to Bank.

9         **Key** – Based on the discussion above regarding a sale free and clear of Narcissa's

10   interest, ADV can also sell the Other Assets free and clear of any interest Key may have in such

11   property pursuant to Section 363(f)(5), as Key's alleged blanket lien is junior to Bank's blanket

12   lien.

13       Based on the foregoing, ADV submits that it has satisfied at least one of the five

14   subsections of Section 363(f) in relation to each creditor with an alleged interest in the ADV

15   Assets.  Therefore, ADV should be authorized to sell the ADV Assets free and clear of all any

16   liens, claims, interests, or encumbrances in such assets.

17   **B.      ADV SHOULD BE AUTHORIZED TO ASSUME AND ASSIGN THE**

18        **CONTRACTS.**

19       Barring exceptions not herein relevant, Section 365(a) authorizes a debtor in possession,

20   "subject to the court's approval, ... [to] assume or reject any executory contract or unexpired

21   lease of the debtor."  If there has been a default on any executory contract or unexpired lease, the

22   debtor cannot assume such contract or lease, unless the debtor (1) cures, or provides adequate

23   assurance that the debtor will promptly cure, such default; (2) compensates, or provides adequate

24   assurance that the debtor will promptly compensate a party for any actual pecuniary loss to such

25   party resulting from such default; and (3) provides adequate assurance of future performance

26   under such contract or lease.  11 U.S.C. § 365(b)(2).

27

28

1       A debtor in possession may assume or reject executory contracts for the benefit of the

2   estate.  In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d. Cir. 1996); In re Central Fla. Metal

3   Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415

4   (S.D.N.Y. 1996).  In reviewing a debtor in possession's decision to assume or reject an executory

5   contract, a bankruptcy court should apply the "business judgment test" to determine whether it

6   would be beneficial to the estate to assume it.  In re Continental Country Club, Inc., 114 B.R.

7   763, 767 (Bankr. M.D. Fla. 1990); see also In re Gucci, supra, 193 B.R. at 415.  The business

8   judgment standard requires that the court follow the business judgment of the debtor unless that

9   judgment is the product of bad faith, whim, or caprice.  In re Prime Motors Inns, 124 B.R. 378,

10   381 (Bankr. S.D. Fla. 1991), citing Lubrizol Enterprises v. Richmond Metal Finishers, 756 F.2d

11   1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986).

12       In this case, all of the foregoing requirements have been met.  As discussed above and in

13   the Sale Documents, only the Contracts designated by Bank or another successful accepted

14   bidder will be assumed and assigned.  The Contracts will only be assumed and assigned to

15   facilitate the proposed sale, which, as discussed, ADV believes is in the best interests of the

16   estate.  Therefore, ADV submits that the "business judgment test" has been satisfied.

17       In addition, under the Sale Documents, Bank or any successful accepted bidder is required

18   pay the amounts required to pay the Cure Amounts and to cure certain breaches and/or defaults

19   by ADV under the Contracts, so as to allow ADV to assume and assign such Contracts and

20   pursuant Section 365.  ADV will include provisions in the Sale Order (1) that any guaranties of

21   the MacAdams under the Contracts will be terminated upon assumption and assignment of the

22   relevant Contracts, but (2) that the assumption and assignment of each of the Contracts will not

23   be effective until the respective Cure Amounts are paid.  This will ensure that the Cure Amounts

24   will be paid to the other parties to the Contracts before any assignment of their respective

25   Contracts will occur and before there is a release of the MacAdams to the extent they have

26   guaranties for any of the obligations under the Contracts.  To the extent required by any party to

27   a Contract, Bank or any successful accepted bidder will provide adequate assurance of future

28

1    performance under such Contract.  Based on the foregoing , ADV submits that the requirements

2    of Section 365(b) have been, or will be, satisfied.

3    **C.      THE COURT SHOULD APPROVE THE EMPLOYMENT AND PAYMENT OF**

4    **KW AND ANY COOPERATING BROKER.**

5          Section 327(a) states that a debtor in possession, with the Court's approval, may employ

6    one or more auctioneers or other professional persons that do not hold or represent and interest

7    adverse to the estate, and that are disinterested persons, to assist the debtor in possession in

8    carrying out its duties.  With that said, Section 327(c) states that a person is not disqualified for

9    employment merely because of such person's employment by a creditor.  Section 328(a) states

10   that a debtor in possession, with the Court's approval, may employ a professional person under

11   Section 327(a) on any reasonable terms and conditions, including, but not limited to, on a fixed

12   or percentage fee basis, or a contingent fee basis.

13         Fed.R.Bankr.P. 2014 generally requires that the employment of a professional under

14   Section 327 is to be made upon application stating the specific facts showing the necessity for

15   employment, the name of the person to be employed, the reasons for the selection, the services to

16   be rendered, any proposed arrangement for compensation, and, to the best of applicant's

17   knowledge, all of the person's connections with the debtor, creditors, any other party in interest,

18   their respective attorneys and accountants, the Office of the United States Trustee, or any person

19   employed by the Office of the United States Trustee.

20         In addition to the requirements of Fed.R.Bankr.P. 2014, L.B.R. 2014-1 generally requires

21   that the applicant specifically state whether it is seeking compensation pursuant to Section 328 or

22   330 and that that the applicant provide notice with certain information as specified in L.B.R.

23   2014-1(b)(3).

24         L.B.R. 6007-1(h) states that proceeds from the sale of assets may be disbursed to pay

25   auctioneer's fees and broker's commissions without additional order if payment is consistent

26   with the terms of the order approving the sale or authorizing the employment of the auctioneer or

27   broker.

28

1    As discussed above, the only scenario under which ADV would have to employ and pay

2    KW and a cooperating broker is if Bank is not the buyer of the ADV Assets.  If an accepted

3    bidder other than Bank buys all of the Assets, the Sale Documents provide that a portion of the

4    sale proceeds will be used to pay the KW Fees and the Broker Fees.  In that case, ADV hereby

5    seeks to (a) employ and pay KW the KW fees, and (b) employ and pay any cooperating broker

6    the Broker Fees pursuant to Sections 327(a) and 328(a), and L.B.R. 6007-1(h) without further

7    order of the Court.

8    All of the requirements of the foregoing sections and rules are satisfied here.  As set forth

9    herein, ADV requires KW's services so that the Assets will be effectively marketed and the

10   highest and best price for the Assets can be obtained.  The specific services to be performed by

11   KW are set forth in Section I.D hereof.  The amount of the KW Fees to be paid to KW pursuant

12   to Section 328 are set forth in Section I.F hereof.

13   As set forth in the attached declaration of Clifford Smith, (a) while KW is employed by

14   Bank, KW is a disinterested person; therefore, pursuant to Bankruptcy Code Section 327(c), KW

15   is not automatically disqualified from employment, (b) other than as set forth herein, neither

16   KW, nor any principals or employees of KW, are connected with the Debtors, their creditors, any

17   other party in interest, their respective attorneys and accountants, or to these estates, and have no

18   relation to the Office of the United States Trustee, or any person employed at the Court or the

19   Office of the United States Trustee, nor does KW or its principals or employees represent or hold

20   an adverse interest with respect to the Debtors, any creditor, or to this estate, and (c) KW

21   otherwise meets the requirements for employment set forth in Section 327, Fed.R.Bankr.P. 2014,

22   and L.B.R. 2014-1.

23   ADV is not able to identify any cooperating broker that may bring an accepted bidder to

24   purchase the assets.  However, ADV submits that the pre-approval of the employment and

25   authorization to pay a cooperating broker the Broker Fees will facilitate ADV's efforts to obtain

26   the highest and best offer for the assets.  If such employment and payment are not pre-approved,

27

28

1   potential cooperating brokers may not be motivated exert their best efforts to seek out and bring

2   additional buyers for the assets.

3       Based on the foregoing, ADV submits that, to the extent necessary, ADV should be

4   authorized to employ and pay KW and any cooperating broker as requested herein, pursuant to

5   Sections 327(a) and 328(a), and L.B.R. 6007-1(h) without further order of the Court.

6   **D.    THE COURT SHOULD WAIVE THE FOURTEEN-DAY WAITING PERIODS**

7   **SET FORTH IN BANKRUPTCY RULES 6004(h) AND 6006(d).**

8       Bankruptcy Rule 6004(h) provides, among other things, that an order authorizing the

9   sale of property other than cash collateral is stayed until the expiration of fourteen (14) days

10  after entry of the order, unless the court orders otherwise.  Bankruptcy Rule 6006(d) has a

11  similar provision with respect to an order approving of a debtor's assumption and assignment of

12  unexpired leases and executory contracts.

13      In this case, in order to obtain Bank's initial bid for the ADV Assets, Bank's continued

14  cooperation in the sale process, and Bank's forbearance in exercising its rights to immediately

15  seek relief from stay, ADV stipulated to provide Bank with immediate relief from stay,

16  provided that Bank could not complete any foreclosure until the earlier of, among other things,

17  (1) July 30, 2010, or (2) after notice by Bank that, in its reasonable determination, the proposed

18  sale has become futile or impossible.  In consideration of the foregoing, and in the interest of

19  the most expeditious sale closing possible, ADV requests that the Court waive the fourteen (14)

20  day waiting periods of Bankruptcy Rules 6004(h) and 6006(d).

21                              **III.**

22                          **CONCLUSION**

23      **WHEREFORE**, Debtors respectfully request that the Court enter an order, in

24  substantially the form attached hereto as Exhibit "1:"

25      (1)    approving the sale of the Assets to Bank for a credit bid purchase price of $6.1

26  million (subject to certain credits and adjustments), subject to overbid, free and clear of all liens,

27

28

claims, interests, and encumbrances, pursuant to 11 U.S.C. § 363(f), on the terms set forth herein and in the attached Sale Documents,

(2)    approving the assumption of the Contracts by ADV and the assignment thereof to Bank or a successful accepted bidder pursuant to 11 U.S.C. § 365;

(3)    approving the Cure Amounts for the Contracts and deeming the failure of a counter-party to a particular Contract to object to the proposed Cure Amount and assumption and assignment to be a waiver of such objections;

(4)    approving the employment and payment of KW and any cooperating broker in conjunction with the proposed sale;

(5)    waiving the 14-day stay periods set forth in Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d);

(6)    authorizing Debtors to take all necessary and reasonable steps to consummate the sale of the assets and the assumption and assignment of the Contracts; and

(7)    granting such other relief as is just and proper under the circumstances.

Dated: May 24, 2010                    AGUA DULCE VINEYARDS, LLC,
                                       a California limited liability company

                                       CATHERINE P. MACADAM and
                                       DONAL J. MACADAM


                                       By:___/s/ Martin J. Brill_____
                                           MARTIN J. BRILL
                                           TODD M. ARNOLD
                                           LEVENE, NEALE, BENDER, RANKIN
                                             & BRILL L.L.P.
                                           Attorneys for Debtors and
                                           Debtors in Possession

### DECLARATION OF CATHERINE P. MACADAM

I, CATHERINE P. MACADAM, hereby declare as follows:

1.      I am over 18 years of age.   Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I make this declaration in support of the Sale Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Sale Motion.

3.      I am the Manager of Sweetwater Vineyards, LLC, which is the Manager of ADV.

4.      On May 4, 2009, ADV filed a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code").  ADV is operating its business, managing its financial affairs, and operating its bankruptcy estate as a debtor in possession pursuant to Sections 1107 and 1108.

5.      On June 17, 2009, my husband and I filed a voluntary petition under Chapter 11 of the Bankruptcy Code.  We are operating our business, managing our financial affairs, and operating our bankruptcy estate as debtors in possession pursuant to Sections 1107 and 1108.

6.      ADV is the operator of a 37 acre, fully operational vineyard and winery, featuring daily wine tasting and tours, and a gourmet gift shop.

7.      In 1999, my husband and I, along with our partner, Ray Watt, through his various entities and affiliates including Narcissa Estates, Inc. ("Narcissa"), founded ADV when we discovered that the forty acre property that we originally acquired for real estate development had ideal soil and climate conditions for growing world-class grapes.  This property, which is located at 9640 and 9830 Sierra Highway, Agua Dulce, California 91390, houses ADV's winery, a residence occupied by my husband and I and our 4 minor children, and planted vineyards (the "ADV Property").

8.      In December 2005, my husband and I bought out Ray Watt's interest in ADV (which at that point was held entirely through Narcissa) for approximately $6.5 million.  Our

buyout of Mr. Watt's interest was financed in part through a hard money loan from KSI Capital Corporation ("KSI") for approximately $5.6 million (the "KSI Loan"), and in part through a promissory note in favor of Narcissa in the sum of $992,290, which was subsequently increased to $1,356,000, secured by a deed of trust against the ADV Property.

9.    Following the buyout of Ray Watt's interest in ADV in December 2005, ADV leased a 53 acre parcel of vacant land adjoining the ADV Property located at 10124 Sierra Highway, Agua Dulce, California 91390 (the "Bank Property" and together with the ADV Property, the "Properties") from Narcissa to expand ADV's planted vineyards.  ADV acquired the Bank Property from Narcissa in October 2007.  ADV's acquisition of the Bank Property was financed in part through a loan from Western Commercial Bank ("Bank") in the principal amount of $1 million (the "$1M Loan"), which loan was secured by a first priority deed of trust against the Bank Property, and in part through a promissory note in favor of Narcissa in the sum of $3,100,000, secured by a second priority deed of trust against the Bank Property.

10.    In 2007, ADV entered into a series of loan agreements with Bank, including the (a) $1M Loan and, (b) a loan in the principal amount of $6 million (the "$6M Loan), which loan was secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other monetary liens and encumbrances on the ADV Property, and (ii) senior liens on substantially all of ADV's other assets.  Since Bank did not provide enough funding to completely retire the KSI Loan, my husband and I executed a new note in the amount of $400,000 in favor of KSI (the "New KSI Loan").

11.    Although ADV's business experienced robust and steady growth, at a rate of 10% each year from 2001 to 2007, the partner buyout and the purchase of the Bank Property increased ADV's debt load, creating cash flow issues when ADV's revenue was not sufficient to service all of ADV's debts.

12.    In an effort to increase its revenue, ADV attempted to expand its existing in-home wine parties division, called "Agua Dulce Wine Adventures," which eventually partnered up with Suzanne Somers' direct selling company.  This partnership was then picked up by a

company called Youngevity, which had at the time over 300,000 consultants worldwide (primarily in the United States and Asia). Although ADV hoped that its in-home wine parties division would benefit from the Youngevity network, it ultimately did not result in the increase in sales and revenue that ADV had expected.

13.    Although ADV began increasing its revenues by, among other things, selling its wine in bulk, ADV suffered a huge setback in 2008 when a large number of its Wine Club members were repeatedly invoiced in error by ADV's credit card processing system. In the normal course of business, ADV's Wine Club members receive six bottles of wine every three months and ADV's credit card processing system automatically debits the payment for the wine from the members' credit cards on file. In early 2008, ADV's credit card processing software was upgraded, causing a glitch that resulted in repeated debiting from the Wine Club members' credit cards. In an effort to salvage its relationships with the Wine Club members, ADV paid refunds directly to many of the members. In the meantime, members who had also contacted their credit card companies obtained refunds directly from their credit card companies, who then turned around and debited the refund amounts from ADV's bank accounts. This resulted in a double hit to ADV's bank accounts, leaving ADV's accounts overdrawn approximately $287,000 by the end of the summer.

14.    As a result of the credit card processing fiasco, ADV faced a cash flow crisis, causing ADV to fall behind on its accounts payable and prompting ADV to seek an additional loan from Bank. In November 2008, after contracting with a new credit card processing company, ADV obtained a loan from Bank in the principal amount of $750,000 (the "$750K Loan"). ADV's obligations to Bank under the $750K Loan are secured by a security interest in off-site and on-site bottled wines, in-tank or in-barrel. The documents underlying the $750K Loan allowed Bank to create a reserve (the "Reserve Funds") from 30% of ADV's credit card deposits up to $100,000 to cover chargebacks from the credit card processor. This caused a severe cash flow crunch for ADV. Pursuant to Bank's various loans to ADV, Bank provided financing to ADV in the total principal sum of $8.1 million and obtained a security interest in

substantially all of ADV's assets, including the ADV Property and the Bank Property.  One of the goals of these loans was to retire the KSI Loan.  On March 4, 2009, Bank filed and recorded a Notice of Default against ADV to initiate a foreclosure proceeding against the Bank Property.

15.    As a result of all of the foregoing, ADV was forced to seek protection under Chapter 11 of the Bankruptcy Code in order to gain control over its cash (including the Reserve Funds) and operations, to have the opportunity to implement business strategies targeted at increasing revenue – including working with wine brokers and national distributors to increase sales of its wine, at both the bulk sales level and direct sales level, to restructure its existing debt and emerge a stronger and profitable company.

16.    My husband and I personally guarantied ADV's obligations to Bank.  My husband and I also personally guarantied a number of other ADV business debts.  Additionally, we are liable on the New KSI Loan.

17.    As a result of ADV's financial difficulties and inability to remain current on its debt obligations, including those for the payment of salaries for my husband and I, (a) a number of ADV creditors made demands and initiated litigation against my husband and I based on our guaranty obligations, and (b) my husband and I were unable to remain current on the New KSI Loan.  Based on the foregoing events, among others, my husband and I were forced to seek protection under Chapter 11 of the Bankruptcy Code in order to gain control over our assets, to continue to work towards reorganization in the ADV bankruptcy case, and to restructure our existing debts.

18.    After Debtors' bankruptcy cases were filed, Bank obtained relief from stay and foreclosed on the Bank Property.

19.    In consideration of the foregoing, and after considering its options, I have concluded, in an exercise of my business judgment, that a sale of the ADV Property and substantially all of ADV's other assets (excluding cash and avoidance causes of action) (the "Other Assets" and, together with the ADV Property (the "ADV Assets") in a joint sale with the Bank Property (together with the ADV Assets, the "Assets") is in the best interests of ADV and

the creditors of its estate. I believe that a joint sale of the Assets will provide the most benefit to the estate by, among other things, increasing the sale price for the Assets due to synergies between the Bank Property, the ADV Property, and the Other Assets, which should provide the maximum possible debt reduction and recovery for Debtors' estates.

20.    After substantial arms-length negotiations among Debtors, Bank, and KW, the parties negotiated the Sale Documents to effectuate a joint sale of the Assets. A true and correct copy of the Sale Documents in substantially the form to be used by the parties is attached hereto as Exhibit "2."

21.    In summary,[7] under the Sale Documents, (a) ADV was required to obtain an order of the Court (the "Bid Procedures Order") approving sale procedures set forth in the Sale Documents and in a motion to approve bid procedures previously filed by Debtors (the "Sale Procedures Motion"), which has now been granted, and (b) ADV is required to obtain a Sale Order of the Court approving this Sale Motion and providing for, among other things, (i) the sale of the ADV Assets free and clear of all liens, claims, encumbrances or interests to Bank, subject to overbid, pursuant to Section 363(f), together with a good faith finding pursuant to Section 363(m), and (ii) the assumption by ADV and assignment to Bank or an accepted bidder of the Contracts designated in the Sale Documents pursuant to Section 365.

22.    If either (a) none of the bid amounts for the Assets is greater than the Minimum Overbid Amount (as defined below), or (b) the accepted bidder does not purchase all of the Assets for any reason, other than a breach or default by Bank of the Bank APA, then Bank shall purchase the ADV Assets pursuant to the ADV APA by offsetting $6.1 million from the $6M Loan. In the event Bank purchases the ADV Assets, Bank shall be responsible to pay the KW Fees (as defined below), Bank has agreed to pay KW in connection with the auction of the Assets, the title costs, escrow costs, transfer taxes (to the extent owed), the Cure Amounts, and

---

[7] The summary description of the proposed transaction under the Sale Documents is for informational purposes only. To the extent there is any inconsistency between the summary and the Sale Documents, the Sale Documents shall govern.

certain professional fees Bank has agreed to pay (the "Professional Fees"). Bank shall not pay, and shall purchase the ADV Assets subject to, all outstanding property taxes.

23.    In connection with any accepted bidder other than Bank purchasing the Assets, Bank and ADV agree to divide, allocate, and pay the accepted bid amount pursuant to Section 6 of the Agreement to Sell. In addition to the bid amount, any accepted bidder will also be responsible for paying the Cure Amounts.

24.    If Bank purchases the ADV Assets as described in Section 6.2 of the Agreement to Sell, Bank will pay the unpaid attorneys' fees and costs incurred by counsel to ADV, as approved by the Court (the "Professional Fees") incurred from and after December 1, 2009 (the "Post-December Professional Fees"), up to a maximum amount of $150,000.00.

25.    If an accepted bidder purchases the Assets, Bank will pay the Post-December Professional Fees and twenty-five percent (25%) of the attorneys' fess and costs incurred by counsel to ADV incurred after the petition date and prior to December 1, 2009 (the "Pre-December Professional Fees"), up to the aggregate, maximum amount of $150,000.00; provided, however, that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the loans from Bank to ADV, instead of the foregoing, Bank shall pay the Post-December Professional Fees and seventy-five percent (75%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $200,000.00.

26.    If the Court does not grant this Sale Motion, Bank shall use commercially reasonable efforts to foreclose all of its security interest in and to the ADV Assets under applicable non-bankruptcy law in a commercially-reasonable period of time following Bank's termination of the Agreement to Sell unless there is reasonable cause for Bank not to foreclose, including, by way of example but not limitation, the discovery of material environmental contamination on the ADV Property or the imposition of an stay or injunction prohibiting Bank from doing so. Notwithstanding any provision of the Agreement To Sell, provided (a) ADV and my husband and I, and our attorneys, have provided genuine cooperation and diligent, good faith, and best efforts to obtain approval of this Sale Motion, and (b) ADV and my husband and I, and

1    our attorneys, have not directly, indirectly, or collusively interfered with Bank's efforts to

2    foreclose upon any of the ADV Assets, upon completion of the foreclosure sales of the ADV

3    Assets or termination of the Agreement to Sell, Bank shall pay the Post-December Professional

4    Fees to the appropriate parties up to a maximum amount of $100,000.00.

5        27.    **Sale Procedures Motion** – Pursuant to the Sale Procedures Motion, ADV sought

6    and obtained approval of the following sale procedures (the "Sale Procedures"):

7        28.    **Marketing** – Commencing on May 13, 2010, and continuing until June 24, 2010,

8    KW will market the Assets (the "Marketing Period").

9        During the Marketing Period, KW will market the Assets by (a) delivering a notice of

10   offering letter to as many potential bidders as possible, (b) listing and advertising the Assets for

11   sale at an estimated price of between $10-$15 million (the "Auction Estimate Range") on various

12   internet sites, and with various brokerage and/or listing services, that list and offer for sale real

13   property and assets, similar to the Assets; and (c) submitting advertisements for the sale of the

14   Assets at the Auction Estimate Range in trade or industry newspapers and other print media.

15       In conjunction with the foregoing marketing efforts by KW, KW shall provide reasonable

16   assistance to potential bidders to enable such potential bidders to review, inspect, and evaluate the

17   Assets during the Marketing Period.  Without limiting the generality of the foregoing, during the

18   Marketing Period, KW shall (a) make information regarding the Assets available to potential

19   bidders that have completed, executed, and delivered to KW a Confidentiality Agreement, (b)

20   coordinate with Bank and Debtors to permit potential bidders to access the Assets for purposes of

21   conducting site visits, and (c) receive written questions from potential bidders with respect to the

22   Assets and the auction, seek answers to the same from Bank and Debtors, and provide written

23   answers to such questions, as approved by Bank and Debtors, to all potential bidders.

24       29.    **Bids** – KW will require all potential bidders to submit their bids to KW on or

25   before the first business day following the end of the Marketing Period (the "Bid Submission

26   Date").  KW may, in its reasonable discretion, (a) advise any Qualified Bidder (as defined below),

27   who submit bids prior to the Bid Submission Date with bid amounts that are less than threshold

28

minimum price equal to approximately $9.3 million (the "Minimum Overbid Amount"), which is the sum of the amounts of the $6.1 million Bank credit bid for the ADV Assets, the $2.6 million offering price for Bank Property, the KW Fees, the cooperating Broker Fees, the Bank Breakup Fees, and the costs and expenses incurred by Bank in connection with the Bank Property on or after December 1, 2009, and will not be accepted, and that a higher amount may be submitted prior to the Bid Submission Date, and (b) extend the Bid Submission Date for any bid that is not received by the Bid Submission Date if the reason for such failure was beyond the reasonable control of the applicable Potential Bidder.

KW shall review each bid to determine if the person submitting the bid is a Qualified Bidder.  If, in KW's reasonable determination, the person submitting the bid appears to be a Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may notify such person and provide a one-time opportunity to submit additional information demonstrating that it is a Qualified Bidder.  Bids from all persons that are not Qualified Bidders shall be set aside and not evaluated or considered further in the auction.

KW shall review and evaluate the bids submitted by Qualified Bidders and provide a summary and analysis of the same to Bank and Debtor within one (1) Business Day after the Bid Submission Date (as defined below).

If as part of its bid, any Qualified Bidder requests any insertions, deletions, or other modifications to the Bank APA or the Debtor APA ("PSA Comments"), such bid shall be considered non-conforming, unless and until such PSA Comments are approved by Bank or Debtor, as applicable.  At the request of the applicable seller, KW shall notify the Qualified Bidder as to which PSA Comments, if any, are approved by the applicable seller and permit the Qualified Bidder to revise, amend, or withdraw its bid with respect thereto.

30.    **Qualification of Bidders** – In order to bid for the assets, a person must be a qualified bidder (a "Qualified Bidder").  A Qualified Bidder is a person, other than Bank, that:

        a.   Has submitted a bid to purchase the Assets;

      b.   Has provided reasonably-detailed, credible, written evidence verifying its ability to pay the applicable bid amount, in cash or other immediately available funds, which such evidence may include, without limitation, (i) statements of third-party deposit account balances showing readily-available, liquid funds in the excess of the bid amount, (ii) letters of credit or unconditional commitment letters from banks, credit unions, or other financial institutions, and/or (iii) other written information demonstrating that the Qualified Bidder has the financial ability to pay the bid amount; and

      c.   Is otherwise ready, willing, and permitted to purchase the Assets pursuant to the Sale Documents.

31.    **Auction** – Bank and ADV Parties shall review the summary of the bids prepared by KW. Unless Bank and Debtor otherwise agree, and direct KW, in writing, to the contrary:

      a.   If only one (1) Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then such bid shall be deemed the accepted bid;

      b.   If more than one Qualified Bidder submits a bid in excess of the Minimum Overbid Amount, then following Bank's and Debtors' review of the submitted bids, Bank and Debtors shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Assets (the "Live Auction"). In respect of the Live Auction, (i) all Qualified Bidders that submitted bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (ii) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and Debtors agree that KW's services shall not be required for the Live Auction, (iii) the Live Auction shall be held at the location agreed upon by Bank and Debtors, with the offices of the Court, the ADV Property, and the offices of the Debtors' attorneys being approved locations for the Live Auction, and (iv) all other matters with respect to the Live Auction shall be agreed to by Bank and Debtors, with the advice and

input from KW.  The Qualified Bidder submitting the highest bid amount in excess of the Minimum Overbid Amount at the Live Auction shall be the accepted bid.

If no Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, or if a Qualified Bidder does not purchase the Assets for any reason, other than a breach or default of the Bank APA by Bank, pursuant to the Sale Order, (a) Bank shall continue to own, and not sell the Bank Property, (b) Bank and Debtors shall enter into the ADV APA, and consummate the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV APA, and (c) as discussed below, ADV will be deemed to have assumed and assigned those Contracts to Bank that Bank has elected to accept, upon payment of the Cure Amounts by Bank.

If a Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, ADV will seek final approval of the Sale Motion providing for a sale of the Assets, and the assumption and assignment of the Contracts, to such Qualified Bidder, upon payment of the Cure Amounts.  Upon such approval, Bank and ADV shall promptly sign and date the applicable purchase agreements submitted by the successful Qualified Bidder, deliver the same to the escrow agent, and consummate the sale of the Assets pursuant to the terms and conditions of the Sale Documents.

32.    **Bank Breakup Fees** – The Sale Procedures contemplate an auction with Bank as a stalking horse bidder.  The breakup fees to be paid to Bank (the "Bank Breakup Fees") are in an amount equal to the fees and costs owed to Bank's attorneys incurred in connection with Debtors' bankruptcy cases on and after December 1, 2009, the date the parties began talking in earnest about the proposed sale, which include, without limitation, the fees and costs of Bank's attorneys incurred pursuant to the transactions set forth herein.  As of April 13, 2010, the Bank Breakup Fees were equal to approximately $23,000.  This fee will only be paid if a Qualified Overbidder purchases the Assets.  ADV believes that the existence of Bank as stalking horse bidder will generate additional interest in the purchase of the ADV Assets and spur multiple bids at the

auction, because the existence of a party willing and able to purchase the ADV Assets for an established price helps provide additional potential buyers with an idea of the true market value of the asset being sold and lends credibility to the sale of the ADV Assets.  Moreover, as discussed above, due to synergies among the Bank Property, the ADV Property, and the Other Assets (e.g., the fact that the Bank Property, which is adjacent to the ADV Property, provides additional vineyard acreage and has active water wells necessary for the operation of both properties), ADV believes that offering the ADV Assets and the Bank Property together will result in ADV obtaining a higher and better price for the ADV Assets.

33.    Based on my review and ADV's counsel's review of title reports, UCC filings, and other information available, I am informed and believe that the following creditors allege that they have claims secured by the ADV Assets:

a.    ADV Property (i.e., real property):

In conjunction with the filing of its bankruptcy case, on April 21, 2009, ADV and its counsel obtained a Title Report showing all encumbrances on the ADV Property.  A true and correct copy of the Title Report is attached hereto as Exhibit "3."  The Title Report and the other information available to ADV shows the following claims are allegedly secured by the ADV Property:

| **Purported Creditor** | **Nature of Interest** | **Alleged Claim** |
| --- | --- | --- |
| Bank | 1st Deed of Trust (through subordination agreements) | $7,182,944 (approx.) |
| Bank | 2nd Deed of Trust (through subordination agreements) | $374,250 (approx.) |
| Narcissa | 3rd Deed of Trust (through subordination | $1,356,000 (approx) |

| Purported Creditor | Nature of Interest | Alleged Claim |
|---|---|---|
| | agreements) | |
| County of Los Angeles (the "County") | Taxes | $17,408.89[8] |
| Franchise Tax Board (the "FTB") | Taxes | $0[9] |
| Newmark Communications ("Newmark") | Judgment | $0[10] |

b.    Other Assets (i.e., personal property):

34.    In conjunction with the filing of its bankruptcy case, on April 10, 2009, ADV and its counsel obtained a summary report regarding all UCC-1 Financing Statements that could conceivably relate to ADV and the back-up documentation regarding such UCC-1 Financing Statements (collectively, the "UCC Information").    A true and correct copy of the UCC Information is attached hereto as Exhibit "4."    The UCC Information and the other information available to ADV show that some of the following claims are allegedly secured by the Other Assets:

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| Encino State Bank | Terminated | N/A – Terminated |
| Global Vintage Ltd. Tustin Community Bank | Lapsed | N/A – Lapsed |
| Global Vintage Ltd. | Terminated | N/A – Terminated |

---

[8] The County filed Proof of Claim No. 7 asserting a secured claim in the amount of $48,531.36.   However, the APN numbers referenced in that Proof of Claim do not relate to the ADV Property.   Therefore, ADV disputes this Proof of Claim from the County.   On the other hand, the amount listed here is the amount of the recorded tax liens appearing on the Title Report.

[9] The FTB filed Proof of Claim No. 52 asserting a secured in the amount of $9,565.5.   However, the FTB does not appear on the Title Report for the ADV Property.   FTB is only listed here in an abundance of caution and in the interests of full disclosure.

[10] Newmark filed Proof of Claim No. 48 asserting a general unsecured claim in the amount of $48,531.36, and Newmark does not appear on the Title Report for the ADV Property.   Newmark is only listed here in an abundance of caution and in the interests of full disclosure.

| **Purported Lien Creditor** | **Nature of Interest and /or Status** | **Alleged Claim** |
|---|---|---|
| Tustin Community Bank | | |
| IRS | Terminated | N/A – Terminated |
| Narcissa as assignee or successor in interest to First Private Bank & Trust | Active<br><br>2nd Priority Security Interest in Modular Barn (original 1st priority lien subordinated to Bank liens) | $1,356,000 (approx) |
| Leaf Funding, Inc. ("Leaf") as assignee or successor in interest to Axis Capital Inc. ("Axis") assigned to | Active<br><br>1st Priority Security Interest in Equipment Leased Pursuant to Lease No. 91092 (the "Leaf Lease") | $18,855 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled Axis with a secured claim in the amount of $36,467.<br><br>Leaf filed Proof of Claim No. 18 asserting a secured claim in the amount of $15,000 and a general unsecured claim in the amount of $21,467.71.<br><br>The Leaf Lease will either be (1) assumed by ADV and assigned to the Bank or an accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Leaf. |
| KSI Funding, Inc. | Terminated | N/A – Terminated |
| Pentech Financial Services, Inc. ("Pentech") as assignee or successor in interest to Capital Network Leasing Corp. | Active<br><br>1st Priority Security Interest in Barrels Leased Pursuant to Lease No. 15606 (the "Pentech Lease") | $38,205 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled Pentech with a secured claim in the amount of $60,517.  Pentech filed Proof of Claim No. 24 asserting a secured claim in the amount of $57,841.55.<br><br>The Pentech Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure |

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| | | amount, or (2) rejected with the underlying equipment returned to Pentech. |
| Associated Winery Systems, Inc. ("AWS") as assignee or successor in interest to Prospero Equipment Corp. | Active<br><br>1st Priority Security Interest in Bottling Line Equipment Pursuant to Lease (the "AWS Lease") and/or or Stipulated Judgment regarding the AWS Lease | $22,500 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled AWS with a secured claim in the amount of $90,000.  AWS filed Proof of Claim No. 47 asserting a secured claim in the amount of $333,062.85.<br><br>Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount.<br><br>The Court entered an agreed order (1) providing AWS with relief from stay if required payments under the stipulated judgment were not made in a timely manner going forward, and (2) requiring that the balance owed to AWS under the Stipulated Judgment be paid by October 31, 2010, unless otherwise agreed in a writing signed by the parties, by ADV or any purchaser of the Debtor's assets.<br><br>The AWS Lease and/or if necessary, the Stipulated Judgment, will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount/ purchase price set forth above, or (2) rejected with the underlying equipment returned to AWS. |
| Bank | Active<br><br>1st Priority Security Interest in All Personal Property Not Subject to Senior | $7,182,944 (approx.) |

| Purported Lien Creditor | **Nature of Interest and /or Status** | **Alleged Claim** |
|---|---|---|
| | Purchase Money Liens | |
| Key Equipment Finance, Inc. ("Key") | Active<br><br>2nd Priority Security Interest in All Personal Property Not Subject to Senior Purchase Money Liens Pursuant to Judgment Lien | ADV scheduled Key with a secured claim in the amount of $59,696.34.  Key filed Proof of Claim No. 21 asserting a secured claim in the amount of $59,696.34. |
| Bank | Active<br><br>Assignment of existing or future Bottling Contracts. | $374,250 (approx.) |
| Bank | Active<br><br>Priority Security Interest in All Bottled, Tank, and Barrel Wine and/or Juice Not Subject to Senior Liens on All Personal Property | $763,864 (approx.) |

35.     As discussed above, ADV intends to assume and assign to Bank those Contracts that Bank has agreed to accept in connection with any purchase of the ADV Assets.  Under the Sale Documents, the buyer, whether Bank or some other successful accepted bidder, will be responsible for paying the Cure Amounts.  To the extent required by any party to a Contract,

Bank or any successful accepted bidder will provided adequate assurance of future performance under such Contract.

36.    I understand that the Bank would be willing to pay the following estimated Cure Amounts:

| Lease / Contract | Estimated Cure Amount |
|---|---|
| The Leaf Lease | $14,000 - Estimated cure amount through closing date <br><br> The Leaf Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Leaf. |
| The Pentech Lease | $27,000 - Estimated cure amount through closing date <br><br> The Pentech Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Pentech. |
| AWS Lease | $20,000 - Estimated cure amount through July 31, 2010 <br><br> Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount. <br><br> The Court entered an agreed order (1) providing AWS with relief from stay if required payments under the stipulated judgment were not made in a timely manner going forward, and (2) requiring that the balance owed to AWS under Stipulated Judgment be paid by October 31, 2010, unless otherwise agreed in a writing signed by the parties, by ADV or any purchaser of the Debtor's assets. <br><br> The AWS Lease and/or, if necessary, the Stipulated Judgment, will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount/ purchase price set forth above, or (2) rejected with the underlying equipment returned to AWS. |

37.     The Sale Documents define "KW Fees" as all amounts Bank has agreed to pay to KW in connection with the sale, which are expected to be equal to the sum of the following amounts: (i) actual third-party costs and expenses incurred by KW in connection with the marketing for the sale, in accordance with a marketing budget approved by Bank, in its sole discretion, which costs and expenses shall not, in aggregate, exceed $30,500.00, (ii) a base fee in the amount of $125,000.00, and (iii) an incentive fee equal to either (y) 3% of the difference between the accepted bid amount and $5,000,000.00 if an accepted bidder, other than Bank, purchases all of the assets, or (z) $33,000.00 if Bank purchases the ADV Assets, which amount is equal to 3% of the difference between the Bank $6.1 million credit bid amount and $5,000,000.00.

38.     The Sale Documents define "Broker Fees" as amounts owed to any cooperating broker that represents any accepted bidder; provided, however, that (a) no Broker Fees shall be paid unless the accepted bidder actually purchases all of the assets pursuant to the Sale Documents, and (b) the total amount of the Broker Fees shall not exceed one and one-half percent (1.5%) of the Accepted Bid Amount.

39.     The Sale Documents provide that (a) if Bank is the buyer of the ADV Assets, Bank will pay the KW Fees and no Broker Fees will be owed, (b) if an accepted bidder buys all of the Assets, a portion of the sale proceeds will be used to pay the KW Fees and the Broker Fees; in that case, ADV hereby seeks to (i) employ and pay KW the KW fees, and (ii) employ and pay any cooperating broker the Broker Fees pursuant to Bankruptcy Code Sections 327(a) and 328(a), and L.B.R. 6007-1(h), without further order of the Court.

40.     As a result of, among other things, (a) the factors discussed above regarding the reasons for the filing of ADV's bankruptcy case, which ADV never fully recovered from, (b) ADV's inability to obtain additional funding and/or an equity investment, (c) a general downturn

in the economy inhibiting ADV's ability to increase revenue so that it can operate on a net-profit basis and remain current on a number of leases necessary for continued operations, and (d) the loss of the Bank Property to foreclosure, which substantially reduced ADV's ability to produce additional wine on a cost-effective basis by benefiting from the economies of scale arising from the operation of two adjacent vineyards, I have determined, in an exercise of my business judgment, that an immediate sale of the ADV Assets to Bank, subject to overbid, is in the best interests of ADV and the creditors of the estate.  In the absence of the asset sale to be effectuated pursuant to the Sale Documents, I believe that the ADV Assets will likely lose value, and the Bank may foreclose on the ADV Assets, which will be to the detriment of the ADV and the creditors of the ADV's estate, as it would foreclose the possibility of selling the ADV Assets after marketing and an opportunity for overbids, which should maximize the sale price and, therefore, the benefit from disposing of the ADV Assets.

41.    I believe that the terms of the Sale Documents, as well as the sale procedures previously approved by the Court, ensure that ADV will obtain a fair and reasonable price for the ADV Assets under the circumstances.    That is, there will be substantial marketing by KW during the forty-five (45) day Marketing Period, which should be enough time to identify any parties interested in bidding on the assets, especially considering that, in advance of the Marketing Period, KW will have set up a "document room" with all pertinent information regarding the assets, which potential bidders will have access to after signing a Confidentiality Agreement.  After the Marketing Period, qualified bidders will be allowed to bid on the asset.  In the event there is more than one qualified overbid, then an auction will be held whereby bidders will have an opportunity to make higher bids until the highest price is obtained.  In addition, the multi-layered fee structure for KW set forth in the Sale Documents should provide a substantial motivation for KW to obtain the best possible price for the ADV Assets.

42.    Prior to the Marketing Period, KW established a "document room" with all pertinent information regarding the assets.  During the forty-five (45) day Marketing Period, KW, among other things (1) has made, or will make, information in the "document room" available to all potential bidders that have completed, executed, and delivered to KW and Bank a Confidentiality Agreement, (2) has delivered, or will deliver, a "Notice of Offering Letter" to as many potential bidders as possible, (3) has listed and advertised, or will list and advertise, the Assets for sale at the Auction Estimate Range of prices on various internet sites, and with various brokerage and/or listing services, that list and offer for sale real property and assets, similar to the Assets, (4) has submitted, or will submit, advertisements for the sale of the Assets at the Auction Estimate Range of prices in various trade or industry newspapers and other print media, (5) has coordinated, or will coordinate, with Bank and Debtors to permit potential bidders to access the Assets for purposes of conducting site visits, and (6) has received, or will receive, written questions from potential bidders with respect to the Assets and the Live Auction, has sought, or will seek, answers to the same from Bank and Debtors, and has provided, or will provide, written answers to such questions, as approved by Bank and Debtors, to all potential bidders.

43.    I believe that the proposed sale of the ADV Assets has been, and will be, conducted in good faith.  As set forth herein above and below, the Sale Documents were negotiated at arms-length over a protracted period of time, and I believe that the Sale Documents and sale procedures will result in ADV obtaining the highest and best price for the ADV Assets. Moreover, I am informed that KW is a "disinterested person" as that term is defined in Section 101(14).  Therefore, other than being employed by Bank (which in and of itself is not a disqualifying factor per Section 327(c)), KW has no connections to ADV, any creditors of ADV, or any other party in interest in this case.  In addition, as set forth above, the terms of the Sale

Documents ensure that KW will be motivated to obtain the best possible price for the Assets. Finally, I do not contemplate that the Assets will be sold to ADV's insiders, as that term is defined by Section 101(31)(B).   Accordingly, I submit that Bank or any successful accepted bidder is entitled to a good faith finding pursuant to Section 363(m).

44.    Bank is a party to the Sale Documents and consents to the sale of the ADV Assets.

45.    ADV's has contacted Narcissa and I am informed and believe that Narcissa consents to the sale of the ADV Assets.

46.    As discussed above and in the Sale Documents, only the Contracts designated by Bank or another successful accepted bidder will be assumed and assigned.   The Contracts will only be assumed and assigned to facilitate the proposed sale, which, as discussed, I believe is in the best interests of the estate.   Therefore, I submit that the "business judgment test" has been satisfied.

47.    In addition, under the Sale Documents, Bank or any successful accepted bidder is required pay the amounts required to pay the Cure Amounts and to cure certain breaches and/or defaults by ADV under the Contracts, so as to allow ADV to assume and assign such Contracts and pursuant Section 365.  ADV will include provisions in the Sale Order (1) that any guaranties of my husband and I under the Contracts will be terminated upon assumption and assignment of the relevant Contracts, but (2) that the assumption and assignment of each of the Contracts will not be effective until the respective Cure Amounts are paid.   This will ensure that the Cure Amounts will be paid to the other parties to the Contracts before any assignment of their respective Contracts will occur and before there is a release of my husband and me to the extent we have guaranties for any of the obligations under the Contracts.   To the extent required by any

party to a Contract, Bank or any successful accepted bidder will provide adequate assurance of future performance under such Contract.

48.     As discussed above, the only scenario under which ADV would have to employ and pay KW and a cooperating broker is if Bank is not the buyer of the ADV Assets.  If an accepted bidder other than Bank buys all of the Assets, the Sale Documents provide that a portion of the sale proceeds will be used to pay the KW Fees and the Broker Fees.  In that case, ADV hereby seeks to (a) employ and pay KW the KW fees, and (b) employ and pay any cooperating broker the Broker Fees pursuant to Sections 327(a) and 328(a), and L.B.R. 6007-1(h) without further order of the Court.

49.     All of the requirements of the foregoing sections and rules are satisfied here.  As set forth herein, ADV requires KW's services so that the Assets will be effectively marketed and the highest and best price for the Assets can be obtained.  The specific services to be performed by KW are set forth in Section I.D of the Sale Motion.  The amount of the KW Fees to be paid to KW pursuant to Section 328 are set forth in Section I.F of the Sale Motion.

50.     As set forth in the attached declaration of Clifford Smith, (a) while KW is employed by Bank, KW has informed the ADV that KW is a disinterested person; therefore, pursuant to Bankruptcy Code Section 327(c), KW is not automatically disqualified from employment, (b) other than as set forth herein, neither KW, nor any principals or employees of KW, are connected with the Debtors, their creditors, any other party in interest, their respective attorneys and accountants, or to these estates, and have no relation to the Office of the United States Trustee, or any person employed at the Court or the Office of the United States Trustee, nor does KW or its principals or employees represent or hold an adverse interest with respect to the Debtors, any creditor, or to this estate, and (c) KW otherwise meets the requirements for employment set forth in Section 327, Fed.R.Bankr.P. 2014, and L.B.R. 2014-1.

51.     I am not able to identify any cooperating broker that may bring an accepted bidder to purchase the assets.   However, I submit that the pre-approval of the employment and authorization to pay a cooperating broker the Broker Fees will facilitate ADV's efforts to obtain the highest and best offer for the assets.  If such employment and payment are not pre-approved, potential cooperating brokers may not be motivated exert their best efforts to seek out and bring additional buyers for the assets.

52.     In this case, in order to obtain Bank's initial bid for the ADV Assets, Bank's continued cooperation in the sale process, and Bank's forbearance in exercising its rights to immediately seek relief from stay, ADV stipulated to provide Bank with immediate relief from stay, provided that Bank could not complete any foreclosure until the earlier of, among other things, (1) July 30, 2010, or (2) after notice by Bank that, in its reasonable determination, the proposed sale has become futile or impossible.  In consideration of the foregoing, and in the interest of the most expeditious sale closing possible, I request that the Court waive the fourteen (14) day waiting periods of Bankruptcy Rules 6004(h) and 6006(d).

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of May 2010, at Agua Dulce, California.

CATHERINE P. MACADAM

56

## DECLARATION OF CLIFFORD R. SMITH

I, CLIFFORD R. SMITH, hereby declare as follows:

1.    I am over 18 years of age.  Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.    I make this declaration in support of the Sale Motion to which this declaration is attached.  Unless otherwise stated, all capitalized terms herein have the same meanings as in the Sale Motion.

3.    I am a Senior Vice President of Kennedy Wilson, Inc. ("KW").  Collectively attached hereto as Exhibit "5" is some general information about KW, general information about the proposed sale (as posted in KW's website), my personal résumé, and the professional résumés of other KW personnel that are principally involved with the proposed sale.

4.    There will be substantial marketing by KW during the forty-five (45) day Marketing Period, which, in my opinion, should be enough time to identify any parties interested in bidding on the assets, especially considering that, in advance of the Marketing Period, KW has set up a "document room" with all pertinent information regarding the assets, which potential bidders will have access to after signing a Confidentiality Agreement.  After the Marketing Period, qualified bidders will be allowed to bid on the asset.  In the event there is more than one qualified overbid, then an auction will be held whereby bidders will have an opportunity to make higher bids until the highest price is obtained.  In addition, the multi-layered fee structure for KW set forth in the Sale Documents provides a substantial motivation for KW to obtain the best possible price for the ADV Assets.

5.    As discussed above, prior to the Marketing Period, KW established a "document room" with all pertinent information regarding the assets.  During the forty-five (45) day Marketing Period, KW, among other things (1) has made, or will make, information in the "document room" available to all potential bidders that have completed, executed, and delivered to KW and Bank a Confidentiality Agreement, (2) has delivered, or will deliver, a "Notice of

Offering Letter" to as many potential bidders as possible, (3) has listed and advertised, or will list and advertise, the Assets for sale at the Auction Estimate Range of prices on various internet sites, and with various brokerage and/or listing services, that list and offer for sale real property and assets, similar to the Assets, (4) has submitted, or will submit, advertisements for the sale of the Assets at the Auction Estimate Range of prices in various trade or industry newspapers and other print media, (5) has coordinated, or will coordinate, with Bank and Debtors to permit potential bidders to access the Assets for purposes of conducting site visits, and (6) has received, or will receive, written questions from potential bidders with respect to the Assets and the Live Auction, has sought, or will seek, answers to the same from Bank and Debtors, and has provided, or will provide, written answers to such questions, as approved by Bank and Debtors, to all potential bidders.

6.      As set forth herein above and below, the Sale Documents related to KW were negotiated at arms-length over a protracted period of time, and I believe that the Sale Documents and sale procedures will result in ADV obtaining the highest and best price for the ADV Assets.

7.      I believe that KW is a "disinterested person" as that term is defined in Section 101(14).   Other than being employed by Bank (which I understand in and of itself is not a disqualifying factor per Section 327(c)), KW has no connections to the Debtors, any creditors of the Debtors, any other parties in interest in the Debtors' cases, their respective attorneys and accountants, the Office of the United States Trustee, or any person employed by the Court or the Office of the United States Trustee, nor does KW or its principals or employees represent or hold an adverse interest with respect to the Debtors, any creditors, or to these estates.

/ / /

/ / /

/ / /

1    8.    As set forth herein, ADV has sought KW's services so that the Assets will be
2 effectively marketed and the highest and best price for the Assets can be obtained. The specific
3 services to be performed by KW are set forth in Section I.D of the Sale Motion. The amount of
4 the KW Fees to be paid to KW pursuant to Section 328 are set forth in Section I.F of the Sale
5 Motion.

6    I declare under penalty of perjury that the foregoing is true and correct to the best of my
7 knowledge.

8    Executed this 24th day of May 2010, at Beverly Hills, California.

9

10    CLIFFORD R. SMITH

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

1 MARTIN J. BRILL (SBN 53220)
TODD M. ARNOLD (SBN 221868)
2 LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
3 10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
4 Telephone: (310) 229-1234
Facsimile: (310) 229-1244
5 Email: mjb@lnbrb.com, tma@lnbrb.com

6
Counsel for Debtors and Debtors in Possession

7
UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
8 SAN FERNANDO VALLEY DIVISION

9

10 In re                                          ) Lead Case No. 1:09-bk-15207-MT
                                                  ) (Jointly Administered with  Catherine P.
11 AGUA DULCE VINEYARDS, LLC, a                   ) MacAdam and Donal J. MacAdam – Case No.
California limited liability company,             ) 1:09-bk-17476-MT)
12                                                )
            Debtor.                               )
13 _____                 ) Chapter 11 Cases
                                                  )
14 In re                                          )
                                                  ) **ORDER APPROVING:**
15 CATHERINE P. MACADAM and                       )
DONAL J. MACADAM,                                 ) **(1)  THE SALE OF SUBSTANTIALLY ALL**
16                                                ) **OF THE ASSETS OF AGUA DULCE**
            Debtors.                              ) **VINEYARDS, LLC FREE AND CLEAR OF**
17 _____                 ) **LIENS, CLAIMS, INTERESTS AND**
                                                  ) **ENCUMBRANCES;**
18 ☒  Affects All Debtors                         ) **(2)  THE ASSUMPTION AND ASSIGNMENT**
                                                  ) **OF CERTAIN UNEXPIRED LEASES AND**
19 ☐  Affects Agua Dulce Vineyards, LLC           ) **EXECUTORY CONTRACTS; AND**
only                                              ) **(3)  THE EMPLOYMENT AND PAYMENT**
20                                                ) **OF KENNEDY WILSON AUCTION GROUP,**
☐  Affects Catherine P. MacAdam and               ) **INC. AND ANY COOPERATING BROKER**
21    Donal J. MacAdam only                       ) **IN CONJUNCTION WITH THE SALE**
                                                  )
22                                                ) Hearing:
                                                  ) Date:   June 14, 2010
23                                                ) Time:   11:00 a.m.
                                                  ) Place:  Courtroom "301"
24                                                )           21041 Burbank Boulevard
                                                  )           Woodland Hills, California 91367
25                                                )
                                                  )
26                                                )
                                                  )
27                                                )
                                                  )
28 _____                 )

1    At the above-referenced date, time, and location, the Court held a hearing to consider the

2  motion (the "Sale Motion")[1] filed by ADV and the MacAdams, the Debtors and Debtors in

3  Possession in the above-captioned, jointly administered Chapter 11 cases, for an order:

4    (1)    approving the sale of substantially all of ADV's assets to Bank, ADV's primary

5  secured creditor, for a credit bid purchase price of $6.1 million (subject to certain credits and

6  adjustments), subject to overbid, free and clear of all liens, claims, interests, and encumbrances,

7  pursuant to 11 U.S.C. § 363(f), on the terms set forth in the Sale Motion and in the Sale

8  Documents, which include the following primary documents and any exhibits and schedules

9  attached thereto: (a) the Agreement to Sell, attached to the Sale Motion as Exhibit "2," (b) the

10  Auction Agreement, attached as Exhibit "B" to the Agreement to Sell, (c) the Bank APA,

11  attached as Exhibit "B" to the Auction Agreement, (d) the ADV APA, attached as Exhibit "C" to

12  the Auction Agreement, and (e) the list of "Assumed Contracts," listing (i) Contracts ADV was

13  seeking to assume and assign to Bank or an accepted bidder, and (ii) the Cure Amount for the

14  Contracts;

15    (2)    approving the assumption of the Contracts by ADV and the assignment thereof to

16  Bank or an accepted bidder pursuant to 11 U.S.C. § 365;

17    (3)    approving the Cure Amounts for the Contracts and deeming the failure of a

18  counter-party to a particular Contract to object to the proposed Cure Amount and assumption and

19  assignment to be a waiver of such objections;

20    (4)    approving the employment and payment of  KW and any cooperating broker in

21  conjunction with the proposed sale;

22    (5)    waiving the 14-day stay periods set forth in Federal Rules of Bankruptcy

23  Procedure 6004(h) and 6006(d);

24    (6)    authorizing Debtors to take all necessary and reasonable steps to consummate the

25  sale of the assets and the assumption and assignment of the Contracts; and

26

27  [1] Unless otherwise stated, all capitalized terms herein have the same meanings as in the Sale Motion.

28

4

(7)     granting such other relief as is just and proper under the circumstances.

Appearances were made as set forth in the record of the Court.

Upon consideration of the Notice of the Sale Motion, the Sale Motion, any objections to the Sale Motion, any replies thereto, all declarations and exhibits in support thereof duly admitted into evidence by the Court, the arguments of counsel made at the hearing on the Sale Motion, the entire record in these cases, and for other good cause, the Court hereby finds, as a matter of fact, and concludes, as a matter of law, that:

1.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 to approve the sale of the ADV Assets which are the subject of the Sale Motion free and clear of those liens, encumbrances, claims and interests identified in this Order, and to authorize the Debtors to enter into and perform in accordance with the Sale Documents, including the modifications thereto, if any, set forth in the record of the hearing on the Sale Motion, a copy of which are collectively attached hereto as Exhibit "A".  The Sale Motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O). The statutory predicates for the relief requested in the Sale Motion are 11 U.S.C. §§ 105, 327, 328, 363, and 365 and Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") 2002, 2014, 6004, 6006 and 9014.

2.     All objections, if any, to the Sale Motion and to the approval of the Sale Documents, including the transactions contemplated thereby, have been withdrawn, resolved or overruled.

## SALE OF THE ADV ASSETS

3.     The ADV Property is situated in Augua Dulce, County of Los Angeles, State of California, described more fully as follows:

[LEGAL DESCRIPTION TO FOLLOW]

4.     Record title to the Property is vested in Agua Dulce Vineyards, LLC, a California

limited liability company (the "Record Owner").

5.    As set forth in the proofs of service filed with this Court in connection with the Sale Motion, notice of the hearing on the approval of the Sale Motion (the "Notice") was duly served on (a) all creditors and interested parties, including parties requesting special notice, (b) each entity known to the Debtors to assert a lien, encumbrance or other interest in, or claim to, the ADV Assets to be affected by this Order, (c) all other parties to the Contracts, and (d) the Office of the United States Trustee, all in accordance with Bankruptcy Rules 2002(a)(2), (c)(1), (i), and (k), 6004(a) and (c), and 6006(c). Each entity known to the Debtors to assert a lien, encumbrance, claim or other interest in or to the ADV Assets to be affected by this Order was also served with a complete copy of the Sale Motion, and all supporting declarations and pleadings filed by the Debtors in connection with the Sale Motion.

6.    The Notice complied in all respects with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Riles; fully and adequately described the relief requested in the Sale Motion and set forth the means by which the Sale Motion, and all supporting declarations and pleadings filed by the Debtors in connection with the Sale Motion, could be obtained promptly by a party in interest; provided fair and reasonable notice under the circumstances of these cases with respect to the deadlines and procedures for objecting to the relief requested in the Sale Motion; and set forth the time, date and place for the hearing on the Sale Motion.

7.    The ADV Assets are allegedly subject to the liens, encumbrances and other interests of record as set forth in the title report and UCC-1 report, or otherwise known to the Debtors, including, without limitation, the following:

ADV Property (i.e., real property):

| **Purported Creditor** | **Nature of Interest** | **Alleged Claim** |
|---|---|---|
| Western Commercial Bank | 1st Deed of Trust (through subordination agreements) | $7,182,944 (approx.) |
| Western Commercial Bank | 2nd Deed of Trust (through subordination agreements) | $374,250 (approx.) |
| Narcissa Estates, Inc. | 3rd Deed of Trust (through subordination agreements) | $1,356,000 (approx) |
| County of Los Angeles (the "County") | Taxes | $17,408.89[2] |
| Franchise Tax Board (the "FTB") | Taxes | $0[3] |
| Newmark Communications ("Newmark") | Judgment | $0[4] |

Other Assets (i.e., personal property):

| **Purported Lien Creditor** | **Nature of Interest and /or Status** | **Alleged Claim** |
|---|---|---|
| Encino State Bank | Terminated | N/A – Terminated |
| Global Vintage Ltd. Tustin Community Bank | Lapsed | N/A – Lapsed |
| Global Vintage Ltd. Tustin Community Bank | Terminated | N/A – Terminated |

---

[2] The County filed Proof of Claim No. 7 asserting a secured claim in the amount of $48,531.36. However, the APN numbers referenced in that Proof of Claim do not relate to the ADV Property. Therefore, ADV disputes this Proof of Claim from the County. On the other hand, the amount listed here is the amount of the recorded tax liens appearing on the Title Report.

[3] The FTB filed Proof of Claim No. 52 asserting a secured in the amount of $9,565.5. However, the FTB does not appear on the Title Report for the ADV Property. The FTB is only listed here for notice purposes.

[4] Newmark filed Proof of Claim No. 48 asserting a general unsecured claim in the amount of $48,531.36, and Newmark does not appear on the Title Report for the ADV Property. Newmark is only listed here for notice purposes.

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| IRS | Terminated | N/A – Terminated |
| Narcissa Estates, Inc. as assignee or successor in interest to First Private Bank & Trust | Active<br><br>2nd Priority Security Interest in Modular Barn (original 1st priority lien subordinated to Bank liens) | $1,356,000 (approx) |
| Leaf Funding, Inc. ("Leaf") as assignee or successor in interest to Axis Capital Inc. ("Axis") assigned to | Active<br><br>1st Priority Security Interest in Equipment Leased Pursuant to Lease No. 91092 (the "Leaf Lease") | $18,855 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled Axis with a secured claim in the amount of $36,467.<br><br>Leaf filed Proof of Claim No. 18 asserting a secured claim in the amount of $15,000 and a general unsecured claim in the amount of $21,467.71.<br><br>The Leaf Lease will either be (1) assumed by ADV and assigned to the Bank or an accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying equipment returned to Leaf. |
| KSI Funding, Inc. | Terminated | N/A – Terminated |
| Pentech Financial Services, Inc. ("Pentech") as assignee or successor in interest to Capital Network Leasing Corp. | Active<br><br>1st Priority Security Interest in Barrels Leased Pursuant to Lease No. 15606 (the "Pentech Lease") | $38,205 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled Pentech with a secured claim in the amount of $60,517. Pentech filed Proof of Claim No. 24 asserting a secured claim in the amount of $57,841.55.<br><br>The Pentech Lease will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount, or (2) rejected with the underlying |

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| | | equipment returned to Pentech. |
| Associated Winery Systems, Inc. ("AWS") as assignee or successor in interest to Prospero Equipment Corp. | Active<br><br>1st Priority Security Interest in Bottling Line Equipment Pursuant to Lease (the "AWS Lease") and/or or Stipulated Judgment regarding the AWS Lease | $22,500 - Estimated cure amount through July 31, 2010<br><br>ADV scheduled AWS with a secured claim in the amount of $90,000.  AWS filed Proof of Claim No. 47 asserting a secured claim in the amount of $333,062.85.<br><br>Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount.<br><br>The Court entered an agreed order (1) providing AWS with relief from stay if required payments under the stipulated judgment were not made in a timely manner going forward, and (2) requiring that the balance owed to AWS under the Stipulated Judgment be paid by October 31, 2010, unless otherwise agreed in a writing signed by the parties, by ADV or any purchaser of the Debtor's assets.<br><br>The AWS Lease and/or if necessary, the Stipulated Judgment, will either be (1) assumed by ADV and assigned to the Bank or a successful accepted bidder with the Bank or such accepted bidder to pay the cure amount/ purchase price set forth above, or (2) rejected with the underlying equipment returned to AWS. |
| Western Commercial Bank | Active<br><br>1st Priority Security Interest in All Personal Property Not Subject to Senior | $7,182,944 (approx.) |

| Purported Lien Creditor | Nature of Interest and /or Status | Alleged Claim |
|---|---|---|
| | Purchase Money Liens | |
| Key Equipment Finance, Inc. ("Key") | Active<br><br>2nd Priority Security Interest in All Personal Property Not Subject to Senior Purchase Money Liens Pursuant to Judgment Lien | ADV scheduled Key with a secured claim in the amount of $59,696.34.  Key filed Proof of Claim No. 21 asserting a secured claim in the amount of $59,696.34. |
| Western Commercial Bank | Active<br><br>Assignment of existing or future Bottling Contracts. | $374,250 (approx.) |
| Western Commercial Bank | Active<br><br>Priority Security Interest in All Bottled, Tank, and Barrel Wine and/or Juice Not Subject to Senior Liens on All Personal Property | $763,864 (approx.) |

8.     For the reasons set forth in the Sale Motion at Section II.A.2, at least one of the subsections of 11 U.S.C. § 363(f)(1) through (5) was satisfied in relation to each creditor such that 11 U.S.C. § 363(f) permits the sale of the ADV Assets free and clear of any and all liens, encumbrances, and other interests, including, but not limited to those liens, encumbrances, and other interests listed in Paragraph 7 above, provided, however, that outstanding real property

taxes owed to the County and secured by the ADV Property will (a) in the event of a sale to Bank, remain with, and attach to, the ADV Property, and (b) in the event of a sale to a Qualified Bidder, be paid by the Qualified Bidder.

9.     The Debtors, with the assistance of KW, have engaged in fair and reasonable marketing, advertising, and other sale efforts and procedures in connection with the sale of the ADV Assets, which efforts and procedures have enabled the Debtors to obtain a fair and reasonable price for the ADV Assets under the circumstances of these cases.  In connection with the proposed sale, the Debtors have complied with all sale procedures established or required by this Court.

10.     The highest and best offer to purchase the ADV Assets, thus far, is the offer of Bank to purchase the ADV Assets for a credit bid of $6.1 million, subject to certain adjustments as set forth in the Sale Documents, and subject to overbid after the Marketing Period, which ends on June 24, 2010, pursuant to the Sale Procedures previously approved by the Court.

11.     If no Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, or if a Qualified Bidder does not purchase the Assets for any reason, other than a breach or default of the Bank APA by Bank, pursuant to this Order, (a) Bank shall continue to own, and not sell the Bank Property, (b) Bank and Debtors shall enter into the ADV APA, and consummate the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV APA, and (c) as discussed below, ADV will be deemed to have assumed and assigned those Contracts to Bank that Bank has elected to accept, upon payment of the Cure Amounts by Bank.  In that case, within five (5) business days after the Marketing Period, the Debtors shall provide a notice of the outcome of the sale to the Court and serve such notice by regular mail or Notice of Electronic Filing, as appropriate, on (a) the United States Trustee, (b) counsel to Bank, (c) other parties to the

11

Contracts, (d) parties requesting special notice, (e) any parties that objected to the Sale Motion, and (f) parties receiving Notice of Electronic Filing (the "Notice Parties").

12.     If a Qualified Bidder for the purchase of the Assets is identified, upon the conclusion of the Marketing Period or the Live Auction, as applicable, ADV shall seek final approval, at a supplemental sale hearing (the "Supplemental Sale Hearing"), of the Sale Motion providing for a sale of the Assets, and the assumption and assignment of the Contracts, to such Qualified Bidder, upon payment of the Cure Amounts.  In that case, within seven (7) business days after the later of (a) the end of the Marketing Period and (b) the conclusion of the Live Auction, the Debtors shall file and serve on the Notice Parties, by overnight mail or Notice of Electronic Filing, as appropriate, (a) notice of the proposed Qualified Bidder, (b) notice of the Supplemental Sale Hearing, which shall be held on _____, 2010, at ___:___ __.m., (c) any additional papers regarding approval of the sale to the Qualified Bidder, and (d) notice of the deadline to oppose the proposed sale to the Qualified Bidder, which shall be _____, 2010, at ___:___ __.m. _____, 2010, with any opposition to be filed and served so that it is actually received by ___:___ __.m. on the foregoing date by (a) the United States Trustee, (b) counsel to Bank, and (c) counsel to the Debtors.

13.     Upon approval of any sale of the Assets to a Qualified Bidder, Bank and ADV shall promptly sign and date the applicable purchase agreements submitted by the successful Qualified Bidder, deliver the same to the escrow agent, and consummate the sale of the Assets pursuant to the terms and conditions of the Sale Documents.

14.     Bank is unrelated to the Debtors.  The Sale Documents were negotiated, proposed, and entered into by the parties without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors nor Bank have engaged in any conduct that would cause or permit the Sale Documents, or the transactions contemplated thereby, to be invalidated

or avoided under 11 U.S.C. § 363(n).  Accordingly, upon consummation of the sale transaction

contemplated by the Sale Documents, Bank will be a buyer in "good faith" within the meaning

of 11 U.S.C. § 363(m), and, as such, is entitled to the protections afforded thereby.

15.    The terms and conditions of the sale transaction as provided for in the Sale

Agreements are fair and reasonable; entry into the Sale Documents on behalf of the Debtors'

estates is a sound exercise of the Debtors' reasonable business judgment; and, the sale

transaction contemplated by the Sale Agreements are in the best interests of creditors, interest

holders and the Debtors' estate.

## ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND

## RELATED CURE AMOUNTS

16.    ADV's decision to assume the Contracts and assign them to Bank is a sound

exercise of the ADV's reasonable business judgment; and such assumption and assignment is in

the best interests of the Debtors' estates.

17.    The Contracts and Cure Amounts are as follows:

| Lease / Contract | Estimated Cure Amount |
|---|---|
| The Leaf Lease | $14,000 - Estimated cure amount through closing |
| The Pentech Lease | $27,000 - Estimated cure amount through closing |
| AWS Lease | $20,000 - Estimated cure amount through closing<br><br>Estimate $75,000 owed per Stipulated Judgment, after accounting for monthly payments from April 2010 through July 2010, but before payment of cure amount. |

18.    Upon the closing date of any sale to Bank and payment of the Cure Amounts by

Bank (a) ADV shall be authorized to assume and assign the Contracts to the Bank, (b) ADV's

assumption and assignment to Bank of the Contracts shall be effective, (c) Bank shall be deemed

to have assumed any on-going liabilities and obligations in connection with the Contracts, and

(d) any guaranties or liabilities of the MacAdams under the Contracts shall be terminated and of no further effect.

19.    The Cure Amounts specified above are the sole and entire amounts necessary to cure all defaults by ADV and to pay all actual pecuniary losses, if any, payable by ADV or Bank under the Contracts pursuant to 11 U.S.C. § 365(b)(1), and the non-Debtor parties to such Contracts shall not have any claims against ADV or Bank in respect of any Contracts on account of any defaults occurring prior to the transfer of such Contracts to Bank.

20.    Subject to payment of the Cure Amounts, if any, the Debtor and Bank have (a) cured, or provided adequate assurance of cure, of any default (other than defaults of a type specified in 11 U.S.C. § 365(b)(2)) by ADV existing prior to the closing date of any sale to Bank under any of the Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (b) compensated, or provided adequate assurance of compensation, to all non-debtor parties to any of the Contracts for any actual pecuniary loss to such party resulting from a default by ADV prior to the closing date of any sale to Bank under such Contracts, within the meaning of 11 U.S.C. § 365(b)(l)(B).  Bank has provided adequate assurance of its future performance of and under the Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).

## **EMPLOYMENT AND PAYMENT OF KW AND ANY COOPERATING BROKER**

21.    As set forth in the Sale Motion, the only scenario under which ADV would have to employ and pay KW and a cooperating broker is if Bank is not the buyer of ADV Assets.  If a Qualified Bidder other than Bank buys all of the Assets, the Sale Documents provide that a portion of the sale proceeds will be used to pay the KW Fees and the Broker Fees.  In that case, ADV has sought to (a) employ and pay KW the KW fees, and (b) employ and pay any cooperating broker the Broker Fees.

/ / /

/ / /

/ / /

## WAIVER OF THE FOURTEEN-DAY STAY PERIODS ST FORTH IN

## BANKRUPTCY RULES 6004(h) AND 6006(d).

22.    In consideration of (a) the fact that, in order to obtain Bank's initial bid for the ADV Assets, Bank's continued cooperation with the sale process, and Bank's forbearance from exercising its rights to immediately seek relief from stay, ADV stipulated to provide Bank with immediate relief from stay, provided Bank would not complete any foreclosure sale until the earlier of, among other things, (i) July 30, 2010 and (ii) after notice by Bank that, in its reasonable determination, the proposed sale has become futile or impossible, and (b) the need for the Debtors to quickly close any sale transaction to limit administrative costs, the Court hereby waives the fourteen (14) day stay periods of Bankruptcy Rules 6004(h) an 6006(d), provided however, that (a) no sale to Bank can close until after the Marketing Period if no Qualified Bidder is identified, and (b) no sale to a Qualified Bidder can close until after the Supplemental Sale Hearing and a further order of the Court.

Based on the record in these case, the findings of fact and conclusions of law set forth above and stated on the record pursuant to Bankruptcy Rules 9014 and 7052, and for good cause appearing therefor,

**IT IS HEREBY ADJUDGED AND ORDERED** that:

A.    The Sale Motion is granted as set forth herein;

B.    The terms, conditions, and transactions contemplated by the Sale Documents are hereby approved in all respects, and the Debtors are hereby authorized under 11 U.S.C. §§ 105(a) and 363(b), (c), (f) and (m) to sell the ADV Assets free and clear of those liens, claims, encumbrances and interests set forth herein—and, except as otherwise expressly provided below, all other liens, claims encumbrances and interest claimed by all parties having received actual or constructive notice of the motions described herein--to Bank on the terms and conditions

provided in the Sale Documents, subject, however, to overbid after the Marketing Period and, in the event a successful overbidder is the identified, to that overbidder pursuant to a supplemental order of this Court providing protections to such purchaser which are substantively identical to those protecting the Bank's acquisition of the ADV Property hereunder, to be issued following the conclusion of the Supplemental Sale Hearing ;

C.      The Debtors and Bank are hereby authorized, empowered, and directed to (1) perform under, consummate, and implement the Sale Documents, (2) execute all additional instruments and documents that may be reasonably necessary or desirable to implement the Sale Documents and the transactions contemplated thereby, (3) take all further actions as may be necessary or appropriate for the purposes of assigning, transferring, granting, conveying, encumbering, or transferring the ADV Assets as contemplated by the Sale Documents, and (4) take such other and further steps as are contemplated by the Sale Documents or reasonably required to fulfill the Debtors' or the Bank's obligations under the Sale Documents, all without further order of the Court, subject, however, to overbid after the Marketing Period;

D.      The sale of the ADV Assets to the Bank or, if applicable, to a successful overbidder, shall be free and clear of any and all liens, encumbrances, and other interests, including, but not limited to (1) those liens, encumbrances, and other interests listed in Paragraph 7 above, (2) the ownership interests of ADV, and its predecessors and successors in interest, (3) any unrecorded equitable or legal interests in the ADV Assets asserted by any person or entity, or their respective predecessors and successors in interest, (4) the claims or interests asserted by any person or entity, or their respective predecessors and successors in interest, against the Debtors' estates which do not constitute liens against or interests in the ADV Assets provided, however, that outstanding real property taxes owed to the County and secured by the ADV Property will (1) in the event of a sale to Bank, remain with, and attach to, the ADV Property,

and (2) in the event of a sale to a Qualified Bidder, be paid by the Qualified Bidder.

E.    Except as authorized for payment hereby, each lien, encumbrance or interest identified above shall attach, as adequate protection to the holder thereof pursuant to 11 U.S.C. § 363(e), to any net proceeds of sale paid to the estate pursuant to the Sale Documents and not otherwise distributed from the gross proceeds of sale in accordance with the Sale Motion, with the same extent, validity and priority, if any, as such lien, encumbrance, or interest now has with respect to the ADV Assets, subject to any and all defenses, offsets, counterclaims and/or other rights of any party relating thereto;

F.    Pursuant to 11 U.S.C. §§ 327 and 328, Bankruptcy Rule 2014, and Local Bankruptcy Rules 2014-1 and 6007-1(h), and for good cause shown, to the extent required, ADV is authorized to (a) employ and pay KW the KW fees from the sale proceeds, and (b) employ and pay any cooperating broker the Broker Fees from the sale proceeds without further order of the Court;

G.    This Court shall and hereby does retain jurisdiction to (1) enforce and implement the terms and provisions of the Sale Documents, all amendments thereto, any waivers and consents thereunder, and any other supplemental documents or agreements executed in connection therewith;  (2) compel delivery and payment of the consideration provided for under the Sale Documents; (3) resolve any disputes, controversies or claims arising out of or relating to the Sale Documents and; (4) interpret implement, and enforce the provisions of this Order;

H.    Pursuant to 11 U.S.C. § 363(m), absent a stay of this Order pending appeal, the reversal or modification on appeal of this Order, or any provision thereof, shall not affect the validity of the sale transaction approved hereby which is consummated prior to such stay, reversal or modification on appeal; and

1        I.    The validity of the sale approved hereby shall not be affected by the appointment

2    of a trustee or successor trustee, the dismissal of the above-captioned case, or its conversion to

3    another chapter under title 11 of the United States Code.

4        **IT IS SO ORDERED.**

5

6                                           ###

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "2"

## AGREEMENT TO SELL PROPERTY AND ASSETS

This AGREEMENT TO SELL PROPERTY AND ASSETS ("Agreement") is made this _____ day of May, 2010, by and among WESTERN COMMERCIAL BANK, a California banking corporation ("Bank"), on the one hand, and AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D. MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), and SWEETWATER VINEYARDS, LLC, a California limited liability company ("Sweetwater", and together with D. MacAdam and C. MacAdam, individually and collectively, "Guarantor" and together with ADV, the "ADV Parties"), on the other hand, with respect to the following facts:

## RECITALS

A.    Bank has heretofore made the following loans (collectively, the "Loans") to ADV:

1.    $350M Loan.

a.    On or about August 14, 2007, Bank made a loan (the "$350M Loan") to ADV in the original principal amount of $200,000.00, as evidenced by that certain Promissory Note, dated August 14, 2007 (the "$350M Note"), made by ADV for the benefit of Bank. Pursuant to the $350M Note, ADV was required to repay the $350M Loan to Bank by November 14, 2007 (the "$350M Maturity Date").

b.    On or about November 14, 2007, and again on December 20, 2007, Bank and ADV executed those certain Change In Terms Agreements (each a "$350M CIT"), pursuant to which, among other things, Bank agreed to (i) increase the principal amount of the $350M Loan from $200,000.00 to $300,000.00, and (ii) extend the $350M Maturity Date from November 14, 2007 to November 14, 2008.

c.    On or about August 8, 2008, Bank and ADV entered into that certain Change In Terms Agreement (also a "$350M CIT"), pursuant to which, among other things, (i) Bank agreed to increase the principal amount of the $350M Loan from $300,000.00 to $350,000.00, (ii) Bank agreed to extend the $350M Maturity Date to October 29, 2012, (iii) the parties entered into that certain Business Loan Agreement, dated August 8, 2008 (the "$350M Loan Agreement"), setting forth certain terms and conditions with respect to the $350M Loan, (iv) ADV granted Bank a security interest in and to that certain real property located at 9830 Sierra Highway, Agua Dulce, California (the "ADV Property"), as further described on Exhibit A-1 of the Auction Sale Agreement, attached hereto as Exhibit B, and made a part hereof (the "Auction Sale Agreement"), junior in priority only to the $6MM DOT (defined below) and the $6MM Assignment (defined below), and made pursuant to (1) that certain Deed of Trust, dated August 8, 2008, made by ADV for the benefit of Bank, and recorded on August 25, 2008, in the Official Records of Los Angeles County, California, as Instrument Number 2008-1528562 (the "$350M DOT"), and (2) that certain Assignment of Rents, dated August 8, 2008, made by ADV for the benefit of Bank, and recorded on August 25, 2008, in the Official Records of Los Angeles County, California, as Instrument Number 2008-1528564 (the "$350M Assignment"), (v) ADV granted Bank a security interest in certain existing and future bottling contracts, pursuant to, and as further described in, that certain Commercial Security Agreement, dated August 8, 2008 (the "$350M Security Agreement"), made

1

by ADV for the benefit of Bank, and (vi) the indebtedness and other obligations of ADV under the $350M Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated August 14, 2008 (individually and collectively, the "$350M Guaranty").

        d.      As of May 7, 2010, the $350M Loan has an unpaid principal balance of $325,000.00, plus accrued and unpaid interest thereon in the amount of $45,913.18, plus late charges in the amount of $3,336.17, and plus all other fees, costs, and expenses owed thereunder.

        e.      As used herein, the term "$350M Loan Documents" shall mean, collectively, the $350M Note, $350M CITs, $350M Loan Agreement, $350M DOT, $350M Assignment, $350M Security Agreement, $350M Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $350M Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

        2.      $6MM Loan.

        a.      On or about October 29, 2007, Bank made a loan (the "$6MM Loan") to ADV in the original principal amount of $6,000,000.00, as evidenced by that certain Promissory Note, dated October 29, 2007 (the "$6MM Note"), made by ADV for the benefit of Bank.

        b.      The $6MM Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated October 29, 2007 (the "$6MM Loan Agreement"), executed by ADV and Bank.

        c.      The $6MM Loan was secured by, among other things, (i) a lien on the ADV Property, senior in priority to all other monetary liens and encumbrances on the ADV Property, and made pursuant to that certain Deed of Trust, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number 2007-2457263 (the "$6MM DOT"), and (ii) security interests, senior in priority to all other security interests, granted by ADV to Bank in and to, among other things, certain farm products, inventory, equipment, accounts, accessions, fixtures, and general intangibles, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated October 29, 2007 (the "$6MM Security Agreement").

        d.      The indebtedness and other obligations under the $6MM Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated October 29, 2007 (individually and collectively, the "$6MM Guaranty").

        e.      As of May 7, 2010, the $6MM Loan has an unpaid principal balance of $5,932,712.71, plus accrued and unpaid interest thereon in the amount of $1,200,373.40, plus late charges in the amount of $49,859.49, and plus all other fees, costs, and expenses owed thereunder.

        f.      As used herein, the term "$6MM Loan Documents" shall mean, collectively, the $6MM Note, $6MM Loan Agreement, $6MM DOT, $6MM Security Agreement, $6MM Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $6MM Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

2

3.    $1MM Loan.

a.    On or about October 29, 2007, Bank made a loan (the "$1MM Loan") to ADV in the original principal amount of $1,000,000.00, as evidenced by that certain Promissory Note, dated October 29, 2007 (the "$1MM Note"), made by ADV for the benefit of Bank.

b.    The $1MM Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated October 29, 2007 (the "$1MM Loan Agreement"), executed by ADV and Bank.

c.    The $1MM Loan was secured by, among other things, (i) a lien on that certain vacant land described on Exhibit A-2 of the Auction Sale Agreement (the "Bank Property"), and made pursuant to that certain Deed of Trust, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number 2007-2457271 (the "$1MM DOT"), and that certain Assignment of Rents, dated October 29, 2007, made by ADV for the benefit of Bank, and recorded on October 31, 2007, in the Official Records of Los Angeles County, California, as Instrument Number: 2007-2457272 (the "$1MM Assignment"), and (ii) security interests granted by ADV to Bank in and to, among other things, certain farm products, inventory, equipment, accounts, accessions, fixtures, and general intangibles, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated October 29, 2007 (the "$1MM Security Agreement").

d.    The indebtedness and other obligations under the $1MM Loan were guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated October 29, 2007 (individually and collectively, the "$1MM Guaranty").

e.    As used herein, the term "$1MM Loan Documents" shall mean, collectively, the $1MM Note, $1MM Loan Agreement, $1MM DOT, $1MM Assignment, $1MM Security Agreement, $1MM Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $1MM Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

4.    $750M Loan.

a.    On or about November 18, 2008, Bank made a loan (the "$750M Loan") to ADV in the original principal amount of $750,000.00, as evidenced by that certain Promissory Note, dated November 18, 2008 (the "$750M Note"), made by ADV for the benefit of Bank.

b.    The $750M Loan was made pursuant to, among other things, that certain Business Loan Agreement, dated November 18, 2008 (the "$750M Loan Agreement"), executed by ADV and Bank.

c.    The $750M Loan was secured by, among other things, security interests granted by ADV to Bank in and to certain farm products, inventory, equipment, accounts, accessions, fixtures, general intangibles, off-site and on-site bottled wines, tanks, and barrels, and other property, pursuant to, and as further described in, that certain Commercial Security Agreement, dated November 18, 2008 (the "$750M Security Agreement").

3

    d.  The indebtedness and other obligations under the $1MM Loan was guaranteed by each of Guarantor, each made pursuant to a certain Commercial Guaranty, each dated November 18, 2008 (individually and collectively, the "$750M Guaranty").

    e.  As of May 7, 2010, the $750M Loan has an unpaid principal balance of $648,655.02, plus accrued and unpaid interest thereon in the amount of $106,922.81, plus late charges in the amount of $8,287.48, and plus all other fees, costs, and expenses owed thereunder.

    f.  As used herein, the term "$750M Loan Documents" shall mean, collectively, $750M Note, the $750M Loan Agreement, $750M Security Agreement, $750M Guaranty, and all other agreements, statements, assignments, indemnities, instruments, and documents made in connection with the $750M Loan, and all amendments, modifications, supplements, and restatements thereto or thereof.

  B.  As used in this Agreement, the term "Loan Documents" shall mean, collectively, the $350M Loan Documents, $6MM Loan Documents, $1MM Loan Documents, and the $750M Loan Documents.

  C.  ADV, D. MacAdam, and C. MacAdam are the debtor in those certain bankruptcy proceedings, styled as *In re Agua Dulce Vineyards, LLC, a California limited liability company*, Case No. 1:09-bk-15207-MT, and *In re Catherine P. MacAdam and Donal J. MacAdam*, Case No. 1:09-bk-17476-MT (collectively, the "Bankruptcy"), filed in the United States Bankruptcy Court, Central District of California, San Fernando Valley Division (the "Court"), and Bank is a creditor in the Bankruptcy.

  D.  Bank has completed a non-judicial foreclosure of the Bank Property under the $1MM Deed of Trust (the "Non-Judicial Foreclosure"), and Bank is the grantee under that certain Trustee's Deed Upon Sale, dated September 28, 2009, and recorded on October 8, 2009, in the Official Records of Los Angeles County, California, as Instrument Number 2009-1532940 ("Trustee's Deed"), with respect to the Bank Property

  E.  ADV Parties are in default of their obligations under the Loan Documents as a result of, among other things, failing to make payments due under the Loan Documents as and when required (collectively, the "Existing Defaults"). As a result of the Existing Defaults, and in accordance with the Loan Documents, and subject to the limitations imposed at law as a result of the Non-Judicial Foreclosure with respect to the $1MM Loan, Bank has accelerated the unpaid balance due and owing under each of the Loans, and all amounts thereunder are due and payable.

  F.  ADV Parties, directly or indirectly, are the owners of that certain business which, among other things, consists of a winery, vineyard, and gift shop (the "Business") located at or near the ADV Property.

  G.  In an effort to resolve Bank's claims in the Bankruptcy, and to maximize the value received from the sale of the Bank Property, ADV Property, and all assets of ADV Parties used in connection with the Business (collectively, the "Auctioned Property"), Bank and ADV Parties have agreed to offer the Auctioned Property for sale pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement.

4

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Obligations Conditioned Upon Court Approval; Notices; Termination Right.

1.1    Bid Procedures Motion. The effectiveness of this Agreement, and all rights and obligations of all parties hereto are subject to, and conditioned upon, the Court granting a motion (the "Bid Procedures Motion") approving the sale of the Auctioned Property pursuant to the procedures set forth in the Auction Sale Agreement (the "Bid Procedures Motion Approval"). A copy of the Bid Procedures Motion Approval, once received, shall be attached to this Agreement as Exhibit A, and by this reference, is incorporated herein. Following receipt of Bid Procedures Motion Approval, each of the parties hereto shall undertake and perform its obligations as and when required pursuant to the terms and conditions of this Agreement. The "Effective Date" of this Agreement shall mean the later of (a) the date hereof, and (b) the date that Bid Procedures Motion Approval has been obtained.

1.2    Sale Motion. Promptly following the Bid Procedures Motion Approval, the parties shall file with the Court a motion (the "Sale Motion"), in form and content acceptable to Bank and the Bank's title insurance company, in its and their sole, reasonable discretion, approving the sale of the ADV Assets (defined below) to Bank subject to the acceptance of the Accepted Bid, if any, from a Qualified Bidder pursuant to the Auction Sale Agreement (the "Sale Motion Approval"). The Sale Motion shall, among other things, provide for (a) the Court's finding that the Bank or the Accepted Bidder, as applicable, is a "good faith purchaser" within the meaning of 11 U.S.C. Section 363(m), (b) the Court's approval of the assumption by ADV, and the assignment to Bank or the Accepted Bidder (defined below, as applicable), of the Required Contracts and Optional Contracts (as defined and described in the Auction Sale Agreement and the ADV Purchase Agreement), and (c) the Court's approval of the sale of the ADV Assets, free and clear of all Encumbrances (as defined in the ADV Purchase Agreement, which is defined in the Auction Sale Agreement), including, without limitation, any and all restrictions, agreements, judgments, injunctions, orders, decrees, or awards that are binding upon ADV or the ADV Assets, including, without limitation, any covenant not to compete that limits or impairs any activity of the Business, any acquisition of property by the Business, or the overall conduct of the Business, and any Taxes (defined in the ADV Purchase Agreement), including, without limitation, all payroll, employment, sales, and income Taxes, except real property taxes and assessments attributable to the ADV Property, and sales taxes, if any, to the extent arising from the transactions being consummated pursuant to the ADV Purchase Agreement, and any liabilities, obligations, or commitments of any nature relating to the Business, and any successor liability that does, may, or could be attributed to Bank or the Accepted Bidder, as applicable, following the acquisition of the ADV Assets, whether any of the foregoing are known or unknown, absolute, accrued, contingent, matured, or unmatured, except to the extent that any of the foregoing are expressly assigned to, and assumed by the Bank or Accepted Bidder, as applicable, under the ADV Purchase Agreement. Any hearing related to the Sale Motion shall be continued until the conclusion of the Auction, at which time, the parties shall seek final approval by the Court of, as applicable, the sale of the Auctioned Property to the Accepted Bidder or the transfer of the

5

ADV Assets to Bank, pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement.

   1.3  Notice to Creditors. ADV shall provide notice of the Bid Procedures Motion and the Sale Motion as required by Bankruptcy Code, the Federal Rules of Bankruptcy Procedures, the Local Bankruptcy Rules, or as otherwise required by the Court; provided, however, that notwithstanding the foregoing, ADV shall provide notice of the Sale Motion by certified mail, return receipt requested, (a) to all parties that have recorded a lien or encumbrance on the ADV Property, and (b) to all parties that Bank's title insurance company requires such notice, and (c) to all federal, state, and local taxing authorities for which the Sale Motion Approval will eliminate successor liability, to Bank or the Accepted Bidder, as applicable, for Taxes due or owed by ADV. ADV represents and warrants to Bank that a true and complete list of the name and address of all known interested parties with respect to the ADV Bankruptcy, including, without limitation, all persons, entities, agencies, or organizations that hold, or purport to hold, any right, title, interest, claim to, or lien upon any of the ADV Assets, is set forth on Schedule 2, attached hereto and made a part hereof.

   1.4  Termination Right. If (a) the Court does not grant the Bid Procedures Motion Approval and/or the Sale Motion Approval, or (b) the Bid Procedures Motion Approval and/or Sale Motion Approval are granted and subsequently timely appealed, or (c) the sale of the ADV Assets to Bank, or the Auctioned Property to an Accepted Bidder, as applicable, is not, or, in Bank's reasonable determination, will not be, consummated by July 30, 2010 pursuant to the terms and conditions of this Agreement and the Auction Sale Agreement, Bank may, in its discretion, by written notice to ADV Parties terminate this Agreement, the Auction Sale Agreement, and any other written documents, instruments, and/or agreements entered into, or made in connection with, this Agreement and/or the Auction Sale Agreement.

  2.  Recitals. The Recitals set forth in this Agreement above are incorporated herein by this reference. ADV Parties, and each of them, represent and warrant to Bank that the information set forth in the each of the Recitals is true and complete, including, without limitation, the amounts set forth in paragraphs A.1.d, A.2.e, and A.4.e of the Recitals. Each of ADV Parties is in default of its obligations under the Loan Documents; provided, however, that ADV Parties' obligations under the $1MM Loan Documents are limited as provided by law with respect to the Non-Judicial Foreclosure. Except as specified herein, all of the terms and conditions of the Loan Documents, and each of them, shall remain in full force and effect.

  3.  Reaffirmation of Loan. This Agreement is, in part, a reaffirmation of the obligations by ADV Parties to Bank as evidenced by each of the Loan Documents to which each of the ADV Parties is a party. Accordingly, subject to the limitations provided by law of ADV Parties' obligations under the $1MM Loan following the Non-Judicial Foreclosure, (a) each of ADV Parties represents, warrants, covenants, and agrees that all of the terms and conditions of each of the Loan Documents to which it is a party is in full force and effect, without waiver or modification of any kind whatsoever, (b) each of the ADV Parties acknowledges that all amounts required to be paid under the Loan Documents are, and have been, due, and shall continue to be due notwithstanding the terms and provisions of this Agreement, and (c) ADV Parties further acknowledge that interest shall continue to accrue on any and all amounts outstanding as set forth in the Loan Documents, and ADV shall remain obligated to pay, and Guarantors shall be and remain obligated to guaranty the payment of, all such interest and principal amounts due as required under Loan Documents. Bank enters into

6

this Agreement without waiver of any term, covenant, or condition required to be performed or satisfied by ADV Parties, or any of them, pursuant to any of the Loan Documents and without waiver or release of any breach or default under the Loan Documents, or any rights or remedies of Bank with respect thereto.

4.      Auction Sale Agreement. On, before, or promptly following, the Effective Date, Bank and ADV Parties shall execute and deliver, and Bank shall cause KENNEDY WILSON AUCTION GROUP INC., a California corporation ("KW"), to execute and deliver, the Auction Sale Agreement.

5.      Conditions Precedent. The obligations of Bank hereunder are expressly conditioned upon the following having occurred, or Bank having received all of the following agreements, documents, and/or instruments, each in form and content satisfactory to Bank, in its reasonable discretion, opinion, and judgment, by no later than the Effective Date:

5.1      This Agreement, executed by each of the ADV Parties;

5.2      The Auction Sale Agreement, executed by each of the ADV Parties and KW; and

5.3      Such additional agreements, reports, approvals, instruments, documents, and consents as Bank may request, in its reasonable discretion, opinion, and judgment, in connection with this Agreement.

6.      Allocation of Proceeds.

6.1      Definitions. As used in this Agreement, the following terms shall have the following meanings:

(a)      "Accepted Bid Amount" shall have the meaning set forth in the Auction Sale Agreement.

(b)      "ADV Assets" shall have the meaning set forth in the Auction Sale Agreement.

(c)      "Auction" shall have the meaning set forth in the Auction Sale Agreement.

(d)      "Bank Breakup Fees" means the fees and costs owed to Bank's attorneys incurred in connection with the Bankruptcy on and after December 1, 2009, which include, without limitation, the fees and costs of Bank's attorneys incurred pursuant to the transactions set forth herein, the Auction Sale Agreement, and the Purchase Agreements. As of April 13, 2010, the Bank Breakup Fees are equal to approximately $23,000.

(e)      "Bank Credit Bid Amount" means Six Million One Hundred Thousand and No/100 Dollars ($6,100,000.00).

7

(f)    "Bank Property Costs" means all costs, expenses, and other amounts paid or incurred by Bank in connection with the Bank Property on and after December 1, 2009.

(g)    "Broker Fees" shall have the meaning set forth in the Auction Sale Agreement.

(h)    "Escrow Costs" means the amounts owed by Bank and ADV under the applicable Purchase Agreement to the applicable Escrow Agent (as defined in each Purchase Agreement).

(i)    "Minimum Overbid Amount" means the sum total of the following amounts:  (a) Bank Credit Bid Amount, (b) $2,600,000.00, (c) KW Fees, (d) Broker Fees, (e) Bank Breakup Fees, and (f) Bank Property Costs.

(j)    "KW Fees" means all amounts Bank has agreed to pay to KW in connection with the Auction pursuant to a written agreement, separate and apart from this Agreement, which are expected to be equal to the sum of the following amounts:

(i)    Actual third-party costs and expenses incurred by KW in connection with the marketing for the Auction, in accordance with a marketing budget approved by Bank, in its sole discretion, which costs and expenses shall not, in aggregate, exceed $30,500.00;

(ii)    A base fee in the amount of $125,000.00; and

(iii)    An incentive fee equal to either (A) 3% of the difference between the Accepted Bid Amount and $5,000,000.00 if an Accepted Bidder (as defined in the Auction Sale Agreement), other than Bank, purchases all of the Auctioned Property as described in this Agreement and the Auction Sale Agreement, or (B) $33,000.00 if Bank purchases the ADV Assets as described in this Agreement and the Auction Sale Agreement, which amount is equal to 3% of the difference between the Bank Credit Bid Amount and $5,000,000.00.

(k)    "Post-December Professional Fees" means the Professional Fees incurred from and after December 1, 2009.

(l)    "Pre-December Professional Fees" means the Professional Fees incurred after the petition date under the Bankruptcy and prior to December 1, 2009.

(m)    "Professional Fees" means the unpaid attorneys' fees and costs actually and reasonably charged by counsel to ADV in connection with the Bankruptcy, as approved by the Court.

(n)    "Property Taxes" means, collectively, (i) any and all general and special real property taxes and assessments (including, without limitation, delinquent, defaulted, and prorated taxes and assessments) levied against the Bank Property and ADV Property that are due or owed by the Bank and ADV Parties, respectively, under the applicable Purchase Agreement, and (ii) any sale and/or use taxes that are due or owed by ADV Parties under the ADV Purchase Agreement (as defined in the Auction Sale Agreement) in connection with the sale of the ADV Assets.

8

(o)     "Purchase Agreements" shall have the meaning set forth in the Auction Sale Agreement.

(p)     "Title Costs" means, collectively, (a) the amounts Bank and ADV Parties are required to pay under the Purchase Agreements to any title company or title insurance company, or otherwise with respect to any title policy or title endorsement, or in connection with the recordation of any agreements, documents, or instruments with respect to the Bank Property and ADV Property, less any credits applicable thereto received in connection with the payment of the Litigation Guaranty (defined below), plus (b) the amounts paid in consideration for any litigation guaranty (the "Litigation Guaranty") obtained from any title company or title insurance company in respect of litigation associated with the Bank Property and the ADV Property, including, without limitation, the Bankruptcy.

(q)     "Transfer Taxes" means any and all city and county documentary transfer taxes paid by Bank and ADV Parties under any Purchase Agreement in connection with the sale and transfer of any of the Real Property.

6.2     Bank As Purchaser.  As described in the Auction Sale Agreement, if either (a) none of the Bid Amounts (defined in the Auction Sale Agreement) is greater than the Minimum Overbid Amount, or (b) the Accepted Bidder (defined in the Auction Sale Agreement) does not purchase all of the Auctioned Property for any reason, other than a breach or default by Bank of the Bank Purchase Agreement (defined in the Auction Sale Agreement), then Bank shall purchase the ADV Assets pursuant to the ADV Purchase Agreement (as defined in the Auction Sale Agreement) by offsetting from the $6MM Loan an amount equal to the Bank Credit Bid Amount.  Any amounts paid as damages by the Accepted Bidder under either or both of the Purchase Agreements (including, without limitation, any liquidated damages) shall be paid and allocated to Bank and not considered a reduction in indebtedness owed by any of the ADV Parties.  In the event Bank purchases the ADV Assets as described in this Section 6.2, Bank shall be responsible to pay the KW Fees, Bank Breakup Fees, Title Costs, Escrow Costs, Transfer Taxes (to the extent owed), and the Professional Fees, subject to the limitations set forth in Section 6.4 of this Agreement.  Seller and ADV Parties acknowledge that Bank shall not pay, and shall purchase the ADV Assets subject to, all outstanding Property Taxes to the extent due and payable.

6.3     Third Party As Purchaser.  In connection with any Accepted Bidder purchasing the Auctioned Property, Bank and ADV Parties agree to divide, allocate, and pay the Accepted Bid Amount in the following manner and in the following order of priority:

(a)     All Escrow Costs and Title Costs arising from the Purchase Agreements shall be paid to the applicable Escrow Agents and Title Companies identified thereunder, and all Transfer Taxes shall be paid to the applicable public agencies; provided, however, that any of the foregoing amounts, or portions thereof, that have been paid in advance by Bank shall be paid to Bank..

(b)     Bank shall be paid an amount equal to (i) $6,100,000.00, which amount shall be allocated to a reduction in the indebtedness owed by ADV Parties under the $6MM Loan, plus (ii) $2,600,000.00, which amount shall be allocated to the sale of the Bank Property and

not credited as a reduction in indebtedness under any of the Loans, plus (iii) the Bank Breakup Fees, and plus (iv) the Bank Property Costs.

(c)    The KW Fees will be paid to KW; provided, however, that any portion of the KW Fees paid in advance by Bank shall be paid to Bank;

(d)    If applicable, the Broker Fees will be paid to the cooperating broker representing the Accepted Bidder, if any;

(e)    The "Remaining Amount," if any, equal to the Accepted Bid Amount less the amounts allocated and paid as described in Sections 6.3(a), 6.3(b), 6.3(c), and 6.3(d), above shall be divided and paid as follows:

(i)    Thirty percent (30%) of the Remaining Amount will be paid to Bank in consideration for the sale of the Bank Property. Such amounts shall not be considered a reduction in the indebtedness owed by ADV Parties to Bank. From the amounts received by Bank under this Section 6.3(e)(i), Bank shall be responsible to pay all Property Taxes attributable to the Bank Property; and

(ii)    Seventy percent (70%) of the Remaining Amount will be allocated to the sale of the ADV Assets, and shall be paid in the following order of priority: (A) first to the appropriate governmental agencies to pay all Property Taxes owed in connection with the sale of the ADV Assets; provided, however, that if the amounts allocated to this Section 6.3(e)(ii)(A) are insufficient funds to pay all Property Taxes owed in connection with the sale of the ADV Assets, then such Property Taxes shall be paid pursuant to Section 6.3(a) above, but only to the extent of such deficiency, (B) second to Bank as a reduction of indebtedness owed by the ADV Parties until Bank has been indefeasibly paid in full for all principal, interest, costs, expenses, and other amounts owed to Bank in connection with all of the Loans, and (C) third to the Bankruptcy estate as directed by the Court.

6.4    Professional Fees.

(a)    If Bank purchases the ADV Assets as described in Section 6.2 of this Agreement, Bank will pay the Post-December Professional Fees to the appropriate parties up to a maximum amount of $150,000.00.

(b)    If the Accepted Bidder purchases the Auctioned Property, Bank will pay the Post-December Professional Fees and twenty-five percent (25%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $150,000.00; provided, however, that if Bank has been indefeasibly paid in full with respect to all amounts owed under all of the Loans, as described in Section 6.3(e)(ii)(B) of this Agreement, then instead of the foregoing, Bank will pay the Post-December Professional Fees and seventy-five percent (75%) of the Pre-December Professional Fees, up to the aggregate, maximum amount of $200,000.00. For sake of clarity, all Professional Fees, including, but not limited to Pre-December Professional Fees and Post-December Professional Fees, must be approved by the Court. To the maximum extent possible, all amounts paid by Bank pursuant to this Section 6.4(b) shall be paid from the amounts allocated to the Bank Property as described in Section 6.3(e)(i) of this Agreement, and to the extent such amounts allocated to the Bank Property are insufficient, such amounts shall be paid by the Bank from its separate funds. At

10

Bank's election, Bank may pay the Professional Fees identified in this Section 6.4(b) directly from the Escrow identified and described in the Bank Purchase Agreement (defined in the Auction Sale Agreement).

(c)    If the Court does not grant the Bid Procedures Motion Approval and/or the Sale Motion Approval, Bank shall use commercially reasonable efforts to foreclose all of its security interest in and to the ADV Assets under applicable non-bankruptcy law in a commercially-reasonable period of time following the Bank's termination of this Agreement unless there is reasonable cause for Bank not to foreclose, including, by way of example but not limitation, the discovery of material environmental contamination on the ADV Property or the imposition of an stay or injunction prohibiting the Bank from doing so. Notwithstanding any provision of this Agreement, including Section 1.1 of this Agreement, provided (i) the ADV Parties, and their attorneys, have provided genuine cooperation and diligent, good faith, and best efforts to obtain the Bid Procedures Motion Approval and the Sale Motion Approval, and (ii) the ADV Parties, and their attorneys, have not directly, indirectly, or collusively interfered with the Bank's efforts to foreclose upon any of the ADV Assets, within ten (10) days following the completion of the foreclosure sales of the ADV Assets, Bank shall pay the Post-December Professional Fees to the appropriate parties up to a maximum amount of $100,000.00.

7.    Representations and Warranties. ADV Parties, and each of them, individually and collectively, jointly and severally, hereby make the following representations and warranties to Bank:

7.1    Each of the ADV Parties that is an entity has been duly formed under the state in which it was organized and is in good standing and qualified to conduct business in the State of California. Each person executing this Agreement in a representative capacity has been duly authorized and empowered to do so.

7.2    Subject to the Court granting the Bid Procedures Motion Approval and the Sale Motion Approval, ADV Parties, and each of them, have full legal right, power, and authority to enter into and perform its and their obligations under this Agreement and the Ancillary Documents (defined below). The execution and delivery of this Agreement and the Ancillary Documents by ADV Parties, and the consummation by ADV Parties of the transactions contemplated hereby and thereby, have been duly authorized by all necessary action by, or on behalf of, each of ADV Parties, and do not (a) require any consent or approval not heretofore obtained, (b) result in or require the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest, claim, charge, right of others, or any encumbrance of any nature, (c) violate any provision of any laws, or of any order, writ, judgment, injunction, decree, determination, or award, or (d) result in a breach of, or constitute a default under, or cause or permit the acceleration of any obligation owed under, or require any consent under, any indenture or loan or credit agreement, or any other agreement, lease, or instrument to which any of ADV Parties is a party or by which any of their property or assets is bound or affected. The Loan Documents constitute legal, valid, and binding obligations of ADV Parties enforceable in accordance with their terms. Subject to the execution by ADV Parties, and the Court granting the Bid Procedures Motion Approval, the Auction Sale Agreement, the ADV Purchase Agreement (as defined in the Auction Sale Agreement), and any and all financing statements, assignments, agreements, reports, approvals, instruments, documents, and consents made

11

in connection with and of the foregoing (collectively, the "Ancillary Documents"), constitute legal, valid, and binding obligations of ADV Parties enforceable in accordance with their terms.

7.3    ADV Parties have received independent legal advice from attorneys of their choice with respect to the advisability of executing this Agreement and the Ancillary Documents, and prior to the execution of this Agreement and the Ancillary Documents, their attorneys reviewed this Agreement and the Ancillary Documents and made all desired changes. This Agreement and the Ancillary Documents have been carefully read, the contents hereof are known and understood, and it is signed freely, by ADV Parties, and each of them.

7.4    Except as expressly set forth in this Agreement and any of the Ancillary Documents , neither Bank nor any other person or entity has made any statement, representation, or promise to ADV Parties, or any of them, regarding facts relied upon by any of them.

7.5    This Agreement and the releases contained herein are intended to be final and binding against ADV Parties, and ADV Parties acknowledge that Bank is expressly relying on the finality of this Agreement as a substantial, material factor to induce Bank to enter into this Agreement.

7.6    Other than the Bankruptcy, and the matters set forth on Schedule 1, attached hereto and made a part hereof, there are no actions, suits, or proceedings pending or, to the knowledge of any of ADV Parties, threatened, against or affecting any of ADV Parties in relation to its or their obligations to Bank, or involving the validity or enforceability of this Agreement, the Loan Documents, or the Ancillary Documents, or the ability of any of them to perform their obligations to Bank under this Agreement, the Loan Documents, or the Ancillary Documents, or the priority of any liens thereof, at law or in equity, or before or by any governmental entity.

7.7    Subject to the limitations imposed at law as a result of the Non-Judicial Foreclosure of the $1MM Loan, Bank's security interests in the ADV Property, and any and all other security for the obligations evidenced by this Agreement, the Loan Documents, and the Ancillary Documents, are valid, perfected, and are not subject to avoidance, elimination, or reduction in any manner whatsoever.

7.8    ADV Parties acknowledge and agree that any amounts advanced or paid by Bank to KW in connection with the Auction Sale Agreement, or otherwise in connection with the Auctioned Property, shall be an advance under the $6MM Loan, secured by the $6MM DOT, $6MM Assignment, $6MM Security Agreement, and all other security interest, pledges, grants, and assignments made for the benefit of Bank under the $6MM Loan Documents. ADV shall be obligated to pay such amounts to Bank pursuant to the terms and conditions of the $6MM Loan Documents. However, claims for such advances shall not be treated as an administrative claim in the Bankruptcy.

7.9    The representations, warranties, and agreements set forth herein shall be cumulative, and in addition to any and all other representations, warranties, and agreements which ADV Parties gave, or cause to be given, to Bank, either now or hereafter.

7.10    All covenants, representations, and warranties of ADV Parties herein are incorporated by reference and hereby made a part of the Loan Documents.

12

7.11    ADV is the sole owner of all right, title, and interest in and to all of the ADV Assets, and D. MacAdam, C. MacAdam, and Sweetwater have no right, title, or interest therein or thereto.

7.12    D. MacAdam, C. MacAdam, and Sweetwater each represent and warrant to Bank that he, she, or it has reviewed the representations and warranties being made by ADV in the ADV Purchase Agreement, and to the best of his, her, or its knowledge and belief, no representation or warranty made by ADV in the ADV Purchase Agreements is false or misleading in any material respect.

8.    <u>Reservation of Rights</u>.  Except as otherwise expressly provided in this Agreement, Bank specifically reserves all of its rights, interests, and remedies, regardless of whether such rights, interests, or remedies have been undertaken prior to the date hereof, or may be undertaken following the date hereof, at law and in equity, or otherwise, with respect to, in connection with, or relating to this Agreement, the Loan Documents, the Ancillary Documents, and any other agreements, instruments, facts, or matters pertaining or relating to any of the foregoing.  This reservation of rights is not intended, and shall not be construed, as exclusive.  Without limiting the generality of the foregoing, (a) Bank reserves all rights and remedies, and does not waive, and this Agreement shall not be deemed as a cure or waiver of, the Existing Defaults, (b) Bank shall not be required to take any action, or refrain from taking any action, in respect of the Bankruptcy, and (c) Bank shall not be restrained or prevented, or required to delay or refrain, from taking any action (or failing to take any action) with respect to (i) any matter related to any judicial or non-judicial foreclosure of any of the ADV Property, (ii) any foreclosure of any other collateral or security interest granted, pledged, assigned, or otherwise made under this Agreement or any of the Loan Documents, or (iii) any other right, interest, or remedy available to Bank under the Loan Documents, or otherwise at law or in equity, all such rights, interests, and remedies being expressly reserved hereby.

9.    <u>No Joint Venture, Management, or Control</u>.  Notwithstanding any provision of this Agreement, the Loan Documents, the Ancillary Documents, or the Purchase Agreements to the contrary:  (a) Bank is not, and shall not be, construed to be a partner, joint venture, alter ego, manager, controlling person, or other business associate or participant of any kind of ADV Parties, or any of them, or any other person or entity; (b) Bank shall not be deemed responsible to perform or participate in any acts, omissions, or decisions of ADV Parties, or any of them; and (c) ADV Parties do not have any claims, causes of action, or defenses to their obligations to Bank based on any allegations of management or control exercised by Bank.  Each of ADV Parties acknowledge and agree that Bank does not manage or control it in any way.

10.    <u>Release of Bank</u>.

10.1    Effective as of the Effective Date, and except for the obligations of Bank hereunder, ADV Parties, and each of them, each on behalf of itself, and each of its and their successors and assigns, and each of its and their past and present attorneys, accountants, representatives, affiliates, parents, partners, shareholders, officers, directors, managers, and employees (individually and collectively, "<u>Releasor</u>"), jointly and severally, shall and do hereby forever relieve, release, and discharge Bank, and its successors and assigns, and each of its and their past and present attorneys, accountants, representatives, affiliates, parents, partners, officers, directors, employees, managers, and shareholders (the "<u>Released Parties</u>") from any and all claims,

13

debts, liabilities, demands, obligations, promises, acts, agreements, costs and expenses (including, but not limited to, attorneys' fees), damages, injuries, actions, and causes of actions, of whatever kind or nature, whether legal or equitable, known or unknown, suspected or unsuspected, contingent or fixed, including, without limitation, by reason of any acts, facts, transactions, or any circumstances whatsoever occurring or existing through the date of this Agreement, including, but not limited to, those based upon, arising out of, appertaining to, or in connection with the Loan Documents, or the provisions of this Agreement, the Auction Sale Agreement, the Purchase Agreements, or the other Ancillary Documents, the facts pertaining to this Agreement, the Auction Sale Agreement, the Purchase Agreements, Loan Documents, or any of the other Ancillary Documents, any collateral granted to Bank in connection with Loan Documents, any other obligations of any of Releasor owed to Bank, or the lending arrangements between Bank and any Releasor.

10.2    Releasor, and each of them, expressly waive and release any right or benefit which it has, or may have, under Section 1542 of the California Civil Code, or any similar statute, code, law, and/or regulation of the United States, or any state thereof, to the full extent that it may waive all such rights and benefits pertaining to the matters released herein. Section 1542 of the California Civil Code provides as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

10.3    In connection with each such waiver and relinquishment set forth herein, Releasor, and each of them, acknowledge that it is aware that it may hereafter discover claims presently unknown or unsuspected, or facts in addition to, or different from, those which it now knows or believes to be true. Nevertheless, it is the intention of Releasor, and each of them, through this Agreement, to fully, finally, and forever release, waive, and relinquish all such matters, and all claims relative thereto, which now exist, may exist, or heretofore have existed. In furtherance of such intention, the releases herein given shall be and remain in effect as a full and complete release of such matters notwithstanding the discovery or existence of any such additional or different claims or facts relative thereto.

10.4    In entering into the release provided for in this Agreement, Releasor, and each of them, recognize that no facts or representations are ever absolutely certain, and Releasor, and each of them, assumes the risk of any mistake. If Releasor should subsequently discover that any understanding of the facts or of the law was incorrect, Releasor shall not be entitled to set aside this release by reason thereof, regardless of any mistake of fact or law.

10.5    Releasor, and each of them, is the sole and lawful owner of all right, title, and interest in and to every claim and other matter which it purports to release herein, and it has not assigned or transferred, or purported to assign or transfer, to any person or entity any claims or other matters herein released. Releasor, individually and jointly, shall and hereby does indemnify, defend, and hold the Released Parties harmless from and against any claims, liabilities, actions, causes of action, demands, injuries, damages, costs, and expenses (including, but not limited to, attorneys'

14

fees), based upon, or arising in connection with, any such prior assignment or transfer, or any such purported assignment or transfer, or any claims or other matters released herein.

11.   Intentionally Omitted.

12.   Miscellaneous.

12.1   No Waiver. This Agreement is not a novation, nor is it to be construed as a release or modification of any of the terms, conditions, warranties, waivers, or rights set forth in the Loan Documents, except as expressly set forth herein. No failure or delay on the part of Bank in the exercise of any right, power, or privilege hereunder, or under the documents or instruments referred to herein, shall operate as a waiver hereof or thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

12.2   Survival of Warranties. All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

12.3   Applicable Law. This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed in accordance with, the laws of the State of California. ADV Parties, and each of them, and Bank hereby submit to the jurisdiction of the Court regarding any disputes arising under this Agreement, the Auction Sale Agreement, the Purchase Agreements, and any Ancillary Documents.

12.4   Assignability. This Agreement shall be binding upon and inure to the benefit of Bank and ADV Parties, and their respective successors and assigns, except that none of ADV Parties' rights hereunder are assignable, and none of ADV Parties' obligations hereunder are delegable, without the prior written consent of Bank, which consent may be granted or withheld in Bank's sole and absolute discretion. If Bank assigns any of its rights hereunder, including, without limitation, in connection with the sale of the Loans, Bank shall require the assignee thereof (the "Bank Assignee") to assume the obligations of Bank hereunder. Following such assumption by the Bank Assignee, Bank shall be released from all of its obligations hereunder and all documents, instruments, and agreements executed in connection herewith, and ADV Parties shall look solely to Bank Assignee in respect of the obligations of Bank hereunder and all documents, instruments, and agreements executed in connection herewith.

12.5   Attorneys' Fees and Costs. The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

12.6   Modifications and Amendments. This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

12.7   Severability. If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable. This Agreement shall be construed and enforced as if such

15

illegal, invalid, or unenforceable provision never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision, or by severance from this Agreement.

      12.8    Acknowledgment of Waiver. The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing, and with an understanding of their significance and consequence, and that they are reasonable.

      12.9    Headings. The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

      12.10   Time of Essence. The parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

      12.11   Execution in Counterpart. This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.

      12.12   Conflict. To the extent that any term, provision, or condition of any of the Loan Documents conflicts with this Agreement, the term, provision, or condition of this Agreement shall control.

      12.13   Neutral Interpretation. This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

      12.14   WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION THEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY,

EXECUTION COPY

IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

_____    _____    _____
Bank Initials            ADV Initials        D. MacAdam Initials


_____    _____
C. MacAdam Initials    Sweetwater Initials

12.15  Notices.  Any notice required to be given hereunder shall be given at the address for each respective party as provided in the Loan Documents. Any notice given by U.S. mail shall be deemed given no later than three (3) days after placed in the U.S. mail; any notice given by facsimile, messenger, or hand delivery, when sent; and any notice by overnight mail service such as FedEx, the following day.

[SIGNATURE PAGE FOLLOWS]

17

IN WITNESS WHEREOF, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**ADV Parties:**

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Title: _____


_____
DONAL J. MACADAM, an individual


_____
CATHERINE P. MACADAM, an individual


SWEETWATER VINEYARDS, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

**BANK:**

WESTERN COMMERCIAL BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

18

**EXHIBIT A
TO AGREEMENT TO SELL PROPERTY**

**COURT APPROVAL**
[SEE ATTACHED]

1 | MARTIN J. BRILL (SBN 53220)
2 | TODD M. ARNOLD (SBN 221868)
  | LEVENE, NEALE, BENDER, RANKIN
3 |   & BRILL L.L.P.
  | 10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
  | Telephone: (310) 229-1234
5 | Facsimile: (310) 229-1244
  | Email: mjb@lnbrb.com, tma@lnbrb.com
6 |
7 | Counsel for Debtors and Debtors in Possession

```
                          FILED & ENTERED

                             MAY 14 2010

                        CLERK U.S. BANKRUPTCY COURT
                        Central District of California
                        BY williams  DEPUTY CLERK
```

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>AGUA DULCE VINEYARDS, LLC, a<br>California limited liability company,<br><br>           Debtor. | ) Lead Case No. 1:09-bk-15207-MT<br>) (Jointly Administered with Catherine P.<br>) MacAdam and Donal J. MacAdam – Case<br>) No. 1:09-bk-17476-MT)<br>)<br>) Chapter 11 Cases<br>) |
| In re<br><br>CATHERINE P. MACADAM and<br>DONAL J. MACADAM,<br><br>           Debtors. | )<br>) **ORDER (1) ESTABLISHING**<br>) **PROCEDURES FOR THE SALE OF**<br>) **ESTATE PROPERTY; AND (2)**<br>) **SETTING HEARING ON MOTION TO**<br>) **SELL ESTATE PROPERTY**<br>) |
| ☒ Affects All Debtors<br><br>☐ Affects Agua Dulce Vineyards, LLC only<br><br>☐ Affects Catherine P. MacAdam and<br>    Donal J. MacAdam only | )<br>) Hearing:<br>) Date:  May 3, 2010<br>) Time:  10:00 a.m.<br>) Place:  Courtroom "301"<br>)             21041 Burbank Boulevard<br>)             Woodland Hills, California 91367<br>)<br>)<br>)<br>) |

1

1    A hearing was held at the above-referenced date, time, and location to consider the

2  motion of Agua Dulce Vineyards, LLC, a California limited liability company, and Catherine P.

3  and Donal J. MacAdam, debtors and debtors in possession in the above-captioned, jointly

4  administered Chapter 11 cases ("Debtors"), for an order establishing the procedures for the sale

5  of substantially all of ADV's assets (the "Sale Procedures Motion"). Unless otherwise stated, all

6  capitalized terms herein shall have the same meanings as in the Sale Procedures Motion.

7  Appearances were made as set forth on the record of the Court.

8    Upon consideration of the Notice of the Sale Procedures Motion, the Sale Procedures

9  Motion, the memorandum of points and authorities, declaration, and exhibits in support of the

10  Sale Procedures Motion, the arguments and representations of counsel at the hearing on the Sale

11  Procedures Motion, the entire record in this case, and that there were no objections to the Sale

12  Procedures Motion, and for good cause shown,

13    **IT IS HEREBY ORDERED AS FOLLOWS:**

14    (1)    Notice of the Sale Procedures Motion was adequate and appropriate and complied

15  with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local

16  Bankruptcy Rules;

17    (1)    The Sale Procedures Motion is hereby granted in its entirety;

18    (2)    The sale procedures set forth in the Sale Procedures Motion are hereby approved;

19    (3)    The Debtors are hereby authorized to conduct the sale of the Assets as set forth in

20  the Sale Procedures Motion, provided, however, that such sale of the Assets shall be subject to a

21  further motion of the Debtors to approve, among other things, the sale of the Assets to the Bank

22  or a successful overbidder, the assumption and assignment of certain executory contracts and

23  unexpired leases to the Bank or a successful overbidder, and, to the extent necessary, the

24  employment and payment of Kennedy Wilson Auction Group, Inc. and any cooperating broker

25  in conjunction with the sale of the Assets (the "Sale Motion") and an order or orders of the Court

26  thereon; and

27

28

2

1    (4)    The Court shall hold a hearing to consider the Sale Motion on June 14, 2010, at

2    11:00 a.m., at the above-referenced location.

3    **IT IS SO ORDERED.**

4    *###*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    DATED: May 14, 2010

27                                United States Bankruptcy Judge

28

3

| In re:<br>AGUA DULCE VINEYARDS, LLC<br><br>Debtor(s). | CHAPTER  11<br><br>Lead Case No. 1:09-bk-15207-MT (Jointly Administered with  Catherine P.<br>MacAdam and Donal J. MacAdam – Case No. 1:09-bk-17476-MT) |
|---|---|

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Boulevard, Suite 1700, Los Angeles, California 90067

The foregoing document described as **ORDER (1) ESTABLISHING PROCEDURES FOR THE SALE OF ESTATE PROPERTY; AND (2) SETTING HEARING ON MOTION TO SELL ESTATE PROPERTY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____, ____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):** On May 11, 2010, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**Via Overnight Mail**
Hon. Maureen Tighe
United States Bankruptcy Court
Central District of California
21041 Burbank Blvd., Ctrm 302
Woodland Hills, CA  91367

**Via U.S. Mail**
Kennedy Wilson
9701 Wilshire Blvd. Suite 700
Beverly Hills, CA 90212

☐ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 11, 2010 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.
January 2009                                                                                                    **F 9013-3.1**

4

| In re:<br>AGUA DULCE VINEYARDS, LLC<br><br>                                    Debtor(s). | CHAPTER   11<br><br>Lead Case No. 1:09-bk-15207-MT (Jointly Administered with  Catherine P.<br>MacAdam and Donal J. MacAdam – Case No. 1:09-bk-17476-MT) |
|---|---|

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled **ORDER (1) ESTABLISHING PROCEDURES FOR THE SALE OF ESTATE PROPERTY; AND (2) SETTING HEARING ON MOTION TO SELL ESTATE PROPERTY** was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. <u>SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of May 11, 2010, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

    * Melody G Anderson    manderson@hemar.com
    * Todd M Arnold    tma@lnbrb.com
    * Martin J Brill    mjb@lnbrb.com
    * Katherine Bunker    kate.bunker@usdoj.gov
    * Lesley A Hawes    lhawes@mckennalong.com, pcoates@mckennalong.com
    * Kenneth N Russak    krussak@frandzel.com, banderson@frandzel.com;efiling@frandzel.com
    * Ramesh Singh    claims@recoverycorp.com
    * United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

                                        ☐  Service information continued on attached page

**II. <u>SERVED BY THE COURT VIA U.S. MAIL</u>:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

                                        ☐  Service information continued on attached page

**III. <u>TO BE SERVED BY THE LODGING PARTY</u>:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

                                        ☐  Service information continued on attached page

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                          **F 9021-1.1**

Case 1:09-bk-15207-MT    Doc 142    Filed 05/16/10    Entered 05/16/10 22:05:56    Desc
Imaged Certificate of Service    Page 6 of 6

# CERTIFICATE OF NOTICE

District/off: 0973-1          User: admin          Page 1 of 1          Date Rcvd: May 14, 2010
Case: 09-15207               Form ID: pdf031       Total Noticed: 11

The following entities were noticed by first class mail on May 16, 2010.
db        +Agua Dulce Vineyards, LLC,   9640 Sierra Highway,   Santa Clarita, CA 91390-4622
aty       +Katherine Bunker,   21051 Warner Center Lane Ste 115,   Woodland Hills, CA 91367-6550
aty       +Kenneth N Russak,   6500 Wilshire Blvd 17th Fl,   Loa Angeles, CA 90048-4904
aty       +Lesley A Hawes,   300 S Grand Ave 14th Fl,   Los Angeles, CA 90071-3124
aty       +Martin J Brill,   10250 Constellation Blvd Ste 1700,   Los Angeles, CA 90067-6253
aty       +Melody G Anderson,   Law Offices of Hemar & Associates,   2001 Wilshire Blvd #300,
           Santa Monica, CA 90403-5683
aty       +Natalia Minassian,   16633 Ventura Blvd Ste 940,   Encino, CA 91436-1854
aty       +Todd M Arnold,   Levene, Neale, Bender, Rankin & Bri,   10250 Constellation Blvd Ste 1700,
           Los Angeles, CA 90067-6253
ust       +United States Trustee (SV),   21051 Warner Center Lane, Suite 115,
           Woodland Hills, CA 91367-6550
cr        +Western Commercial Bank,   c/o Frandzel Robins Bloom & Csato, L.C.,   ATTN:  Kenneth N. Russak,
           6500 Wilshire Blvd.,   17th Floor,   Los Angeles, CA 90048-4904
The following entities were noticed by electronic transmission on May 15, 2010.
aty       +E-mail/PDF: rmscedi@recoverycorp.com May 15 2010 01:36:17     Ramesh Singh,
           Recovery Management Systems Corp,   25 S E 2nd Ave Ste 1120,   Miami, FL 33131-1605
                                                                                    TOTAL: 1

          ***** BYPASSED RECIPIENTS (undeliverable, * duplicate) *****
cr         Associated Winery Systems, a California Corporatio
intp       Courtesy NEF
cr         Merchant eSolutions, Inc.
br         Re/Max of Valencia
acc        Stein & Company
sp         William A Soroky
aty*      +Martin J Brill,   10250 Constellation Blvd Ste 1700,   Los Angeles, CA 90067-6253
                                                                            TOTALS: 6, * 1

Addresses marked '+' were corrected by inserting the ZIP or replacing an incorrect ZIP.
USPS regulations require that automation-compatible mail display the correct ZIP.

I, Joseph Speetjens, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.

Meeting of Creditor Notices only (Official Form 9): Pursuant to Fed. R. Bank. P. 2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed.  This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.

Date: May 16, 2010                    Signature:    Joseph Speetjens

**EXHIBIT B
TO AGREEMENT TO SELL PROPERTY**

**AUCTION SALE AGREEMENT**
[SEE ATTACHED]

## AUCTION SALE AGREEMENT

This AUCTION SALE AGREEMENT ("Agreement") is made this _____ day of May, 2010 ("Effective Date"), by and among (a) WESTERN COMMERCIAL BANK, a California banking corporation ("Bank"), (b) AGUA DULCE VINEYARDS LLC, a California limited liability company ("ADV"), DONAL J. MACADAM, an individual ("D. MacAdam"), CATHERINE P. MACADAM, an individual ("C. MacAdam"), and SWEETWATER VINEYARDS, LLC, a California limited liability company ("Sweetwater", and together with ADV, D. MacAdam, and C. MacAdam, individually and collectively, "ADV Parties"), and (c) KENNEDY WILSON AUCTION GROUP INC., a California corporation ("KW"), with respect to the following facts:

## RECITALS

A.    ADV is the owner of that certain business which, among other things, consists of a winery, vineyard, and gift shop (the "Business") located at or near 9640 Sierra Highway, Agua Dulce, California, as further described in the ADV Purchase Agreement (defined below) (the "ADV Property").

B.    ADV, D. MacAdam, and C. MacAdam are the debtor in those certain bankruptcy proceedings, styled as *In re Agua Dulce Vineyards, LLC, a California limited liability company*, Case No. 1:09-bk-15207-MT, and *In re Catherine P. MacAdam and Donal J. MacAdam*, Case No. 1:09-bk-17476-MT (collectively, the "Bankruptcy"), filed in the United States Bankruptcy Court, Central District of California, San Fernando Valley Division (the "Court").

C.    Bank is a secured creditor in the Bankruptcy, having heretofore made four separate loans (collectively, the "Loans") to ADV, as further described in that certain Agreement To Sell Property and Assets, dated May _____, 2010, by and between Bank and ADV Parties (the "Agreement To Sell Property And Assets").

D.    Bank is the grantee under that certain Trustee's Deed Upon Sale, dated September 28, 2009, and recorded on October 8, 2009, in the Official Records of Los Angeles County, California, as Instrument Number 2009-1532940 ("Trustee's Deed"), with respect to that certain vacant land described in the Bank Purchase Agreement (defined below) (the "Bank Property" and together with the ADV Property, the "Real Property").

E.    KW provides brokerage and auction services in connection with sale and auctioning of real property and other assets.

F.    In an effort to resolve Bank's claims in the Bankruptcy, and to maximize the value received from the sale of the Auctioned Property (defined below), Bank and ADV Parties have agreed, pursuant and subject to the terms and conditions of this Agreement, (i) to jointly offer, with the assistance of KW, the Auctioned Property for sale to Qualified Bidders (defined below), and (ii) if no Qualified Bids (defined below) are received for the Auctioned Property in excess of the Minimum Overbid Amount (defined below), Bank shall purchase the ADV Assets from ADV pursuant to the terms and conditions of the ADV Purchase Agreement (defined below).

## AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

1.1    "Accepted Bid" means the Bid accepted by Bank and ADV Parties to purchase the Auctioned Property pursuant to the Auction.

1.2    "Accepted Bid Amount" means the Bid Amount of the Accepted Bid.

1.3    "Accepted Bidder" means the Qualified Bidder that made the Accepted Bid.

1.4    "ADV Assets" means all Assets (as defined in the ADV Purchase Agreement) of ADV Parties being sold, assigned, and conveyed under the ADV Purchase Agreement.

1.5    "ADV Purchase Agreement" means that certain Asset Purchase Agreement and Joint Escrow Instructions [Agua Dulce Vineyards], attached hereto as Exhibit C, and made a part hereof.

1.6    "Auction" means the terms, conditions, and procedures describing and governing the purchase and sale of the Auctioned Property pursuant to a sealed-bid and live auction, in compliance with the terms and conditions of this Agreement and all other agreements related hereto and/or referenced herein.

1.7    "Auction Estimate Range" shall mean $10,000,000 to $15,000,000, which is the range of prices agreed to by the parties that KW will disclose to the Potential Bidders as the estimated range of prices for the Auctioned Property.

1.8    "Auctioned Property" means, collectively, the Bank Property and the ADV Assets.

1.9    "Bank Credit Bid Amount" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.10    "Bank Property" means all of the real and personal property of Bank being sold, assigned, and conveyed under the Bank Purchase Agreement.

1.11    "Bank Purchase Agreement" means that certain Purchase and Sale Agreement and Joint Escrow Instructions [Western Commercial Bank Property], attached hereto as Exhibit B, and made a part hereof.

1.12    "Bid" means a sealed, written bid from a Qualified Bidder offering to purchase the Auctioned Property pursuant to the terms and conditions of the Auction, together with (a) such written documentation demonstrating that the Person submitting the Bid is a Qualified Bidder, and (b) two (2) originals of both Purchase Agreements, executed by the Qualified Bidder,

containing any modifications or comments to any Purchase Agreement, if any. A Bid, if selected as the Accepted Bid, shall be paid in cash or other immediately available federal funds, in accordance with the Bank Purchase Agreement and the ADV Purchase Agreement.

1.13    "Bid Amount" means the amount that a Qualified Bidder offers to pay to purchase the Auctioned Property pursuant to its Bid.

1.14    "Bid Submission Date" means the date that is the first Business Day following the expiration of the Marketing Period.

1.15    "Broker Fees" means amounts owed to any cooperating broker that represents the Accepted Bidder; provided, however, that (a) no Broker Fees shall be paid unless the Accepted Bidder actually purchases all of the Auctioned Property pursuant to the Purchase Agreements, and (b) the total amount of the Broker Fees shall not exceed one and one-half percent (1.5%) of the Accepted Bid Amount.

1.16    "Business Day" means any day other than a Saturday, Sunday, or a California or federal holiday.

1.17    "Due Diligence and Confidentiality Agreement" means that certain form of Due Diligence and Confidentiality Agreement, attached hereto as Exhibit D, and made a part hereof.

1.18    "Escrow Agent" means the escrow officer identified in each Purchase Agreement.

1.19    "KW Fees" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.20    "Marketing Period" shall mean the time period commencing as soon as possible following the date hereof, but in no event later than May 13, 2010 and continuing until June 24, 2010.

1.21    "Minimum Overbid Amount" shall have the meaning set forth in the Agreement To Sell Property And Assets.

1.22    "Notice of Offering Letter" shall mean a letter to Potential Bidders prepared by KW, and approved by Bank and ADV Parties, describing the sale of the Auctioned Property, the procedures for the Auction, and the Auction Estimate Range. In the event of any inconsistencies between the provisions of the Notice of Offering Letter and this Agreement, the provisions of this Agreement shall control.

1.23    "Person" means an individual, corporation, limited liability company, partnership, joint venture, trust, or unincorporated organization.

1.24    "Potential Bidders" means any Person that is interested, or may be interested, in submitting a Bid under the Auction.

1.25    "Property Information" means all agreements, instruments, reports, analysis, studies, statements, explanations, documents, and other written information (including, without limitation, such information described on Exhibit E, attached hereto and made a part hereof), to the extent such information is the in possession of the parties hereto, with respect to the Auctioned Property made available to Potential Bidders that have executed a Due Diligence and Confidentiality Agreement during the Marketing Period and Bank.

1.26    "Purchase Agreement" means, individually and collectively, the Bank Purchase Agreement and the ADV Purchase Agreement.

1.27    "Qualified Bidder" shall mean a Person, other than Bank, that:

(a)    Has submitted a Bid to purchase the Auctioned Property pursuant to the Auction;

(b)    Has provided reasonably-detailed, credible, written evidence verifying its ability to pay the applicable Bid Amount, in cash or other immediately available funds, which such evidence may include, without limitation, (i) statements of third-party deposit account balances showing readily-available, liquid funds in the excess of the Bid Amount, (ii) letters of credit or unconditional commitment letters from banks, credit unions, or other financial institutions, and/or (iii) other written information demonstrating that the Qualified Bidder has the financial ability to pay the Bid Amount pursuant to the Purchase Agreements; and

(c)    Is otherwise ready, willing, and permitted to purchase the Auctioned Property pursuant to the Purchase Agreements.

1.28    "Seller" means, individually and collectively, Bank, with respect to the Bank Purchase Agreement, and ADV Parties, with respect to the ADV Purchase Agreement.

2.    Property Information.

2.1    Property Information. Commencing prior to the date hereof, and continuing from time to time until the Bid Submission Date, Bank shall, with respect to the Bank Property, and ADV Parties shall, with respect to the ADV Assets, each at their own cost, deliver the Property Information to KW, and otherwise assist KW in collecting such Property Information as KW reasonable determines to be necessary to conduct the Auction. Without limiting the generality of the foregoing, during the Marketing Period, ADV shall reasonably cooperate with KW to provide updated financial information with respect to the ADV Assets for release and distribution to Potential Bidders and Bank.

2.2    Contracts. Commencing on or before the Effective Date, and continuing through the Marketing Period, ADV Parties shall permit Bank and Potential Bidders to contact all counterparties to, and otherwise make available to Bank and Potential Bidders such information with respect to, any and all Contracts (as defined in the ADV Purchase Agreement) for purposes of, among other things, (a) determining and/or confirming the terms and conditions of such Contracts, including, but not limited to, any limitations with respect to the assignment of such Contracts, (b) identifying any breaches or defaults, and the requirements to cure any breaches or defaults, under the Contracts, (c) negotiating terms upon which the assignment and/or assumption of the Contracts shall

occur, and (d) otherwise determining the value and benefit of such Contracts to Bank and the Potential Bidders. In connection with the foregoing, following the Effective Date, Bank shall determine, in Bank's sole and absolute discretion, (i) which, if any, Contracts Bank will take an assignment from ADV Parties if Bank purchases the ADV Assets as described in Section 5.2 of this Agreement ("Bank Assumed Contracts"), and (ii) what amounts, if any, Bank will pay to cure any breaches or defaults by any of the ADV Parties under the Bank Assumed Contracts. All Bank Assumed Contracts, and all amounts Bank has agreed to pay to cure any breaches or defaults thereunder, shall be set forth on Schedule 2 attached to the ADV Purchase Agreement. All Potential Bidders shall be required to assume the Bank Assumed Contracts, and pay the amounts that Bank has elected to pay to cure any breaches or defaults thereunder. Bank and/or Potential Bidders shall be permitted to enter into written agreements with the counterparties to the Contracts (including, without limitation, the Bank Assumed Contracts) with respect to the matters described in this Section 2.2. Any assumption and assignment of the Bank Assumed Contracts or other Contracts shall be subject to the Sale Motion Approval, as defined and described in the Agreement To Sell Property And Assets.

2.3     Other Liens. Commencing on or before the Effective Date, ADV Parties shall notify Bank of all Persons other than Bank (the "Other Lienholders") that hold any liens, encumbrances, pledges, collateral assignments, and/or security interests, including, without limitation, pursuant to the Uniform Commercial Code (the "Other Liens"), with respect to any of the ADV Assets, including, without limitation, with respect to any equipment owned or leased by any of the ADV Parties. ADV Parties hereby authorize Bank to contact the Other Lienholders, and Bank may, at its option and in its sole and absolute discretion, negotiate and/or reach an agreements (each a "Lien Agreement") with any of the Other Lienholder with respect to the disposition of any of the Other Liens, subject to the condition that Bank acquires the ADV Assets as described in Section 5.2 of this Agreement, and provided that such Lien Agreement does not create any new claim against, or obligation for, the ADV Parties or the Bankruptcy estates. Bank may, in its discretion, make the Potential Bidders the beneficiaries of all rights of Bank under any of the Lien Agreements subject to the condition that a Potential Bidder is the Accepted Bidder and purchases all of the Auctioned Property as described in Section 5.1 of this Agreement, in which event Bank may make the applicable Lien Agreements available to Potential Bidders as a Property Information hereunder.

2.4     Future Services. As part of the Property Information, ADV Parties may, in its or their discretion, make written offers to (a) provide consulting and/or employment services to the Accepted Bidder following the sale of the Auctioned Property, and/or (b) lease some or all of the Real Property from the Accepted Bidder following the consummation of the sale of the Auctioned Property; provided, however, that (i) no Potential Bidder shall be obligated to accept any such offer of consulting or employment services from, or lease any of the Real Property to, any of the ADV Parties as a condition to making its Bid, and (ii) KW shall inform the Potential Bidders that the acceptance or rejection, in whole or in part, of any such offer of consulting or employment services or lease shall have no bearing on whether any Bid is accepted as the Accepted Bid.

2.5     Estoppel Certificates.

(a)     Bank and ADV Parties shall cause all Persons (other than the ADV Parties) that lease, license, rent, or otherwise occupy or use any portion of the Auctioned Property ("Tenants") to execute, and deliver as Property Information hereunder, an estoppel certificate

acknowledging that that such Tenant's rights to occupy and/or use the Auctioned Property shall terminate thirty (30) calendar days following the effective dates of the Purchase Agreements (as applicable), unless otherwise agreed by Bank or the Accepted Bidder, in the event that Bank or the Accepted Bidder, respectively, purchases the ADV Assets or Auctioned Property, respectively, pursuant to Section 5 of this Agreement.

      (b)    ADV Parties shall execute, and deliver as Property Information hereunder, an estoppel certificate acknowledging that all of their rights to occupy and/or use the Auctioned Property shall terminate ninety (90) calendar days following the effective date of the Purchase Agreements (as applicable), unless otherwise agreed by Bank or the Accepted Bidder, in the event that Bank or the Accepted Bidder, respectively, purchases the ADV Assets or Auctioned Property, respectively, pursuant to Section 5 of this Agreement.

      (c)    All estoppel certificates to be executed and delivered pursuant to this Section 2.5 shall be in form and content acceptable to Bank, in its reasonable opinion and judgment.

      3.    <u>Marketing Period</u>.

      3.1    <u>Solicitation Efforts</u>.  The parties desire to solicit as many Potential Bidders, and to receive as many Bids, to purchase the Auctioned Property as possible.  Accordingly, during the Marketing Period, KW will undertake the following:

      (a)    Deliver the Notice of Offering Letter to as many Potential Bidders as possible;

      (b)    List and advertise the Auctioned Property for sale at the Auction Estimate Range of prices on various internet sites, and with various brokerage and/or listing services, that list and offer for sale real property and assets, similar to the Auctioned Property; and

      (c)    Submit advertisements for the sale of the Auctioned Property at the Auction Estimate Range of prices in various trade or industry newspapers and other print media.

      At the request of Bank or ADV Parties, KW shall provide a description of the individuals and entities solicited with respect to the sale of the Auctioned Property during the Marketing Period.

      3.2    <u>KW Assistance</u>.  KW shall provide reasonable assistance to Potential Bidders to enable such Potential Bidders to review, inspect, and evaluate the Auctioned Property during the Marketing Period  Without limiting the generality of the foregoing, during the Marketing Period, KW shall:

      (a)    Make the Property Information available to such Potential Bidders that have completed, executed, and delivered to KW a Due Diligence and Confidentiality Agreement and to Bank;

      (b)    Coordinate with Bank and ADV Parties to permit Potential Bidders to access the Real Property and the ADV Assets for purposes of conducting site visits; and

(c)    Receive written questions from the Potential Bidders with respect to the Auctioned Property and the Auction, seek answers to the same from Bank and ADV Parties, and provide written answers to such questions, as approved by Bank and ADV Parties, to all Potential Bidders.

4.    Bids.

4.1    Receipt. KW will require all Potential Bidders to submit their Bids to KW on or before the Bid Submission Date, time being of the essence with respect thereto. KW may, in its reasonable discretion, (a) advise Qualified Bidders, who submit Bids prior to the Bid Submission Date with Bid Amounts that are less than the Minimum Overbid Amount, that such Bid Amounts are less than the Minimum Overbid Amount and will not be accepted, and that a higher amount may be submitted prior to the Bid Submission Date, and (b) extend the Bid Submission Date for any Bid that is not received by the Bid Submission Date if the reason for such failure was beyond the reasonable control of the applicable Potential Bidder.

4.2    Qualification. KW shall review each Bid to determine if the Person submitting the Bid is a Qualified Bidder. If, in KW's reasonable determination, the Person submitting the Bid appears to be a Qualified Bidder, but failed to provide adequate written evidence of its qualifications, KW may notify such Person and provide a one-time opportunity to submit additional information demonstrating that it is a Qualified Bidder. KW acknowledges that the Bank and ADV Parties consider the prompt payment of the Accepted Bid Amount, in cash or other immediately available funds, under each Purchase Agreement to be a critical component of the Auction, and accordingly, KW agrees to carefully inspect and review the financial qualifications of each Person submitting a Bid under the Auction. Bids from all Persons that are not Qualified Bidders shall be set aside and not evaluated or considered further in the Auction.

4.3    Bids.

(a)    KW Review. KW shall review and evaluate the Bids submitted by Qualified Bidders under the Auction, and provide a summary and analysis of the same to Bank and ADV Parties within one (1) Business Day after the Bid Submission Date.

(b)    PSA Comments. If as part of its Bid, any Qualified Bidder requests any insertions, deletions, or other modifications to either Purchase Agreement ("PSA Comments"), such Bid shall be considered non-conforming, unless and until such PSA Comments are approved by the applicable Seller. At the request of the applicable Seller, KW shall notify the Qualified Bidder as to which PSA Comments, if any, are approved by the applicable Seller and permit the Qualified Bidder to revise, amend, or withdraw its Bid with respect thereto.

(c)    Accepted Bid. Bank and ADV Parties shall review the summary of the Bids prepared by KW. Unless Bank and ADV Parties otherwise agree, and direct KW, in writing to the contrary:

(i)    If only one (1) Qualified Bidder submits a Bid in excess of the Minimum Overbid Amount, then such Bid shall be deemed the Accepted Bid.

(ii)    If more than one Qualified Bidder submit Bids in excess of the Minimum Overbid Amount, then following Bank's and ADV Parties' review of the submitted Bids, Bank and ADV Parties shall, within three (3) calendar days following the Bid Submission Date, hold a live auction for the Auctioned Property (the "Live Auction").  In respect of the Live Auction, (A) all Qualified Bidders that submitted Bids in excess of the Minimum Overbid Amount shall be invited to participate in the Live Auction, (B) the Live Auction shall be conducted and officiated by KW, unless given the small number of participants, Bank and ADV Parties agree that KW's services shall not be required for the Live Auction, (C) the Live Auction shall be held at the location agreed upon by Bank and ADV Parties, with the Court, the ADV Property, and the offices of the ADV Parties' attorneys being approved locations for the Live Auction, and (D) all other matters with respect to the Live Auction shall be agreed to by Bank and ADV Parties, with the advice and input from KW.  The Qualified Bidder submitting the highest Bid Amount in excess of the Minimum Overbid Amount at the Live Auction shall be the Accepted Bid.

(iii)    Notwithstanding any provision of this Agreement to the contrary, if none of the Bid Amounts submitted by Qualified Bidder is greater than the Minimum Overbid Amount, then no Bid shall be selected as the Accepted Bid, and Bank shall purchase the ADV Assets as described in Section 5.2 of this Agreement.

5.    Sale of Auctioned Property.

5.1    Sale to Accepted Bidder.  If an Accepted Bidder is identified pursuant to Section 4 of this Agreement, following all requisite approval by the Court, each Seller shall promptly sign and date the applicable Purchase Agreement submitted by the Accepted Bidder, deliver the same to Escrow Agent, and consummate the sale of the Auctioned Property pursuant to the terms and conditions of the Purchase Agreements.  The Accepted Bid Amount shall be divided, allocated, and paid pursuant to Section 6 of the Agreement To Sell Property And Assets.

5.2    Sale to Bank.  If no Accepted Bidder is identified pursuant to Section 4 of this Agreement, or if an Accepted Bidder does not purchase all of the Auctioned Property for any reason, other than a breach or default of the Bank Purchase Agreement by Bank, (a) Bank shall continue to own, and not sell, the Bank Property, and (b) Bank and ADV Parties shall enter into the ADV Purchase Agreement, and consummate the transfer and sale of the ADV Assets to Bank pursuant to the terms and conditions of the ADV Purchase Agreement for a purchase price equal to the Bank Credit Bid Amount.  For sake of clarity, and as set forth in the ADV Purchase Agreement, Bank shall not make a payment of the Bank Credit Bid Amount to ADV Parties under the ADV Purchase Agreement, but instead, Bank shall offset the Bank Credit Bid Amount from amounts owed by ADV Parties to Bank under the Loans effective as of the date Bank takes title to the ADV Assets.

6.    Intentionally Omitted.

7.    Miscellaneous.

7.1    No Waiver.  No failure or delay on the part of any party in the exercise of any right, power, or privilege hereunder, or under the documents or instruments referred to herein, shall operate as a waiver hereof or thereof, and no single or partial exercise of any such power, right, or privilege shall preclude a further exercise of any right, power, or privilege.

      7.2     <u>Survival of Warranties</u>.  All agreements, representations, and warranties made herein shall survive the execution and delivery of this Agreement.

      7.3     <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties hereto shall be governed by, and construed in accordance with, the laws of the State of California. ADV Parties, and each of them, Bank, and KW hereby submit to the jurisdiction of the Court regarding any disputes arising under this Agreement.

      7.4     <u>Assignability</u>.  This Agreement shall be binding upon and inure to the benefit of Bank, ADV Parties, KW, and their respective successors and assigns; provided, however, that no party hereto may assign any rights, or delegate any obligations, to any other person or entity without the prior, written consent of the other parties.

      7.5     <u>Attorneys' Fees and Costs</u>.  The prevailing party in any action or proceeding to interpret or enforce this Agreement, or any of its terms, shall be entitled, in addition to any judgment or award upon such action or proceeding, to an award for all costs and expenses (including costs of all legal or administrative proceedings or hearings and attorneys' fees) incurred by such prevailing party or parties, including, without limitation, all attorneys' fees and related costs of enforcement of any such judgment or award and upon any appeal relating thereto.

      7.6     <u>Modifications and Amendments</u>.  This Agreement may be modified or amended only by written agreement duly executed by the parties to this Agreement.

      7.7     <u>Integration</u>.  This Agreement constitute the entire agreement of the parties hereto relative to the subject matter hereof. No covenants, agreements, representations, or warranties of any kind whatsoever have been made by any party hereto with respect to the subject matter hereof, except as specifically set forth in this Agreement.

      7.8     <u>Severability</u>.  If any provision of this Agreement is found to be illegal, invalid, or unenforceable under present or future laws effective during the term of this Agreement, such provisions shall be fully severable.  This Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision never comprised a part of this Agreement, and the remaining provisions of this Agreement shall remain in full force and effect, and shall not be affected by the illegal, invalid, or unenforceable provision, or by severance from this Agreement.

      7.9     <u>Acknowledgment of Waiver</u>.  The parties represent and warrant that all of the waivers, warranties, and promises set forth in this Agreement are made after an opportunity to consult with legal counsel of their choosing, and with an understanding of their significance and consequence, and that they are reasonable.

      7.10    <u>Headings</u>.  The headings of Sections of this Agreement are inserted solely for the convenience of reference and are not a part of, and are not intended to govern, limit, or aid in the construction or interpretation of, any term or provision hereof.

      7.11    <u>Time of Essence</u>.  The parties hereto expressly acknowledge and agree that time is of the essence and that all deadlines and time periods provided for under this Agreement are ABSOLUTE AND FINAL.

7.12    Execution in Counterpart. This Agreement may be executed and delivered in two or more counterparts, each of which, when so executed and delivered, shall be an original, and such counterparts together shall constitute but one and the same instrument and agreement, and the Agreement shall not be binding on any party until all parties have executed it.

7.13    Neutral Interpretation. This Agreement is the product of negotiations of the parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to construction or interpretation for or against any party by reason of that party having drafted, or caused to have drafted, this Agreement, or any portion thereof, shall not be effective in regard to the interpretation hereof.

7.14    WAIVER OF RIGHT TO TRIAL BY JURY; JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (1) ARISING UNDER THIS AGREEMENT, OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR (2) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THIS AGREEMENT OR ANY OTHER INSTRUMENT, DOCUMENT, OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION    SHALL    BE    DECIDED    BY    COURT    TRIAL    WITHOUT    A JURY. NOTWITHSTANDING THE FOREGOING TO THE CONTRARY, IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH PARTY HERETO HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, THE PARTIES AGREE TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE THEIR BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES ARE UNABLE TO AGREE ON A SINGLE REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON; PROVIDED, HOWEVER, THAT ANY MATTERS WHICH WOULD NOT OTHERWISE BE THE SUBJECT OF A JURY TRIAL WILL BE UNAFFECTED BY THIS WAIVER AND THE AGREEMENTS CONTAINED HEREIN. THE PARTIES HERETO HEREBY AGREE THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH BOTH SIDES AGREEING TO THE SAME KNOWINGLY AND BEING AFFORDED THE OPPORTUNITY TO HAVE THEIR RESPECTIVE LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN

EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.

_____    _____    _____
Bank Initials                    ADV Initials                   D. MacAdam Initials

_____    _____    _____
C. MacAdam Initials           Sweetwater Initials      KW Initials

      7.15   Notices.  Any notice, request, or demand required or permitted by this Agreement to be given by any party hereto shall be deemed delivered if (a) transmitted by telecopier or similar facsimile transmission to the telecopier number of the receiving party specified below, with original copy thereof to be deposited within twenty-four (24) hours after such transmission in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified below; (b) deposited in the U.S. Mail, first class postage prepaid, and addressed to the receiving party at the address specified below; (c) deposited with a reputable overnight private commercial delivery service and addressed to the receiving party at the address specified below; or (d) given by personal delivery, by the party giving notice directly or through commercial messenger or courier service, at the receiving party's address specified below. If notice is given by deposit in the U.S. Mail as herein provided, delivery shall not be deemed to be effective until forty-eight (48) hours after such deposit; if deposited with an overnight courier or delivery service as herein provided prior to any applicable deposit deadline for guaranteed overnight delivery, delivery shall be deemed effective twenty-four (24) hours after such deposit; if transmitted by telecopier or personal delivery, delivery shall be deemed to be effective upon receipt, if transmitted or delivered during normal business hours of the receiving party, otherwise on the next business day of the receiving party. No notice of termination shall impair the rights or priorities of any party created or acquired prior to the receipt of such notice.

For Bank:

          WESTERN COMMERCIAL BANK
          21550 Oxnard Street, Suite 100
          Woodland Hills, CA  91367
          Attention:  Kathleen C. Bryan, EVP/Chief Credit Officer
          Facsimile No.:  (818) 449-7701

With a copy to:

          FRANDZEL ROBINS BLOOM & CSATO, L.C.
          6500 Wilshire Blvd., 17th Floor
          Los Angeles, CA 90048-4920
          Attention: Ken R. Russak, Esq.
          Facsimile No.: (323) 658-9620

For ADV Parties:

        AGUA DULCE VINEYARDS LLC
        9640 Sierra Highway
        Agua Dulce, CA  91390
        Attention:  Catherine P. MacAdam
        Facsimile No.:  (661) 268-7450

With a copy to:

        LEVENE, NEALE, BENDER, RANKIN & BRILL, L.L.P.
        10250 Constellation Blvd, Suite 1700
        Los Angeles, CA  90067
        Attention:  Martin J. Brill, Esq.
        Facsimile No.:  (310) 229-1244

For KW:

        KENNEDY WILSON AUCTION GROUP INC.
        9701 Wilshire Blvd. Suite 700
        Beverly Hills, CA 90212
        Attention:  Clifford R. Smith, Senior Vice President
        Facsimile No.:  (310) 887-6459

     Any party may change its address for purposes of this Section upon delivery to the other party of a notice of a change of address in the manner provided for notices hereunder.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have approved and executed this Agreement as of the date and year first written above.

**ADV Parties:**

AGUA DULCE VINEYARDS LLC,
a California limited liability company

By: _____
Name: _____
Title: _____


By: _____
　　　DONAL J. MACADAM, an individual


By: _____
　　　CATHERINE P. MACADAM, an individual

SWEETWATER VINEYARDS, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____

**BANK:**

WESTERN COMMERCIAL BANK,
a California banking corporation

By: _____
Name: _____
Title: _____

**KW:**

KENNEDY WILSON AUCTION GROUP INC.
a California corporation

By: _____
Name: _____
Title: _____

**EXHIBIT A-1**
**TO AUCTION SALE AGREEMENT**

**INTENTIONALLY OMITTED – TO FOLLOW**

# EXHIBIT A-2
## TO AUCTION SALE AGREEMENT

## INTENTIONALLY OMITTED – TO FOLLOW

**EXHIBIT B**
**TO AUCTION SALE AGREEMENT**

**BANK PURCHASE AGREEMENT**
[SEE ATTACHED]